## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| FMP STRATFORD LLC | : | **FILED: JULY 17, 2008** |
| | : | **08CV4073** |
| Plaintiff, | : | **JUDGE CONLON** |
| | : | **MAGISTRATE JUDGE VALDEZ** |
| v. | : | **AEE** |
| | : | |
| CENTURY THEATRES, INC. | : | No. _____ |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

### COMPLAINT

Plaintiff, FMP Stratford LLC ("FMP"), by and through its undersigned counsel,

hereby files this Complaint and avers as follows:

### Nature of the Action

1.    This is an action by a landlord to collect unpaid rent and related charges under

the express terms of a commercial lease.  Although the tenant began operating its movie

theatre in the leased premises ahead of schedule and has operated it continuously since June

of 2007, it did not begin making rent payments until February of 2008.  This is an action to

recover all amounts due to the landlord under the lease.

### Parties

2.    Plaintiff, FMP, is a Delaware limited liability company with its principal place

of business located at 152 Stratford Square, Bloomingdale, Illinois.  FMP is the owner and

operator of the Stratford Square Mall (the "Mall").

3.     Defendant, Century Theatres, Inc. ("Century"), on information and belief, is a California corporation with a principal place of business located at 3900 Dallas Parkway, Suite 500, Plano, Texas.

### Jurisdiction and Venue

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs and is between citizens of different states.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this district, the property that is the subject of the action is situated in this district, and the Defendant is subject to personal jurisdiction in this district.

### Background

6.     On or about December 12, 2005, FMP and Century entered into a Lease Agreement (the "Lease").  A copy of the Lease is attached hereto as Exhibit A.

7.     Pursuant to the Lease, Century agreed to lease space in the interior of the Mall for the purpose of operating a movie theatre at the Mall.

8.     The Lease provides for an initial term of fifteen (15) years with 5 consecutive option terms of 5 years each.

9.     For the first 5 lease years, Century is required to pay $24 per square foot in Base Rent plus $0.95 per square foot in Annual Common Area Maintenance.

10.     The leased premises consists of 53,486 square feet.

11.    FMP constructed the leased premises in accordance with Century's specifications and on Century's timetable and expended approximately $30 million to construct a modern and state-of-the-art multiplex consisting of 16 separate theatres.

12.    Although the Lease contemplated completion of the leased premises and an opening day for the theatre in September of 2007, FMP accelerated the construction schedule at the request of Century in order to enable Century to open for business in June of 2007.

13.    Century began operating its theatre in the leased premises in June of 2007 and has operated continuously from June of 2007 to the present.

14.    Despite repeated demands by FMP, however, Century failed to pay any Base Rent or Common Area Maintenance charges for the leased premises until March, 2008, when it delivered to FMP two checks totaling $110,385.56, which were apparently intended to cover rent for March of 2008 and the last three days of February, 2008.

15.    Century has still not paid the Base Rent or Common Area Maintenance charges due from June, 2007, through February 28, 2008, and, while it has made monthly payments since February of 2008, it has not paid the full amount of rent and related charges due under the Lease for the period from February 28, 2008 to the present.  The total amount of Base Rent and Common Area Maintenance charges now due and owing is $927,434.08.

## COUNT I:  BREACH OF CONTRACT

16.    FMP incorporates by reference herein paragraphs 1 through 14 as if fully set forth at length.

17.    The Lease Agreement is a contract between FMP and Century.

18.    Century has breached the contract by failing to pay Base Rent and Common Area Maintenance charges as expressly required by the contract.

L # 720419 v.1

19.     Century currently owes FMP $927,434.08 in back Base Rent and Common Area Maintenance charges.

20.     Additionally, pursuant to the terms of the Lease, FMP is entitled to recover all of its expenses associated with this action, including reasonable attorneys' fees.

WHEREFORE, Plaintiff, FMP Stratford LLC, hereby requests that judgment be entered in its favor and against Defendant, Century Theatres, Inc., in the amount of $927,434.08 together with such additional Base Rent and Common Area Maintenance charges as may be due and owing at the time of judgment as well as interest and all costs and attorneys' fees incurred in the prosecution of this action and such other and further relief as this Court may deem just and proper.

Dated: July 17, 2008                         FMP STRATFORD LLC


                                             By:  /s/ Michael L. Sullivan
                                                  One of Its Attorneys

Michael L. Sullivan (ARDC No. 06207822)
A. Colin Wexler (ARDC No. 06270813)
GOLDBERG KOHN BELL BLACK
  ROSENBLOOM & MORITZ, LTD.
55 East Monroe Street
Suite 3300
Chicago, IL   60603
(312) 201-4000

Keith R. Dutill, Esquire
STRADLEY RONON STEVENS &
YOUNG, LLP
30 Valley Stream Parkway
Malvern, PA  19355
(610) 640-5809
*pro hac vice application to be filed*

L # 720419 v.1



## FELDMAN MALL PROPERTIES, INC.
3225 North Central Avenue, Suite 1205
Phoenix, Arizona 85012
Telephone 602-277-5559
Facsimile 602-277-7774
www.FeldmanMall.com

Moving Malls to the Head of the Class

Sender's e-mail address
JErhart@FeldmanMall.com

December 8, 2005

BY FAX TO (415) 448-8499

Century Theatres, Inc.
150 Pelican Way
San Rafael, California 94901
Attention: Victor Castillo

    Re:    Lease between FMP Stratford LLC ("Landlord") and Century Theatres, Inc.
            ("Tenant") for Premises at Stratford Square Mall

Dear Victor:

    We are pleased to enclose four signed counterparts of the proposed lease with all exhibits attached. Also enclosed are four signed counterparts of the REA termination side letter ("Side Letter").

    In executing the lease and the Side Letter, we relied on your telephonic agreement with Larry Feldman as follows:

    1.    Landlord has the right to rescind the lease by written notice to Tenant received by Tenant on or before 5:00 PM PST on December 23, 2005 ("Rescission Notice") if Landlord is unable to obtain approval from JPMorgan Commercial Mortgage Pass Through Certificate Series 2005-FL1 (Midland Loan Services Inc. acting as servicer) ("Existing Lender") of the lease by December 23, 2005. Landlord represents to Tenant that Landlord has previously requested approval of the lease from the Existing Lender, and Landlord covenants to use good faith efforts to obtain approval of the lease from the Existing Lender on or prior to December 23. Any written notice of disapproval from the Existing Lender shall be provided to Tenant by Landlord together with the Rescission Notice. If Lender has not received written notice of disapproval from the Existing Lender prior to sending the Rescission Notice, Landlord shall work cooperatively with Tenant following the issuance of the Rescission Notice to allow Tenant to confirm with the Existing Lender that the Existing Lender did not approve the Lease prior to issuance of the Rescission Notice, including without limitation requesting written confirmation of such fact from the Existing Lender and/or holding a telephonic conference call with the Existing Lender; Landlord's obligation under this sentence shall survive rescission.

FELDMAN MALL PROPERTIES, INC.                                    December 8, 2005

2.    Concurrently herewith, Landlord will deposit with Tenant $10,000 (the "Deposit"), which will be retained by Tenant if Landlord rescinds the lease pursuant to paragraph 1 above, and the Deposit will be refunded by Tenant to Landlord if the lease is not rescinded.

3.    Concurrently herewith, Landlord will pay $6,500 (the "Reimbursement") to Tenant in reimbursement of certain architectural expenses previously incurred by Tenant in connection with the Lease.  Assuming Tenant executes all of the documentation and returns to us an executed Lease, the Reimbursement is not refundable.

4.    Notwithstanding the provisions of Section 2.3(a) of the lease, Tenant's time period for giving notice of any Disapproved Exceptions shall terminate on December 23, 2005 at 5:00 PM PST.

Enclosed with this letter is a check for $16,500 for the Deposit and the Reimbursement. You are not authorized to cash the check, and none of the enclosed documents will be binding unless you sign and return the lease, the Side Letter, and this letter to me, with a facsimile copy of your signatures sent to me by 5:00 PM PST on Friday, December, 9, and the originals sent to me by overnight delivery for delivery at the address on this letterhead on Monday, December 12. If the lease, side letter and this letter are not signed and sent to pursuant to the foregoing time deadlines, our offer to enter into the lease, make the Deposit and pay the Reimbursement will be automatically withdrawn at that time without any further action on our part.

Please sign this letter in the space shown below to indicate your agreement with the foregoing and return two of the four enclosed counterparts of this letter when you return the lease and the Side Letter.

If you have any questions regarding this letter or the enclosures, please call me.

Sincerely,

FMP Stratford LLC,
a Delaware limited liability company

Jeffrey Erhart
Vice President

Accepted and agreed to
this ___ day of December, 2005:

Century Theatres, Inc.

By: _____
Its: RAYMOND W. SYUFY
Name: CHAIRMAN

2

**FELDMAN MALL PROPERTIES, INC.**
3225 North Central Avenue, Suite 1205
Phoenix, Arizona 85012
Telephone 602-277-5559
Facsimile 602-277-7774
www.FeldmanMall.com

Sender's e-mail address
JErhart@FeldmanMall.com

December 8, 2005

Century Theatres, Inc.
150 Pelican Way
San Rafael, California 94901
Attention: Chief Executive Officer

Re:     Lease Agreement ("Lease") dated December **12**, 2005 between FMP
        Stratford LLC ("Landlord") and Century Theatres, Inc. ("Tenant")

Dear Sir:

        Reference is made to the Lease, the capitalized terms used herein shall have the meaning
set forth in the Lease, unless otherwise defined herein. This letter agreement ("Letter") is being
executed by Landlord and Tenant concurrently with execution of the Lease in connection with
Section 21.18 of the Lease. Landlord is concerned that the obligation to pay the Fair Market
Value of Tenant's Interest in connection with an REA Termination pursuant to Section 21.18(b)
or (c) of the Lease and the obligation to pay other sums/damages under Section 21.18(c) of the
Lease (collectively, the "Payment Obligation") will not be acceptable to a third party (i.e., entity
which is not an affiliate of Landlord) lender or prospective lender ("Lender") to Landlord or an
actual or prospective third party (i.e., entity which is not an affiliate of Landlord) assignee of
Landlord's interest in the Lease. Tenant believes that some Lenders may accept the Payment
Obligation but acknowledges that some Lenders may not accept the Payment Obligation.
Landlord and Tenant therefore agree as follows:

1.      If a Lender in writing conditions any aspect of its loan or proposed loan or the delivery of
        a Non-Disturbance Agreement, on the Payment Obligation not applying to (a) the Lender,
        (b) any third party (i.e., entity which is not an affiliate of Landlord) purchaser of any real
        property securing the Loan through foreclosure, trustee's sale or deed in lieu of
        foreclosure (a "Foreclosure Purchaser"), and/or (c) any third party (i.e., entity which is
        not an affiliate of Landlord) assignee of the Lender's or a Foreclosure Purchaser's rights
        (Lender, Foreclosure Purchaser and such assignee collectively, the "Exempt Entities"),
        Landlord shall give notice to Tenant of such fact (together with copies of the
        documentation conditioning the loan or proposed loan as indicated in this paragraph 1)
        and the Payment Obligation thereafter shall not apply to the Exempt Entities (although
        Tenant shall be entitled to exercise any termination rights under Section 21.18, which
        shall remain unaffected). In such event, as between Tenant and any of the Exempt

~CHGO2:40082471.v2

*FELDMAN MALL PROPERTIES, INC.*

Entities, the Lease shall be interpreted as though Section 21.18 did not contain the Payment Obligation; without limitation of the foregoing, Tenant shall have no right to offset any portion of the Payment Obligation against rent or other sums owing to any of the Exempt Entities.

2.    Tenant shall execute any reasonable written confirmation of the non-applicability of the Payment Obligation to the Exempt Entities that the Lender may reasonably request within ten (10) business days following notice to Tenant from Landlord requesting such written confirmation.

3.    Landlord shall not suggest or volunteer to a Lender that the Lender exercise its rights under paragraph 1 of this Letter.

4.    Landlord shall not provide a copy of this Letter to a Lender unless (a) the Lender requests that Landlord provide to Lender all documents pertaining to the Lease, (b) the Lender informs Landlord that the Lender is unwilling to proceed with a loan or proposed loan or to deliver a Non-Disturbance Agreement because of the existence of the Payment Obligation, (c) Landlord would be in breach of the loan documents or proposed loan documents if Landlord did not deliver this Letter to the Lender, or (d) Landlord otherwise reasonably concludes that Landlord would breach an ethical or legal duty to the Lender if Landlord failed to deliver this Letter to the Lender.

5.    Breach by Landlord or Tenant of such party's obligations under this Letter shall, subject to the notice and cure provisions of the Lease, constitute a breach of the Lease by such party. Tenant's failure to deliver any confirmation required under paragraph 2 of this Letter shall not affect the applicability or enforceability of paragraph 1 of this Letter.

6.    This Letter shall be binding on and inure to the benefit of Landlord and Tenant and their respective successors and assigns. Any dispute regarding this Letter shall be governed by the dispute resolution procedures specified in the Lease. Each of the Exempt Entities is hereby declared to be a third party beneficiary of the provisions of this Letter. The prevailing party in any litigation, arbitration or other proceeding regarding this Letter shall be entitled to recover its costs, reasonable attorneys fees and other reasonable expenses of such proceeding. This Letter has been reached by negotiation between parties represented by legal counsel and shall therefore not be construed against any party hereto based on such party or its counsel having drafted any provision hereof. It being the intention of the parties that any amendment to this Letter be in writing and signed by the parties, any party asserting the existence of an unwritten or unsigned amendment to this Letter shall have the burden of proving such amendment by clear and convincing evidence. This Letter may be signed in counterparts. Notices under this Letter shall be pursuant to the notice provisions of the Lease.

Please execute four counterpart originals of this Letter in the space shown below to reflect your agreement with the foregoing and return two original counterparts to me for our files.

~CHGO2:40082471.v2

*FELDMAN MALL PROPERTIES, INC.*

Sincerely,

FMP Stratford LLC,
a Delaware limited liability company

Scott Jensen
Vice President

Accepted and agreed to this 12 day of December, 2005:

Century Theatres, Inc.,
a California corporation

Raymond W. Syufy
Chairman and CEO

~CHGO2:40082471.v2

LEASE AGREEMENT

BETWEEN

FMP STRATFORD LLC,
AS LANDLORD

AND

CENTURY THEATRES, INC.,
AS TENANT

for the lease of certain premises located at the

"STRATFORD SQUARE MALL"
BLOOMINGDALE, ILLINOIS

DATED: December 12, 2005

## TABLE OF CONTENTS

| ARTICLE | | | PAGE |
|---|---|---|---|
| 1 | BASIC LEASE INFORMATION | | 1 |
| | Section 1.1. | Reference Data | 1 |
| | Section 1.2. | Definitions | 4 |
| 2 | PREMISES; SITE PLAN; CONDITIONS | | 18 |
| | Section 2.1. | Premises | 18 |
| | Section 2.2. | Site Plan | 18 |
| | Section 2.3. | General Conditions | 20 |
| 3 | TERM AND POSSESSION | | 23 |
| | Section 3.1. | Term of Lease | 23 |
| | Section 3.2. | Initial Occupancy | 24 |
| | Section 3.3. | Extension Options | 24 |
| | Section 3.4. | Partial Extension | 25 |
| | Section 3.5. | Early Co-Tenancy Termination Option | 25 |
| | Section 3.6. | Additional Early Termination Right | 25 |
| 4 | RENT | | 26 |
| | Section 4.1. | Annual Base Rent | 26 |
| | Section 4.2. | Percentage Rent | 26 |
| | Section 4.3. | Percentage Rent Payment and Statements | 26 |
| | Section 4.4. | Records and Audits | 26 |
| | Section 4.5. | Confidentiality of Financial Information | 27 |
| | Section 4.6. | Alternate Rent | 27 |
| 5 | COMMON AREAS | | 27 |
| | Section 5.1. | Annual CAM Amount | 27 |
| | Section 5.2. | Landlord's Maintenance Obligations | 27 |
| | Section 5.3. | Failure to Maintain | 29 |
| | Section 5.4. | Remote Ticket Sales | 30 |
| | Section 5.5. | Trash and Refuse Area | 30 |
| 6 | REAL ESTATE TAXES | | 31 |
| | Section 6.1. | Landlord's Obligation | 31 |
| | Section 6.2. | Tenant's Tax Contribution | 31 |
| | Section 6.3. | Method of Payment | 31 |
| | Section 6.4. | Tax Refunds | 32 |
| | Section 6.5. | Right to Contest Taxes | 32 |
| | Section 6.6. | Improvement or Special Assessment District | 32 |
| | Section 6.7. | Tax Incentive Programs | 33 |
| | Section 6.8. | Reassessment of Real Estate Taxes upon Sale or Financing | 33 |
| | Section 6.9. | New Construction | 33 |
| 7 | INSURANCE AND INDEMNIFICATION | | 34 |
| | Section 7.1. | Insurance Policies | 34 |
| | Section 7.2. | Certificates of Insurance | 36 |
| | Section 7.3. | Alternate Insurance | 36 |
| | Section 7.4. | Additional Insurance Provisions | 36 |
| | Section 7.5. | Mutual Release and Waiver of Subrogation | 37 |
| | Section 7.6. | Landlord's Indemnity | 37 |
| | Section 7.7. | Tenant's Indemnity | 37 |
| 8 | UTILITIES | | 38 |
| | Section 8.1. | Service to the Premises | 38 |
| | Section 8.2. | Interruption of Service | 38 |
| 9 | MAINTENANCE AND REPAIRS | | 38 |
| | Section 9.1. | Landlord's Maintenance and Repairs | 38 |
| | Section 9.2. | Tenant's Maintenance and Repairs; Compliance with Laws | 43 |
| | Section 9.3. | HVAC System | 44 |
| | Section 9.4. | Other Tenants and Occupants | 44 |
| | Section 9.5. | Failure to Maintain | 45 |

**ARTICLE**                                                                                        **PAGE**

10   ALTERATIONS; IMPROVEMENTS ................................................................45
     Section 10.1.  Alterations to Premises ...............................................................45
     Section 10.2.  Tenant's Cost .............................................................................45
     Section 10.3.  Ownership of Tenant's Property ................................................46
     Section 10.4.  Changes Required by Law ..........................................................46

11   REPRESENTATIONS AND WARRANTIES AND COVENANTS ................47
     Section 11.1.  Landlord's Warranties and Representations ...............................47
     Section 11.2.  Easement Agreements ...............................................................49
     Section 11.3.  Rules and Regulations ...............................................................50
     Section 11.4.  Tenant's Representation ............................................................50

12   COMMON AREAS AND PARKING ..............................................................50
     Section 12.1.  Common Areas ..........................................................................50
     Section 12.2.  Interference with Common Area ...............................................50
     Section 12.3.  Parking .......................................................................................51

13   USE ...................................................................................................................51
     Section 13.1.  Permitted Use .............................................................................51
     Section 13.2.  Operating Covenant ..................................................................52
     Section 13.3.  Exclusive Use .............................................................................52
     Section 13.4.  Food Sales, Advertising and Long-Term Retail Area ..............55
     Section 13.5.  Prohibited Uses for Center .......................................................55
     Section 13.6.  No Lease Prohibitions ................................................................56
     Section 13.7.  Prohibition of Use .....................................................................56
     Section 13.8.  Landlord's Parcel Modifications ...............................................56

14   ASSIGNMENT AND SUBLETTING ............................................................56
     Section 14.1.  Assignment and Subletting ........................................................56
     Section 14.2.  Permitted Transfers ...................................................................56
     Section 14.3.  Release ........................................................................................57

15   SIGNAGE .........................................................................................................57
     Section 15.1.  Tenant's Signs ............................................................................57
     Section 15.2.  Maintenance of Tenant's Signs ..................................................58
     Section 15.3.  Sign Permits ...............................................................................58
     Section 15.4.  Sign Easements ..........................................................................58
     Section 15.5.  No Obstructions .........................................................................58
     Section 15.6.  Roof-Top Access .......................................................................58
     Section 15.7.  Directional Signs ........................................................................59

16   DAMAGE AND DESTRUCTION ...................................................................59
     Section 16.1.  Landlord and Tenant to Rebuild ................................................59
     Section 16.2.  Procedure ...................................................................................59
     Section 16.3.  Right to Terminate .....................................................................60
     Section 16.4.  Rental Abatement .......................................................................61
     Section 16.5.  Tenant's Special Self-Help Rights .............................................62

17   EMINENT DOMAIN ........................................................................................62
     Section 17.1.  Taking of the Premises ...............................................................62
     Section 17.2.  Taking of the Center ..................................................................62
     Section 17.3.  Obligations if Lease Not Terminated ........................................62
     Section 17.4.  Temporary Taking ......................................................................63
     Section 17.5.  Condemnation Award .................................................................63
     Section 17.6.  Takings Generally ......................................................................63

18   DEFAULT AND REMEDIES; ARBITRATION .............................................63
     Section 18.1.  Events of Default ........................................................................63
     Section 18.2.  Landlord's Remedies ..................................................................64
     Section 18.3.  Damages .....................................................................................64
     Section 18.4.  Interest on Late Payments .........................................................65
     Section 18.5.  Arbitration Of Certain Disputes ...............................................66
     Section 18.6.  Default by Landlord ...................................................................67
     Section 18.7.  Consequential Damages .............................................................68

19   ENVIRONMENTAL ........................................................................................68
     Section 19.1.  Tenant's Responsibilities ...........................................................68

**ARTICLE**                                                                                       **PAGE**

|   |   |   |
|---|---|---|
| | Section 19.2. Landlord's Responsibilities. | 69 |
| | Section 19.3. Environmental Remedial Work | 71 |
| | Section 19.4. Effect of Termination | 72 |
| | Section 19.5. Survival of Obligations | 72 |
| 20 | SURRENDER OF PREMISES AND REMOVAL OF PROPERTY | 72 |
| | Section 20.1. Surrender; Holdover | 72 |
| | Section 20.2. Financing of Trade Fixtures. | 72 |
| | Section 20.3. Waiver of Liens and Distraint | 73 |
| 21 | GENERAL PROVISIONS | 73 |
| | Section 21.1. Subordination | 73 |
| | Section 21.2. Notices | 74 |
| | Section 21.3. Invalid Provisions | 74 |
| | Section 21.4. Interlineation | 74 |
| | Section 21.5. Joint Preparation | 74 |
| | Section 21.6. Relationship of Parties | 74 |
| | Section 21.7. Short Form Lease. | 74 |
| | Section 21.8. Estoppel Certificate. | 74 |
| | Section 21.9. No Continuing Waiver | 74 |
| | Section 21.10. Entire Agreement | 75 |
| | Section 21.11. Captions | 75 |
| | Section 21.12. Binding Effect. | 75 |
| | Section 21.13. Reasonable Consent | 75 |
| | Section 21.14. Brokers' Commissions | 75 |
| | Section 21.15. Unavoidable Delays | 75 |
| | Section 21.16. Submission of Lease | 75 |
| | Section 21.17. Attorneys' Fees | 75 |
| | Section 21.18. Anti-Merger | 78 |
| | Section 21.19. Quiet Enjoyment | 77 |
| | Section 21.20. Tenant's Operation. | 77 |
| | Section 21.21. Promotional Activities/Merchants' Association | 77 |
| | Section 21.22. Business Days | 77 |
| | Section 21.23. Counterparts | 77 |
| | Section 21.24. Confidentiality of Financial Information | 77 |
| | Section 21.25. Exhibits | 78 |
| | Section 21.26. Governing Law | 78 |
| | Section 21.27. Time of Essence | 78 |
| | Section 21.28. Severability | 78 |
| | Section 21.29. Waiver of Jury Trial | 78 |
| | Section 21.30. REA Termination | 76 |

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Center Site Plan and Floor Plans |
| Exhibit A.1 | | Center Floor Plan showing Premises location |
| Exhibit A.2 | | Protected Area |
| Exhibit A.3 | | Priority Parking Area |
| Exhibit A.4 | | Required Vertical Transportation |
| Exhibit A.5 | | No Cart/Kiosk Area |
| Exhibit A.6 | | No Vending Area |
| | | No Video/Game Area |
| | | Candy Restricted Area |
| | | Beverage Restricted Area |
| | | General Concession Restricted Area |
| Exhibit A.7 | | Critical Access Ways |
| Exhibit A.8 | | Tenant's Refuse Compactor |
| Exhibit A.9 | | Long Term Retail Lease Area |
| Exhibit A.10 | | Victoria's Secret Location |
| Exhibit B | - | Legal Description (Landlord's Parcel) |
| Exhibit B.1 | - | Depiction of Premises |
| Exhibit B.2 | - | Legal Description (Center) |
| Exhibit C | - | Commencement Date Conditions |

Century Stratford Square Lease.v21.12-5-05



**ARTICLE**                                                              **PAGE**

Exhibit D      -    Work Letter
Exhibit D.1    -    Site Plan
Exhibit D.2    -    Site Specifications
Exhibit D.3         Work Matrix
Exhibit D.4         Common Area Improvements
Exhibit D.5         Mall Entry Plans
Exhibit D.6         Deer Park Plans
Exhibit D.7         Deer Park Lobby Finishes
Exhibit E      -    Fixtures, Furnishings and Equipment
Exhibit F      -    Form of Estoppel Certificate
                        Schedule A – Lease
                        Schedule B – Landlord's Data Sheet
Exhibit G      -    Permitted Encumbrances
Exhibit H      -    Memorandum of Lease
Exhibit I      -    Intentionally Deleted
Exhibit J      -    Existing Exclusives
Exhibit K      -    Legal Description of Anchor Parcels
Exhibit L           Form of SNDA
Exhibit M           Fair Market Value of Tenant's Interest

Century Stratford Square Lease.v21.12-5-05



## LEASE AGREEMENT

THIS LEASE AGREEMENT, (this "Lease") dated as of December **12**, 2005 (the "**Effective Date**"), is by and between **FMP STRATFORD LLC**, a Delaware limited liability company ("**Landlord**"), and **CENTURY THEATRES, INC.**, a California corporation ("**Tenant**").

## BACKGROUND

A.    Landlord is the fee simple owner of a certain parcels of land located in Bloomingdale, DuPage County, Illinois, as legally described on Exhibit B attached hereto ("**Landlord's Parcel**"), on which Landlord operates and is re-developing and will operate certain retail areas and certain common areas of a retail shopping center complex commonly known as the "**Stratford Square Mall**," located at 152 Stratford Square, Bloomingdale, Illinois (as more particularly described below, the "**Center**"), which Center is substantially as depicted on Exhibit A.1 attached hereto and legally described on Exhibit B.2 attached hereto.

B.    Subject to the terms and conditions of this Lease, Landlord desires to lease to Tenant and Tenant desires to lease certain premises to be constructed by Landlord within the Center, containing approximately 50,000-60,000 square feet of Floor Area as depicted on Exhibit B.1 hereto (as more particularly described below, the "**Premises**").

C.    Accordingly, Landlord and Tenant hereby agree as follows:

## ARTICLE 1

## BASIC LEASE INFORMATION

**Section 1.1.    Reference Data.** The following reference data constitutes certain terms of this Lease. Whenever any data is referred to as "approximately" or "estimated," said data shall be determined in the manner provided in this Lease and such estimate shall be disregarded.

| | |
|---|---|
| **Landlord:** | **FMP STRATFORD LLC**, a Delaware limited liability company |
| **Tenant:** | **CENTURY THEATRES, INC.**, a California corporation |
| **Premises:** | The interior of the premises located (or to be located) within the Center that is depicted as such on Exhibit A.1 attached hereto and described (or to be described) on Exhibit B.1 attached hereto, which premises shall be constructed by Landlord in accordance with this Lease. |
| **Floor Area of Premises:** | Approximately 50,000–60,000 square feet. |
| **Center:** | Stratford Square Mall, located at 152 Stratford Square, Bloomingdale, Illinois (as more particularly described in Section 1.2). |
| **Initial Term:** | Fifteen (15) Lease Years. |
| **Extension Terms:** | Five (5) consecutive option terms of five (5) Lease Years each. |
| **Annual Base Rent:** | A)    For the first 5 Lease Years, $24.00 per square foot of Floor Area within the Premises per Lease Year; |

B) For Lease Years 6-10 (inclusive), $26.00 per square foot of Floor Area within the Premises per Lease Year;

C) For Lease Years 11-15 (inclusive) $28.00 per square foot of Floor Area within the Premises per Lease Year; and

D) For each Extension Term, the applicable amount determined pursuant to Section 3.3(c).

**Percentage Rent Rate:** Eight Percent (8%).

**Percentage Rent Breakpoint:** Initially, $12,500,000.00 per annum, subject to adjustment as provided in Section 1.2.

**Annual CAM Amount:** Initially, $0.95 per square foot of Floor Area within the Premises per year, subject to adjustment as provided in Section 1.2.

**Landlord's Reimbursement:** The lesser of Five Million and No/100 Dollars or the actual costs incurred by Tenant for the design, funding and installation of Tenant's Work pursuant to the Work Letter, whether payable by Tenant to affiliated or unaffiliated parties; provided, however, that costs reimbursed to any Tenant Affiliate in connection with Tenant's Work shall not exceed the amount which would have been paid to unaffiliated third party contractors and shall not, in the aggregate exceed One Million and No/100 Dollars. Landlord shall fund the Landlord's Reimbursement to Tenant in accordance with Article 5 of the Work Letter.

**Tenant's Tax Contribution:** Tenant's Pro Rata Share of Real Estate Taxes in excess of the Base Year Real Estate Taxes.

2



| | | |
|---|---|---|
| **Minimum Free Parking Spaces:** | A) | With respect to all Parking Areas within the Center, including the Priority Parking Area, the greater of (i) the number of parking spaces required to be maintained with respect to the Center pursuant to Applicable Laws (determined as modified by any variances or other special exceptions), or (ii) four and one-half (4.5) parking spaces per thousand square feet of Floor Area in the Center; provided, however, that if the REA is ever terminated in whole or in part on a date which is on or after the stated expiration date of the REA set forth therein, the Minimum Free Parking Spaces for the Center (but not the Priority Parking Area) shall be calculated without regard to the Floor Area or the parking located on any Anchor Parcel for which the REA has been terminated and for which a replacement cross-parking easement has not been entered into between Landlord and the owner of the applicable Anchor Parcel; and |
| | B) | With respect to the Priority Parking Area, 950 parking spaces. |
| **Notice Address for Landlord:** | | FMP Stratford LLC<br>c/o Feldman Mall Properties<br>3225 North Central Avenue, Suite 1205<br>Phoenix, Arizona 85012<br>Attention: Lease Administration<br>Facsimile No.: (602) 277-7774 |
| **With a separate copy to:** | | FMP Stratford LLC<br>c/o Mall Management Office<br>152 Stratford Square Mall<br>Bloomingdale, Illinois 60108<br>Attention: General Manager<br>Facsimile No.: (630) 351-9769 |
| **Landlord's Telephone Number** | | (602) 277-5559 |
| **Notice Address for Tenant:** | | Century Theatres, Inc.<br>150 Pelican Way<br>San Rafael, California 94901<br>Attention: Chief Executive Officer |
| **With a separate copy to:** | | Century Theatres, Inc.<br>150 Pelican Way<br>San Rafael, California 94901<br>Attention: General Counsel<br>Facsimile No.: (415) 448-8499 |

Century Stratford Square Lease.v21.12-5-05



And an additional copy to:                    DLA Piper Rudnick Gray Cary US LLP
                                              203 N. LaSalle Street, Suite 1800
                                              Chicago, Illinois 60601
                                              Attention:  David B. Sickle, Esq.

Tenant's Telephone Number:                    (415) 448-8400

Landlord's Broker:                            None

Tenant's Broker:                              Next Realty

**Section 1.2.    Definitions.**  The following definitions constitute certain terms of this Lease which are set forth in this Section 1.2 for ease of reference.  Each subsequent reference in this Lease to any of the terms defined shall incorporate the definitions in this Section as if the same were fully and completely stated therein.

"**Additional Rent**" shall mean the Annual CAM Amount and Tenant's Tax Contribution.

"**Adjustment Date**" shall mean the first day of the sixth (6th) and eleventh (11th) Lease Years of the Term and (if applicable) the first day of each Extension Term that is added to the Term.

"**Alternate Rent**" shall mean, for any period during which the Co-Tenancy Condition is not satisfied or any other period for which Alternate Rent is payable pursuant to the terms hereof, the lesser of (i) Eight Percent (8%) of Tenant's Gross Sales during the applicable period or (ii) the aggregate amount of Base Rent, Percentage Rent and Additional Rent otherwise due with respect to the applicable period.

"**Anchor**" shall mean each of the current occupants of the retail department stores operating in the Anchor Buildings, consisting of J.C. Penny, Sears, Carson Pirie Scott, Burlington Coat Factory, Marshall Fields (whose name is being changed to Macy's) and Kohls or any single department store operator (or up to two department store operators, if the applicable Anchor Building has two levels, with one operator on the lower level and the other operator on the upper level of the applicable Anchor Building) that replaces an existing Anchor and occupies all or substantially all of the existing Anchor's Anchor Building, provided that any such replacement anchor is (i) an anchor department store operator customarily found in First Class shopping centers within a 100 mile radius of the Center provided that for purposes of this provision, Bass Pro Shops, Cabelas and similar sporting goods/outdoor anchor retailers shall be considered acceptable Anchors under this definition if they occupy all or substantially all of an Anchor Building (or a full floor of an Anchor Building with another Anchor occupying the balance of such Anchor Building); or (ii) an anchor department store operator customarily found in First Class shopping centers within the continental United States which are located outside of a one hundred (100) mile radius of the Center, provided that such anchor department store operator has been approved by Tenant in writing, such approval not to be unreasonably withheld.

"**Anchor Buildings**" shall mean the buildings currently located on the Anchor Parcels which are currently operated as retail department stores by the Anchors, and any replacements of such buildings on an Anchor Parcel occupied by an Anchor or Anchors which are of substantially the same (or greater) Floor Area as the Anchor Buildings so replaced.

"**Anchor Co-Tenancy Level**" shall mean the number of Anchors that (i) are fully occupying all or substantially all of their Anchor Buildings (provided that the parties acknowledge that, as of the Effective Date, Burlington Coat Factory currently only occupies one full floor and one-half of a floor in its Anchor Building, and the Anchor Building currently occupied by Burlington Coat Factory shall be deemed to be fully occupied for purposes of clause (i) of this definition so long as an Anchor occupies one and one-half floors in such Anchor Building), and (ii) are regularly open to the public and operating for business as anchor retail stores on a continuous basis, at least on such days and at such times as a majority of anchor retail stores in other First Class shopping centers in the Metropolitan Area are typically open to the public and operating for business (except that Anchors closed for reasonable temporary periods for remodeling (not to exceed ninety (90) days) or for repair of damage caused by fire or other

4



casualty, where the Anchor commences the restoration work within one hundred eighty (180) days following the date of the casualty, and thereafter diligently prosecutes the restoration to completion but in no event later than fifteen (15) months following the date of the casualty, shall be considered open for purposes of this provision. For example, if an Anchor Building is damaged and the Anchor occupant takes eighteen months to restore such Anchor Building, such Anchor shall be deemed fully occupying its Anchor Building for the first fifteen (15) months of such eighteen (18) month period.

"**Anchor Co-Tenancy Threshold**" shall mean for purposes of Section 3.5 three (3) or more Anchors and for all other purposes, four (4) or more Anchors.

"**Anchor Parcels**" shall mean those parcels of real property described in Exhibit L attached hereto, which Landlord hereby represents and warrants are not owned by Landlord or a Landlord Affiliate as of the Effective Date, and are occupied by the Anchors and on which the Anchor Buildings are located; provided, however, that as more particularly described in Section 13.8, if Landlord or a Landlord Affiliate hereafter acquires or ground leases all or any portion of any Anchor Parcel, from and after the date of acquisition, the Anchor Parcel (or portion thereof) shall no longer be deemed to be an "Anchor Parcel" under this Lease but shall be deemed to be part of "Landlord's Parcel" for purposes of this Lease.

"**Anniversary**" shall mean the date that is twelve (12) full calendar months from the date of a given event; provided, however, that if the Commencement Date occurs on a day other than the first day of a calendar month, then the first Anniversary of the Commencement Date shall be deemed to be the date that is twelve (12) full calendar months from the first day of the calendar month immediately following the Commencement Date and each subsequent Anniversary of the Commencement Date shall be deemed to be the same day in the succeeding calendar years.

"**Annual CAM Amount**" shall mean: (i) initially and for each of the first five (5) Lease Years, an annual amount equal to $0.95 per square foot of Floor Area of the Premises, and (ii) thereafter on each Adjustment Date, the Annual CAM Amount shall be increased by the lesser of the CPI Adjustment from the immediately preceding Adjustment Date or ten percent (10%).

"**Applicable Laws**" shall mean any law, ordinance, order, rule, regulation, requirement or judicial decision of any Governmental Authority which is at any time during the Term applicable to the Premises or the Center, including, all Governmental Requirements and Environmental Laws. Such laws, ordinance, orders, rules, regulations shall include, without limitation, any of those which relate to zoning, public health, public safety, environmental protection, accessibility, the removal of architectural barriers and the existence or removal of any Hazardous Materials.

"**Base Rent**" shall have the meaning given such term in Section 4.1.

"**Base Year Real Estate Taxes**" shall mean the Real Estate Taxes actually assessed against Landlord's Parcel during the second (2nd) full Lease Year of the Term. The parties acknowledge that Real Estate Taxes are payable in arrears in Illinois and the Base Year Real Estate Taxes will be based on the Real Estate Taxes actually assessed for the second Lease Year, although such Real Estate Taxes will not be payable during the second (2nd) full Lease Year. For example, if the Commencement Date was March 1, 2007, the Base Year Real Estate Taxes would be the Real Estate Taxes assessed for the period March 1, 2008 through February 28, 2009, a portion of which are payable in 2009 and in 2010, and shall be determined by prorating the actual Real Estate Taxes payable in 2009 and 2010.

"**Beverage Restricted Area**" shall have the meaning given such term in Section 13.4.

"**Building**" shall mean the building in which the Premises are located (or will be located, upon completion of Landlord's Work).

"**Candy Restricted Area**" shall have the meaning given such term in Section 13.4.

"**Center**" shall mean the shopping center complex and all other buildings and improvements located or to be located on Landlord's Parcel and the Anchor Parcels, including the Parking Areas , Critical Accessways, ring road and entryways from exterior streets and roads



(as shown on the Site Plan) and other Common Areas, which shopping center complex is operated and is being redeveloped by Landlord and is commonly known as the "Stratford Square Mall" located at 152 Stratford Square, in the City of Bloomingdale, DuPage County, Illinois, and which is outlined on the Site Plan attached hereto as Exhibit A. As shown on the Site Plan attached hereto as Exhibit A, upon completion of Landlord's Work the Center is intended to contain approximately 1,312,000 square feet of Floor Area, inclusive of the Floor Area of the Premises. In no event shall the portions of the Center on Landlord's Parcel that are leased or available for lease (i.e., are useable for retail or non-retail uses, unoccupied and being marketed for lease) contain less than the Minimum Center Floor Area, exclusive of the Premises. The Center shall be operated and maintained in a First Class manner at all times.

"City" shall mean the City of Bloomingdale, Illinois.

"Commencement Date" shall mean the day established as the Commencement Date under Section 3.1 hereof.

"Commencement Date Conditions" shall mean the conditions precedent to the occurrence of the Commencement Date, as set forth on Exhibit C attached hereto and made a part hereof.

"Common Areas" shall mean and include all areas within the exterior boundaries of the Center which are now or hereafter made available for general use, convenience and benefit of the occupants and tenants of the Center (including Tenant) and their customers, employees, invitees and licensees, including, without limitation, all Parking Areas and entryways from public streets into the Center, the ring road (as shown on the Site Plan) and all entry points and exists from the mall building of which the Premises is a party, interior malls, driveways, sidewalks, stairways, ramps and landscaped and planted areas of the Center. The Common Areas are currently configured substantially as shown on Exhibit A hereto. Further, notwithstanding anything to the contrary contained herein, for purposes of Landlord's maintenance and insurance obligations under this Lease, the "Common Areas" shall be deemed to include (without limitation) the exit stairways, ramps, sidewalks and other hardscape and landscape features around the perimeter of the Premises. Landlord shall have the right to modify the configuration of the Common Areas, subject to the terms and conditions of Section 2.2.

"Common Area Expenses" shall mean all costs and expenses incurred by Landlord for or in connection with the ownership, operation, insurance, security management, maintenance, cleaning and repair of the Common Areas of the Center, other than Real Estate Taxes.

"Compatible Use" shall have the meaning set forth in Section 13.1.

"Co-Tenancy Condition" shall mean the occurrence and continuation of the following conditions: (i) the Co-Tenancy Level of the Center shall be equal to or greater than the applicable Co-Tenancy Threshold; (ii) the Anchor Co-Tenancy Level shall be equal to or greater than the applicable Anchor Co-Tenancy Threshold; and (iii) the Center is being maintained and repaired as a First Class shopping center.

"Co-Tenancy Level" shall mean, at any given time, the quotient (expressed as a percentage) obtained by dividing (i) the Floor Area of the premises within the Center, excluding the Premises and the Anchor Buildings, that are leased, occupied and regularly open to the public and operating for business by businesses normally found in first class shopping centers in the United States at least on such days and at such times as a majority of first-class retail stores and restaurants (as the case may be) in other first class shopping centers in the Metropolitan Area are typically open to the public and operating for business, by (ii) the total Floor Area of the Center (excluding the Premises and the Anchor Buildings). Notwithstanding the foregoing, for purposes of determining the Co-Tenancy Level, with respect to the Floor Area of the premises within the Center (excluding the Anchor Buildings and the Premises) that are "leased, occupied, and regularly open to the public and operating for business" and are subject to Temporary Leases, the following shall apply with respect to those Temporary Leases: (a) during the first Lease Year, one hundred percent (100%) of the Floor Area (excluding the Anchor Buildings, any portion of an Anchor Parcel hereafter acquired by Landlord or a Landlord Affiliate and the Premises) which is subject to Temporary Leases and is "leased, occupied and regularly open to the public and operating for business" shall be included in the Floor Area for purposes of clause (i) above;



(b) during the second Lease Year, only eighty percent (80%) of the Floor Area (excluding the Anchor Buildings and the Premises, any portion of an Anchor Parcel hereafter acquired by Landlord or a Landlord Affiliate) which is subject to Temporary Leases and is "leased, occupied, and regularly open to the public and operating for business" shall be included in the Floor Area for purposes of clause (i) above; (c) during the third Lease Year, only fifty percent (50%) of the Floor Area (excluding the Anchor Buildings, any portion of an Anchor Parcel hereafter acquired by Landlord or a Landlord Affiliate and the Premises) which is subject to Temporary Leases and is "leased, occupied and regularly open to the public and operating for business" shall be included in the Floor Area for purposes of clause (i) above; (d) during the fourth Lease Year only thirty percent (30%) of the Floor Area (excluding the Anchor Buildings, any portion of an Anchor Parcel hereafter acquired by Landlord or a Landlord Affiliate and the Premises) which is subject to Temporary Leases and is "leased, occupied and regularly open to the public and operating for business" shall be included in the Floor Area for purposes of clause (i) above; and (d) from and after the end of the fourth Lease Year, only fifteen percent (15%) of the Floor Area (excluding the Anchor Buildings, any portion of an Anchor Parcel hereafter acquired by Landlord or a Landlord Affiliate and the Premises) which is subject to Temporary Leases and is "leased, occupied and regularly open to the public and operating for business shall be included in the Floor Area for purposes of clause (i) above. In addition, if more than 38,000 square feet of the Floor Area (excluding the Anchor Buildings and the Premises) is leased and occupied by tenants that are not entertainment uses commonly found in first class centers, retail stores or restaurants ("Non-Retail Users"), the square footage of the Non-Retail Users which is in excess of 38,000 square feet of the Floor Area of the Center shall be deemed not to be "leased, occupied and regularly open to the public and operating for business" for purposes of determining the Co-Tenancy Level, and the square footage of such premises in excess of 38,000 square feet of the Floor Area of the Center shall not be included in the Floor Area for purposes of clause (i) above. From time to time at the request of Tenant, Landlord shall certify to Tenant the then-current and historical Co-Tenancy Levels and Anchor Co-Tenancy Levels of the Center (or any specific portion thereof), which shall be subject to verification by Tenant.

"Co-Tenancy Threshold" shall mean (i) for purposes of Section 3.5, sixty-five percent (65%), and (ii) for all other purposes, seventy percent (70%).

"CPI" shall mean the Consumer Price Index, All Urban Consumers (CPI-U), U.S. City Average, All-Items Index (1982-1984 = 100) as published by the Bureau of Labor Statistics, United States Department of Labor. If at any time during the Term of this Lease, the United States Bureau of Labor Statistics discontinues the issuance of such Index, or such Index shall be superseded as the generally accepted cost-of-living index, then "CPI" shall mean the successor cost-of-living index or any other standard nationally recognized cost-of-living index agreed upon by Landlord and Tenant or in the absence of such agreement, such index as may be determined by arbitration pursuant to Section 18.5. If any monthly CPI is not available for use, the CPI as issued and published for the earliest preceding month shall be used. If the CPI ceases to be published on a monthly basis, then the shortest stated period for which it is published shall be used for purposes of this Lease.

"CPI Adjustment" shall mean the process (and result) of adjusting a monetary figure by the percentage increase in the CPI over a period of time, which shall be calculated by multiplying the monetary figure in question (e.g., the Annual CAM Amount) by a fraction (expressed as a percentage) the numerator of which is the CPI for the calendar month two (2) months prior to the date of adjustment, and the denominator of which is the CPI for the calendar month two (2) months prior to the previous date of adjustment; provided that with respect to any CPI Adjustment to be made at the commencement of the sixth (6th) Lease Year, the "previous date of adjustment" shall be deemed to be the Commencement Date.

"Effective Date" means the effective date of this Lease, as set forth in the preamble on the first page hereof.

"Environmental Hazard" means any of the following: (1) existence or discovery in the Premises or elsewhere in the Center of any Hazardous Material in violation of any Applicable Law; (2) issuance of any cleanup order by any governmental agency in connection with any Hazardous Material in, on, under or otherwise affecting the Premises or the Center; (3) issuance by any court or governmental agency of any order or judgment permanently or temporarily closing down the Premises or any other part of the Center as a result of any Hazardous Material

7

in, on under or otherwise affecting the Premises of the Center; or (4) the performance of any work for the purpose of remedying any Hazardous Material or complying with any Environmental Law.

"**Environmental Laws**" shall mean all current and future federal, state and local statutes, regulations, ordinances and rules relating to (1) the emission, discharge, release or threatened release of a Hazardous Material into the air, surface water, groundwater or land, (2) the manufacturing, processing, use, generation, treatment, storage, disposal, transportation, handling, removal, remediation or investigation of a Hazardous Material, or (3) the protection of human health, safety or the indoor or outdoor environmental, including (without limitation) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et. seq.* ("**CERCLA**"); the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, *et. seq.*; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et. seq.* ("**RCRA**"); the Toxic Substances Control Act, 15 U.S.C. Section 2601 *et. seq.*; the Clean Water Act, 33 U.S.C. Section 1251, *et. seq.*; the Clean Air Act; the Federal Water Pollution Control Act; the Occupational Safety and Health Act; all applicable environmental statutes of the State of Illinois, as amended; and all other federal, state or local statutes, laws, ordinances, resolutions, codes, rules, regulations, orders or decrees regulating, relating to, or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter in effect.

"**Environmental Remedial Work**" shall have the meaning given such term in Section 19.3.

"**Equitable Abatement**" or "**Equitably Abated**" shall mean a reduction in Base Rent upon the interruption or reduction of utility service to the Premises or upon the occurrence of a fire or other casualty or upon a Taking, applicable whereever this Lease refers to an Equitable Abatement or that Base Rent be Equitably Abated, such that the Base Rent payable by Tenant for the applicable period shall be equal to the lesser of (x) the Base Rent otherwise payable hereunder, on a per square foot basis, multiplied by the Floor Area of the portion(s) of the Premises that are reasonably available for the continued use and operation of Tenant's business in a first-class manner, or (y) Tenant's Gross Sales during the applicable period multiplied by a fraction (expressed as a percentage), the numerator of which is the aggregate amount of Base Rent paid by Tenant over the 24-month period immediately preceding such casualty event or Taking (or such shorter period during which Tenant operated its business at the Premises) and the denominator of which is aggregate amount of Tenant's Gross Sales over the 24-month period immediately preceding such utility interruption or reduction, casualty event or Taking (or such shorter period during which Tenant operated its business at the Premises). During any period which, pursuant to the express provisions hereof, Tenant is entitled to an Equitable Abatement of Base Rent, Tenant shall pay such Base Rent in the manner and at the times that would apply to the payment of Alternate Rent pursuant to Section 4.6.

"**Excused Closure**" shall mean (i) temporary periods of construction, alterations, renovation, remodeling and repair of the Premises undertaken in accordance with this Lease, including reasonable periods of mobilization and de-mobilization of such work, provided that Tenant is diligently proceeding with the work (ii) periods when Tenant ceases operating as a result of a casualty or condemnation or pursuant to the terms of Section 16.4, (iii) periods when Tenant cannot practicably operate the Premises as a consequence of Governmental Requirements, *Force Majeure* or other matters beyond the reasonable control of Tenant or as a consequence of the failure of Landlord to perform its obligations under this Lease, (iv) days or times when fewer than a majority of the so-called "first-run" motion picture theaters within the Metropolitan Area are open and operating for business, and (v) other periods of not more than ten (10) days duration in the aggregate in any calendar year when Tenant elects not to operate its business at the Premises.

"**Extension Term**" shall mean each period of five (5) Lease Years for which the Term of this Lease is extended pursuant to Section 3.3 hereof, subject to further extension pursuant to Section 3.4 hereof.

"**Fair Market Value of Tenant's Interest**" shall mean the price, in dollars, that a prospective, arms-length purchaser of Tenant's business at the Premises (including Tenant's interest under this Lease), willing but not obligated to purchase Tenant's business at the

Century Stratford Square Lease.v2t.12-5-05



Premises, would pay for Tenant's business at the Premises (including Tenant's interest in this Lease) as determined in accordance with the procedure set forth on <u>Exhibit M</u> hereto. In determining the Fair Market Value of Tenant's Interest, the value of Tenant's business shall take into account the remaining Term of the Lease (including unexercised extension options, but without regard to the instant termination and with the assumption that the REA will remain in effect during the balance of the Term, including unexercised extension options) and the profit earned by Tenant from the business conducted at the Premises (over the fiscal year of Tenant most recently completed prior to the exercise of the termination right).

"**FF&E**" shall mean the furniture, trade fixtures and equipment installed by Tenant or Landlord in or upon the Premises, including, without limitation, the items described on <u>Exhibit E</u> attached hereto, a portion of which shall be owned by Tenant and considered Tenant's FF&E and a portion of which shall be owned by Landlord and considered Landlord's FF&E. Throughout the Term, Tenant shall maintain accurate books and records reflecting which items of FF&E are Landlord's FF&E and Tenant's FF&E in accordance with generally accepted accounting principles. Any disputes regarding the accuracy of Tenant's books and records with respect to FF&E shall be resolved by binding arbitration pursuant to <u>Section 18.5</u>.

"**Final Plans**" shall have the meaning given such term in the Work Letter attached hereto.

"**Finance Company**" shall have the meaning given such term in <u>Section 20.2</u>.

"**First Class**" shall mean the standard of operation, maintenance and repair appropriate for and generally applicable to retail shopping centers in the Metropolitan Area that are generally perceived in the community to provide superior service and amenities in a superior environment. When the term "first class" is used in this Lease, the parties do NOT intend that the definition of "First Class" shall apply.

"**Floor Area**" shall mean the floor area, whether of the Premises or of other premises within the Center, measured from the exterior faces of exterior walls and from the center lines of party or partition walls at each level of the applicable premises; provided, however that the Floor Area of the Premises shall not include any of the following (i.e., the square footage of the following shall be deducted if otherwise included pursuant to this definition): any basement or mezzanine level(s) of the Premises; any mechanical penthouse(s) on the Building; any enclosed or exterior areas for the location of Tenant's trash compactor; any queuing areas within the Common Areas and any escalators, elevators, stairways, corridors, exitways or passageways that are required by Landlord or by Applicable Laws but would not be required if the Premises were a one-story, free-standing, on-grade rectangular structure. The Floor Area of the Center shall exclude the Common Areas, a management office for the Center, not to exceed 3,000 square feet of Floor Area and other areas within Landlord's Parcel necessary for the operation of the Center which cannot be made available for lease (e.g., mechanical rooms) but shall include (without limitation) any space (whether or not leased) devoted to or which can be leased or used for retail or non-retail uses (whether or not used for such purposes).

"*Force Majeure*" shall mean delays in the performance of a Party's obligations hereunder that are caused by reason of acts of God, extraordinarily inclement weather, strikes, lockouts, labor troubles, inability to procure materials, supplies or inventory at commercially reasonable rates, the general unavailability of suitable first run film product, failure of power, illegality, general unavailability of permits or approvals required under applicable Governmental Requirements, riots, insurrection, acts of terrorism or war, or other reason of a similar or dissimilar nature not the fault of or within the reasonable control of such Party, including (without limitation), the failure of the other Party to perform its obligations as and when required hereunder. Lack of funds or inability to obtain internal approvals shall not constitute *Force Majeure*.

"**Four Wall Deal**" shall mean, a bona fide transaction where an unaffiliated third party is permitted to use one or more auditoria in the Premises on a limited-engagement basis not exceeding thirty (30) days either for a fixed fee or where (as in so-called "90-10" transactions) Tenant retains only a specified percentage of ticket revenues and an unaffiliated third party is entitled to the balance of the ticket revenues. Any Four Wall Deal entered into by Tenant shall



be entered into in good faith with a reasonable business justification, and not for the purpose of avoiding the inclusion of amounts or items in Gross Sales.

"**General Concession Restricted Area**" shall have the meaning given such term in Section 13.4.

"**Governmental Authority**" shall mean any federal, state, municipal or local governmental authority, agency or board or any division thereof.

"**Governmental Requirements**" shall mean those Applicable Laws which relate to the development, construction, occupancy or use of the Premises or the Center for their intended uses.

"**Gross Sales**" shall mean all cash receipts from the sale of theater admission tickets for shows in the Premises, regardless of where the ticket is sold from (including, without limitation, from the ticket kiosks installed in the Center pursuant to this Lease and via internet), from the sale of food and beverages and other merchandise, goods and products sold anywhere within the Premises, including from food concessions at the Premises, all revenues payable to Tenant in connection with Four Wall Deals and all revenues payable to Tenant from valet parking services at the Center (after first deducting all costs and expenses of providing the service). Notwithstanding the foregoing, however, Gross Sales shall not include the following: any tax, fee, assessment or charge collected for payment to any Governmental Authority, whether imposed by present or future federal, state or local law; any customer refunds, credits, and adjustments; vending machine sales or receipts unless the food and drink sales from vending machines in the Premises during a Percentage Rent Year comprise more than fifteen percent (15%) of the total food and drink sales from the Premises for such Percentage Rent Year, in which case vending machine sales and receipts for food and drink items shall be included in Gross Sales; advertising receipts (including screen slide and trailer advertisers and display of commercials or payments for display of merchandise on a promotional basis); license and concession fees paid to Tenant (but the Gross Sales of the licensee or concessionaire shall be included); receipts from video or electronic games (unless or to the extent payable to or retained by Tenant); receipts of a licensee under a Four Wall Deal; any receipts from the sale of VIP or gift certificates or discount cards, except that the actual charge will be included in Gross Sales when redeemed at the Premises; any "Pass Admissions," including EBF charges (i.e., amounts paid to Tenant and remitted to Tenant's employee benefit fund) on "Pass Admissions" (i.e., free, other than EBF charge, admissions); agency fees and commissions paid third parties for selling tickets and surcharges for tickets purchased or reserved from any off-Premises locations, including fees charged by third parties for purchases and reservations made by telephone, over the internet or other remote means (provided that to the extent Tenant owns any interest in the party charging the fee, commission or surcharge, such fee, commission or surcharge shall not exceed the fees, commissions or charges customarily paid to unaffiliated third parties); and any proceeds of insurance or any compensation with respect to any Taking or amounts received for the sale of Tenant's furnishing, fixtures and equipment or any sublet rents or other consideration paid to Tenant for the subletting of the Premises or the assignment of this Lease (but the Gross Sales of the subtenants and assignees shall be included). Notwithstanding the foregoing, if the use of the Premises is changed to a use other than the Theater Use, from and after the change in use, Gross Sales shall mean all amounts received by Tenant from all sales of good or services conducted in the Premises, excluding: proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and in addition to the purchase price; refunds given to customers for merchandise purchased at the Leased Premises and returned or exchanged; sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business; discounted sales to employees working in the Premises; fees paid to issuers of credit cards; fees paid to check validating companies; bad checks, net of recovery; bonafide exchanges of merchandise between stores and warehouses of Tenant, Tenant's parent or subsidiaries; returns to shippers or manufacturers; bulk sales or closeouts of merchandise not sold to the general public; that portion of the layaway sales not collected; sales from vending machines and pay telephones intended primarily for the use of Tenant's employees; and proceeds of casualty insurance policies.

"**Hazardous Materials**" shall mean (a) any substance, product, waste or other material of any nature whatsoever which is or becomes listed, regulated, or addressed pursuant to any Environmental Laws; (b) any substance, product, waste or other material of any nature



whatsoever (including, without limitation, mold and other biological agents) which may give rise to liability under any Environmental Laws or under any statutory or common law theory based on negligence, trespass, intentional tort, nuisance or strict liability or under any reported decisions of a state or federal court; (c) petroleum or crude oil, other than petroleum and petroleum products contained within regularly operated motor vehicles; (d) asbestos and asbestos- containing materials; (e) subsurface gas (including radon); (f) urea formaldehyde foam insulation; (g) poly-chlorinated biphenyls; (h) freon and other chlorofluorocarbons; and (i) underground storage tanks.

"**Identified Environmental Report**" shall mean that certain "Phase I" Environmental Site Assessment covering Landlord's Parcel, dated December 15, 2004 and prepared by CEDG, Inc., true, correct and complete copies of which shall be furnished by Landlord to Tenant pursuant to Section 2.3.

"**Initial Term**" shall mean the period that commences on the Commencement Date and expires on the day immediately preceding the fifteenth (15th) Anniversary of the Commencement Date, subject to extension as provided in Section 3.4.

"**Interest Rate**" shall mean five percent (5%) per annum in excess of the "prime" or "corporate base" lending rate announced by Bank of America or any successor thereto from time to time, whichever is lower, or, if neither such rate is readily discernible, the "Prime Rate" published from time to time in the "Money Rates" column of the *Wall Street Journal* (or any successor thereto) (or if there is more than one such rate, then the average of the rates so published).

"**Landlord Affiliate**" shall mean an entity that controls, is controlled by, or is under common control with Landlord; for purposes of this definition, control shall mean the direct or indirect ownership of more that fifty percent (50%) of the beneficial interest in the entity in question.

"**Landlord Anchor Enforcement Action**" shall mean, with respect to any matter, including any act or omission of an Anchor or an occupant of an Anchor Parcel under this Lease for which Landlord is required to cause or attempt to cause an Anchor or other occupant of an Anchor Parcel to take an action or to cease any activity occurring on or about the Anchor Parcel, that Landlord, at Landlord's sole cost, shall take all commercially reasonable steps to cause the Anchor or occupant to take the required action or to cease the activity, as applicable, including, without limitation: (i) instituting and diligently prosecuting to completion a lawsuit or other appropriate legal proceeding to enforce Landlord's rights against the applicable Anchors or occupants at law, in equity and/or under the REA (unless the REA has been terminated after its stated expiration pursuant to its terms with respect to the applicable Anchor Parcel), any Anchor Exclusive Consent and/or any other agreement, instrument or document by which the Anchor or Anchor Parcel is bound or which the Anchor Parcel is subject to; (ii) exercising any self-help rights available to Landlord under the REA (unless the REA has been terminated after its stated expiration pursuant to its terms with respect to the applicable Anchor Parcel) or in any other agreement, document or instrument binding on the Anchor Parcel or occupant, or at law or in equity, with respect to any failure of an Anchor or occupant to take or cease any action; and (iii) if Landlord has no legal ability to compel the Anchor or occupant to act or cease an activity, using good faith efforts to persuade the Anchor or occupant to undertake the requested action or to cease the objectionable activity.

"**Landlord's Environmental Acts**" shall have the meaning given such term in Section 19.2.

"**Landlord's FF&E**" shall mean that portion of the FF&E which is funded by Landlord from or reimbursed to Tenant out of the Landlord's Reimbursement.

"**Landlord's Parcel**" shall have the meaning given such term in Recital A; provided, however, that if Landlord or a Landlord Affiliate hereafter acquires or ground leases any real property adjacent to Landlord's Parcel, including, without limitation, all or any portion of the Restaurant/Lifestyle Addition Area, or all or any portion of any Anchor Parcel, such property shall be included in Landlord's Parcel (and if previously all or a portion of an Anchor Parcel), and such property or portion thereof shall no longer be considered an Anchor Parcel or portion



thereof for purposes of this Lease, whether or not it is subsequently transferred by Landlord, as more particularly described in Section 13.8, except that the Anchor Buildings existing on the Anchor Parcels as of the Effective Date and any replacements of such Anchor Buildings shall continue to be considered as Anchor Buildings on Anchor Parcels for purposes of the Anchor Co-Tenancy Level definition.

"**Landlord's Work**" shall have the meaning given such term in the Work Letter attached hereto as Exhibit D.

"**Leasehold Title Policy**" means a current ALTA form leasehold owner's title insurance policy issued to Tenant by Chicago Title Insurance Company (or any other national title insurance company licensed to underwrite and issue title insurance in the State of Illinois, subject to Tenant's reasonable approval), insuring Tenant's leasehold estate hereunder, in the amount of Five Million Dollars ($5,000,000.00), or as otherwise required by Tenant, subject only to (x) this Lease and other matters arising by, through or under Tenant, (y) matters that are disclosed in the title commitment and survey delivered to Tenant pursuant to Section 2.3 below and are approved by Tenant as Permitted Encumbrances hereunder, and (z) the Non-Disturbance Agreements, with such endorsements thereto as Tenant may reasonably request, including without limitation, (1) an ALTA form "3.1 Zoning Endorsement," expressly insuring that the Premises may be lawfully operated for the Theater Use and modified to include the adequacy of parking and to insure against the closure of Tenant's business within the Premises as a consequence of any breach or violation of applicable zoning laws or ordinances and (2) an ALTA form "13.1 Leasehold Policy Endorsement", insuring Tenant's interest in the Premises. Tenant shall be responsible for the cost of the Leasehold Title Policy and the commitment therefor.

"**Lease Year**" means (i) the approximately twelve (12) calendar month period that commences on the Commencement Date and expires on the day immediately preceding the first (1st) Anniversary of the Commencement Date, and (ii) each successive twelve (12) month period that expires on the day immediately preceding the next following Anniversary of the Commencement Date (provided, however, that the final Lease Year shall expire on the last day of the Term).

"**Long Term Retail Lease Area**" shall mean that portion of Landlord's Parcel depicted on Exhibit A-9 to the Site Plan attached hereto, for which Landlord covenants, from the Effective Date through the expiration of the Initial Term, not to enter into: (i) Temporary Leases (other than Temporary Leases for First Class seasonal retail tenants such as Hickory Farms) or (ii) leases with Non-Retail Users, in each case without the prior written consent of Tenant, not to be unreasonably withheld.

"**Material and Adverse Effect**" shall have the meaning set forth in Section 11.2.

"**Memorandum**" shall mean the memorandum of lease to be executed by Landlord and Tenant and recorded against Landlord's Parcel pursuant to Section 21.7, in the form of Exhibit H hereto.

"**Metropolitan Area**" shall mean the Chicago, Illinois MSA as defined by the United States Census Bureau.

"**Minimum Center Floor Area**" shall mean three hundred eighty thousand (380,000) square feet of Floor Area within Landlord's Parcel, exclusive of the Premises.

"**No Kiosk Area**" shall have the meaning given such term in Section 12.1.

"**No Vending Area**" shall have the meaning given such term in Section 12.1.

"**No Video/Game Area**" shall have the meaning given such term in Section 12.1.

"**Non-Disturbance Agreement**" shall have the meaning given such term in Section 21.1.

"**Non-Seasonal Period**" shall mean, in any calendar year (i) the period beginning on the first Monday in January following January 1 and ending on the first Thursday in May, and (ii) the period beginning on August 16 and ending on the first Thursday in November.



"**Operating Covenant Period**" shall mean the first ten (10) Lease Years of the Term.

"**Parking Areas**" shall mean all surface, subsurface and structural parking areas and facilities within or serving the parking areas of the Center depicted on Exhibit A, and all additional parking areas from time to time located within the Center or appurtenant to the Center. At all times from and after the Commencement Date the Parking Areas shall contain at least as many parking spaces as the Minimum Free Parking Spaces specified in Section 1.1 above, both with respect to all of the Parking Areas in the Center and with respect to the Priority Parking Area. All parking spaces within the Parking Areas shall be available to Tenant and Tenant's employees, customers, patrons, licensees and invitees on a first-come, first-served, non-exclusive and unreserved basis and without time limits (but Landlord may prohibit non-operable vehicles and/or parking of cars by Tenant's employees, customers, patrons, licensees and invitees outside the time periods during which such persons are within the Premises or other portions of the Center or traveling to or from the Premises and/or other portions of the Center). The number of parking spaces that are leased or rented on a weekly (or longer) basis (whether or not reserved or designated) shall not be counted toward the Minimum Free Parking Spaces. The Priority Parking Area, and convenient pedestrian access thereto from the Premises shall be open and operated (including lighting and security in accordance with Section 5.2) seven (7) days per week, every week of the year (including holidays), for at least the hours commencing two (2) hours before Tenant's opening and ending one (1) hour after Tenant's closing each day. No charge or fee shall be assessed by Landlord or the operator of the Parking Area for the use thereof by Tenant or Tenant's employees, customers, patrons, licensees and invitees. Tenant, in its sole and absolute discretion but subject to Applicable Laws, may institute and collect a fee (and/or contract with an outside service) for valet parking of the vehicles of Tenant's patrons, and Landlord shall cooperate with such service, including designating a curbside drop-off area adjacent to the entry to the mall in the Protected Area which is closest to the Premises for the valet service.

"**Party**" shall mean either Landlord or Tenant; and "**Parties**" shall mean Landlord and Tenant.

"**Percentage Rent**" shall have the meaning given such term in Section 4.2.

"**Percentage Rent Breakpoint**" initially shall mean, for the first five (5) Lease Years of the Term, Twelve Million Five Hundred Dollars ($12,500,000.00) per annum. On each Adjustment Date, the Percentage Rent Breakpoint shall be adjusted by multiplying (x) the annual Percentage Rent Breakpoint applicable to the immediately preceding five-year period, by (y) the percentage adjustment in the Base Rent as adjusted on such Adjustment Date. As an example, on the first Adjustment Date (i.e., the 5th Anniversary of the Commencement Date), when the Base Rent is adjusted from $24.00 psf/annum to $26.00 psf/annum, or a 8.3333% increase, the Percentage Rent Breakpoint shall be increased from $12,500,000 to $13,541,666 (i.e., $12,500,000 x 1.083333). With respect to any Percentage Rent Year that is longer or shorter than 365 days in duration, the Percentage Rent Breakpoint for such year shall be adjusted on a per diem basis. The Percentage Rent Breakpoint shall be proportionately decreased for any Percentage Rent Year in which an Excused Closure (other than an Excused Closure pursuant to clause (iv) of the definition of Excused Closure) occurs or for any period that Tenant is not conducting business in the Premises in violation of Section 13.2.

"**Percentage Rent Year**" shall mean each calendar year that includes any part of the Term, provided, however that if the Commencement Date is any day other than January 1, then the first Percentage Rent Year shall be the period commencing on the Commencement Date and ending on December 31 immediately following the first Anniversary of the Commencement Date and provided further that the final Percentage Rent Year shall expire on the last day of the Term, whether or not occurring on the 31st of December. If the annual Percentage Rent Breakpoint is adjusted in any Percentage Rent Year, then the Percentage Rent Breakpoint for such Percentage Rent Year shall be the daily weighted average of the Percentage Rent Breakpoints over the applicable period.

"**Permitted Encumbrances**" shall mean the title exceptions set forth on Exhibit G hereto, and any other title exceptions approved by Tenant in accordance with Section 2.3 below.

"**Permitted Transfer**" shall have the meaning given such term in Section 14.1.



"**Permitted Use**" shall mean (x) during the Operating Covenant Period, the Theater Use, and (y) from and after the expiration of the Operating Covenant Period, the Theater Use or any other Compatible Use.

"**Plans Start Date**" shall have the meaning given such term in Section 3.3 of the Work Letter attached hereto.

"**Premises**" shall mean the interior of the premises shown as such on Exhibit B.1 attached hereto, which upon completion of Landlord Work shall contain approximately 50,000 - 60,000 square feet of Floor Area, 14 to 16 theater auditoria (screens) and approximately 2,600 - 3,000 theater seats. The Premises will be constructed by Landlord (subject to installation of the FF&E in accordance with the Work Letter) as a first class "Century Theatres" multiplex containing stadium seating with 18-inch risers, rocking high back love seats, high gain wall-to-wall screens, digital surround sound, concessions and café facilities within a spacious lobby with ceiling height of no less than 30 and up to 50 feet and high quality finishes throughout the theater that match or exceed those found in Tenant's other theaters in the Metropolitan Area as of the Effective Date. Landlord hereby covenants to use best efforts to accommodate a minimum ceiling height for the theater lobby of at least 40 feet. The Premises will also have a prominent first class storefront. Without limitation, the storefront of the Premises shall feature the "Century Theatres" marquee, which shall be readily visible from all levels within the Center.

"**Priority Parking Area**" shall mean the portions of the Parking Area that are located within the "Protected Area" identified on Exhibit A.3 of the Site Plan, attached hereto in which Landlord shall at all times maintain at least the applicable number of Minimum Free Parking Spaces set forth in Section 1.1.

"**Protected Area**" shall mean the portion of the Center that is depicted as such on Exhibit A.2 of the Site Plan attached hereto and the Common Areas (including Parking Areas) therein.

"**REA**" shall mean the Easement and Operating Agreement dated October 22, 1979, recorded November 5, 1979 as Document Number R79-100343 in the Office of the Recorder of Deeds, DuPage County, Illinois, which instrument, as heretofore amended, governs the operations of the Center.

"**REA Termination**" shall have the meaning set forth in Section 21.18.

"**Real Estate Taxes**" shall mean the following, subject to the terms and limitations specified below and in Article 6: all real estate taxes assessed against the land and buildings comprising Landlord's Parcel and all other governmental levies of every kind or nature whatsoever, general or special, extraordinary as well as ordinary, which shall be charged, levied, assessed or imposed by any lawful taxing authority against the land and/or buildings comprising Landlord's Parcel and which are customarily considered part of real estate taxes. Notwithstanding anything to the contrary contained herein, however, in no event shall "**Real Estate Taxes**" payable (in whole or in part) by Tenant include: (i) any taxes, levies or assessments for betterments or special assessments levied or assessed to directly or indirectly pay for, finance or offset the costs of the development, financing or construction of the Center or any part thereof (including taxes, levies and assessments with respect to any special assessment district, the proceeds of which were used directly or indirectly to pay for, to finance or to offset the cost of constructing the Center or any aspects thereof (including the Parking Areas and other Common Areas) or off-site improvements constructed by or on behalf of Landlord in connection with the development, re-development or entitlements for the improvements on Landlord's Parcel and/or the Center), although taxes assessed pursuant to a tax increment financing district ("**TIF**") affecting only Landlord's Parcel and/or the Center to recoup costs related to improvements to the Common Areas for the benefit of all occupants of Landlord's Parcel and/or the Center as a result of the Renovation may be included in Real Estate Taxes to the extent they are structured as a reimbursement of taxes paid by Landlord out of the increased assessed value resulting from the Renovation and that Real Estate Taxes for the Base Year Real Estate Taxes are adjusted to reflect a fully assessed Center, taking into account the completed Renovation (and Landlord shall be entitled to retain any such reimbursement received from the TIF and not credit any portion to Tenant), (ii) the cost of utility meters or "tap," "hook-up," "connection" or other fees, however designated, for connection of such utilities, (iii) any taxes, levies, charges or fees

14

payable by virtue of the particular use being made by a tenant or occupant of space in the Center, (iv) any tax, assessment or levy that is otherwise separately allocable to a tenant or occupant of the Center, (v) building permit fees or fees imposed by any Governmental Authority as a condition to granting any entitlements to the Center or as a condition to permitting the construction of the Center or any portion thereof, such as school fees, park fees, library or fire district fees, or fees charged to mitigate traffic or other development impact, (vi) any transfer taxes or deed stamps (or similar charges) imposed on the sale, change of ownership or transfer of any portion of Landlord's Parcel (including the creation of the leasehold estate hereunder), all of which shall be paid by Landlord at no cost or expense to Tenant (except that Tenant shall be solely responsible for any transfer taxes imposed on the sale or assignment by Tenant of its leasehold estate hereunder), or (vii) any tax, assessment or levy that is assessed or levied against or with respect to any facilities that are not part of Landlord's Parcel. As used herein, Real Estate Taxes "for" or "with respect to" a particular Lease Year shall mean the Real Estate Taxes that are assessed for such Lease Year, regardless of when such Real Estate Taxes are payable. Landlord shall make payment of Real Estate Taxes over the longest period of time permitted by law, and only the installment required to be paid for a given Lease Year may be included in Real Estate Taxes for such Lease Year. Real Estate Taxes shall include interest on all installment payments (but not interest or late fees assessed on delinquent payments or installments). Further, in no event shall Real Estate Taxes include any of the following: income, franchise, corporate, personal property, excess profits, transfer, revenue, estate, inheritance, gift, devolution, succession or excise taxes of Landlord or impact fees, brokerage fees, parking fees or development fees or any other tax, assessment or charge upon or measured, in whole or in part, by the rent payable hereunder or any costs or expenses of reviewing bills or assessments or except to the extent reasonable, out-of-pocket costs or expenses of tax abatement proceedings not exceeding the reduction in Real Estate Taxes actually achieved or obtaining a tax reduction or abatement. Notwithstanding the foregoing, if any such tax, excise on rents or other imposition, however described, is levied or assessed by any taxing authority on account of the Rent, Tenant's inventory, any Tenant Property, or if any other taxes are imposed upon Tenant's investment or business operation in the Leased Premises, then Tenant shall be responsible therefor and shall pay the same before delinquency. If any taxing authority requires that any such tax or excise on rents or other imposition, however described, for which Tenant is responsible, be paid by Tenant, but collected by Landlord for and on behalf of such taxing authority and forwarded by the Landlord to such taxing authority, then the same shall be paid by Tenant to Landlord at such times as such taxing authority shall require and be collectible by Landlord and the payment thereof enforced in the same fashion as provided for the enforcement of payment of Rent.

"**Renovation**" shall mean the renovation and re-tenanting of Landlord's Parcel and Common Areas from the condition existing as of the Effective Date to the condition shown on the Site Plan, including (without limitation) the construction of the Premises by Landlord and all other improvements to Landlord's Parcel and the Common Areas contemplated by the Work Letter, and if and when Landlord is able to procure tenants and elects in Landlord's sole discretion to proceed with construction of the Restaurant/Lifestyle Addition Area, the construction of improvements in the Restaurant/Lifestyle Addition Area. As part of the Renovation, Landlord will use commercially reasonable efforts to (i) on or before the Commencement Date, install new property signage, upgraded lighting or skylights, and other general capital improvements including, without limitation, upgraded finishes throughout Landlord's Parcel and Common Areas and (ii) as soon as reasonably practicable based upon Landlord's ability to procure acceptable leases, renovate and re-tenant Landlord's Parcel (as it may be expanded in accordance with this Lease) with the addition of one or more "junior anchor" tenants, multiple sit-down restaurants, outdoor cafes and streetscape retail, some of which may be located in the proposed "Restaurant/Lifestyle Addition Area" designated on the Site Plan, which Landlord intends to construct as part of the Renovation.

"**Rent**" shall mean, collectively, Base Rent, Alternate Rent, Percentage Rent, Additional Rent and all other charges payable by Tenant hereunder.

"**Required Vertical Transportation**" shall mean the escalators, elevators and stairways designated as such on Exhibit A.4 of the Site Plan attached hereto. If the Required Vertical Transportation is moved after the Premises is open, the work shall be performed in accordance with Article 9 and the new elevator/escalator must be operational before the existing elevator/escalator is shut down.



"**Restaurant/Lifestyle Addition Area**" shall mean that portion of the Protected Area designated as such on Exhibit A.3 of the Site Plan attached hereto, in which Landlord may elect to construct additional improvements to the Center for restaurant and lifestyle retail purposes as part of the Renovation, subject to the terms and conditions of this Lease.

"**Restaurant Pads**" shall mean that portion of the Protected Area designated as such on Exhibit A.3 of the Site Plan attached hereto, upon which Landlord may elect to construct restaurant improvements, not to exceed one restaurant per pad, subject to the terms and conditions of this Lease.

"**Restoration Work**" shall have the meaning given such term in Section 16.1.

"**Seasonal Period**" shall mean (a) the period beginning on the Friday after the first Thursday in May and ending on August 15 next following, and (b) the period beginning on the Friday after the first Thursday in November and ending on the first Monday in January after January 1st next following.

"**Site Plan**" shall mean (collectively) the site plan and floor plans for the Center that is or are attached hereto as Exhibit A and Exhibit A.1 through A.10, subject to Section 2.2.

"**Substantial Casualty**" shall have the meaning given such term in Section 16.3.

"**Taking**" shall have the meaning given such term in Section 17.1.

"**Temporary Leases**" shall mean leases or occupancy agreement for portions of the Floor Area of the Center (excluding the Anchor Parcels), which have an initial term of less than one (1) year or are for seasonal periods.

"**Tenant Affiliate**" shall mean an entity that controls, is controlled by, or is under common control with Tenant or any entity that is controlled by a member or members of the Syufy family, including trusts established for the benefit of one or more of the heirs or descendants of the Syufy family; for purposes of this definition, control shall mean the direct or indirect ownership of more than fifty percent (50%) of the beneficial interest in the entity in question.

"**Tenant's Environmental Acts**" shall have the meaning given such term in Section 19.1.

"**Tenant's FF&E**" shall mean that portion of the FF&E that is paid for by Tenant (and not funded or reimbursed from the Landlord Reimbursement).

"**Tenant's Plans**" shall have the meaning given such term in the Work Letter attached hereto.

"**Tenant's Pro Rata Share**" shall mean a fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the greater of (x) the actual Floor Area of Landlord's Parcel (reduced by the Floor Area of any tenant or occupant excluded by the definition of Real Estate Taxes from the calculation in question), whether or not leased or occupied, or (y) the Minimum Center Floor Area.

"**Tenant's Property**" shall have the meaning given such term in Section 10.3.

"**Tenant's Signs**" shall have the meaning given such term in Section 15.1 hereof.

"**Tenant's Tax Contribution**" shall mean the amounts payable by Tenant in respect of Real Estate Taxes pursuant to Article 6 hereof.

"**Tenant's Work**" shall have the meaning given such term in the Work Letter.

"**Tenant's Work Commencement Conditions**" shall have the meaning given such term in Section 5.1 of the Work Letter.



"**Tenant's Work Period**" shall mean the period of one hundred twenty (120) days commencing on the date on which all of Tenant's Work Commencement Conditions are satisfied (including, without limitation, the issuance of all building permits required for Tenant's Work), subject to extension for delays caused by *Force Majeure*.

"**Term**" shall mean the Initial Term and each Extension Term (if any) that is duly added to the Initial Term pursuant to Section 3.3.

"**Theater Use**" shall mean the use of the Premises (1) primarily as a first class motion picture theater complex (including, without limitation, the exhibition of movies, films, style shows, telecasts, meetings and other presentations and entertainment customarily shown or permitted in first class motion picture theaters in the Metropolitan Area), a majority of which are so-called "first-run" films (provided that a majority of the films being shown by a majority of the "stadium seating" first class motion picture complexes in the suburban portion of the Metropolitan Area are "first run" films) and other films in general distribution at the time in question, but not to the exclusion of other films or presentations, and (2) for uses ancillary to (and consistent with) the operation of the Premises primarily as a motion picture theater complex, such as (without limitation) the following:  (i) the preparation and retail sale of food, beverages and refreshments primarily intended for consumption on the Premises; (ii) the sale or rental of video cassettes, compact discs, and other visual recorded media provided that the area devoted to sales of such items does not take up more than 300 square feet of Floor Area in the Premises, except with the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed so long as the additional area will not cause Landlord to be in violation of any of the existing exclusives listed on Exhibit J attached hereto which remain in effect and such usage would be consistent with the usage permitted in other comparable motion picture complexes in the Metropolitan Area; (iii) the sale of records, digital audio tapes and other audio recorded media, provided that the area devoted to sales of such items does not take up more than 300 square feet of Floor Area, except with the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed so long as the additional area will not cause Landlord to be in violation of the existing exclusives listed on Exhibit J attached hereto which remain in effect and such usage would be consistent with the usage permitted in other comparable motion picture complexes in the Metropolitan Area; (iv) the sale of books, magazines and newspapers, clothing, merchandise, memorabilia, and toys and novelties, provided that the area devoted to sales of books, magazines and newspapers does not take up more than 700 square feet of Floor Area in the Premises and the Gross Sales from books, magazines and newspapers in any Percentage Rent Year shall not exceed 7% of the total Gross Sales from the Premises in such Percentage Rent Year, except with the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed so long as the additional area will not cause Landlord to be in violation of any of the existing exclusives listed on Exhibit J attached hereto which remain in effect and such usage would be consistent with the usage permitted in other comparable motion picture complexes in the Metropolitan Area; (v) the use of electronic video, arcade and game machines provided that the area in the Premises devoted to the use of electronic video, arcade and game machines does not exceed five percent (5%) of the Floor Area of the Premises; and (v) the location and operation of one (1) ATM machine (for admission tickets and/or cash) in the Premises.

"**Transfer**" shall have the meaning given such term in Section 14.2.

"**Unamortized Tenant Costs**" shall mean, as of the date in question, the unamortized portion of the cost of Tenant's Work and other leasehold improvements (including Tenant's FF&E, permitted alterations and cost of installing Tenant's Property) performed and/or paid for by Tenant (and not reimbursed from the Landlord Reimbursement), plus the unamortized portion of all other capitalized costs incurred by Tenant in connection with this Lease, in each case determined in accordance with Tenant's income tax accounting procedures; provided, however that any Tenant's FF&E or other property that is removed from the Premises by Tenant pursuant to Section 20.1 shall be excluded from the calculation of Unamortized Tenant Costs. The Unamortized Tenant Costs shall be set forth in a certificate executed by the chief financial officer, treasurer or other senior executive officer of Tenant from time to time when required pursuant to the terms of this Lease, which certificate shall be accompanied by copies of invoices for all costs incurred by Tenant and Tenant's detailed calculation of the amortization of such costs. Any dispute regarding the Unamortized Tenant Costs shall be resolved by arbitration pursuant to Section 18.5.

17



"**Uncontrollable Event**" shall have the meaning given such term in Section 14.2.

"**Work Letter**" shall mean the work letter attached hereto and made a part hereof as Exhibit D, including the exhibits and schedules attached thereto or identified therein.

## ARTICLE 2

## PREMISES; SITE PLAN; CONDITIONS

**Section 2.1.    Premises.** Subject to the terms and conditions hereof (including, without limitation, Section 2.3 below), Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises and Landlord's FF&E, together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto, whether arising under any private or public grant or authority, including, without limitation, the direct right of ingress to and egress from the Premises and the streets shown on the Site Plan through the entrances shown on the Site Plan (subject in each case to Landlord's rights pursuant to Section 2.2 to modify the configuration of the Center), and a non-exclusive, irrevocable right and easement for Tenant, its employees, patrons and invitees to use the Common Areas (including the Parking Areas), for their intended purposes throughout the Term, subject to the terms hereof.

**Section 2.2.    Site Plan.** Landlord represents and warrants that Exhibit A attached hereto accurately depicts the intended current development plan for the Center, as approved by all applicable Governmental Authorities (except for issuance of approvals for Tenant's Signs and building permits for the Premises and other portions of the Renovation and other governmental approvals for the proposed improvements to the Restaurant/Lifestyle Addition Area), including the physical configuration of the Center, and illustrates the approximate location, relative size, and configuration of all buildings and significant Common Areas (including the Parking Areas elements) of the Center and the location of the Premises as of the Effective Date, all as approved as of the Effective Date by all applicable Governmental Authorities (except for issuance of approvals for Tenant's Signs, building permits for the Premises and other portions of the Renovation and other governmental approvals for the proposed improvements to the Restaurant/Lifestyle Addition Area). From time to time promptly after the completion, addition, removal or alteration of any building improvements or Common Area elements of the Center, Landlord shall deliver to Tenant a revised, "as-built" site plan of the Center, but the delivery of such revised site plan shall not constitute a permitted modification or substitution of or permitted deviation from the Site Plan attached hereto as Exhibit A.

(a)    Landlord shall not make any modification, changes, revisions or deviations to the Site Plan ("**Site Plan Modifications**") which affect the Protected Area or the Premises, or the ring road as shown on the Site Plan, without in each case obtaining the prior written consent of Tenant. In addition, Landlord covenants and agrees that patrons of the Premises will at all times have reasonable access from the Premises through the Common Areas to all Parking Areas of the Center (and Landlord shall not implement, permit or consent to any Site Plan Modification which would result in a violation of the foregoing covenant) and Landlord shall not eliminate any entryway from the mall building to any of the Parking Areas of the Center without replacing such entryway with another reasonably convenient entryway to the applicable Parking Areas of the Center (which requirement may be satisfied if there are convenient entrances from the Parking Areas into Anchor Buildings from which patrons of the Center can readily access the other Common Areas of Landlord's Parcel, with all Anchor Building entrances existing as of the Effective Date being deemed convenient entrances for this purpose). If any REA Termination results in a loss of any entrance in an Anchor Building or an Anchor elects to close any entrance which is used for access to a Parking Area and Landlord has previously closed an entrance in reliance on the existence of the Anchor Building entrance under the preceding sentence, Landlord shall provide alternative access and entranceways to such Parking Area through a new entrance to be constructed in the Common Areas on Landlord's Parcel (unless, as a result of the REA Termination, use of such Parking Area on the Anchor Parcel is no longer permitted, Tenant acknowledging that an REA Termination may result in the loss of use of the Parking Area on the Anchor Parcel affected by the REA Termination). With respect to any Site Plan Modification that affects the Protected Area (but not the Premises), or the ring road as shown on the Site Plan, including any installation of outdoor restaurant seating for restaurants

18



constructed as part of the Restaurant/Lifestyle Addition Area in the Protected Area, Tenant shall not unreasonably withhold, condition or delay its consent, except to the extent the Site Plan Modification would have a **"Material and Adverse Effect"** on Tenant's operations and/or business at the Premises (Tenant acknowledging, however, that outdoor seating areas will be included in construction of restaurants in the Restaurant/Lifestyle Addition Area, subject to compliance with all of the terms of this Lease related to such construction, including without limitation, Sections 9.1(g) and (h), and that Tenant's reasonable approval rights are only to govern the size and location of such outdoor seating areas so that they do not have a Material and Adverse Effect on Tenant's operations and/or business at the Premises). With respect to any Site Plan Modification which affects the Premises or would have a **"Material and Adverse Effect"** on Tenant's operations and/or business at the Premises, Tenant may withhold its consent, in its sole and absolute discretion. Notwithstanding the foregoing Landlord and Tenant hereby agree that the following Site Plan Modifications within the Protected Area shall not require Tenant's approval: (i) construction of restaurant/retail improvements in the Restaurant/Lifestyle Addition Area, so long as all of the terms and conditions of Sections 9.1(g) and (h) are complied with; and (ii) so-called "store front pop-outs" extending no more than two (2) feet into the Protected Area in connection with the build-out of space for tenants of Landlord's Parcel whose premises are adjacent to the Protected Area.

(b)     Landlord shall have the right, without Tenant's consent, to implement Site Plan Modifications which do not affect the Premises or Protected Area, so long as the Site Plan Modifications do not have a **"Material and Adverse Effect"** on Tenant's operations and/or business at the Premises. No less than ten (10) business days prior to implementing any Site Plan Modification for which Tenant's consent is not required under this Section 2.2(b), Landlord shall notify Tenant in writing as to the scope of the Site Plan Modification contemplated and Landlord's determination that Tenant's consent is not required.

(c)     Without limitation of any other Site Plan Modifications which would be considered to have a **"Material and Adverse Effect"** on Tenant's operations and/or business at the Premises, the following Site Plan Modifications shall be deemed to have a **"Material and Adverse Effect":**

(i)     Any Site Plan Modification which alters or necessitates an alteration in the size, location or configuration of the Premises;

(ii)     Any Site Plan Modification which reduces the number of parking spaces in the Center or Priority Parking Area below the number of Minimum Free Parking Spaces specified in Section 1.1.

(iii)     Any Site Plan Modification which materially and adversely affects access to the Premises from the Common Areas;

(iv)     Any Site Plan Modification which adversely affects visibility of the Premises or Tenant's Signs from the public streets and sidewalks adjacent to the Premises;

(v)     Any Site Plan Modification which directly or indirectly increases Tenant's costs of operating or maintaining the Premises;

(vi)     Any Site Plan Modification which involves the installation of building improvements in the **"Protected Area"** on the Site Plan;

(vii)     Any Site Plan Modification which involves any closure (other than temporary closures for required repairs and maintenance) of the **"Critical Accessways"** shown on the Site Plan or any reconfiguration or relocation thereof which adversely affects the flow of pedestrian and vehicular traffic to and from the Common Areas to the Premises;



(viii)   Any Site Plan Modification which involves any closing off of corridors within Landlord's Parcel providing access from the Premises to other portions of the interior of Landlord's Parcel or the Parking Areas (excluding closures of entrances into Anchor Buildings after an REA Termination as to the applicable Anchor Parcel, so long as Section 2.2(a) is complied with) or any closure of the existing entrance between the mall and the Priority Parking Area;

(ix)   Any Site Plan Modification which involves any relocation or reconfiguring of the Required Vertical Transportation, except as expressly permitted in Exhibit A-4 and subject to compliance with the covenants described in the definition of Required Vertical Transportation; and

(x)   Any Site Plan Modification which involves landscaping, lighting or signage and which (A) causes a reduction in parking in the Priority Parking Area below the Minimum Free Parking Spaces for the Priority Parking Area, (B) causes security issues in Parking Areas, (C) involves a reduction in lighting, (D) involves or affects Tenant's Signs, or (E) adversely affects the visibility of Tenant's Signs or the entrance to the Premises.

Tenant acknowledges that the following will not constitute Site Plan Modifications: (A) restriping or resurfacing of Parking Areas in compliance with the terms of this Lease (including Sections 9.1(g), (h) and (i)), (B) changes to finishes or colors of or other cosmetic changes to flooring, sidewalks, facades or storefronts in compliance with the terms of this Lease (including Sections 9.1(g), (h) and (i)), or (C) modifications to landscaping, lighting or signage (other than Tenant's Signs) which do not have a Material and Adverse Effect under Section 2.2(c)(x) and are otherwise in compliance with all of the terms of this Lease.

(d)   In any instance where Tenant's consent is required to a Site Plan Modification, Tenant shall endeavor to respond in writing to Landlord's written request for approval of the Site Plan Modification, within ten (10) business days following Landlord's request, which must specify in bold in all capital letters, at the top of the Notice "SITE PLAN MODIFICATION REQUEST", accompanied by plans and specifications showing the proposed Site Plan Modification and a proposed work schedule for implementing and completing the Site Plan Modification. Any disapproval by Tenant shall specify the reasons therefor. If Tenant fails to respond within the ten (10) business day period, Landlord may send a reminder notice (containing a copy of the original notice and all materials) which shall specify that a failure to respond within five (5) business days shall be deemed approval of the Site Plan Modification and shall contain an additional legend at the top of the notice in bold, all capital letters, 16 point type stating "YOUR FAILURE TO RESPOND WITHIN FIVE (5) BUSINESS DAYS WILL RESULT IN YOUR APPROVAL OF THE REQUESTED SITE PLAN MODIFICATION", and if Tenant fails to respond within five (5) business days following receipt of the reminder notice, the proposed Site Plan Modification shall be deemed approved.

(e)   Nothing contained herein shall be deemed to permit Tenant to withhold its consent to a Site Plan Modification, to the extent such Site Plan Modification is required by Applicable Law (and the requirement to comply does not arise because of any other modification being made to the Center or the Common Areas) (although Landlord shall be required to give the notices set forth in clause (d) above, and Tenant shall be entitled to dispute whether the modification is required by Applicable Law).

(f)   Any dispute under this Section 2.2 as to whether Tenant's consent is required for any Site Plan Modification, as to whether any Site Plan Modification will be considered a "Material and Adverse Effect", or is required by Applicable Law or as to whether Tenant is being reasonable (where Tenant is required to act reasonably pursuant to this Section 2.2) may be submitted to arbitration pursuant to Section 18.5.

Section 2.3.   General Conditions.   In addition to the conditions set forth elsewhere in this Lease, at Tenant's option this Lease shall be subject to the following conditions:

(a)    That, within thirty (30) days after the Effective Date, Landlord shall provide to Tenant the following:

(i)    A current commitment ("**Commitment**") for the Leasehold Title Policy in favor of Tenant issued by Lawyers Title Insurance Corporation ("**Title Company**"), showing all matters of record affecting Landlord's Parcel (including mortgages) and legible copies of all documents identified or referred to therein (excluding the REA, which Tenant has previously received, and excluding copies of other tenant's leases).

(ii)    A current ALTA "Urban" survey of Landlord's Parcel, which shows (at a minimum) all locatable matters disclosed in the title commitment and which is expressly certified to Tenant and the title company by the surveyor. Notwithstanding the foregoing, Landlord shall be deemed to have satisfied this requirement by previously delivering to Tenant the existing ALTA Survey of the Center dated December 13, 2004, prepared by Haeger Engineering LLC, so long as the title company issuing the Leasehold Title Policy will issue the Leasehold Title Policy to Tenant without an exception for matters disclosed by a current ALTA survey of Landlord's Parcel.

(iii)    If the Identified Environmental Report is not expressly addressed to Tenant, a "reliance letter" from the author(s) thereof confirming that Tenant may rely on the Identified Environmental Report; Tenant acknowledges its prior receipt of the Identified Environmental Report.

The matters disclosed in the Commitment and survey ("Survey") delivered pursuant to (a)(i) and (a)(ii) which are approved by Tenant pursuant to the procedure hereinafter provided shall be considered "**Permitted Encumbrances**" hereunder and upon such approval, a list of the Permitted Encumbrances shall be attached hereto as Exhibit G. Tenant shall have ten (10) business days following the later of the Effective Date or Tenant's receipt of the last of the items referenced in Section 2.3(a)(i) and (ii) above to notify Landlord whether Tenant approves or disapproves any of the exceptions to title disclosed in the Commitment and/or any matters disclosed by the Survey (any matters disapproved are the "**Disapproved Exceptions**"), and if Tenant notifies Landlord of any Disapproval Exceptions, and Landlord does not cause the Disapproved Exceptions to be removed from the Commitment within five (5) business days after receipt of Tenant's notice, this Lease shall automatically terminate upon the expiration of such five (5) business day period or on such earlier date as Landlord gives notice to Tenant of Landlord's election not to cause the Disapproved Exceptions to be removed from the Commitment. Landlord shall have no obligation to cause any Disapproved Exception to be removed from the Commitment and shall have the right to immediately terminate this Lease upon receipt of any notice of Disapproved Exceptions. Tenant shall not have the right to disapprove as an exception, any existing lease of Landlord's Parcel, so long as the exception for the lease is limited to the rights of the applicable tenant to utilize the Common Areas on a non-exclusive basis (and to the extent applicable, its rights, if any, with respect to the exclusives listed in Exhibit J to this Lease) and the Title Company confirms that the lease does not otherwise affect Tenant's interest in the Premises. If Tenant fails to respond within the ten (10) business day period following the later of the Effective Date or Tenant's receipt of the items in (a)(i) and (a)(ii), Landlord may send a reminder notice, which shall contain a legend at the top in 16 point, bold, all capital letters, that "**YOUR FAILURE TO RESPOND WITHIN ONE (1) BUSINESS DAY SHALL BE DEEMED APPROVAL OF THE MATTERS SET FORTH HEREIN**". A failure to respond within the one (1) business day period following receipt of the reminder notice shall be deemed an approval of the exceptions disclosed by the Commitment and Survey and a waiver of this condition. Tenant shall have ten (10) business days after receipt of the item in Section 2.3(a)(iii) to review and approve (or disapprove) same, and if Tenant disapproves such item, this Lease shall terminate. If Tenant fails to respond within the ten (10) business day period, Landlord may send a reminder notice, which shall contain a legend in sixteen point, bold, all capital letters, that "**YOUR FAILURE TO RESPOND WITHIN ONE (1) BUSINESS DAY SHALL BE DEEMED APPROVAL OF THE MATTERS SET FORTH HEREIN**". A failure to approve or disapprove the items referenced in Section 2.3(a)(iii) within one (1) business



day following receipt of the reminder notice containing all of the required deliveries under Section 2.3(a)(iii), shall be deemed an approval.

(b)    That, within one hundred eighty (180) days after the Effective Date: (i) Landlord shall (x) obtain, and furnish to Tenant reasonable documentary evidence (such as, without limitation, a commitment (at Tenant's expense) to issue title insurance with an ALTA form "3.1 Zoning Endorsement", with such commitment and title insurance endorsement to be at Tenant's expense) that Landlord has obtained all zoning and other discretionary governmental approvals and entitlements (other than occupancy certificates) required (1) to develop (or redevelop), operate and maintain the Center in accordance with the Site Plan, including the Renovation (but not the proposed Restaurant/Lifestyle Addition Area), (2) for the development and operation of a movie theater within the Premises containing (at least) 50,000-60,000 square feet of Floor Area, 14-16 theater auditoria and approximately 2,600–3,000 theater seats and a game room, and (3) to permit the operation of the Premises for the Theater Use, and that such approvals and entitlements are in full force and effect and are not subject to challenge or appeal, and (y) obtain and deliver to Tenant satisfactory written evidence of all approvals necessary for the installation and maintenance of the Blade Sign and the shared pylon/monument signs described in Section 15.1, including approvals from all applicable Governmental Authorities, provided, however, in the event that Landlord is unable to obtain approval from Governmental Authorities for both the Blade Sign and the shared pylon/monument signs described in Section 15.1 but obtains approval for either the Blade Sign or such shared pylon/monument signs, no further approval by Governmental Authorities of the unapproved Blade Sign or shared pylon/monument signs shall be required hereunder (but Landlord shall continue to attempt to obtain such approval and shall remain obligated to construct such sign if approval is obtained).

(c)    That, within forty-five (45) days after the Effective Date, Landlord shall (i) record the Memorandum and deliver the original recorded Memorandum to Tenant, (ii) deliver the Leasehold Title Policy to Tenant (provided Tenant has paid the premiums for the policy), and (iii) obtain and provide to Tenant, from the holder of each and every mortgage or deed of trust encumbering Landlord's Parcel or any portion thereof as of the date that the Memorandum is recorded, an executed original Non-Disturbance Agreement in accordance with Section 21.1 below (with such modifications as may be required by the applicable lender and acceptable to Tenant in Tenant's reasonable judgment). Tenant shall be responsible for paying any recording costs incurred in connection with the recordation of the Memorandum and any Non-Disturbance Agreement.

(d)    On or before the earlier to occur of the satisfaction of all of Tenant's Work Commencement Conditions specified in the Work Letter (other than this Section 2.3(d)) or December 15, 2006, Landlord shall obtain and deliver to Tenant a written approval in form and substance reasonably satisfactory to Tenant, of the construction, installation and maintenance of Tenant's Signs described in Article 15 to be located on or about the Building and in the Common Areas, from all parties to the REA having approval rights over such signs; provided, however, (a) in the event that Landlord is unable to obtain approval from Governmental Authorities for both the Blade Sign and the shared pylon/monument signs described in Section 15.1 but obtains approval for either the Blade Sign or such shared pylon/monument signs, no further approval by the parties to the REA of the unapproved Blade Sign or shared pylon/monument signs shall be required hereunder (but Landlord shall continue to attempt to obtain such approval and shall remain obligated if it is able to obtain the approvals from Governmental Authorities to construct such sign if approval is obtained) or (b) in the event Landlord has obtained all approvals from Governmental Authorities required to construct Tenant's Signs, but has not been able, after using best efforts, including expenditure of funds (but not including the obligation to pay money or provide other compensation to an Anchor that is not otherwise due to the Anchor), to obtain all required Anchor approvals, Landlord shall, unless any of the Anchors have disapproved the proposed Tenant Signs, proceed to construct Tenant's Signs, and Landlord shall indemnify, defend, protect and hold harmless Tenant from any and all claims, liabilities, losses, damages, costs and expenses (including reasonable attorneys' fees and costs) arising from any claim by an Anchor related to a failure to obtain the Anchor's approval. In addition, if Landlord fails to

22



obtain such Anchor approvals, and any of Tenant's Signs are required to be removed as a result thereof, Landlord shall use best efforts to promptly obtain Anchor and governmental approvals for replacements to Tenant's Signs reasonably acceptable to Tenant, and during any period that Tenant's Signs have been removed and not replaced by signs of equal quality, Landlord shall, at Tenant's request (but at Landlord's sole cost) as soon as practicable undertake marketing efforts for Tenant's business at the Premises (including but not limited to newspaper, mailers, and internet advertising). The amount of such marketing efforts shall be that reasonably necessary to compensate for the loss of Tenant's Signs, but Landlord acknowledges that some amount of marketing effort will be appropriate for any removed Tenant's Signs. Any dispute regarding the sufficiency of Landlord's marketing efforts shall be subject to arbitration under this Agreement, but the parties agree that the arbitrator shall consider the amount of Tenant's Signs removed in determining the amount of marketing required. If Landlord uses best efforts to obtain the Anchor approvals but is unable to do so, Landlord constructs Tenant's Signs and Tenant's Signs are not removed at any time during the Term (or, Tenant's Signs are removed and Landlord undertakes marketing efforts as required hereunder), this condition shall be deemed satisfied. In no event shall Landlord construct any exterior signage for any tenant in the Restaurant/Lifestyle Addition Area or the on either of the Restaurant Pads at any time that Tenant does not have any signage required under this Lease. Landlord acknowledges that Tenant has not required or encouraged Landlord to construct any of Tenant's Signs for which Landlord has been unable to obtain all necessary non-governmental approvals (including all necessary Anchor approvals) and that Landlord's election to proceed with construction of any Tenant's Signs without any such necessary approval will be made of Landlord's own free will, however, the parties acknowledge that Landlord's election not to construct any Tenant's Signs as a result of not obtaining any necessary approval shall result in the failure of the condition in this Section 2.3(d); and

(e)    That, on or before seventeen (17) months following the Effective Date, Landlord shall satisfy the Tenant's Work Commencement Conditions specified in the Work Letter (to the extent not referred to above in this Section 2.3); provided, however, that Landlord shall use commercially reasonable efforts to satisfy the Tenant's Work Commencement Conditions on or before fourteen (14) months following the Effective Date.

Landlord and Tenant shall cooperate in good faith and use commercially reasonable efforts to satisfy the foregoing conditions as soon as practical after the Effective Date. If any or all of the foregoing conditions precedent are not satisfied or waived in writing by Tenant within the applicable time period specified above, then: (1) at any time thereafter but prior to the satisfaction of the applicable condition, Tenant may terminate this Lease by notice to Landlord of its election to terminate (but such termination shall be rescinded if the conditions are satisfied within thirty (30) days thereafter), and (2) unless and until this Lease is terminated or the applicable condition is satisfied or waived in writing by Tenant, Landlord shall diligently and continuously use its best efforts to satisfy the applicable condition. Notwithstanding the foregoing, Tenant shall have no further right to terminate under this Section 2.3 following the Commencement Date (although Landlord shall continue to be obligated to perform its obligations under Section 2.3(d), including without limitation its obligations to undertake marketing efforts, obtain approvals, and, if applicable, replacement signs, and Landlord covenants and agrees to perform such obligations)

## ARTICLE 3

## TERM AND POSSESSION

Section 3.1.    Term of Lease. The Term of this Lease shall commence on the date (the "Commencement Date") which is the first to occur of (i) the first day following the end of Tenant's Work Period, provided that the Commencement Date Conditions have been satisfied and provided further that if such date occurs on or after August 16, and prior to October 1st, then Tenant shall have the option of postponing the Commencement Date until October 1st; or (ii) the date Tenant initially opens the Premises for business to the general public. Tenant shall not be deemed to have initially opened the Premises for business to the general public during any period in which Tenant opens for business with a special preview on an invitation-only basis or with



other special activities which do not provide theater revenues to Tenant. The Term shall expire on the day immediately preceding the Fifteenth (15th) Anniversary of the Commencement Date, subject to extension pursuant to Section 3.3 (in which case the Term shall expire on the last day of the Extension Term, subject, if applicable, to further extension pursuant to Section 3.3) and, if applicable, subject to extension pursuant to Section 3.4. Within ten (10) days after request from either Party following the Commencement Date, Tenant and Landlord shall execute a supplement hereto, in form and substance satisfactory to Landlord and Tenant acting reasonably and in good faith, setting forth the Commencement Date and the scheduled termination date of the Initial Term, but the failure to do so shall not affect the actual Commencement Date.

(a) **Early Opening**. Tenant, in its sole discretion, may elect to open and operate its business in the Premises prior to the satisfaction of the Commencement Date Conditions. Tenant's election to open and operate its business in the Premises prior to the satisfaction of the Commencement Date Conditions shall not constitute Tenant's waiver of any of the Commencement Date Conditions, and Landlord shall continue to use its best efforts to satisfy all of the Commencement Date Conditions as soon as possible after the Commencement Date.

(b) **Termination Right**. If the Commencement Date Conditions are not satisfied by Landlord within one hundred eighty (180) days after the expiration of Tenant's Work Period (whether or not Tenant shall have elected to open and operate its business in the Premises) or, if prior to the expiration of the one hundred eighty (180) day period, Tenant reasonably determines that the Commencement Date Conditions cannot be satisfied within one hundred eighty (180) days after the expiration of Tenant's Work Period, then Tenant may elect to terminate this Lease by sending written notice to Landlord at any time thereafter but prior to the satisfaction of the Commencement Date Conditions. Such notice shall specify the effective date of the termination, which shall be not less than one hundred eighty (180) days after the later of the date of the notice or the date which is one hundred eighty (180) days following the expiration of Tenant's Work Period, but shall be void and ineffective if Landlord diligently proceeds to satisfy the Commencement Date Conditions after receipt of Tenant's notice and satisfies the applicable conditions prior to the specified effective date of termination in the notice; provided, further that to the extent Landlord is unable to satisfy the Commencement Date Conditions before the effective date of termination set forth in Tenant's notice, and such failure to satisfy the Commencement Date Conditions results from Force Majeure occurrences, then the effective date of termination shall be automatically extended on a day for day basis, for each day of delay in satisfying the Commencement Date Conditions actually caused by Force Majeure occurrences, except that in no event shall the effective date of termination be extended by Force Majeure beyond that date which is the later of (i) one (1) year following the date which is sixty (60) days following the expiration of Tenant's Work Period or (ii) the date which is one (1) year following the date of Tenant's notice. If Tenant so terminates this Lease, then within ten (10) days after Tenant's written demand, Landlord shall reimburse Tenant for all out-of-pocket costs and expenses incurred by Tenant in pursuance of this Lease and in the performance of Tenant's undertakings hereunder, including (without limitation) the Unamortized Tenant Costs and all legal fees, fees and expenses of Tenant's architects and design professionals and amounts paid by Tenant to Landlord hereunder, not to exceed $150,000 in the aggregate. Landlord's reimbursement obligation shall survive the termination of this Lease and shall not be subject to any provisions hereof otherwise purporting to limit Landlord's liability or the recourse that may be had against Landlord.

Section 3.2. **Initial Occupancy**. Although the terms and provisions of this Lease to be performed by Tenant shall be effective from and after the Effective Date (except for Tenant's insurance and indemnity obligations hereunder, which shall be effective from the date Tenant takes possession of the Premises or the first day of Tenant's Work Period, whichever occurs first), no Rent or other charges shall be payable by Tenant with respect to any period prior to the Commencement Date.

Section 3.3. **Extension Options**. Landlord hereby grants to Tenant the option to extend the Term of this Lease for (not more than) the number of Extension Terms set forth in Section 1.1, each of which shall be five (5) Lease Years in duration or as otherwise set forth in Section 1.1. Tenant's extension options may be exercised at once or serially, as Tenant sees fit.



(a)     Each extension option shall be exercised by written notice to Landlord at least two hundred seventy (270) days before the end of the then-current Term; provided, however, that Landlord and Tenant agree that Tenant's extension options hereunder shall not be forfeited or deemed waived by neglect or inadvertence and, accordingly, Tenant's right to extend shall not be deemed waived or forfeited unless (i) Tenant affirmatively elects in writing not to extend the Term or (ii) Tenant fails to exercise its extension option by the date which is the later of: (x) two hundred seventy (270) days prior to the expiration of the then-current Term, or (y) thirty (30) days after receipt of Landlord's "reminder notice," which shall be sent by Landlord to Tenant no sooner than three hundred five (305) days prior to the expiration of the then-current Term.

(b)     If the Term of this Lease is extended for any Extension Term, then during such Extension Term (but subject to Section 4.6 below), Tenant shall pay to Landlord the applicable Base Rent specified in Section 3.3(c) below and, except as otherwise provided herein to the contrary, all terms and conditions in effect under this Lease immediately prior to such Extension Term shall continue to apply throughout such Extension Term.

(c)     On each Adjustment Date during the Extension Terms (i.e., on the first day of each Extension Term), annual Base Rent shall be increased by the lesser of (i) the CPI Adjustment from the immediately preceding Adjustment Date, or (ii) ten percent (10%).

(d)     As a condition to Tenant's valid exercise of each extension option pursuant to this Section 3.3, no uncured Event of Default by Tenant shall be outstanding under Section 18.1(a) at the time of Tenant's exercise.

**Section 3.4.     Partial Extension.**  If the Initial Term or any Extension Term would otherwise expire during or within thirty (30) days prior to a Seasonal Period and if Tenant does not extend the Term of this Lease pursuant to Section 3.3, then Tenant nevertheless shall have the right to extend the Term of the Lease through the last day of such Seasonal Period by providing written notice of such election to Landlord not less than two hundred seventy (270) days prior to the expiration of the then-current Term.  In such event, the Base Rent payable by Tenant during such extension period shall be equal to the Base Rent payable in the previous Lease Year, on a per diem basis and the Percentage Rent Breakpoint applicable during the extension period shall equal the Percentage Rent Breakpoint for the previous Lease Year.  No extension under this Section shall extend the time period for Tenant's exercise of an extension option under Section 3.3.

**Section 3.5.     Early Co-Tenancy Termination Option.**  If at any time after the Commencement Date, the Co-Tenancy Condition or Anchor Co-Tenancy Condition remains unsatisfied for eighteen (18) consecutive months or more, then at any time after the expiration of such eighteen (18) month period (but only for so long as the Co-Tenancy Condition and/or Anchor Co-Tenancy Condition, as applicable, remains unsatisfied), but on or prior to the date which is six (6) months following the expiration of the eighteen (18) month period (the period from the expiration of the eighteen (18) month period until the date which is six (6) months thereafter being the "Co-Tenancy Termination Period"), Tenant shall have the option to terminate this Lease upon written notice of such election given to Landlord.  If Tenant elects to terminate this Lease pursuant to this Section 3.5, then on the termination date specified in Tenant's notice (which termination date shall be not less than ninety (90) nor more than one hundred eighty (180) days following the date of the notice), Tenant shall surrender the Premises to Landlord in accordance with Section 20.1 and this Lease shall terminate.  Tenant's termination right under this Section 3.5 shall be in addition to Tenant's right to pay Alternate Rent in accordance with Section 4.6 below.  If Tenant fails to terminate the Lease on or prior to the expiration of the Co-Tenancy Termination Period, Tenant shall be deemed to have waived its right to terminate with respect to the applicable failure to satisfy the Co-Tenancy Condition (but not as to any subsequent failures to satisfy), but Tenant shall nevertheless only be obligated to pay Alternate Rent until such time as the Co-Tenancy Condition and/or Anchor Co-Tenancy Condition is satisfied.

**Section 3.6.     Additional Early Termination Right.**  If Tenant's total Gross Sales for the 5th, 6th and 7th Percentage Rent Years do not exceed in the aggregate $22,500,000 (which amount shall be reduced on a pro rata basis by the number of days that the Premises is not



operating for business during the 5th, 6th, and 7th Percentage Rent Years, to the extent the failure to operate is a breach of Tenant's obligations under Section 13.2 of the Lease, and the number of days of Excused Closure of the Premises during the 5th, 6th and 7th Percentage Rent Years, other than Excused Closures pursuant to clause (iv) of the definition of Excused Closure, which shall not reduce the $22,500,000 number), then within sixty (60) days following the end of the 7th Percentage Rent Year, Tenant may elect, by written notice to Landlord, to terminate this Lease, with the termination to be effective on the date which is one (1) year following the date of Tenant's notice, and Tenant shall surrender the Premises to Landlord in accordance with Section 20.1 on or before the termination date and this Lease shall terminate on such date. **IF TENANT FAILS TO NOTIFY LANDLORD OF TENANT'S ELECTION TO TERMINATE THIS LEASE PURSUANT TO THIS SECTION 3.6 WITHIN SIXTY (60) DAYS FOLLOWING THE EXPIRATION OF THE 7TH PERCENTAGE RENT YEAR, TENANT SHALL BE DEEMED TO HAVE WAIVED ITS RIGHT TO TERMINATE UNDER THIS SECTION 3.6.**

## ARTICLE 4

## RENT

**Section 4.1.     Annual Base Rent.**     Beginning on the Commencement Date and continuing throughout the Term, but subject to Section 3.1(a) above and Section 4.6 below, Tenant shall pay annual base rent ("**Base Rent**") to Landlord at the rate specified in Section 1.1 (subject to adjustment as provided in Section 3.3(c) for the Extension Terms). Base Rent shall be paid in equal monthly installments in advance on the Commencement Date and thereafter on the first day of each and every calendar month during each Lease Year. Base Rent and other charges payable by Tenant hereunder for any partial calendar month at the beginning or end of the first Lease Year and last Lease Year of the Term shall be prorated on a daily basis. All rentals and other charges to be paid by Tenant to Landlord hereunder shall be paid at the place designated in writing from time to time by Landlord. Subject to Tenant's express set-off, abatement, deduction and similar rights set forth in this Lease, all Base Rent and other amounts payable by Tenant hereunder shall be paid without deduction, abatement or off-set.

**Section 4.2.     Percentage Rent.**     In addition to Base Rent (but subject to Section 3.1 and Section 4.6), Tenant shall pay Landlord percentage rent ("**Percentage Rent**") with respect to each Percentage Rent Year within the Term. Percentage Rent for any Percentage Rent Year shall equal the Percentage Rent Rate set forth in Section 1.1 multiplied by the amount, if any, by which Tenant's Gross Sales during the applicable Percentage Rent Year exceeds the Percentage Rent Breakpoint for such Percentage Rent Year.

**Section 4.3.     Percentage Rent Payment and Statements.**     Tenant shall pay Percentage Rent (if any is due) within sixty (60) days following the end of each Percentage Rent Year. Together with each payment of Percentage Rent and in any event, within sixty (60) days after the end of the applicable Percentage Rent Year, Tenant shall submit a statement signed by a corporate officer, showing the amount of Tenant's Gross Sales for such Percentage Rent Year.

**Section 4.4.     Records and Audits.**     Tenant shall keep accurate records of all Gross Sales in accordance with generally accepted accounting principles consistently applied ("**GAAP**") and shall maintain such records at the Premises or at Tenant's primary place of business. Landlord may, not more frequently than once in any 12-month period, audit Tenant's Gross Sales records for the Premises by providing forty-five (45) days advance written notice of such audit. Landlord must exercise its audit rights (if at all) within two (2) years following the end of the Percentage Rent Year that Landlord desires to audit. If Landlord fails to notify Tenant of Landlord's intention to audit Tenant's Gross Sales records for a particular Percentage Rent Year within two (2) years after the expiration thereof (or if Landlord notifies Tenant of Landlord's intention to audit but fails to pursue the audit diligently), then Landlord may not seek to recover any deficiencies in the amount paid. All audits shall be performed during Tenant's usual business hours and without unreasonable interference with the conduct of business at the place where the audit is made. If an audit reveals that Gross Sales reported by Tenant were understated by more than three percent (3%), then Tenant shall pay to Landlord the reasonable cost of such audit plus interest at the Interest Rate on the amount owed Landlord which was understated, from the date such amount should have been paid to Landlord if properly reported in Gross Sales, until the date the amount is paid. In addition, within twenty (20) business days after

the completion of the audit, Tenant shall pay to Landlord any additional Percentage Rent owed based on the audited Gross Sales figure. If the audit discloses an overpayment of Percentage Rent by Tenant, then Landlord shall pay to Tenant the amount of the overpayment within twenty (20) business days after the completion of the audit.

Section 4.5.    **Confidentiality of Financial Information**.  The financial information provided by Tenant to Landlord under this Lease, (including, without limitation, information concerning Tenant's Gross Sales and/or Tenant's general financial condition), together with any additional information that Landlord may obtain in connection with its audit rights hereunder, shall be received, handled and treated in all respects as confidential information, to be used solely by Landlord in connection with the bona fide purposes of this Article 4, and shall not be communicated, delivered, published or otherwise disclosed to any person or entity (in summary form or otherwise) without the express prior written consent of Tenant in each instance; provided, however, that nothing contained herein shall prohibit Landlord from making disclosures of any such information to the extent required by law or in pursuance of a valid subpoena or legal process or to Landlord's actual or prospective investors or lenders (provided that, if Landlord is no longer an affiliate of a publicly traded company, the prospective investors and lenders shall not own or operate any movie theaters and that such disclosure shall be made subject to the confidentiality and non-disclosure requirements hereof or to prospective purchasers of Landlord's Parcel (provided such purchasers do not own or operate any movie theaters).  Notwithstanding the foregoing Tenant acknowledges that Landlord is currently an affiliate of a publicly traded company and as such is required to make certain disclosures in written and oral form to its shareholders and regulatory agencies, provided that, except as otherwise required by Applicable Law, the disclosures with respect to the Lease should be limited to the amount of base rent and additional rent payable under this Lease, the length of the Lease term, and as to Gross Sales, the total Gross Sales reported by Tenant from the Premises, and not individual line items, and Landlord shall in all events, except as otherwise required by Applicable Law, use commercially reasonable efforts to avoid disclosures to Tenant's competitors.  The provisions of this Section 4.5 shall survive the expiration of the Term or the earlier termination of this Lease.

Section 4.6.    **Alternate Rent**.  If at any time after the Commencement Date, the Co-Tenancy Condition or Anchor Co-Tenancy Condition is not satisfied, then until the date that the Co-Tenancy Condition and/or Anchor Co-Tenancy Condition, as applicable, is satisfied, all Rent otherwise due hereunder shall be abated and in lieu thereof Tenant shall pay Alternate Rent to Landlord pursuant to this Section 4.6.  The Alternate Rent shall be paid monthly in arrears on or before the fifteenth (15th) day after the end of each calendar month.  Together with each payment, Tenant shall submit a statement, showing the total Gross Sales for the applicable period, which shall be subject to the reporting, audit and confidentiality provisions of this Article 4.  Tenant's payment of Base Rent or any other amounts with respect to any period when the Co-Tenancy Condition or Anchor Co-Tenancy Condition is not satisfied shall not constitute a waiver of Tenant's rights under Section 3.5 or Section 4.6, whether or not Tenant knew or should have known that the applicable condition(s) was not satisfied.  If Rent is abated pursuant to this Section 4.6, and prior to any termination of this Lease under Section 3.5 the Co-Tenancy Condition and/or Anchor Co-Tenancy Condition, as applicable, is satisfied, Tenant's obligations to pay all Rent under this Lease shall be reinstated from and after the date the Co-Tenancy Condition and/or Anchor Co-Tenancy Condition, as applicable, is satisfied and so long as it remains satisfied.

## ARTICLE 5

## COMMON AREAS

Section 5.1.    **Annual CAM Amount**.  Beginning on the Commencement Date, Tenant shall pay to Landlord the Annual CAM Amount, in equal monthly installments, on the first day of each calendar month from and after the Commencement Date through the termination of the Lease.  Payments for any partial month shall be prorated on a per diem basis.

Section 5.2.    **Landlord's Maintenance Obligations**.  The Common Areas shall be under the exclusive control and management of Landlord, subject to the terms hereof.  Landlord shall at all times operate and maintain the Common Areas (including, without limitation, the Parking Areas) in a safe, secure and sightly First Class condition and repair, commensurate with

(or better than) the then current standards of shopping center operation and maintenance for a majority of the other First Class shopping centers in the Metropolitan Area. Landlord shall provide therefor all such services as are reasonably required. As part of such operation and maintenance (but not as a limitation thereof), Landlord shall:

     (a)    Regularly inspect, maintain, repair and replace the surface of the Common Areas (including, without limitation, the Parking Areas, curbs and sidewalks), keeping them level, smooth and evenly covered with the type of surface material originally installed thereon or such substitute therefor as shall be in all respects equal or greater in quality, appearance and durability;

     (b)    Promptly remove all papers, debris, filth, refuse, snow and ice from the Common Areas (including, without limitation, the Parking Areas) and wash or thoroughly sweep paved areas as required, including (i) removal of accumulated snow and ice from the Priority Parking Areas and walkways providing access to the Premises within, to the extent reasonably practical, not more than one (1) hour after every two (2) inches of snow have accumulated (and no snow, ice or debris shall be stockpiled within the Priority Parking Area or Protected Area), and (ii) to the extent reasonably practical, power-washing the sidewalks and plaza around the Premises not less frequently then once every week during Seasonal Periods and once every two (2) weeks during Non-Seasonal Periods;

     (c)    Provide at all times a sufficient number of first-class, functional trash receptacles in the Parking Areas and other Common Area, and remove trash and refuse from such receptacles on a regular basis throughout the day and night as needed to avoid overflowing trash cans;

     (d)    Install, maintain, replace and repair all entrance, exit and directional signs, markers and lights as shall be reasonably required and in accordance with the practices prevailing in the operation of First Class shopping centers;

     (e)    Clean Common Area lighting fixtures and re-lamp as needed and, in all events pertaining to the lighting fixtures within the Protected Area, as soon as reasonably practicable, but in no event later than five (5) days after notice from Tenant;

     (f)    Repair, remark and replace striping, markers and directional signs in the Common Areas as necessary to maintain the same in good condition;

     (g)    Install, maintain, repair and replace landscaping as necessary to keep the same in good condition (subject to seasonal conditions), and maintain all wetlands (if any) on Landlord's Parcel in good condition ard in compliance with all Applicable Laws;

     (h)    Regularly clean signs of the Center (as contrasted with those of tenants or other occupants), including relamping and making repairs as required;

     (i)    Keep the Common Areas (including, without limitation, the Parking Areas, the enclosed mall portions of the Center and all accessways and entrances to, from and between the Premises, the Parking Areas and the enclosed mall portions of the Center) open, operating and adequately lit and patrolled, as conditions may require during such hours as the retail portions of the Center is open for business and in all events commencing at least two (2) hours before Tenant opens for business and ending not earlier than one (1) hour after Tenant closes for business each day;

     (j)    Maintain, repair and replace, as necessary, all utility facilities within and/or serving the Common Areas, including (without limitation) any utility facilities outside the Premises to which the Premises are connected (except to the extent such facilities are owned or maintained by the applicable utility, in which case Landlord shall diligently enforce the utility's repair, maintenance and replacement obligations);

     (k)    Take all steps reasonably necessary or appropriate and permitted by Applicable Law to ensure that the use of and activities within the Common Areas do not unreasonably disrupt or interfere with access to the Premises or the conduct of Tenant's business in the Premises;



(l)     Perform all maintenance, repairs, replacements, alterations and improvements in and to the Common Areas that are necessary to keep the Common Areas in compliance with Applicable Laws applicable to the design, construction, operation, use and maintenance of the Common Areas, including, but not limited to, all maintenance, repairs, replacements, alterations and improvements in or to the Common Areas that are required by Applicable Laws to permit Tenant to use the Premises for the uses contemplated under this Lease;

(m)     Keep the Common Areas insured and covered by insurance policies providing coverage (in scope and amount) not less than the coverages specified in Article 7;

(n)     To the extent applicable, provide heating and air conditioning to the interior Common Areas (including the enclosed mall of the Center, if applicable) and maintain such Common Areas at a temperature of no less than 65 degrees Fahrenheit nor more than 75 degrees Fahrenheit (except as otherwise required by law) at all times when the Center is open and, in any event if the Premises enters into or is connected to the enclosed mall of the Center, such that the interior Common Areas of the Center do not increase the load on or drain the HVAC system maintained by Tenant for the Premises;

(o)     Take all reasonable legal steps necessary to ensure that any demonstrations, leafleting or picketing in the Common Areas is removed or eliminated so that access to the Premises or the conduct of Tenant's business is not hindered or interrupted;

(p)     Provide traffic personnel and additional security personnel to direct traffic and provide additional security during peak business periods, including Christmas shopping season and holiday weekends;

(q)     Repaint and re-finish the exterior surfaces of the buildings on Landlord's Parcel and on any adjacent land owned by Landlord or a Landlord Affiliate (and take Landlord Anchor Enforcement Action in order to cause the Anchors to repaint and refinish the exterior surfaces of the Anchor Buildings periodically in order to maintain the First Class appearance of the Center) and repaint and refinish the interior Common Areas of the Center periodically, in order to maintain the First-Class appearance of the Center; and

(r)     Adopt and implement, throughout the Term, a safety and security program that is consistent with or better than the safety and security program at a majority of the other First Class shopping centers in the Metropolitan Area that include movie theaters.

Without limiting Landlord's obligations hereunder with respect to the Common Areas and the maintenance, repair and operation of the Center, Landlord acknowledges that Tenant may operate its business in the Premises on days and at hours that some or all of the other tenants and occupants of the Center are not open and operating their businesses and Landlord covenants and agrees to keep the Common Areas of the Center open and staffed with sufficient security personnel at all times that Tenant's business in the Premises is open and operating for business. Notwithstanding the foregoing, Tenant acknowledges that Landlord has informed Tenant that currently, after normal mall hours, Landlord closes off access to the corridors leading to the portions of the Center occupied by the Marshall Fields (to become Macy's) and Carson Pirie Scott department stores, and that Landlord provides security/escorts to theater patrons from the current theater location to their cars, to the extent escorts are reasonably requested. Initially, after the opening of Tenant's theater, Landlord intends to continue to close off those corridors after normal mall operating hours; however, upon Tenant's reasonable request, Landlord will make arrangements to leave these corridors open to enable Tenant's patrons to use those corridors for convenient access to Parking Areas near Marshall Fields (to become Macy's) and Carson Pirie Scott.

**Section 5.3.     Failure to Maintain.**     If Landlord fails to commence and thereafter diligently complete its Common Area maintenance obligations in whole or in part, within a reasonable time (i.e., (x) immediately following written notice from Tenant, with respect to matters posing an imminent threat to the safety and security of Tenant or Tenant's patrons or



their personal property, or (y) within 24 hours following written notice from Tenant with respect to matters materially and adversely affecting access to the Premises or the conduct of Tenant's business (such as, without limitation, problems in the Protected Area or with respect to the Required Vertical Transportation), or (z) for all other matters within thirty (30) days after written notice thereof from Tenant), Tenant may (but shall not be obligated to) perform such work or cause such work to be performed at Landlord's cost and expenses, and Landlord shall reimburse Tenant for the reasonable, out-of-pocket costs and expenses so incurred by Tenant within ten (10) business days after demand (accompanied by reasonable evidence of the costs incurred). If Landlord fails to reimburse Tenant as aforesaid within ten (10) business days after Tenant's demand, then, subject to Section 18.5, Tenant may deduct the amount of its expense, together with interest thereon of the Interest Rate, from subsequent installments of Rent or other payments due hereunder. Tenant's "self-help" and reimbursement rights under this Section 5.3 shall be in addition to and not in lieu of any and all other rights and remedies of Tenant as a consequence of Landlord's failure to perform its obligations under this Article 5.

Section 5.4.    Remote Ticket Sales.    Landlord shall cooperate with Tenant in good faith to provide up to four (4) suitable, mutually acceptable location(s) within or adjacent to the Common Areas, for Tenant's installation, use and operation of one or more kiosks or other devices for the remote sales of tickets to Tenant's patrons (which kiosks shall not be used for dispensing cash, other than change owed to Tenant's patrons). Tenant shall provide the necessary ticket kiosk equipment and except as hereinafter provided Landlord (as part of Landlord's Work) shall provide and install the necessary conduit, data and power for such equipment, from the theater box office within the Premises to each such kiosk or device. Tenant shall notify Landlord in writing prior to the commencement of Landlord's Work, whether Tenant initially intends to install the ticket kiosks (unless they are reflected in the Final Plans, in which case no notice will be required). If the ticket kiosks are not reflected in the Final Plans or Tenant does not notify Landlord of its intention to have the ticket kiosks installed as part of the initial build-out of the Premises, Tenant may nevertheless elect to have the ticket kiosks installed after the Commencement Date, in up to four (4) mutually acceptable locations in the Common Areas, in which case Tenant, at Tenant's sole cost, shall be responsible for installing the necessary conduit, data and power for the equipment from the theater box office to the kiosks; provided further, that Landlord shall reasonably cooperate with Tenant in connection with such installation and shall provide Tenant with access to the Common Areas and utility facilities to enable Tenant to install and maintain the ticket kiosks. Tenant shall maintain the kiosks in first class condition and repair and Landlord shall not be responsible for damage to or vandalism of the kiosks, except to the extent resulting from Landlord's or its agents, employees and/or contractors negligence or willful misconduct or the breach by Landlord of Landlord's obligations under this Lease.

Section 5.5.    Trash and Refuse Area.    The area within the Center that is depicted as the "Tenant's Refuse Compactor" on the Site Plan shall be used for a trash and refuse compactor to be installed and paid for by Landlord, which will be available for Tenant's exclusive use and benefit. Landlord will also install a trash chute from Tenant's Premises to Tenant's Refuse compactor as part of Landlord's Work, as more particularly described in the Work Letter. Tenant (at Tenant's cost) shall be solely responsible for arranging and paying for the collection, haulage and disposal of the trash and refuse from the Premises in accordance with the standard of operations of other first-class movie theaters in the Metropolitan Area. Although the Trash Refuse Compactor is not located within the Premises, Tenant shall have the right to secure the applicable area to ensure that it is accessible only to Tenant. Tenant shall not be responsible for any costs and expenses associated with the collection, haulage or disposal of trash and refuse from the Center (other than the Premises), as Common Area Expenses or otherwise.



## ARTICLE 6

## REAL ESTATE TAXES

**Section 6.1.    Landlord's Obligation.**  Landlord shall pay (or cause to be paid) when due all Real Estate Taxes that are lawfully charged, assessed or levied against Landlord's Parcel (including the Premises) during the Term, regardless of the Lease Year for which the Real Estate Taxes are payable or accrue and shall take Landlord Anchor Enforcement Action to cause the Anchors to pay all real estate taxes that are lawfully charged, levied or assessed against the Anchor Parcels during the Term.  Landlord shall not do or permit anything within its control which would cause Landlord's Parcel to be assessed for purposes of Real Estate Taxes with any other properties or improvements that are not located within Landlord's Parcel.

**Section 6.2.    Tenant's Tax Contribution.**  Tenant shall not be obligated to pay or contribute towards or reimburse Landlord for any Real Estate Taxes that are actually assessed for any period prior to the second (2nd) Anniversary of the Commencement Date.  For each Lease Year after the second (2nd) Lease Year of the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the amount (if any) by which (i) the Real Estate Taxes that are assessed against Landlord's Parcel for such Lease Year, subject to the limitations set forth herein, exceeds (ii) the Base Year Real Estate Taxes (the amounts payable by Tenant pursuant to this Article 6 are referred to herein as "**Tenant's Tax Contribution**")  The parties acknowledge that in Illinois, Real Estate Taxes are payable one calendar year in arrears, and that the Real Estate Taxes assessed for a calendar year are payable in the next calendar year (i.e., taxes assessed for calendar year 2005 are paid in 2006), and that Tenant's Tax Contribution will be based on Real Estate Taxes actually assessed during the applicable Lease Year, not Real Estate Taxes payable during that Lease Year.

**Section 6.3.    Method of Payment.**  Subject to the limitations set forth in this Lease, Tenant shall pay the amounts due under Section 6.2 for any Lease Year in equal monthly installments based upon estimates of the Real Estate Taxes to be assessed in such Lease Year, calculated in the manner hereinafter specified.  For purposes of the estimated payments to be made by Tenant in the third (3rd) Lease Year, the parties agree that the estimated payments shall be in the amount of $.20 per square foot of Floor Area in the Premises per annum (i.e., $.0167 dollars per square foot of Floor Area in the Premises per month).  For each Lease Year after the third (3rd) Lease Year through and including the expiration of the Term, the estimates paid by Tenant shall not exceed Tenant's Tax Contribution calculated based upon the amount by which the actual Real Estate Taxes for Landlord's Parcel paid during the preceding calendar year exceeded the Base Year Real Estate Taxes.  Within one hundred twenty (120) days following the later of the end of the third (3rd) Lease Year or the date that the actual Base Year Real Estate Taxes and Real Estate Taxes assessed during the third Lease Year have been determined by the applicable Governmental Authority, Landlord shall send Tenant a statement, indicating all adjustments required by this Lease, setting forth the Base Year Real Estate Taxes and reconciling the estimated payments made by Tenant in the third Lease Year with the actual Real Estate Taxes assessed for such period, and within one hundred twenty (120) days following the later of the end of each Lease Year thereafter or the date Real Estate Taxes assessed for such Lease Year have been determined by the applicable Governmental Authority, Landlord shall send to Tenant a statement reconciling the estimated payments made by Tenant with the actual Real Estate Taxes for the applicable period.  Any overpayments shall be refunded to Tenant with the statement and any underpayments as shown by the statement shall be remitted by Tenant within ten (10) business days following receipt of Landlord's statement.  If an Event of Default by Landlord has occurred and is continuing with respect to the payment of Real Estate Taxes, or if Tenant is directed to make payments on account of Real Estate Taxes to Landlord's mortgage lender, then unless Landlord's bill is accompanied by a copy of the official receipt for the payment of the Real Estate Taxes or other appropriate evidence of payment, Tenant thereafter may pay the amount payable hereunder by means of a check made payable jointly to Landlord and the taxing authority or authorities involved or to Landlord and its mortgage lender, as the case may be.  Landlord shall hold all monies received from Tenant pursuant to this Article 6 in trust and use them only to pay Real Estate Taxes.  If there is any discount available to Landlord for early payment of Real Estate Taxes, then Real Estate Taxes shall be determined as if such discount were obtained, whether or not Landlord actually obtains the discount.  Real Estate



31

Taxes for the last Lease Year of the Term (if less than twelve full calendar months) shall be prorated on a per diem basis. The estimated payments made by Tenant under this Section 6.3 shall be subject to verification and reconciliation in accordance with Section 6.10.

Section 6.4.    **Tax Refunds.**  For purposes of calculating Tenant's Tax Contribution under this Article 6, the Real Estate Taxes against Landlord's Parcel for any Lease Year shall mean such amounts as shall be finally determined after deducting abatements, refunds, rebates or credits, if any (less the reasonable out-of-pocket costs and expenses of obtaining the same) (other than payments made to Landlord pursuant to the TIF District, which shall be excluded from the calculation of Real Estate Taxes in the Base Year Real Estate Taxes and in subsequent calculations of Real Estate Taxes), plus any interest which the taxing authority may credit on account of the overpayment of Real Estate Taxes, to be payable with respect to Landlord's Parcel for such period. Expenses of a tax reduction or abatement proceeding shall include reasonable amounts for attorneys' fees and other necessary out-of-pocket expenses, but shall not include any amounts paid or payable to the party prosecuting the review or to any person or legal entity having an interest in Landlord's Parcel (or any affiliate thereof) or to any employee of any of them or to any third party contractor to "review" bills or assessments. Landlord shall not be entitled to reimbursement from Tenant of the expenses of tax abatement proceedings conducted by Landlord in excess of the proceeds of the tax abatement successfully obtained.  If Landlord should obtain a tax abatement allocable to any period all or a portion of which is included in the Term, or if Landlord shall be entitled to any rebate or refund of any Real Estate Taxes paid by Landlord with respect to any such period (other than payments made to Landlord pursuant to the TIF District, which shall be excluded from the calculation of Real Estate Taxes in the Base Year Real Estate Taxes and in subsequent calculations of Real Estate Taxes), then Landlord shall pay Tenant's Pro Rata Share of such amount to Tenant not later than thirty (30) days after Landlord first receives or becomes entitled to such abatement, rebate or refund. Landlord's obligations under this Section 6.4, shall survive the expiration or earlier termination of this Lease.

Section 6.5.    **Right to Contest Taxes**.  If Tenant desires to initiate or to cause Landlord to initiate any proceedings to obtain an abatement or reduction of any Real Estate Taxes assessed against Landlord's Parcel (including any appeal of the assessed valuation of Landlord's Parcel), then Tenant must first notify Landlord, in writing, of Tenant's desire to pursue such action. After the notice is sent, Landlord shall have twenty (20) days to notify Tenant whether Landlord wishes to pursue the action on its accord. Should Tenant fail to receive such written notice from Landlord within the prescribed period, Tenant may initiate and prosecute the action, in which case Tenant shall be solely responsible for any increase in Real Estate Taxes on Landlord's Parcel that is assessed as a direct result of Tenant's initiating or prosecuting such action. In connection with any such proceeding, Landlord shall cooperate with Tenant, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file (but not at no cost, expense or liability to Landlord).  Tenant shall keep Landlord informed of the status of its tax review. If Landlord in its sole discretion elects to initiate the proceeding, Landlord shall use all reasonable and diligent efforts to obtain a reduction in Real Estate Taxes. Landlord shall keep Tenant informed of the status of its tax review. Landlord shall also permit Tenant to present to the taxing authority any information pertaining to the basis for establishing the assessed valuation of the Premises. Except for any proceedings to obtain an abatement or reduction of any Real Estate Taxes assessed against Landlord's Parcel, Landlord shall not, in any event, make application to the taxing authorities which, if granted, would change the manner in which Landlord's Parcel is being, or will be, assessed, or which would have the effect of increasing the assessed valuation of Landlord's Parcel without Tenant's prior written consent, which shall not be unreasonably withheld, delayed or conditioned. In any event, if Landlord makes such application, without Tenant's consent, and as a result thereof, such Real Estate Taxes are increased, Tenant shall not be responsible for paying its Pro Rata Share of such increase.

Section 6.6.    **Improvement or Special Assessment District**.  If at any time during the Term, any Governmental Authority shall undertake to create any tax increment financing, improvement or special assessment district with boundaries that encompass all or any portion of the Center (other than the TIF), then Tenant may appear in any proceeding relating thereto, and Landlord shall not, without the prior written consent of Tenant, support or take any action in support thereof.  Landlord shall promptly advise Tenant of the receipt of any notice or other information relating to the proposed creation of any such tax increment financing, improvement

or special assessment district with boundaries that encompass any portion of the Center. If any Real Estate Taxes imposed on the Center to finance any improvement made or proposed by such district shall be payable in a lump sum during the last ten (10) Lease Years, and all or a portion of the benefit to be conferred by such improvement shall accrue to Landlord after the expiration of the Term, then Tenant and Landlord shall endeavor to determine the apportionment of such Real Estate Taxes and the share thereof to be borne by each. If the Parties shall be unable to agree upon the proper apportionment, such apportionment shall be determined by arbitration in accordance with the provisions of Section 18.5 hereof. Notwithstanding the foregoing or anything to the contrary contained herein, "Real Estate Taxes" shall not include any taxes, assessments or levies under any tax increment financing district, special assessment district or maintenance assessment district or similar governmental authority, the boundaries of which primarily encompass the Center or Landlord's Parcel (and not other properties), whether now existing or hereafter created (other than the TIF); provided, however, that Tenant nevertheless shall retain the right to challenge such taxes, assessments and levies pursuant to this Section 6.6. This Section 6.6 shall not apply to special assessments confirmed prior to the Effective Date hereof which are assessed or imposed by existing Governmental Authorities or assessment districts.

Section 6.7.    Tax Incentive Programs.  If a program exists which will result in a total or partial exemption from, or abatement or reduction of Real Estate Taxes assessed or to be assessed against Landlord's Parcel, Landlord shall use all reasonable and diligent efforts to obtain the benefits of such program and to reduce Real Estate Taxes accordingly following notice thereof from Tenant, but Landlord shall have no obligation to incur any material expense or liability in connection therewith.

Section 6.8.    Reassessment of Real Estate Taxes upon Sale or Financing.  If the assessed valuation of the Premises is increased by any taxing authority due to a sale or financing of any portion of the Center more than once (1x) during the Initial Term or more than once (1x) every ten (10) years after the Initial Term, then such increase in valuation shall be disregarded for purposes of determining Real Estate Taxes until the earlier of (i) such future Lease Year as Landlord's Parcel would have been reassessed in the absence of such sale or refinancing; or (ii) the later of (a) the end of the Initial Term or (b) the date which is ten (10) years following the last reassessment of Landlord's Parcel resulting from a sale or refinancing.

Section 6.9.    New Construction.  In determining the amount payable by Tenant pursuant to this Article 6, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements (other than improvements to the Premises, upgrades (but not new improvements) to the Common Areas which are available for the use and enjoyment of all occupants of the Center and tenant improvements installed within existing buildings in the ordinary course of leasing and re-leasing space) constructed after the assessment day for the Real Estate Taxes for the second (2nd) full Lease Year of the Term or not fully reflected in the Base Year Real Estate Taxes, which are not in replacement of buildings damaged or destroyed by fire or other casualty, plus an allocable portion of any Real Estate Taxes assessed against the land (exclusive of buildings) upon which the Center is situated, shall be deducted from the Real Estate Taxes for the Center, and the Floor Area of any such new buildings or additions shall be deducted from the Floor Area of the Center prior to computation of Tenant's Tax Contribution. If any new improvements, new buildings, or additions to buildings or improvements are not separately assessed, or the components of the assessment are not available in writing from the applicable Governmental Authority, Tenant shall have the burden of demonstrating by reasonable evidence the amount of the increase in Real Estate Taxes attributable to the new improvements, new buildings and/or additions to buildings or improvements.

Section 6.10.    Audit.  Tenant shall have the right to audit Landlord's Real Estate Tax records and Landlord's computation of Base Year Real Estate Taxes and Tenant's Tax Contribution upon forty-five (45) days advance written notice to Landlord. Any such audit shall be conducted during Landlord's regular business hours and without undue disruption of Landlord's business. Tenant must exercise its audit rights (if at all) within three (3) years following the end of the Lease Year that Tenant desires to audit. If Tenant does not contest Tenant's Tax Contribution or the Base Year Real Estate Taxes within such three (3) year period, Tenant shall thereafter have no right to contest the amount of Tenant's Tax Contribution (for clarity Tenant shall have no right to audit/contest Landlord's computation of Base Year Real Estate Taxes from and after the date which is three (3) years following the end of the third Lease

Century Stratford Square Lease.v21.12-5-05



Year, even though such figure is part of the computation of subsequent Lease Year computations of Tenant's Tax Contribution). If any audit discloses that Landlord has understated Base Year Real Estate Taxes or overstated Tenant's Tax Contribution by more than three percent (3%), Landlord shall reimburse Tenant for the cost of the audit within ten (10) business days following Tenant's request, together with the amount of any overpayment by Tenant, with interest at the Interest Rate on such amount from the date of the statement issued by Landlord giving rise to the overpayment, until reimbursed by Landlord. With respect to any estimated payments for the last Lease Year, such payments shall be reconciled within one hundred twenty (120) days following receipt of the final tax bills by Landlord attributable to such Lease Year, and Landlord's obligation to refund any overpayment, and Tenant's obligation to fund any shortfall shall survive the expiration of the Lease.

## ARTICLE 7

## INSURANCE AND INDEMNIFICATION

Section 7.1.    **Insurance Policies.**

(a)    **Tenant's Insurance.** Throughout the Term, Tenant shall procure and maintain, or cause to be maintained, all the following insurance:

(i)    **Commercial General Liability Insurance.**    Commercial or comprehensive general liability insurance on an occurrence basis, with coverage at least as broad as the standard ISO Occurrence Form CG0001 or equivalent, insuring against any and all claims for damages to person or property or loss of life or of property occurring on or about the Premises or arising from the operation of the Premises or arising from any tortuous acts or negligence of Tenant or any of Tenant's agents, employees, licensees or contractors, with coverage limits of not less than $5,000,000 for bodily injury or death to any one person and not less than $5,000,000 for bodily injury or death arising from any one accident or occurrence, and not less than $500,000 for property damage, with such deductibles as Tenant may customarily carry in the conduct of its business.

(ii)    **All-Risk Insurance.** A property insurance policy covering for loss or damage to Tenant's FF&E and other removable personal property within the Premises and a property insurance policy covering for loss or damage to Landlord's FF&E (subject to the terms and conditions hereinafter provided) ("Landlord's FF&E Policy"), in each case with coverage at least as broad as the standard ISO Form CP1030, including fire, lightning, windstorm, hail, explosion, riot, strike, civil commotion, aircraft, smoke, vandalism, malicious mischief, sprinkler damage, collapse, water damage, in an amount equal to the full replacement cost thereof, with such deductible amounts as Tenant may elect, subject to Section 7.4 below. Landlord shall have no interest in the insurance maintained by Tenant under this Section 7.1(a)(ii) with respect to Tenant's Property (as defined in Section 10.3 below) and will execute all documents necessary or proper in connection with the settlement of any claim or loss by Tenant to confirm same, although Landlord shall have certain rights with respect to the proceeds of the Landlord's FF&E Policy, to the extent hereinafter provided in Section 10.3 and in Article 16. Not less than thirty (30) days prior to procuring the Landlord's FF&E Policy, and not less than thirty (30) days prior to each renewal thereof, Tenant will, upon Landlord's request, provide Landlord with an estimate of the premium for the Landlord's FF&E Policy. From time to time throughout the Term, Landlord shall reimburse Tenant for one-half (1/2) of the cost of the Landlord's FF&E Policy, within ten (10) business days following Tenant's written request for reimbursement, accompanied by either an invoice evidencing the cost of the Landlord's FF&E Policy, if separately allocated, or if Tenant procures Landlord's FF&E Policy along with other coverages without a separate cost allocation, Tenant shall reasonably allocate the amount of the premium attributable to the Landlord's FF&E Policy; provided further that Landlord may elect to procure the Landlord's FF&E Policy if (and only if) Landlord is able to procure the coverage at a cost which is at least five percent (5%) less than Tenant's cost thereof and Landlord notifies Tenant within thirty

Century Stratford Square Lease.v21.12-5-05



(30) days following receipt of Tenant's estimate that Landlord elects to obtain the Landlord's FF&E Policy, in which case Tenant shall reimburse Landlord for one-half (1/2) of the cost thereof, within ten (10) business days following Landlord's written request for reimbursement, accompanied by invoices evidencing the cost incurred. The deductible for Landlord's FF&E Policy shall be no more than Two Hundred Fifty Thousand and No/100 Dollars ($250,000), subject to increase on every Adjustment Date by the CPI Adjustment. Tenant shall keep accurate books and records as to the ownership of the FF&E in accordance with generally accepted accounting principles; provided that any dispute as to the accuracy of Tenant's books and records with respect to Landlord's FF&E shall be resolved by arbitration pursuant to Section 18.5. The parties acknowledge that Tenant may from time to time replace Landlord's FF&E when it becomes damaged or obsolete or no longer serviceable for a First Class Theater or performs alterations to the Premises, and any replacement shall be deemed Tenant's FF&E. From time to time (but no more often than one time during each Lease Year), Landlord may request from Tenant (and Tenant shall provide to Landlord) a list of Landlord's FF&E located in the Premises.

(iii) **Worker's Compensation.** Worker's Compensation insurance shall be maintained by Tenant as required by the Applicable Laws of the State of Illinois.

(iv) **Builder's Risk.** While Tenant's Work under the Work Letter is ongoing, and at all times that material construction work is being undertaken by Tenant in or about the Premises, Tenant shall obtain and maintain (or cause its contractor to obtain) an insurance policy providing substantially the same coverage as the insurance provided for in subsection (ii) above, written in a so-called builder's risk completed value form.

(b) **Landlord's Insurance.** From and after the Effective Date, Landlord shall procure and maintain in full force and effect, at its sole cost and expense (provided that a portion of the cost thereof may be reimbursed as part of Common Area Expenses), all the following insurance:

(i) **Commercial General Liability Insurance.** Commercial or comprehensive general liability insurance on an occurrence basis, with coverage at least as broad as the standard ISO Occurrence Form CG0001 or equivalent, insuring against any and all claims for damages to person or property or loss of life or of property occurring upon or about Landlord's Parcel and the Common Areas insuring Landlord against all claims, demands, or actions for personal injury or death, or damage to property, made by or on behalf of any person, firm or corporation, while on or about Landlord's Parcel and the Common Areas, with coverage limits of not less than $5,000,000 in respect of bodily injury or death to any one person and not less than $5,000,000 in respect of bodily injury or death arising from any one accident or occurrence, and not less than $500,000 for property damage or arising from the operation of Landlord's Parcel and the Common Areas or arising from any tortuous acts or negligence of Landlord or any of Landlord's agents, employees, licensees or contractors.

(ii) **Landlord's Property and Other Insurance.** A property insurance policy covering loss or damage to the buildings and other improvements within Landlord's Parcel (including, without limitation, the Building and the leasehold improvements therein (but not Landlord's FF&E), other than Tenant's Property within the Premises, with coverage at least as broad as the Standard ISO Form CP 1030 including fire, lighting, windstorm, hail, explosion, riot, strike, civil commotion, smoke, vandalism, malicious mischief and sprinkler damage, loss of rent insurance (also known as rent continuation insurance), collapse, water damage and flood coverage, and such other insurance in such amounts and covering such other perils or hazards deemed appropriate by Landlord. The amount of coverage of Landlord's insurance hereunder shall be equal to the full replacement cost of the insured buildings and improvements, with such deductible amounts as Landlord may elect, subject to Section 7.4 below,



provided however, that flood and earthquake coverage shall be for the maximum available amount, if less than full replacement cost. All insurance proceeds payable under Landlord's casualty insurance carried hereunder shall be payable solely to Landlord for application in accordance with this Lease.

(iii)     **Workers' Compensation and Employer's Liability Insurance**. Workers' Compensation insurance shall be maintained by Landlord as required by the Applicable Laws of the State of Illinois. Landlord also shall cause the property manager of the Center to maintain "Employer's Liability" insurance with limits of not less than $1,000,000 for each component of "Coverage B".

(iv)     **Builder's Risk**. In addition, prior to commencing Landlord's Work pursuant to the Work Letter and at all times that material construction work is being undertaken by Landlord in or about the Center, Landlord shall obtain and maintain (or cause its contract to obtain and maintain) an insurance policy providing substantially the same coverage as provided for in subsection (ii) above, written in a so-called builder's risk completed value form. .

**Section 7.2.     Certificates of Insurance.** Prior to the commencement of Tenant's Work Period and as a condition thereto, Landlord shall deliver to Tenant satisfactory certificates of insurance evidencing that Landlord has obtained and is maintaining the insurance coverage required herein. Prior to the Commencement Date and as a condition to Tenant's opening for business in the Premises, Tenant shall deliver to Landlord satisfactory certificates of insurance evidencing that Tenant has obtained and is maintaining the insurance coverage required herein. All certificates of insurance shall contain a provision that the insurance carrier shall not cancel or modify the insurance coverage without giving the other Party (and any lender of such Party of whom Landlord or Tenant has given notice to the other Party) thirty (30) days' prior written notice. Current certificates of extension or replacement of insurance shall be delivered to Landlord or Tenant, as the case may be, at least thirty (30) days prior to the expiration of any policy.

**Section 7.3.     Alternate Insurance.**

(a)     **Use of Blanket Policy**. Notwithstanding anything to the contrary hereinabove contained, Landlord or Tenant may, at its option, include any of the insurance coverage hereinabove set forth in general or blanket policies of insurance, provided that the coverage afforded will not be reduced or diminished by reason of the use of such general or blanket policies or the claims history of any other insured property and may be effected by any combination of basic, excess or umbrella coverage.

(b)     **Self-Insurance**. During any period in which Tenant maintains a net worth of at least Seventy-Five Million Dollars ($75,000,000.00), any insurance required to be maintained by Tenant under this Lease may be provided in a formal plan of self insurance and/or the deductible limits on Tenant's property/casualty insurance may exceed the limits specified in Section 7.4(c). Tenant's net worth shall be calculated in accordance with generally accepted accounting principles, consistently applied.

**Section 7.4.     Additional Insurance Provisions.**

(a)     All insurance provided for in this Article 7 shall be effected under standard form policies issued by insurers of recognized responsibility authorized to do business in the state in which the Center is located.

(b)     Each Party shall name the other (and Tenant shall name Landlord's mortgage lender, provided that Landlord expressly requests same in writing) as an additional insured on each liability policy maintained by such Party.

(c)     To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Landlord or Tenant, such Party shall be deemed to be covering the amount thereof under an informal plan of self insurance; provided, however that except as permitted under Section 7.1(a)(ii), and under Section 7.3(b), neither Party shall be permitted to maintain any insurance required of it hereunder with a deductible of



greater than Fifty Thousand Dollars ($50,000.00), without the prior written consent of the other Party.

(d)     All policies shall be written by insurance companies having a rating of "A-VII" or better in the most recent edition of Best's Insurance Reports (or an equivalent rating), and such insurance companies shall acknowledge and confirm, by endorsement to the applicable policies, the release and waiver of subrogation provided hereunder.

(e)     The liability insurance policies maintained by Tenant and Landlord hereunder shall include the following endorsements: (i) deleting any employee exclusion on personal injury coverage; (ii) including coverage for injuries to or caused by employees; (iii) providing for blanket contractual liability coverage (including the Parties' respective indemnity obligations contained in this Lease); and (iv) a cross-liability endorsement. All such insurance: (w) shall be primary and noncontributory; (x) shall provide for severability of interests; (y) shall provide that an act or omission of one of the insureds shall not reduce or void coverage to any other insureds; and (z) shall afford coverage for all claims based on acts, omissions, injury or damage which occurred or arose (or the onset of which occurred or arose) in whole or in part during the policy period.

**Section 7.5.   Mutual Release and Waiver of Subrogation.**  Each of Landlord and Tenant, for themselves and for anyone claiming through or under them by way of subrogation or otherwise, hereby releases the other from any and all liability or responsibility to the releasing Party, for any casualty loss or property damage specifically insured against or required by the terms of Section 7.1(a)(ii) or Section 7.1(b)(ii) to be insured against by the releasing Party, even if such loss or damage shall have been caused by the fault or negligence of the other Party, or anyone for whom such Party may be responsible, but only to the extent of the greater of (i) the amount of insurance required to be maintained by the releasing Party under Section 7.1(a)(ii) or under Section 7.1(b)(ii) if and to the extent such insurance would have covered such loss or damage or (ii) the amount of insurance actually carried by such Party to the extent such releasing insurance covers such loss or damage.

**Section 7.6.   Landlord's Indemnity.**   Subject to Section 7.5, Landlord shall indemnify, defend (with counsel reasonably satisfactory to Tenant) and hold Tenant (and Tenant's subtenants, licensees and concessionaires) harmless from and against all claims, damages, liabilities and expense, including, without limitation, reasonable attorneys' fees, in connection with loss of life, bodily injury or damage to property arising from or out of (a) any occurrence in or about the Common Areas or elsewhere within the Center (other than the Premises) during the Term (unless occasioned by the active negligence or willful misconduct of Tenant, its subtenant, licenses or concessionaires or any of their respective employees or contractors), (b) Landlord's Environmental Acts, (c) any willful misconduct or negligence of Landlord, its employees, agents, licensees or contractors, or (d) a default by Landlord in the performance of any of its obligations under this Lease. Landlord's obligations set forth above in this Section 7.6 shall survive and be enforceable following expiration or termination of this Lease.

**Section 7.7.   Tenant's Indemnity.**   Subject to Section 7.5, Tenant shall indemnify, defend (with counsel reasonably satisfactory to Landlord) and hold Landlord harmless from and against all claims, damages, liabilities and expense, including reasonable attorneys' fees in connection with loss of life, bodily injury or damage to property arising from or out of (a) any occurrence within the Premises during the Term (unless occasioned by the active negligence or willful misconduct of Landlord, its tenants (other than Tenant), licensees or concessionaires or any of their respective employees or contractors) (b) Tenant's Environmental Acts, (c) any willful misconduct or negligence of Tenant, its employees, agents, licensees or contractors, or (d) a default by Tenant in the performance of any of its obligations under this Lease. Tenant's obligations set forth above in this Section 7.7 shall survive and be enforceable following expiration or termination of this Lease.

37

# ARTICLE 8

## UTILITIES

**Section 8.1.    Service to the Premises.**    Landlord, at its expense (and as part of Landlord's Work), shall provide all mains, conduits and other facilities for any utilities or services needed at the Center (including the Premises), including (without limitation) water, sanitary sewer, natural gas, electricity, telephone and telecommunications and, if applicable, storm sewer. Nothing contained herein shall preclude Landlord from seeking reimbursement from the Anchors or other tenants of Landlord's Parcel of the costs described in the preceding sentence. Tenant shall pay to the public utility companies before delinquency all charges for water, gas, electricity and other utility services consumed on the Premises. If during the Term, any utility company or Governmental Authority requires additions to, or replacement of, capital improvements (by way of example and not by limitation, sanitary sewer lines or water lines) to serve the Premises, the cost of the same shall be borne solely by Landlord (unless the utility line being replaced is located below the roof or above the slab within the Premises, serves exclusively the Premises, and was installed as a new line as part of Landlord's Work) in which case Tenant shall be responsible for the cost thereof, subject to Section 9.1(d)).    Landlord, without contribution or reimbursement from Tenant, shall bear all sewer assessments imposed by public authorities to finance construction of sewage utilities and facilities outside the Center. Tenant shall not be responsible for increases in utility charges caused by Landlord's failure to comply with its repair obligations under this Lease.

**Section 8.2.    Interruption of Service.**    Except for interruptions in utility service caused by an Uncontrollable Event (defined below) or by Tenant's negligence or willful misconduct, Landlord shall provide continuous and uninterrupted utility services to the Premises, at least in the capacities specified in the Work Letter and Final Plans. Any interruption of or material reduction in utility service to the Premises (other than an interruption or reduction caused by Tenant's negligence or willful misconduct) that results in Tenant closing its business in the Premises, in whole or in part, shall entitle Tenant to an Equitable Abatement of Rent and other charges otherwise payable hereunder during the period of closure, and if such interruption continues for one hundred eighty (180) consecutive days or more, then Tenant shall have the right to terminate this Lease (in which case the provisions of Section 19.4 shall apply). If Tenant continues to operate its business in the Premises during the period of interruption or reduction, then Tenant shall be entitled to an Equitable Abatement of Base Rent during the period of interruption or reduction. Tenant's rights under this Section 8.2 shall be in addition to any other rights and remedies that Tenant may have as a consequence of Landlord's default hereunder. An "Uncontrollable Event" shall mean the following occurrences: (i) any act of God, (ii) any failure by the provider of the utility to provide the utility service to the Center for any reason, other than Landlord's negligence, willful misconduct or breach of its obligations under this Lease; and (iii) any event that occurs outside of the Center's boundaries which was not a result of any act of Landlord or any of its agents, employees, contractors or tenants.

# ARTICLE 9

## MAINTENANCE AND REPAIRS

**Section 9.1.    Landlord's Maintenance and Repairs.**    In addition to and without limiting Landlord's obligations set forth elsewhere in this Lease (including Section 5.2 and Article 8), Landlord shall be responsible for the maintenance and repair of Landlord's Parcel (including the exterior of the Premises, all structural elements of the Premises, the roof and slab of the Premises, all utility lines within the Premises that do not serve exclusively the Premises, or that were not installed as part of Landlord's Work or otherwise as a replacement by Landlord of a pre-existing line, or are located above the roof or within or below the slab of the Premises, or are located behind the perimeter walls of the Premises, but excluding the remaining elements of the Premises, except as otherwise provided in Sections 9.1(d), 9.2 and 9.3) and the Common Areas at Landlord's sole cost and expense (although Landlord may seek reimbursement of some or all of those costs from other tenants or occupants of the Center as part of Common Area Expenses) in a First Class manner and in accordance with this Section 9.1, and shall take Landlord Anchor Enforcement Action in order to cause the Anchors to maintain and repair the Anchor Buildings and Anchor Parcels (and all improvements thereon) in a First Class manner and in accordance with this Section 9.1 at all times during the Term.



(a)  **Center Improvements**.  During the Term, Landlord shall keep and maintain the buildings and other improvements within Landlord's Parcel, including (without limitation) the roofs, exterior walls, foundations, gutters, waterspouts and structural elements of (or within) the buildings of Landlord's Parcel and the Common Areas (including the exterior of the Premises, all structural elements of the Premises, the roof and slab of the Premises, all utility lines within the Premises that do not exclusively serve the Premises, or that were not installed as part of Landlord's Work or otherwise as a replacement by Landlord of a pre-existing line, or are located above the roof or within or below the slab of the Premises or behind the perimeter walls of the Premises, but excluding the remaining elements of the Premises, except as otherwise provided in Section 9.1(d), Sections 9.2 and 9.3), in good working order and in First Class condition and repair and shall make all necessary repairs thereto and replacements thereof and Landlord shall take Landlord Anchor Enforcement Action to the extent necessary to cause the Anchors or occupants of the Anchor Parcels to similarly maintain the buildings and improvements on the Anchor Parcels in good working order and First Class condition and repair.

(b)  **Utilities and Common Area Facilities**.  During the Term, Landlord shall keep or cause to be kept all wiring, pipes, conduits, water, sewer and utility lines within Landlord's Parcel (other than such wiring, pipes, water, sewer and utility lines, if any, as are (i) located above the slab of the Premises and below the roof of the Premises and inside the perimeter walls of the Premises, serve exclusively the Premises, and were not newly installed as part of Landlord's Work or otherwise as a replacement by Landlord of a pre-existing line or (ii) are owned and maintained by the applicable utility), and all improvements and facilities in the Common Areas, including, without limitation, the Parking Areas, in good working order and in first class condition and repair and shall make all necessary replacements thereto.  Landlord shall diligently enforce the obligations of the applicable utility companies to maintain their utility lines and facilities which serve Landlord's Parcel and the Common Areas.  Landlord shall take Landlord Anchor Enforcement Action to the extent necessary to ensure that all similar facilities on the Anchor Parcels are similarly maintained in good working order and in First Class condition and repair.  Without limitation, Landlord shall be responsible for and promptly make all repairs and replacements necessitated by the willful acts or negligence of Landlord, its agents, employees or contractors, or by the breach of this Lease by Landlord.

(c)  **Compliance with Applicable Laws**.  Landlord shall operate and maintain Landlord's Parcel and the Common Areas as a First Class shopping center and in compliance with all Applicable Laws and Governmental Requirements (including, but not limited to, Applicable Laws pertaining to accessibility and removal of architectural barriers, and all Environmental Laws) applicable to the design, construction, operation, use and maintenance of Landlord's Parcel and Common Areas, including, without limitation, all maintenance, repairs, replacements, alterations and improvements in or to the Common Areas that are required by law to permit Tenant to use the Premises for the uses permitted under this Lease.  Landlord shall also take Landlord Anchor Enforcement Action to the extent necessary to ensure that the Anchor Parcels and Anchor Buildings are operated and maintained as anchor department stores in a First Class shopping center and in compliance with all Applicable Laws and Governmental Requirements (including, without limitation Applicable Laws related to accessibility and removal of architectural barriers and all Environmental Laws) applicable to the design, construction, operation, use and maintenance of the Anchor Parcels and Anchor Buildings.

(d)  **Landlord's Work**.  Landlord shall make all repairs and replacements to and remedy all design, materials and construction defects in Landlord's Work; provided, however, that except as otherwise specifically provided in this Lease, Landlord's obligation to remedy defects in design, materials and/or workmanship with respect to Landlord's Work shall only apply with respect to defects which Tenant notifies Landlord of on or before the date which is one (1) year following the later of the Commencement Date, or if the defect relates to a punchlist item, the date which is one year following completion of the punchlist item (as applicable, the "**Defect Notice Date**"), except that the one year time limitation set forth herein shall not apply to any latent defects in



Landlord's Work ("**Latent Defects**"), which Landlord shall be obligated to remedy, regardless of when Tenant notifies Landlord of the defect. With respect to any defects in Landlord's Work (other than Latent Defects) which Tenant notifies Landlord of after the Defect Notice Date, except as otherwise specifically provided in this Lease, Landlord's obligations shall be limited to using commercially reasonable efforts (including instituting appropriate legal proceedings) to enforce Landlord's rights under any applicable warranties covering the defects, under any contract for Landlord's Work and/or available at law or in equity against any contractor, subcontractor, supplier, architect and/or engineer who may have any legal responsibility for the defect, and, at Tenant's request, Landlord shall assign any or all such rights directly to Tenant, and permit Tenant to pursue Landlord's claims against all such parties (in Landlord's name) and reasonably cooperate with Tenant (executing any necessary documents) in enforcing Landlord's rights and claim. Subject to Section 7.5, Landlord shall be responsible for any damage to the Premises and for any repairs that are caused or necessitated by the faulty performance of Landlord's Work so long as, with respect to defects other than Latent Defects, Tenant notifies Landlord of the applicable defect on or before the later of one (1) year following the Commencement Date or, if the defect relates to a punchlist item, on or before one (1) year following the completion of the punchlist item; provided, further however that Landlord shall not be responsible for defects in furnishings, fixtures, or equipment supplied or installed by Tenant, unless such defect is the result of the installation or other work by Landlord. Notwithstanding anything to the contrary in this Lease, Landlord shall be responsible for and promptly make all repairs to the Premises that are necessitated by the settling of the Center.

(e)    **Damage to Premises**. Subject to Section 7.5, Landlord shall reimburse Tenant for any further loss or damage to the Premises (but not including any loss or damage to Tenant's Property and inventory) arising from defects in or damages to Landlord's Parcel and/or the Common Areas if such damage results from Landlord's negligence or from Landlord's willful failure to properly undertake and diligently prosecute any maintenance and/or repair obligations of Landlord hereunder within a reasonable time after the earlier of (i) Tenant's notifying Landlord of such defect or damage or the need for such repair or (ii) the time at which Landlord became aware of such defect or damage or that such repair was needed. In no event shall Landlord be responsible for loss and damage to Tenant's Property or inventory.

(f)    **Self-Help and Emergency Repairs**. In the event of an emergency, or in the event Landlord fails to undertake and diligently prosecute repairs in accordance with Section 9.1(e) or in the event Landlord fails to perform its maintenance obligations under this Section 9.1 within a reasonable time (i.e., (x) immediately following written notice from Tenant, with respect to matters posing an imminent threat to the safety and security of Tenant or Tenant's patrons or their personal property, or (y) within 24 hours following written notice from Tenant, with respect to matters materially and adversely affecting access to the Premises or the conduct of Tenant's business (such as, without limitation, problems in the Protected Area or with respect to the Required Vertical Transportation), or (z) within thirty (30) days following written notice from Tenant of the need for such maintenance for all other matters) and such failure interferes with the conduct of Tenant's business in the Premises, then in any such event and without further notice to Landlord, Tenant may (but shall not be obligated to) make any repairs and/or perform any maintenance required of Landlord hereunder to the extent reasonably necessary to secure the Premises or prevent injury to person or property or to eliminate (or mitigate) the interference with Tenant's business. Landlord shall reimburse Tenant upon written demand for the actual out-of-pocket costs and expenses incurred by Tenant in connection with such repairs, and if Landlord fails to reimburse Tenant as required hereunder within ten (10) business days after Tenant's demand, accompanied by reasonable evidence of the costs incurred by Tenant, then, subject to Section 18.5, Tenant shall be entitled to offset the applicable amount (plus interest thereon of the Interest Rate from the date of demand) from Rent and other amounts payable to Landlord hereunder. Tenant's rights and remedies under this Section 9.1(f) shall not exclude any other rights or remedies of Tenant as a consequence of Landlord's failure to properly repair and maintain, including (without limitation) Tenant's rights and remedies under Section 5.3 and Section 8.2 hereof.

40



(g) **Manner of Work.** Landlord shall use best efforts to make any repairs, additions or alterations in, about or affecting the "Critical Accessways" shown on Exhibit A.7 of the Site Plan or the Common Areas within the Protected Area or otherwise affecting the Premises, during non-business hours of Tenant (except as specifically hereinafter provided in Section 9.1(h) with respect to the construction of improvements in the Restaurant/Lifestyle Addition Area and on the Restaurant Pads and in all events, in a manner that minimizes interference with Tenant's use and business of the Premises and the Common Areas (including access to, from and between the Common Areas and the Premises), and shall promptly restore the affected areas following any such work or activity. To the greatest extent possible without compromising the maintenance, repairs and operations of the Center as a First Class Center, maintenance and repairs that necessitate interference with Tenant's use of or business within the Premises and/or the Common Areas (including access to, from and between the Common Areas and the Premises) shall be performed during Non-Seasonal Periods. Without limiting the foregoing requirements, except for emergency repairs that are necessary to avoid imminent and material risk of injury to persons or property and emergency repairs required in order to comply with Applicable Law, (i) during Seasonal Periods, Landlord shall not perform any repairs or maintenance to the Priority Parking Area, Critical Accessways, sidewalks and other means of access to, from or between the Premises and the Common Areas within the Protected Area, if such repairs or maintenance renders the affected facilities or areas unusable by Tenant or Tenant's patrons or if such repairs or maintenance materially interferes with the use of the affected facilities or areas by Tenant or Tenant's patrons, and (ii) during Non-Seasonal Periods (and at all times with respect to the Parking Areas other than the Priority Parking Area) and the Common Areas outside of the Protected Area), all repairs and maintenance to the Parking Areas, including the Priority Parking Area, Critical Accessways, sidewalks and other means of access to, from or between the Premises and the Common Areas that renders the affected facilities or areas unusable by Tenant or Tenant's patrons or materially interferes with the use of the affected facilities or areas by Tenant or Tenant's patrons shall be done in sections and phases so that, at all times, (x) the access to, from and between the Premises and the Common Areas by Tenant and Tenant's patrons is not materially and adversely affected, and (y) at least the Minimum Parking Spaces (both within the Center as a whole and within the Priority Parking Area) are readily accessible and available for use by Tenant and Tenant's patrons as contemplated hereunder. In all events, but subject to Sections 9.1(h) and (i), Landlord will consult with Tenant with regard to the staging and hours of any construction or material maintenance activities affecting the Protected Area. In addition to the restrictions and limitations set forth in Sections 9.1(h) and (i), with respect to any exterior construction or other work on or affecting Landlord's Parcel and/or Common Areas, Landlord shall make all efforts and take all steps appropriate, and shall cause its contractor's and subcontractors (and any other tenants and occupants or their contractors or subcontractors) to make all efforts and take all steps appropriate to construction activities undertaken in an occupied First Class shopping center, to minimize dust, noise and construction traffic from and to the Center, and to maintain a First Class construction site including, without limitation, the installation, maintenance, repair and replacement of first class architecturally designed and decorated solid barricades and the maintenance of convenience means of ingress, egress and access to and from the Premises and the surrounding parking areas that serve the Premises. In addition, Landlord shall take Landlord Anchor Enforcement Action to the extent necessary to ensure that the Anchors or other occupants of the Anchor Parcels comply with the foregoing requirements as they relate to any construction or other work to be done on the Anchor Parcels. Landlord shall screen any permitted staging area in the Protected Area with a tarp or other materials to limit visibility of construction materials.

Except in the case of an emergency, Landlord shall not schedule any Common Area maintenance that would unreasonably disrupt parking or vehicular or pedestrian access or the conduct of Tenant's business (such as, without limitation, repaving or restriping the Parking Areas or resurfacing, or repainting any interior mall, during a Seasonal Period).

(h) **Post Commencement Date Construction or Renovation; Protected Areas and Premises.** In addition to the restrictions and limitations set forth in

41



Section 9.1(g), the following covenants and conditions shall apply with respect to any construction, renovations or other work (interior or exterior) undertaken by or on behalf of Landlord on or affecting the Premises and/or the Protected Area after the Commencement Date: (i) the staging area for such work shall be confined to the staging area for such work that is identified by Landlord and approved by Tenant prior to the commencement of the work (Tenant hereby approving as a staging area for potential construction at the "Restaurant/Lifestyle Addition Area" and for potential construction in the Restaurant Pads the "Construction Staging Area" shown on Exhibit A.3), (ii) except in the case of emergency repairs where compliance with this clause is not possible, at least sixty (60) days prior to commencing such work, Landlord shall notify Tenant and provide to Tenant copies of the plans for such work and a copy of Landlord's proposed construction schedule for such work, (iii) except in the case of emergency repairs where compliance with this clause is not possible and except as hereinafter specifically permitted with respect to the potential construction of improvements in the Restaurant/Lifestyle Addition Area and on the Restaurant Pads, such work shall be done at times and in a manner that does not interfere with Tenant's business, the access to the Premises or the use of the Common Areas within the Protected Area (without limiting the foregoing, except as hereinafter specifically provided, Landlord shall schedule all work within or affecting the Protected Area to be finished each day by no later than the commencement of the first movie presentation at Tenant's Premises and no such work shall be undertaken or performed during Seasonal Periods or during Tenant's normal business hours on weekends), (iv) until such work is complete, the work site shall be secured and barricaded in a First-Class manner, with architecturally-designed solid barricades and screening (incorporating Tenant's logo, as well as new tenants that will be occupying the area, and indicating that the Premises remains open and walkways, to minimize the appearance of an on-going construction site, and (v) Landlord shall cause it contractors to clean up and remove all construction debris on a daily basis and, in any event, immediately upon written or telephonic notice from Tenant. Notwithstanding anything to the contrary in Section 9.1(g) or in Section 9.1(h)(iii), Landlord shall, subject to compliance with the other terms and conditions of this Section 9.1(h), have the right to construct restaurant/retail/entertainment improvements within the areas designated as the Restaurant/Lifestyle Addition Area on Exhibit A.3 to the Site Plan and restaurant improvements within the areas designated as the Restaurant Pads on Exhibit A.3 to the Site Plan (and without limitation on the hours of the day or days of the week such construction may be performed, except as hereinafter provided): (A) the construction of the site work and core and shell of the improvements is either (1) commenced on or after August 1st and completed (subject only to punchlist items) on or before the second Friday in November immediately following the date of commencement or (2) on or after January 1st and completed (subject only to punchlist items) on or prior to May 15th immediately following the date of commencement of construction; (B) at all times during the construction of the core and shell and site work there shall be no less than eight hundred fifty (850) parking spaces available for use in the Protected Area and at all times other than the construction periods for the core and shell and site work designated above, there shall be no less than the Minimum Free Parking Spaces available for use in the Protected Area; (C) at all times such work shall be done in a manner that does not unreasonably interfere with Tenant's business, the access to the Premises or the use of the Common Areas within the Protected Area; (D) no restaurant or other improvement constructed on the Restaurant Pads or in the Restaurant/Lifestyle Addition Area shall have a drive-through feature or element; and (E) prior to commencing any improvements of the Restaurant Pads, Landlord shall have provided Tenant with evidence reasonably satisfactory to Tenant (including a parking study from a traffic consultant reasonably acceptable to Tenant) that the improvements to be constructed on the Restaurant Pad contain sufficient convenient parking located on the Restaurant Pad so that the patrons of those improvements will only need to utilize parking on the Restaurant Pad and that at all times (other than during construction), the Minimum Free Parking Spaces will be available for use in the Protected Area (and any parking spaces within the Restaurant Pads shall not be counted for purposes of satisfying this requirement). In no event shall any construction by Landlord result in closure of the mall entrance closest to the Premises, except for emergencies. If Landlord breaches any of the foregoing covenants (including, without limitation, the requirement that Landlord commence and complete the site work and shell work for the applicable improvements



within the designated construction periods), then in addition to any other remedies Tenant may have at law, in equity and/or under this Lease as a result of the breach, while the breach is continuing, in lieu of paying Base Rent, Percentage Rent and Additional Rent, Tenant shall only be obligated to pay Alternate Rent to Landlord for such period.

(i) **Post Commencement Date Construction or Renovation Outside Protected Area.** In addition to the restrictions and limitations set forth in Section 9.1(g), the following covenants and conditions shall apply with respect to construction, renovations, or other work (interior or exterior) undertaken by or on behalf of the Landlord or affecting Landlord's Parcel and/or Common Areas (other than the Protected Area) which will or are likely to interfere with Tenant's business: (i) except in the case of emergency repairs, where compliance with this clause is not possible, Landlord shall notify Tenant at least sixty (60) days prior to commencement of the work, and provide Tenant with copies of the plans for the work and a copy of the proposed construction schedule for such work; (ii) except in the case of emergency repairs where compliance with this clause is not possible, such work shall be done at times and in a manner which will not unreasonably interfere with Tenant's business or the access to the Premises or the Common Areas, and (iii) until such work is complete, the work site shall be secured and barricaded in a First Class manner with architecturally-designed sold barricades, screening and walkways, to minimize the appearance of an ongoing construction site.

**Section 9.2.** **Tenant's Maintenance and Repairs; Compliance with Laws.**

(a) **Maintenance and Repairs.** Subject to Landlord's obligations pursuant to Section 9.1, Tenant, at its sole cost and expense, shall keep the interior of the Premises (i.e., above the slab and below the roof) in good working order and in clean, sanitary and safe condition and repair. Subject to Section 9.1 and Section 9.3, Tenant covenants and agrees to keep and maintain in good working order, and in good condition and repair all electrical, plumbing, heating and air-conditioning equipment and facilities contained within and serving exclusively the Premises, and all signs of Tenant permitted by this Lease and located within the Premises. This Section 9.2 shall not require Tenant to furnish labor or materials or to perform any obligations required of Landlord by Section 9.1 or 9.3 or by any other provision of this Lease. Notwithstanding the above repair responsibilities of Tenant, but subject to Section 7.5, Landlord shall make and pay for repairs which would otherwise be the obligation of Tenant if said repairs are caused by events covered by (or required to be covered by) Landlord's insurance; provided, however, that if the repairs are covered or required to be covered by Landlord's insurance, and the cost thereof does not exceed $10,000.00, subject to increase on each Adjustment Date by the CPI Adjustment, Tenant shall reimburse Landlord the cost of the repair or pay the cost directly.

(b) **Compliance with Laws.** In connection with its operation and use of the Premises, Tenant shall at Tenant's cost comply with all Applicable Laws and Governmental Requirements, except as otherwise provided in Section 9.1(e) and Section 10.4, and except that nothing contained herein shall be deemed to require Tenant to remedy any failure of Landlord's Work to comply with Applicable Laws and Governmental Requirements that existed on the Commencement Date (and Landlord shall be responsible for remedying any such violation at Landlord's sole cost).

(c) **Self-Help and Emergency Repairs.** In the event of an emergency or in the event Tenant fails to undertake and diligently prosecute repairs in accordance with this Section 9.2 within 48 hours following written notice from Landlord and if the conditions within the Premises pose an imminent threat to the safety and security of patrons of the Center or are actually causing damage to the premises of other tenants of Landlord's Parcel or the improvements on Landlord's Parcel, then, provided Tenant is not diligently proceeding with the required repairs after such notice, Landlord may, but shall not be obligated to, make such repairs required of Tenant hereunder to the extent reasonably necessary to prevent injury to person or property. Tenant shall reimburse Landlord within ten (10) business days following Landlord's demand for the actual out-of-pocket costs and expenses incurred by Landlord in connection with the repairs. Landlord's demand shall be accompanied by reasonable evidence of the costs incurred. Any dispute between Landlord and Tenant as to the appropriateness of the exercise of



Landlord's self-help rights or the amount owed to Landlord shall be subject to arbitration under Section 18.5. Landlord's rights and remedies under this Section 9.2(c) shall not exclude any other rights or remedies of Landlord as a consequence of Tenant's failure to properly repair and maintain under this Lease.

Section 9.3. **HVAC System.** The Premises shall be served by a separate heating, ventilating and air conditioning ("HVAC") system devoted to the exclusive use of the Premises. The HVAC system serving the Premises shall be installed by Landlord as part of Landlord's Work. Prior to the Commencement Date, Landlord shall obtain, pay for and assign to Tenant a full-service warranty (covering parts and labor) with respect to the HVAC system, including guarantied service response times approved by Tenant, which warranty shall be subject to Tenant's reasonable approval and shall not expire prior to the first Anniversary of the Commencement Date. Subject to the foregoing obligations of Landlord, Tenant shall be responsible, at its sole cost and expense (except as otherwise provided herein), for the maintenance and servicing of (but not any replacement or repairs of a capital nature with respect to) the HVAC system. Tenant also acknowledges that Landlord has no obligation to make any replacements or repairs of a capital nature with respect to the HVAC system, except pursuant to Section 9.1(d), Article 16 and Article 17 of this Lease and that Landlord has no obligation to maintain or service the HVAC system. Notwithstanding anything to the contrary set forth herein, however, if Tenant shall elect to make any replacement or other capital improvement to the HVAC system during the five (5) year period immediately preceding the expiration or earlier termination of this Lease, then Landlord shall promptly reimburse Tenant for the unamortized portion of the cost thereof as of the date of expiration or earlier termination of this Lease, such reimbursement to be paid within ten (10) business days after Tenant surrenders possession of the Premises to Landlord pursuant to Article 20, with Tenant being obligated, if it has made a replacement within the five (5) year period prior to expiration of the Term for which reimbursement from Landlord is required, to deliver the replacement portions of the HVAC system to Landlord in good operating condition. The unamortized cost shall be determined in accordance with GAAP. Landlord's obligations under this Section 9.3 shall survive the expiration of the Term or the earlier termination of this Lease.

Section 9.4. **Other Tenants and Occupants.** Landlord will not use or permit to be used any other premises in Landlord's Parcel, the Common Areas or any equipment owned or controlled by Landlord or by any other occupant of Landlord's Parcel in such manner as would result in any noise or vibration interfering with the acoustics required by Tenant in its use of the Premises, or as would result in any offensive odors penetrating the Premises, and shall take Landlord Anchor Enforcement Action, to the extent necessary to ensure that no such activity shall take place (or continue) on any Anchor Parcel or in any Anchor Building. Upon receipt of notice from Tenant of any nuisance, interference, disturbance, loss, damage, or destruction Tenant is suffering due to an act or failure to act of any other tenant or occupant of the Center (including, without limitation, noise, vibration or cooking odors originating from premises within the Center (other than the Premises) being discernible within the Premises in any material respect), Landlord shall promptly initiate and thereafter diligently prosecute all reasonable action permitted by law, including (without limitation) the exercise of all rights and remedies available to Landlord under such other tenant's or occupant's lease or operating agreement, and if applicable, Landlord Anchor Enforcement Action, and the institution and diligent prosecution of legal proceedings, to prevent any further nuisance, interference, disturbance, loss, damage or destruction from occurring to Tenant's property and business. Tenant acknowledges, however, that the Premises is adjacent to the food court of the Center, and that odors that are customarily associated with tenant spaces adjacent to food courts which are operated in a First Class manner shall not be deemed objectionable.

Without limiting the foregoing, with respect to any act or occurrence by another tenant or occupant that is in violation of Tenant's express rights or Landlord's express covenants hereunder (including, without limitation, the provisions of Sections 13.3, 13.4 or 13.5), (or with respect to any act or occurrence by any occupant of an Anchor Parcel, which would be a violation of Tenant's rights if it occurred on or about Landlord's Parcel), Landlord shall use its best efforts to remedy such violation as soon as possible and, if applicable, no later than five (5) business days after receiving written notice of such violation from Tenant, Landlord shall commence (and thereafter diligently prosecute to completion) reasonable measures to remedy such situation (including taking Landlord Anchor Enforcement Action). In addition, and without

44



limitation of any other rights or remedies of Tenant under this Lease, if any noise or vibration occurs in any portion of Landlord's Parcel which is audible in one or more theater auditoriums in the Premises, and causes patrons of the Premises to request ticket refunds, and such noise or vibration continues for three (3) days after Landlord's receipt of written notice from Tenant of the occurrence, then from and after the third day, until Landlord causes the activity or equipment which is causing the noise or vibration to permanently cease, all Rent, including, Base Rent, Percentage Rent and Additional Rent shall fully abate, and in lieu thereof, Tenant shall pay to Landlord Alternate Rent.

Section 9.5.    **Failure to Maintain**.  If Landlord shall fail to maintain Landlord's Parcel and the Common Areas in accordance with this Lease (or if an Anchor fails to maintain an Anchor Parcel in a First Class manner), and if such failure materially interferes with the conduct of Tenant's business within the Premises or the use and enjoyment of the Common Areas by Tenant and Tenant's employees, patrons and invitees and is not cured within a reasonable time (as defined in Section 5.3) after notice, as required in Section 5.3 to Landlord, then (in addition to any other rights or remedies that may be available to Tenant as a consequence of such failure) and for so long as such interference continues, Tenant shall be entitled to an Equitable Abatement of Rent (provided that with respect to a failure to maintain the portions of a Anchor Parcel which are not Common Areas, Landlord's obligations shall be to take Landlord Anchor Enforcement Action and Landlord shall not have any liability to Tenant as to such Anchor's failure, although Tenant shall be entitled to an Equitable Abatement while the interference is continuing).  Any disputes between Landlord and Tenant as to the materiality of any failure to maintain or the amount of any Equitable Abatement, shall be resolved pursuant to Section 18.5 below.

## ARTICLE 10

## ALTERATIONS; IMPROVEMENTS

Section 10.1.    **Alterations to Premises**.  Tenant may, without Landlord's consent, make non-structural alterations, additions and improvements to the Premises that do not materially adversely affect the operation of the heating, ventilation, air conditioning, plumbing, mechanical, electrical and/or life safety systems serving the portions of the Center which are outside of the Premises ("Mall Building Systems"), at Tenant's sole cost and expense.  In addition, Tenant shall be permitted to make any structural alterations, additions and structural improvements to the Premises and alterations which may materially and adversely affect the operation of the Mall Building Systems, provided Tenant obtains Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.  Landlord shall endeavor to respond to Tenant's written request for approval (which must be accompanied by reasonably detailed plans and specifications) within ten (10) business days following Tenant's request, with any disapproval specifying the reasons for disapproval.  If Landlord fails to respond within the ten (10) business day period Tenant may send a reminder notice (accompanied by the original notice and all materials), which shall specify in bold, all capital letters, 16 point type in a legend at the top of the first page of the notice, that "YOUR FAILURE TO RESPOND WITHIN FIVE (5) BUSINESS DAYS SHALL BE DEEMED AN APPROVAL OF THE MATTERS DESCRIBED HEREIN", and if Landlord fails to respond within five (5) business days following receipt of the reminder notice, the alteration shall be deemed approved.  Upon completion of any alterations or improvements to the Premises undertaken by Tenant which require Landlord's consent pursuant to this Section 10.1 or for which plans and specifications have been prepared by Tenant, Tenant shall deliver to Landlord a copy of as-built plans and specifications therefor (or, if as-built plans and specifications are not available, any change orders or other revisions to Tenant's final plans and specifications, together with a copy of all permits and approvals obtained by Tenant for such work.  With regard to Tenant's FF&E including, without limitation seats, special lighting, projection and sound equipment (to the extent paid for by Tenant and not reimbursed by Landlord's Reimbursement), which may be installed in the Premises by Tenant prior to or during the Term, the same shall not be deemed to become a part of the Premises and may be altered, removed, replaced and/or improved by Tenant without restriction and may be removed by Tenant from the Premises in accordance with Section 20.1 below.

Section 10.2.    **Tenant's Cost**.  Any alterations or improvements to the Premises made under Section 10.1 shall be made at Tenant's sole cost and expense (subject, however, to

45



Section 9.3 above and Section 10.3 and Section 10.4 below), and Tenant shall be entitled to any and all salvage (other than salvage value received, if any, for Landlord's F&E). Landlord shall cooperate with Tenant in obtaining any necessary governmental permits or approvals or otherwise in making said alterations and improvements; provided, however, such cooperation shall be without cost or expense to Landlord. All work undertaken by or on behalf of Tenant under this Article 10 shall be done in a good and workmanlike manner by a licensed contractor and in accordance with all Applicable Laws. Tenant shall not allow any mechanics' or other liens arising out of Tenant's Work or any other alterations to the Premises undertaken by or on behalf of Tenant to encumber the Center.

Section 10.3.  **Ownership of Tenant's Property.**  Throughout the Term, Tenant shall be and remain the owner of the following to the extent paid for by Tenant and not reimbursed to Tenant from Landlord's Reimbursement (collectively, "**Tenant's Property**"):  (i) all leasehold improvements made by Tenant to and within the Premises paid for by Tenant and not funded from or reimbursed to Tenant from Landlord's Reimbursement, including all equipment, machinery, systems and fixtures that are paid for and installed by Tenant and not funded from or reimbursed to Tenant from the Landlord's Reimbursement and located within and exclusively serve the Premises, (ii) Tenant's FF&E and all other removable personal property installed in the Premises by Tenant, and (iii) to the extent not included above, all alterations, improvements and additions undertaken by Tenant following the completion of Tenant's Work pursuant to this Article 10. Tenant shall be entitled to any depreciation on Tenant's Property. Landlord agrees to execute any and all documents necessary or appropriate to confirm Tenant's ownership rights hereunder with respect to Tenant's Property. Notwithstanding the foregoing or any other provision of this Lease, Landlord's FF&E shall be deemed to be Landlord's Property and not Tenant's Property for all purposes under this Lease. Landlord hereby grants Tenant an irrevocable license and lease to Tenant during the Term to use within the Premises, Landlord's FF&E. Landlord shall have no obligation to repair, replace or maintain Landlord's FF&E, except as otherwise provided in Section 9.1(d), Articles 16 and 17 of this Lease. Tenant shall indemnify, defend, protect and hold harmless Landlord from any damages to persons or property suffered as a result of the use of Landlord's FF&E by Tenant and its employees, agents, invitees and licensees during the Term (although nothing contained herein shall obligate Tenant to indemnify, defend, protect and hold harmless Landlord from and against damage to persons or property resulting from any defects in the installation of Landlord's FF&E, to the extent installed by Landlord, or any damage caused by Landlord's installation). Tenant shall have the right to remove and replace Landlord's FF&E from time to time to the extent that Tenant determines that replacement of Landlord's FF&E is necessary or desirable, Landlord's FF&E becomes obsolete or is no longer useful in connection with the operation of the Premises, Tenant performs alterations to the Premises or Landlord's FF&E becomes damaged, and any salvage value received by Tenant in connection with the removal shall be paid to Landlord (less the cost of removal). Tenant shall be the owner of any FF&E which Tenant installs to replace Landlord's FF&E. Tenant shall keep accurate books and records in accordance with generally accepted accounting principles as to the ownership of the FF&E, and whether any items are considered Landlord's FF&E and Tenant's FF&E. Any disputes as to the accuracy of Tenant's books and records with respect to the ownership of any FF&E may be submitted to arbitration pursuant to Section 18.5. If this Lease is terminated pursuant to Article 16 or Article 17, any proceeds of insurance or condemnation payable with respect to Landlord's FF&E shall be Landlord's property and shall be paid to Landlord. Any of Landlord's FF&E which has not been replaced or removed in accordance with the provisions of this Section 10.3 shall remain in the Premises at the expiration of the Term and shall be delivered to Landlord.

Section 10.4.  **Changes Required by Law.**  Should any alterations, repairs or additions to the Premises be required under any Applicable Law enacted after the issuance of all of the building permits necessary to construct Landlord's Work which are non-structural and do not constitute capital improvements, repairs or alterations, then Tenant shall cause same to be made promptly and at Tenant's sole cost and expense. Should any structural or capital alterations, repairs or additions to the Premises (including any change to the stadium seating podiums within the Premises) be required under any Applicable Law enacted after the issuance of all of the building permits necessary to construct Landlord's Work (collectively, "**Capital Compliance Alterations**"), the responsibility for performing the Capital Compliance Alteration, shall, subject to the terms and conditions hereinafter provided, be (i) Landlord's (and Landlord shall promptly perform in accordance with and subject to the terms of this Lease such Capital Compliance



Alteration, except as hereinafter provided), if the work involves the roof, structure (including, without limitation, slab and load bearing walls) of the Premises or the mechanical, electrical, plumbing or other utility systems and lines serving the Premises, and (ii) Tenant's (and Tenant shall promptly perform in accordance with and subject to the terms of the Lease, the Capital Compliance Alteration, except as hereinafter provided), with respect to the other elements of the Premises, with the cost of the applicable Capital Compliance Alterations to be allocated between Landlord and Tenant in the manner hereinafter specified. If any alterations, repairs or additions are required under any Applicable Law with respect to the buildings and other improvements and facilities comprising Landlord's Parcel or Common Areas, other than the Premises, then Landlord shall cause the same to be performed promptly and at Landlord's sole cost and expense in accordance with <u>Article 9</u> and if any alterations, repairs or additions are required under any Applicable Law with respect to the Anchor Buildings or other portions of the Anchor Parcels not within the Common Areas, Landlord shall take Landlord Anchor Enforcement Action, to ensure that the Anchors perform the same. If the conduct of Tenant's business in the Premises is materially interfered with or interrupted by the performance (or failure to perform) such alterations, repairs or additions, then Tenant shall be entitled to an Equitable Abatement of Rent during the period of interruption or interference; provided that Tenant shall use commercially reasonable efforts to continue to operate while any Capital Compliance Alterations are being performed and, if Tenant is performing the work, to the extent feasible, Tenant will phase the work in a manner that allows Tenant to continue to operate. If Landlord or Tenant receives notice or becomes aware that any Capital Compliance Alteration will be required with respect to the Premises, Landlord or Tenant, as applicable, shall promptly notify the other Party as to the need for the Compliance Cost Alteration (including providing a copy of the notice, if any, received from the applicable Governmental Authorities). Promptly following receipt of the notice, the Party responsible for the work, shall have the cost of the Capital Compliance Alteration competitively bid by no less than three (3) contractors reasonably acceptable to the other Party, on a guaranteed maximum price basis, and shall provide the other Party with a copy of the bids. If the bids show a cost of less than $500,000, the cost of the Compliance Costs Alterations shall be split equally between Landlord and Tenant (and the Party performing the work shall upon substantial completion, be reimbursed by the other Party, within ten (10) business days following a written request for payment for one-half of the reasonable out-of-pocket costs incurred by the Party performing the work, not to exceed one-half of the cost as set forth in the lowest responsive bid. If any of the bids show a cost for the Capital Compliance Alterations in excess of $500,000.00, either Party (the **"Terminating Party"**) may elect to terminate this Lease by written notice to the other Party (the **"Non-Terminating Party"**) given within thirty (30) days following receipt of the bids, although the Non-Terminating Party may further elect to nullify the Terminating Party's termination notice, by written notice to the Terminating Party, given within ten (10) business days following receipt of the Terminating Party's termination notice, notifying the Terminating Party that the Non-Terminating Party has elected to pay the costs of the Compliance Cost Alterations in excess of $500,000 without reimbursement from the Terminating Party (except for reimbursement of one-half (1/2) of the first $500,000.00 in costs). In no event, however, shall Tenant be obligated to reimburse Landlord for any costs incurred by Landlord to remedy any failure of Landlord's Work to comply with Applicable Laws and Governmental Requirements, to the extent those Applicable Laws and/or Governmental Requirements existed on the date of issuance of all of the building permits necessary to construct Landlord's Work (and Landlord shall be responsible at Landlord's sole cost for remedying any such violations).

## ARTICLE 11

## REPRESENTATIONS AND WARRANTIES AND COVENANTS

Section 11.1. **Landlord's Warranties and Representations**. Landlord hereby covenants with Tenant and warrants and represents to Tenant that Landlord is the record owner of Landlord's Parcel in fee simple absolute. Landlord further covenants with Tenant and warrants and represents to Tenant as follows:

(a) That Landlord's Parcel, the Premises, and all rights of Tenant hereunder are free and clear of all encumbrances and restrictions (whether contained in deeds, leases or other instruments or agreements), except the Permitted Encumbrances and the exclusives described in <u>Exhibit J</u>, and that with respect to the Common Areas located on

47



any Anchor Parcels, there are no liens or encumbrances which, if foreclosed, would terminate the REA or otherwise affect Tenant's non-exclusive rights to utilize the Common Areas on any Anchor Parcels under this Lease, and this Lease is and shall remain superior to any and all adverse matters and claims subject only to: any Mortgage to which this Lease may be subordinated in accordance with Section 21.1, to real estate taxes and assessments not yet due and payable, to the rights of others (as set forth in this Lease) to use the Common Areas, those matters caused by Tenant, and the Permitted Encumbrances;

(b)      That Landlord and each person executing this Lease on behalf of Landlord (or in any representative capacity) have full right and lawful authority to execute this Lease;

(c)      That there is no legal or contractual impediment arising out of any of the Permitted Encumbrances or out of any Applicable Laws or otherwise related to the construction and use of the Premises, which would prevent or prohibit the use and enjoyment of the Center (including the Parking Areas and the other Common Areas) as a First Class shopping center or the use and enjoyment of the Premises as a multi-screen movie theater complex in accordance with the provisions of this Lease;

(d)      That as of the Commencement Date, Landlord shall have complied with all Applicable Laws related to Landlord's Parcel and the Common Areas, so that Landlord's Parcel, the Common Areas and the business to be conducted by Tenant from the Premises may be operated in a manner consistent with the operation of a First Class shopping center;

(e)      That as of and after the commencement of Tenant's Work Period Landlord shall have complied with and performed and thereafter shall continue to comply with and perform all recommendations, requirements and obligations regarding the environmental condition of Landlord's Parcel and the Common Areas as specified in the Identified Environmental Report and Landlord will continue to comply with and all applicable Environmental Laws affecting Landlord's Parcel and the Common Areas;

(f)      That Landlord's Parcel and the Common Areas are not subject to, and Landlord will not make or enter into any agreement or lease which is inconsistent with any of Tenant's rights or privileges under this Lease;

(g)      Landlord has obtained all necessary entitlements (including zoning and site plan approvals) from the applicable Governmental Authorities to develop and operate Landlord's Parcel (including the Premises) and the Common Areas as presently used and occupied and as contemplated hereunder, except for the following:  the building permits for the construction of the Premises and applicable permits for Tenant's Signs.

(h)      Landlord represents and warrants that other than Tenant's Signs, which must be approved by the Anchors under the REA, no consents or approvals are required from any of the parties to the REA in connection with the construction and completion of Landlord's Work, Tenant's Work and the portions of the Renovation required to be completed prior to the Commencement Date, from any of the parties under the REA, and no consents or approvals are required from any Party under the REA for the use of the Premises for the Theater Use.

Landlord acknowledges that Tenant has relied on each of the foregoing covenants, warranties and representations in executing this Lease, that each of the same is material and that each of said warranties and representations are true as of the date hereof, will be true as of the Commencement Date and will remain true throughout the Term; provided, however, that Landlord shall not be deemed to have breached the representations and warranties set forth in Section 11.1(h) unless and until any Anchor obtains an injunction or other court order to halt or enjoin the construction or completion of Landlord's Work, Tenant's Work or the Renovation or the use of the Premises for the Theater Use; provided further, however, that if any Anchor (or owner of an Anchor Parcel) asserts a claim that there is a violation of the REA as a result of Landlord's Work, Tenant's Work or the use of the Premises for the Theater Use, Landlord shall indemnify, defend, protect and hold harmless Tenant from any and all losses, liabilities, damages

, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) arising from or incurred by Tenant as a result of the claim (whether or not an injunction is issued or a lawsuit is filed). In addition, and without limitation of any other right or remedy under this Lease as a result of a breach by Landlord of the representations and warranties set forth herein, if the representations and warranties set forth in Section 11.1(h) are not true and correct, and as a result thereof, any Anchor enjoins Tenant from opening the Premises or using the Premises for the Permitted Use, Landlord shall indemnify, defend, protect and hold harmless from any and all liabilities, losses, damages, costs and expenses, including, without limitation, costs of designing the Premises, costs of constructing the Premises, marketing costs, legal costs incurred in connection with the negotiation of the Lease, and any other costs or expenses incurred by Tenant, including, without limitation, reasonable attorneys' fees and expenses (collectively, the "Damages") and Landlord shall immediately upon Tenant's demand following a breach of the representations and warranties set forth in Section 11.1(h), reimburse Tenant the Damages as set forth in invoices provided to Landlord in connection with Tenant's demand.

Section 11.2.  Easement Agreements.  Landlord warrants and represents that there is and shall be no reciprocal easement agreement, operating agreement or agreement of similar import encumbering or benefiting all or any portion of Landlord's Parcel, except as may be disclosed on Exhibit G to be attached hereto, and except that from and after the date hereof, Landlord may, without Tenant's consent, enter in reciprocal easement agreements and other easements that affect the Center provided (i) those reciprocal easement agreements do not affect the Protected Area (unless Tenant consents in writing thereto, which consent shall not be unreasonably withheld, provided the proposed reciprocal easement agreements or modifications do not have a "Material and Adverse Effect" as hereinafter described, on Tenant, in which case Tenant may withhold its consent in Tenant's sole discretion), (ii) with respect to reciprocal easement agreements that do not affect the Protected Area, do not have a Material and Adverse Effect on Tenant.  As used herein any proposed action, easement or document will have a "Material and Adverse Effect" on Tenant if it will materially and adversely affect Tenant's use of the Premises or the cost of operating Tenant's business in the Premises or Tenant's rights or privileges hereunder.  Landlord shall maintain the REA and all easements that benefit the Premises, Landlord's Parcel and/or the Common Areas in full force and effect throughout the Term (except where the failure to maintain a particular easement will, other than those set forth in the REA, not affect the Protected Areas or will not have a Material and Adverse Effect on Tenant) and shall not amend or modify the REA and/or any such easement in any manner that would have a Material and Adverse Effect on Tenant or agree to subordinate any such REA or easement to any mortgage or lien so as to derogate the rights granted to Landlord or the tenants of Landlord's Parcel to the extent such rights materially benefit Tenant (and the loss of such rights would have a Material and Adverse Effect on Tenant), without the consent of Tenant, which consent Tenant may withhold in its sole discretion. Landlord shall not be deemed to have breached its obligations to maintain the REA under this Section 11.2 solely as a result of a termination of the REA in whole or in part as to an Anchor Parcel by an Anchor on or after the expiration of the existing term of the REA, in which case the terms of Section 21.18 shall apply. Landlord shall use all commercially reasonable efforts to enforce the cross easement rights, operating covenants and other similar rights in the REA and other easement documents, if any, in all material respects and shall take Landlord Anchor Enforcement Action, as applicable; provided that if Landlord fails to enforce such rights within thirty (30) days after notice from Tenant (or such additional time as is reasonably required by Landlord), in addition to any other remedies Tenant may have under this Lease, Landlord agrees that Tenant shall, to the extent not prohibited by the applicable instrument, have the right to enforce said rights directly or in the name and on behalf of Landlord, and Landlord shall reimburse Tenant upon demand therefor for the reasonable expenses incurred by Tenant in enforcing such rights, provided Tenant is the prevailing party in the enforcement action.  Notwithstanding the foregoing, Tenant shall not withhold its consent to any amendment to the REA necessary to implement the development of retail improvements in the Restaurant/Lifestyle Addition Area or restaurant improvements on the Restaurant Pads in a manner consistent with the terms of this Lease, to reduce the parking ratio under the REA from 5.0 spaces per thousand square feet of floor area to 4.5 spaces per thousand square feet of floor area, or to implement the construction and operation of the Premises and Renovation pursuant to this Lease so long as in each case the amendment does not have a Material and Adverse Effect on Tenant.  Any dispute as to whether a proposed action or document will have a Material and Adverse Effect on Tenant may be submitted to arbitration under Section 18.5 of this Lease by either Party.

**Section 11.3.   Rules and Regulations.**   Tenant shall comply with such reasonable and customary rules and regulations that Landlord may promulgate in writing from time to time for the entire Landlord's Parcel and Common Areas; provided that such rules and regulations shall not interfere with Tenant's use, occupancy or operation of the Premises for the Theater Use in any material respect, nor increase the cost of operating Tenant's business in any material respect, nor otherwise violate or conflict with this Lease or the rights and privileges granted Tenant hereunder, and provided further that Tenant shall receive not less than thirty (30) days' prior written notice of any rules and regulations proposed by Landlord before such rules and regulations become effective against Tenant; and provided further that such rules and regulations shall not be enforced against Tenant in a discriminatory manner. Landlord covenants and agrees to use all commercially reasonable efforts to enforce such rules and regulations against the other tenants and occupants of Landlord's Parcel in accordance with commercially reasonable standards of shopping center management and operation and to take Landlord Anchor Enforcement Action with respect to any Anchor's failure to comply with such rules and regulations to the extent they can be imposed on the Anchors (or any similar rules and regulations applicable to the Anchors under the REA).

**Section 11.4.   Tenant's Representation.**   Tenant hereby covenants and represents and warrants to Landlord that Tenant and each person executing this Lease on behalf of Tenant (or in any representative capacity) have full right and lawful authority to execute this Lease.

## ARTICLE 12

## COMMON AREAS AND PARKING

**Section 12.1.   Common Areas.**   During the Term, Tenant and its licensees, employees, concessionaires, invitees and customers shall have the right, easement and privilege of using in common with the other occupants of the Center and their respective employees, patrons and invitees, all Common Areas for their intended purposes.   Subject to the limitations of Section 11.3, such use shall be subject to reasonable rules and regulations of general applicability to all tenants of Landlord's Parcel (and if applicable, to the Anchors under the REA), promulgated by Landlord of which Tenant has reasonable notice, provided the rules and regulations are uniformly enforced by Landlord. Landlord shall not construct or permit or suffer the construction or location of any kiosks, pushcarts or sales booths which (i) are located within the "No Kiosk Area" shown on Exhibit A.5 of the Site Plan attached hereto (except for the "Permitted Kiosks", as shown on the Site Plan), or (ii) serve food and/or beverage items and are located within the "Protected Area" shown on Exhibit A.2 of the Site Plan attached hereto.   In addition, Landlord shall not place, construct or otherwise permit the following: (a) any vending machines located within the "No Vending Area" shown on Exhibit A.6 of the Site Plan attached hereto, or (b) any video games, pinball machines or similar entertainment devices located within the "No Video/Games Area" shown on Exhibit A.6 of the Site Plan attached hereto; (c) any improvements, including without limitation, kiosks, planters, structures or other installations of any kind in the portion of the Common Areas which run the length of Tenant's box office and extend out twenty (20) feet from Tenant's box office, as located and relocated by Tenant from time to time; or (iv) any improvements within Landlord's Parcel or the Common Areas which unreasonably impairs the visibility of Tenant's marquee storefront signage contemplated in Section 15.1. Landlord acknowledges that the queuing of Tenant's patrons will take place in the Common Areas adjacent to Tenant's box office and hereby grants Tenant the right to utilize such area for queuing purposes.

**Section 12.2.   Interference with Common Area.**   Landlord, at its sole cost and expense, shall take all reasonable steps permitted under Applicable Law to ensure that any disturbance in the Common Areas is removed or eliminated so that Tenant's business is not unreasonably hindered or interrupted, including, without limitation, taking Landlord Anchor Enforcement Action, if the disturbance is caused by the occupant of an Anchor Parcel.  Tenant (at no additional cost to Tenant) shall reasonably cooperate with Landlord to address queuing issues in the Common Areas adjacent to the Premises, to the extent permitted under Applicable Law.  Landlord covenants, warrants and represents that: (a) neither Landlord, Tenant, nor any other tenant or occupant of Landlord's Parcel (other than owners or occupants of Anchor Parcels; provided Landlord shall take Landlord Anchor Enforcement Action in order to cause the owners or occupants of the Anchor Parcel to hold such events outside of or in a minimal portion of the



Protected Area) shall have the right to use the Common Area within the Protected Area for income producing (selling) promotional events including, but not limited to, sidewalk sales and truckload sales, and the use of the Common Area located outside the Protected Area for such purposes shall at all times be conducted in a first-class manner, consistent with (or better than) the operations of a majority of other First Class shopping centers in the Metropolitan Area; (b) in no event shall Landlord, Tenant, or any other tenant or occupant of Landlord's Parcel be permitted to store or sell food, beverages or merchandise in the Common Areas within the Protected Area (except with Tenant's prior consent, not to be unreasonably withheld for outdoor patio areas adjacent to restaurants and operated as part of such restaurants) and Landlord shall take Landlord Anchor Enforcement Action to attempt to prevent the occupants of the Anchor Parcels from storing or selling food, beverages or merchandise in the Common Areas within the Protected Area, except that this provision shall not apply to kiosks, pushcarts or sales booths in the interior of the mall selling merchandise other than food or beverages and that are located outside of the No Kiosk Area; and (c) Landlord shall use commercially reasonable efforts to ensure that no deliveries to other tenants or occupants of Center during Tenant's business hours shall occur in front of any public entrance to the Center or in any manner that impairs access to the Premises. Landlord further covenants that no leases for space in Landlord's Parcel executed after the Effective Date shall grant any tenant or occupant the right to do anything prohibited by this <u>Section 12.2</u>, whether or not such tenant or occupant is currently a tenant or occupant of the Center.

**Section 12.3. <u>Parking</u>.** Landlord shall not charge or permit the operator of the Parking Areas, if any, to charge for use of the Parking Areas of the Center by Tenant or Tenant's patrons, employees, agents, contractors or invitees. Landlord warrants and represents that on the Commencement Date and thereafter throughout the Term that there will be at least the number of parking spaces in the Parking Areas as the Minimum Free Parking Spaces set forth in <u>Section 1.1</u> (both as to the Parking Areas as a whole and as to the Priority Parking Areas) and that such parking spaces shall be available to Tenant and the other occupants of the Center and their respective patrons, employees, agents, contractors and invitees on an unreserved, first-come first-served basis without time limitation. Tenant shall use all commercially reasonable efforts to cause all employees of Tenant to park their vehicles in the locations within the Parking Areas reasonably designated as "Employee's Parking" by Landlord and approved by Tenant and to assist Landlord in enforcing employee parking restrictions. Landlord will use commercially reasonable efforts to similarly obligate the other tenants and occupants of Landlord's Parcel to use commercially reasonable efforts to cause their employees to park their vehicles within the "Employee Parking" areas of the Center, as reasonably designated by Landlord and approved by Tenant from time to time and Landlord shall take Landlord Anchor Enforcement Action to ensure that the owners and occupants of the Anchor Parcels use commercially reasonable efforts to cause their employees to park in the "Employee Parking" areas. Landlord's security or maintenance personnel shall be available from dusk until dawn to escort Tenant's employees to their automobiles.

## ARTICLE 13

## USE

**Section 13.1. <u>Permitted Use</u>.** Throughout the Term, subject to <u>Section 13.2</u> below, Tenant shall have the right to occupy and use the Premises for the Permitted Use. The Premises initially shall be opened and operated by Tenant for the Theater Use; provided, however, Landlord acknowledges that the Term is long in duration and that the motion picture theater and entertainment industries are competitive and dynamic in nature and are subject to constantly changing technology and ideas, and that, notwithstanding anything to the contrary contained herein, in order to remain competitive, Tenant may need or desire (and shall be permitted) to alter, eliminate or add to the mix of motion pictures exhibited and the products or services which Tenant may sell or provide as part of the Theater Use, subject to <u>Section 13.5</u> below. Nothing in this Lease is intended or shall be applied to preclude Tenant from using the Premises for any use which is from time to time consistent with industry trends for motion picture theater operations, provided such uses comply with all Applicable Laws.

(a)     The lobby of the Premises and the Theater Use may (at Tenant's sole option) include a café or bistro area in which food and beverages (including beer, wine and other alcoholic beverages, if Tenant is able to obtain the appropriate liquor licenses)



are served. Landlord shall cooperate with Tenant (but at no cost to Landlord) to obtain from the City any and all permits and licenses allowing for the sale of beer, wine and liquor in the Premises. Landlord acknowledges that Tenant's intended use of the Premises may involve the generation of sound and noise and the emanation of cooking odors which may be discernible outside the Premises. Tenant shall not be responsible for any disruption or interference with the businesses conducted by other occupants of the Center caused by the emanation of such sounds (or inaudible vibrations) and/or odors from the Premises which are produced in the ordinary conduct of Tenant's business.

(b)    After the expiration of the Operating Covenant Period (and not before), Tenant shall have the right to change the use of the Premises to a use other than the Theater Use (an "**Alternate Use**"), subject to the following conditions: (i) Tenant shall notify Landlord of Tenant's intention to change the use of the Premises to an Alternate Use at least sixty (60) days prior to the proposed effective date thereof, such notice (the "**Change In Use Notice**") to describe in reasonable detail the proposed Alternate Use and the alterations (if any) that Tenant intends to make to the Premises to accommodate the proposed Alternate Use; (ii) such Alternate Use shall be a Compatible Use (defined below). As used herein, a "**Compatible Use**" shall mean any lawful retail, service or entertainment use or uses which is consistent with uses permitted in other comparable First Class shopping centers in the Metropolitan Area and does not violate any of the existing exclusives listed on Exhibit J attached hereto, to the extent the exclusives remain in effect, subject to Landlord's consent, which shall not be unreasonably withheld, delayed or conditioned.

Section 13.2.    **Operating Covenant**. Subject to Excused Closures, Tenant shall operate the Premises for the Theater Use "continuously" from the Commencement Date through the expiration of the Operating Covenant Period so long as a majority of the "stadium seating", "first run" motion picture theatre complexes in the suburban portions of the Metropolitan Area are open and operating. The Premises shall be deemed to be "continuously" operating in accordance with this Section 13.2 for so long as the Premises are regularly open to the public and operated for the Theater Use on such days that a majority of the first class, so called "first run" "stadium seating" motion picture theater complexes in First Class shopping centers in the suburban portions of the Metropolitan Area are regularly open to the public and operating.

Section 13.3.    **Exclusive Use**.

(a)    Landlord's Parcel. Landlord shall not sell, rent, use or permit to be used any premises or space that is located within Landlord's Parcel (other than the Premises) or any other portion of the Center hereafter acquired or controlled by Landlord or a Landlord Affiliate, or on any other land adjoining or adjacent to any part of the Center (including land separate from the Center by streets and rights of way) which is developed, owned or controlled by Landlord or a Landlord Affiliate, for use as a motion picture theater or for the commercial exhibition of full length (i.e., at least 80 minutes in length) motion pictures or films, in a manner that encourages patrons to sit down and view the entire feature from start to finish with the audio portion of the presentation being utilized, including, without limitation, so-called specialty theaters (e.g., I-Max, I-Works and Showscan-type theaters, and ride/simulator theaters), or for the sale of tickets to any other motion picture theater (other than the Premises and other theaters operated by a Tenant Affiliate). If a violation of this Section 13.3(a) occurs, Landlord shall immediately following notice from Tenant of the violation take all such actions as may be required under Section 9.4. Tenant's sole remedy (except as hereinafter specifically provided in this Section 13.3(a)) as a result of a violation of this Section 13.3(a), shall be that if the violation is continuing from and after the date which is seven (7) days following Landlord's receipt of written notice from Tenant of the violation, then from and after the expiration of the seven (7) day period until the violation is permanently discontinued, all Rent otherwise payable under this Lease shall be fully abated, and in lieu thereof Tenant shall pay Alternate Rent (except that during the first thirty (30) days that Tenant is paying Alternate Rent pursuant to this Section 13.3(a), the calculation of Alternate Rent under clause (i) of the definition of Alternate Rent shall be twelve percent (12%) of Tenant's Gross Sales for such period); for the next thirty (30) days the violation is continuing, the calculation of Alternate Rent under clause (i) of the definition of Alternate Rent shall be based upon ten percent (10%) of Tenant's Gross Sales during the



thirty (30) day period; and thereafter Alternate Rent shall be calculated in the manner set forth in the definition of Alternate Rent. In addition to the remedy in the immediately preceding sentence, if the violation continues for more than eighteen (18) months following the date of Tenant's initial notice to Landlord of the violation, then at any time following the expiration of the eighteen (18) month period, Tenant may elect to terminate this Lease by written notice to Landlord given at any time after the expiration of the eighteen (18) month period and prior to the permanent cessation of the violation (provided that Tenant's right to terminate shall be conditioned upon Tenant having been damaged by the violation (with the determination of whether Tenant has been damaged to take into account all relevant factors including the impact of any reduced rent paid by Tenant during the applicable period pursuant to this Section 13.3(a)), and Tenant shall provide reasonable documentation as to the damages suffered by Tenant). Any dispute as to whether Tenant has been damaged by a violation of this Section 13.3(a) may be referred by either Party for resolution by arbitration pursuant to Section 18.5 of the Lease. Finally, in addition to exercising the remedies set forth above in this Section 13.3(g), at any time that a violation of this Section 13.3(a) is continuing, Tenant may elect to take an assignment of Landlord's rights under Landlord's lease, license or other agreement with the person or entity taking the action which violates this Section 13.3(a), and to enforce Landlord's rights thereunder (or any other rights Landlord may have at law and/or in equity with respect to the violation), in Landlord's name, and upon Tenant's request, Landlord shall assign all such rights to Tenant, and shall execute such documentation as may be reasonably required to enable Tenant to enforce Landlord's rights, including reasonably cooperating with Tenant in connection with any enforcement proceedings.

(b)    Anchor Parcels.  Landlord has informed Tenant that the portions of the Center consisting of the Anchor Parcels are currently owned and occupied by the Anchors and are not part of Landlord's Parcel, and that Landlord may not currently have the right through the REA or any other existing contractual arrangement, to prevent any Anchor from utilizing its respective Anchor Parcel in a manner which would constitute an Anchor Violation (as hereinafter defined). Notwithstanding the foregoing, Landlord agrees that if any owner, operator and/or tenant of an Anchor Parcel requests consent or approval of Landlord under the REA or otherwise for use of all or any portion of any Anchor Parcel in a manner which constitutes an Anchor Violation or seeks approvals or permits from any Governmental Authority to utilize all or any portion of an Anchor Parcel in a manner which would constitute an Anchor Violation, Landlord shall not grant any such consent or approval and shall use diligent best efforts through appropriate legal proceedings to oppose any efforts of the owner, operator and/or tenant to obtain approvals to utilize the Anchor Parcel in a manner which constitutes an Anchor Violation and to enforce any rights of Landlord with respect to such Anchor Violation. Without limitation of the foregoing, if Landlord obtains an Anchor Exclusive Consent (as hereinafter defined) from an Anchor, and an Anchor Violation thereafter occurs with respect to such Anchor or its Anchor Parcel, Landlord shall promptly (after becoming aware of the violation or receipt of notice from Tenant, whichever is earlier) take Landlord Anchor Enforcement Action to cause the Anchor Violation to cease. Landlord further acknowledges that the use of any Anchor Parcel in a manner which constitutes an Anchor Violation may result in significant, irreparable harm to Tenant. Accordingly, Landlord and Tenant further agree that unless and until Landlord obtains an enforceable agreement(s) in form reasonably satisfactory to Tenant from each of the Anchors acknowledging that the signing Anchor (and the Anchor Parcels owned by the signing Anchor) will be prohibited from taking or allowing the Anchor Parcel to be used in a manner that would constitute an Anchor Violation (each, an "Anchor Exclusive" Consent), if at any time during the Term (i) any portion of any Anchor Parcel which is not bound by an Anchor Exclusive Consent is used for a motion picture theater or for the commercial exhibition of full length (i.e., no less than 80 minutes) motion pictures or films (with audio of the feature being utilized) whether on a continuous, recurring or periodic basis, in a manner that encourages patrons to sit down and view the entire feature from start to finish, including without limitation, so-called specialty theaters (e.g., I-Max, I-Works and Showscan-type theaters) (each, an "Anchor Violation"), and (ii) (A) Tenant's Gross Sales (on an annualized basis) from the Premises during the twelve (12) month period after the commencement of the Anchor Violation (the "Calculation Period") are less than or equal to eighty percent (80%) of Tenant's average



annual Gross Sales during (1) the three (3) year period ending at the end of the calendar month immediately preceding the calendar month in which the Anchor Violation occurs or (2) if the Anchor Violation occurs less than three (3) years, but more than one (1) year after the Commencement Date, the calculation of Tenant's average annual Gross Sales shall be based upon Tenant's Gross Sales during the period from the Commencement Date until the end of the calendar month immediately preceding the Anchor Violation (which average Gross Sales in the case of clauses (1) and (2) shall be adjusted upward on a pro rata basis to reflect any Excused Closures during the one (1) year period and any portion of the applicable period that Tenant is not operating in breach of Section 13.2, or (B) if the Anchor Violation commenced less than one (1) year following the Commencement Date, Tenant provides evidence (based on projections), that Tenant's Gross Sales for the Calculation Period (adjusted upward to reflect Excused Closures and periods that Tenant is not operating in breach of Section 13.2) were at least twenty percent (20%) less than Tenant's Gross Sales would have been, absent such Anchor Violation (with any dispute as to the amount of the reduction in Tenant's Gross Sales under this clause (B) to be resolved by arbitration in accordance with Section 18.5) (as applicable under causes (A) or (B), the "Required Gross Sales Reduction"), then the following shall apply with respect to each such Anchor Violation:

      (x)    In addition to Tenant's rights set forth in Section 13.3(b)(y) below, if Landlord has not caused the Anchor Violation to cease within eighteen (18) months following the date the Anchor Violation first occurs, Tenant shall have the right to terminate this Lease by written notice to Landlord given at any time thereafter and prior to cessation of the Anchor Violation, which notice shall specify the effective date of termination (provided, however, if an Anchor Violation ceases, but thereafter recommences within twelve (12) months following the date the Anchor Violation ceased, such Anchor Violation shall be deemed to have been continuing throughout the period the Anchor Violation was temporarily suspended for all purposes and calculations under this Section 13.3(b)); and

      (y)    During the period commencing as of the date the Anchor Violation occurs until the date the Anchor Violation ceases, in lieu of paying Base Rent, Percentage Rent and Additional Rent, Tenant shall pay monthly, in arrears on the fifteenth day of each calendar month thereafter an amount ("Modified Percentage Rent") equal to Tenant's Gross Sales for the immediately preceding calendar month (prorated for partial calendar months) multiplied by eight percent (8%); provided further, however, that because Landlord and Tenant will not know whether the Required Gross Sales Reduction has occurred until the end of the Calculation Period, during the Calculation Period, Tenant shall only pay Modified Percentage Rent, and if at the end of the Calculation Period, the Required Gross Sales Reduction has not occurred, the Rent payable by Tenant shall be adjusted to equal the Base Rent, Percentage Rent and any Additional Rent which was otherwise due for such period under this Lease and Tenant shall promptly pay to Landlord any amounts owed for the Calculation Period (or Landlord shall promptly refund any overpayment). To the extent Tenant is entitled to pay Modified Percentage Rent, at the end of each calendar year, the payments of Modified Percentage Rent shall be reconciled in accordance with the procedures set forth in Section 4.2 through Section 4.4.

      (c)    Recordation.  The provisions of this Section 13.3 shall be included in the Memorandum of Lease and recorded against Landlord's Parcel.

      (d)    Tenant Involvement.  None of the foregoing provisions of this Section 13.3 shall apply to the use of any portion of the Center by Tenant or any entity in which Tenant directly or indirectly has an ownership interest in, or that Tenant has entered into a financial arrangement with (such as a loan or consulting agreement) for purposes of encouraging such entity to exhibit motion pictures at the Center.

      (e)    Termination.  The rights granted Tenant under Sections 13.3(a) and 13.3(b) shall terminate if Tenant ceases operating the Premises for the Theater Use for other than Excused Closures for twelve (12) consecutive full calendar months, provided



that no violation of Sections 13.3(a) or (b) was continuing at the time Tenant ceased operations.

Section 13.4.    Food Sales, Advertising and Long-Term Retail Area.  Landlord will not sell or suffer or permit to be sold or served: (i) popcorn from any premises or space (other than the Premises) within Landlord's Parcel, or (ii) bulk candy from any premises or space (other than the Premises) within the "Candy Restricted Area" shown on the Site Plan, or (iii) frozen carbonated beverages, soft drinks, coffee or espresso drinks from any premises or space (other than the Premises) within the "Beverage Restricted Area" shown on Exhibit A.6 of the Site Plan, or (iv) hot dogs, pizza by the slice, chicken tenders, pastries, or other food or beverage items generally sold in movie theaters as of the Effective Date, anywhere within or from the Common Areas or from any other premises or space (other than the Premises) located within or adjacent to the "General Concession Restricted Area" shown on Exhibit A.6 of the Site Plan; for clarity, Tenant acknowledges that the Candy Restricted Area, the Beverage Restricted Area and the General Concession Restricted Area do not affect any level of the Center other than the level on which Tenant's main entrance to the Premises is located (i.e., the "second floor" of the Center).  In addition, Landlord shall not provide, or permit or suffer to be provided, any free or complementary food or beverages from anywhere on Landlord's Parcel (other than the Premises and other than sample tastings entirely within another tenant's premises) that is located within five hundred feet (500') of Tenant's box office and is on the same level of the mall building as Tenant's box office is located.  In addition, Landlord shall take Landlord Anchor Enforcement Action to prevent the Anchors from providing any complementary food or beverages from any portion of the Common Areas on the Anchor Parcels that is on the same level of the mall as Tenant's box office, and is within five hundred feet (500') of Tenant's box office.  Further, except for the signage contemplated under Article 15, Landlord shall not display or distribute or permit or suffer to be displayed or distributed, anywhere within Landlord's Parcel or (to the extent Landlord has the right under the REA or otherwise to restrict such activities in the Common Areas) the Common Areas, any signage, advertisement, flyer, announcement or other information that directly or indirectly refers to the Premises (by name, description of Tenant's business or otherwise) or invites a comparison to the food, beverages or other concessions sold or served within Premises.  (As an example and not as a limitation of the foregoing, no tenant or other occupant of Landlord's Parcel shall be permitted to display signage or other advertising that states or implies that food or beverage products sold within such premises may be available at prices lower than the prices for similar food or beverage products within the Premises.)  The provisions of this Section 13.4 shall be included in the Memorandum of Lease and recorded against Landlord's Parcel.  The provisions of this Section 13.4 shall not, however, apply to conduct within a current tenant's premises that Landlord cannot legally prohibit under the terms of such tenant's currently existing lease but Landlord covenants to include such prohibitions in any extension of such currently existing lease for which Landlord's approval is required and in all future leases.  Additionally, Landlord shall adopt rules and regulations with respect to the Common Areas that contain the prohibitions in this Section 13.4 and shall enforce such rules and regulations.  Finally, Landlord shall not enter into Temporary Leases for space within the Long Term Retail Area or leases with Non-Retail tenants for any space in the Long-Term Retail Area during the initial Term of this Lease without Tenant's prior written consent, which shall not be unreasonably withheld, except that Tenant's consent shall not be required in connection with the execution of Temporary Leases with first class seasonal retail tenants (e.g., Hickory Farms).

Section 13.5.    Prohibited Uses for Center.  Neither the Premises nor any other space or premises in Landlord's Parcel (or the Common Areas) shall be used or operated for any business or operation that is inconsistent and incompatible with the operation and reputation of a First-Class, family-oriented retail/entertainment center or for any use which is repugnant to the sensibility of the community in general, including, without limitation, (i) a store primarily selling or leasing sexually explicit materials, (ii) a movie theater showing "X" rated or other pornographic movies, excluding movies rated NC-17, (iii) a massage parlor, (iv) a so-called "head shop" or drug paraphernalia store, (v) a store showing so-called "peep" shows, (vi) a facility featuring strip tease acts, nude or topless dancing or similar activities, (vii) a store primarily selling items concerning sexuality (e.g. a so-called "sex shop"), (vii) any store which is located within seventy-five feet (75') of the main entrance to the Premises on the same level of the mall as the Premises and which features in its storefront displays, advertising or otherwise in a manner readily visible from outside such premises, lingerie or swimwear or sexually provocative clothing or models (such as for example, the typical "Victoria's Secret" stores



operated as of the Effective Date); provided that Tenant acknowledges and accepts the current location of the existing Victoria Secret's Store in the Center, which location is shown on Exhibit A.10 of the Site Plan attached hereto, (viii) an off-track betting parlor, or (ix) a funeral home or mortuary. If any owner or occupant of an Anchor Parcel shall utilize its Anchor Parcel in a manner which is inconsistent with the restrictions set forth in this Section 13.5 with respect to Landlord's Parcel, Landlord shall promptly take Landlord Anchor Enforcement Action to seek to prevent such use.

**Section 13.6.    No Lease Prohibitions.**  Landlord represents and warrants that (i) no lease or other operating agreement affecting the Center (including, without limitation, the Permitted Encumbrances) prohibits or restricts (or will prohibit or restrict) the operation of the Premises for the Theater Use described above, and (ii) there are no so-called exclusive uses or restricted uses which may apply to the Premises or bind Tenant other than those listed on Exhibit J attached hereto.

**Section 13.7.    Prohibition of Use.**  If at any time during the Term that Tenant is operating the Premises for the Theater Use (including periods of Excused Closures), it shall become illegal to operate a motion picture theater complex within the Premises, Tenant may terminate the Lease unless Landlord obtains a temporary restraining order, an injunction or an enforceable written agreement from the appropriate prosecutor's office against the enforcement of such Applicable Law or restriction within one hundred eighty (180) days of Tenant giving notice to Landlord of, or Landlord becoming aware of (whichever is earlier), its passage. Tenant shall reasonably cooperate with Landlord, at no additional cost to Tenant, in connection with such efforts. If such prohibition shall occur during the time that Tenant is operating the Premises for the Theater Use (including periods of Excused Closure), Rent and all other charges payable by Tenant under this Lease shall be fully abated from the later of the date the prohibition becomes effective or the date Tenant ceases its operations until the Lease is terminated.

**Section 13.8.    Landlord's Parcel Modifications.**  Landlord shall, if Landlord or any Landlord Affiliate acquires all or any portion of a Anchor Parcel, or any other land adjacent to the Center, promptly notify Tenant of the acquisition, and from and after the acquisition, such property shall be deemed a part of Landlord's Parcel (and shall no longer be considered an Anchor Parcel, even if subsequently sold to another Anchor). In addition, promptly after any such acquisition, Landlord shall enter into an amendment to the Memorandum of Lease so that all of the terms and provisions thereof are applicable to the acquired land, and the acquired land shall be deemed a part of Landlord's Parcel for all purposes under this Lease, from and after the date of acquisition.

## ARTICLE 14

## ASSIGNMENT AND SUBLETTING

**Section 14.1.    Assignment and Subletting.**  Except as otherwise provided herein (including, without limitation, Section 14.2 below), Tenant shall not assign this Lease or any interest herein nor sublet the Premises or any portion thereof (singularly, a **"Transfer"** and collectively, **"Transfers"**) without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned and which shall be deemed given unless Landlord expressly withholds its consent to a proposed Transfer and provides the specific reasons therefor, in writing, within twenty (20) days after Tenant requests such consent in writing. Four Wall Deals and customary license and/or concession arrangements shall not be "Transfers" hereunder and shall be permitted without Landlord's consent. In addition, the issuance of and sales or transfers of stock in Tenant shall not be deemed "Transfers" and shall be permitted without Landlord's consent. Except as provided in Section 14.3, no Transfer shall relieve Tenant from liability hereunder. Any disputes between Landlord and Tenant regarding the necessity of obtaining or the reasonableness of Landlord's consent shall, at the request of either Party, be resolved by arbitration pursuant to Section 18.5 below.

**Section 14.2.    Permitted Transfers.**  Notwithstanding anything to the contrary contained herein, Tenant shall have the right, without the necessity of seeking or obtaining Landlord's prior written consent (such consent being hereby granted), to assign this Lease or to sublet all or any portion of the Premises or otherwise to effect a Transfer under this Lease in connection with the following transactions (individually and collectively, the **"Permitted**



Transfers"): (a) any Transfer to a Tenant Affiliate; or (b) any Transfer to any entity or person that expressly assumes all of Tenant's obligations hereunder and either: (i) merges or consolidates with Tenant, or (ii) acquires not less than twenty percent (20%) of Tenant's theaters, or (iii) acquires seven (7) or more of Tenant's theaters. In addition, Tenant shall have the right, without the necessity of seeking or obtaining Landlord's prior written consent (such consent being hereby granted), to effect: (A) any Transfer in connection with which Tenant (or any other entity to which Tenant could effect a Permitted Transfer without Landlord's consent) continues to operate and manage the Premises (i.e., a so-called sale-leaseback or lease-leaseback transaction); and/or (B) any Transfer for collateral purposes, to secure any financing obtained by Tenant.

Section 14.3.   Release.  If Tenant shall enter into an assignment of this Lease which is consented to by Landlord or constitutes a Permitted Transfer under Sections 14.2(a) or (b), then Tenant shall be released from all further obligations and liabilities thereafter arising under the Lease from and after the date of the assignment provided, however, that as a condition to any release in connection with an assignment under Section 14.2(a) or Section 14.2(b)(iii), the entity or individual which is the assignee under this Lease must have a tangible net worth of no less than Twenty Five Million Dollars ($25,000,000.00) ("Minimum Net Worth") as determined in accordance with generally accepted accounting principles (which Minimum Net Worth shall be increased on each Adjustment Date by the CPI Adjustment).  In addition, nothing contained in this Section 14.3 shall be deemed to release the surviving entity in any merger or consolidation under Section 14.2(b)(i) from liability under this Lease.

## ARTICLE 15

### SIGNAGE

Section 15.1.   Tenant's Signs.  Landlord acknowledges the importance and benefit to Landlord, Tenant and the Center of having prominent signage advertising and providing information regarding the Premises and the features thereof.  Subject to obtaining required governmental and Anchor approvals, Landlord shall install and provide for Tenant's use during the entire Term signage throughout the Center prominently featuring Tenant's corporate logo and branded font, consisting of the following (collectively, "Tenant's Signs"): (i) the marquee signage (the "Marquee Sign") described in the definition of the Premises in Section 1.2, the design of which shall be approved by Tenant in accordance with the Work Letter (and the cost of which shall be allocated between Landlord and Tenant in accordance with the Work Letter); (ii) a prominent, illuminated (with Landlord to use commercially reasonable efforts to obtain approvals to have neon or other similar enhancements to the Blade Sign illumination) blade sign ("Blade Sign") containing the Century font, name and logo (which Century name, font and logo must be illuminated) which extends above the roof of the Building, designed in a manner to attempt to maximize visibility from the entry roadways of the Center and all exterior streets surrounding the Center, the exact design of which shall be approved by Tenant in accordance with the Work Letter (and the cost of which shall be allocated between Landlord and Tenant in accordance with the Work Letter); (iii) shared (i.e., having signage for multiple tenants) pylon and monument signs for the Center (installed and maintained at Landlord's sole cost and expense, except that Tenant shall provide and maintain the panels with Tenant's name and logo to be placed on the pylon signs, and to the extent the pylon signs are separately metered, Tenant shall reimburse Landlord for Tenant's pro rata share of the electrical costs for the pylon signs, based on the ratio of the square footage of Tenant's panel to the square footage of all tenant panels on the applicable sign) at the locations shown on the Site Plan (or in such other locations as may be agreed upon by Landlord and Tenant) upon which Tenant shall be entitled to have placed Tenant's identification sign panels (using Tenant's corporate marks or name, as approved and supplied by Tenant), with Tenant's name/sign panel to be at least as large as the names/sign panels of any other tenant or Anchor placed on each such sign (if Landlord is able to gain all necessary approvals to incorporate an LED reader board in lieu of panels on a shared pylon and monument sign on which a Century is entitled to a panel, Century shall be entitled to participate on the LED reader board at least as much as any other tenant or Anchor that participates on the LED reader board); and (iv) the directional signage described in Section 15.7 below.  Tenant shall have the right, however, to elect not to use or have installed all or any portion of Tenant's Signs, which election shall be made on or prior to the approval of the Final Plans pursuant to the Work Letter. Landlord shall be responsible for obtaining any required governmental and Anchor



approvals for Tenant's Signs (but not for subsequent changes to Tenant's Signs made after the installation thereof).

Section 15.2.  **Maintenance of Tenant's Signs.**  Tenant's Signs located within or upon the Premises (including the Blade Sign) shall be maintained in good repair and in compliance with Applicable Laws by Tenant at Tenant's expense, including the cost of any electricity consumed in illuminating such signs; provided, however, that Landlord shall be responsible for repairing, maintaining, and replacing the structural elements of the Blade Sign, for remedying any noncompliance of Tenant's Signs with Applicable Laws on the Commencement Date, and for remedying any defects in design, materials or workmanship of Tenant's Signs, to the extent installed as part of Landlord's Work (subject to the limitations of Section 9.1).  Tenant's Signs located outside the Premises (excluding the Blade Sign), and all other signage within the Common Areas of the Center, including directional and informational signage for the benefit of the Premises shall be maintained in good repair and in compliance with all Applicable Laws by Landlord at Landlord's expense, subject to Tenant's obligations to maintain Tenant's sign panels and to reimburse electrical costs incurred in connection with the operation (but not construction) of the pylon signs in accordance with Section 15.1(iii).

Section 15.3.  **Sign Permits.**  Landlord shall be responsible for obtaining all necessary governmental approvals for Tenant's Signs (but not for subsequent changes to Tenant's Signs made after the installation thereof), in connection with Landlord's efforts to obtain the general development entitlements for the Center.  Tenant shall cooperate and join with Landlord in filing and prosecuting all applications, appeals and/or variances for the obtaining of sign permits and other governmental approvals (and tenant approvals) that may be required with respect to Tenant's Signs, including furnishing sketches and/or plans showing the signs.

Section 15.4.  **Sign Easements.**  There shall be appurtenant to the Premises, and Landlord hereby grants to Tenant, easements over, under and across Landlord's Parcel and the Common Areas (to the extent of Landlord's rights therein) for the purpose of enabling Tenant to have access to the off-Premises Tenant's Signs, to maintain and service the same and to ensure the continued availability of power.

Section 15.5.  **No Obstructions.**  Landlord shall not place or permit any improvements, landscaping, signs or other obstructions in Landlord's Parcel or in the Common Areas (or grant permission or approval to any Anchor to place landscaping, signs or obstructions on any Anchor Parcel or Landlord's Parcel and/or the Common Areas) which would unreasonably or materially interfere in any way with the visibility of Tenant's Signs from the Common Area or from adjoining streets and sidewalks.  Landlord shall also take Landlord Anchor Enforcement Action to cause the removal of any landscaping, signage or other obstructions on any Anchor Parcel which unreasonably or materially interferes with the visibility of Tenant's signs.  All other signs which can be viewed from the exterior of the Center located on Landlord's Parcel or in the Common Area shall be professionally made tenant identification signs which are attractive and in good taste (and Landlord shall take Landlord Anchor Enforcement Action, to ensure that signage on the Anchor Parcels is consistent with the foregoing requirements).

Section 15.6.  **Roof-Top Access.**  Throughout the Term, subject to Applicable Laws, Tenant shall have the right (and without charge by Landlord) from time to time to install, locate, maintain, use, replace and repair satellite dishes and other roof-top communications equipment ("**Roof Top Equipment**") on the roof of the Building above or adjacent to the Premises, in locations and of a size approved by Landlord, which approval, in each case shall not be unreasonably withheld, conditioned or delayed.  All Roof Top Equipment shall only be used in connection with the operation of Tenant's business in the Premises.  Tenant shall give Landlord reasonable prior notice of entry onto the roof of the Building for purposes of exercising its rights under this Section 15.6.  In addition, in connection with its installation, repair, replacement and removal of any Roof Top Equipment, Tenant shall comply with the terms of any roof warranty that Landlord has provided to Tenant and any other reasonable recommendations of Landlord related to the use of the roof.  While Tenant's roof-top rights shall not be exclusive, Landlord shall ensure that any roof top equipment placed by anyone other than Tenant on the roof of the Building shall not interfere with the use or operation of Tenant's Roof Top Equipment then or thereafter installed, shall reserve sufficient space on the roof to allow Tenant to utilize Roof Top Equipment, and prior to allowing the installation of any roof top equipment (other than Tenant's) shall reserve the right to relocate such equipment in order to accommodate the installation and

58

operation of Tenant's Roof Top Equipment, and Landlord shall enforce the right to relocate any other parties' roof top equipment to the extent reasonably necessary to enable Tenant to utilize its intended Roof Top Equipment.

**Section 15.7.** **Directional Signs.** In addition to Tenant's Signs specified above, Landlord shall install and maintain directional signage in appropriate locations (to be agreed upon by the Parties pursuant to the Work Letter) throughout the interior and exterior portions of the Center to inform the patrons of the Center of the location of and means of access to the Premises. The directional signage shall identify Tenant by using Tenant's corporate name and font.

## ARTICLE 16

## DAMAGE AND DESTRUCTION

**Section 16.1.** **Landlord and Tenant to Rebuild.** Subject to Landlord's or Tenant's option to terminate this Lease as hereinafter set forth, if the Premises or any other part of the Landlord's Parcels or the Common Areas, or Tenant's Property shall be damaged, destroyed or rendered untenantable, either in whole or in part, by fire, the elements or other casualty, whether or not such casualty is insured, then Landlord (with respect to the affected portions of the Common Areas and Landlord's Parcel, including the Premises, except Tenant's FF&E and other removable personal property within the Premises) and Tenant (with respect to Landlord's FF&E, Tenant's FF&E and other removable personal property within the Premises), shall promptly rebuild, repair or restore all affected buildings, improvements and property to the condition that existed immediately prior to such casualty, with only such alterations as would be permitted hereunder in the absence of such casualty (the "**Restoration Work**"); provided, however, that Tenant shall not be obligated to commence or proceed with Tenant's Restoration Work unless and until Landlord's Restoration Work (if any is required) is substantially complete. No delay or deficiency in settlement of any insurance claim shall excuse either Party from its obligation to restore the affected improvements and property. Each Party shall be completely liable for the proper disposition of the insurance proceeds paid to it or for its benefit in the event of a fire or casualty. With respect to any Restoration Work involving Landlord's FF&E which is not covered by the insurance maintained by Landlord or Tenant on Landlord's FF&E as provided for in Section 7.1, if the cost of the Restoration Work for Landlord's FF&E which is not covered by insurance does not exceed $10,000, Tenant shall pay the costs, and if the costs not reimbursed by insurance exceed $10,000, Landlord shall reimburse Tenant within ten (10) business days following demand, for one-half of the cost of such work in excess of the amount of insurance proceeds Tenant receives (including one-half (1/2) of any deductible amount).

If any buildings or other improvements within Landlord's Parcel or Common Areas are damaged or destroyed and are not required to be rebuilt, repaired or restored pursuant to this Section 16.1 and if Landlord elects not to undertake the rebuilding, repair or restoration thereof as part of Landlord's Restoration Work, then Landlord nevertheless (as part of Landlord's Restoration Work) shall raze the applicable buildings and improvements, remove all construction debris, and pave or landscape the affected areas in a First Class manner so that the affected areas shall be incorporated into the Common Areas of the Center and shall be available for the non-exclusive use and benefit of Tenant and the other tenants of Landlord's Parcel as contemplated hereunder. In addition, if any buildings or other improvements within the Anchor Parcel are damaged or destroyed and the Anchor elects not to restore the building or improvements in accordance with the REA, Landlord shall take Landlord Anchor Enforcement Action to cause the owner of the Anchor Parcel to raze the applicable buildings and improvements, remove all construction debris and pave, or landscape the affected areas in a First Class manner. In addition, if buildings or improvements within an Anchor Parcel are damaged or destroyed, and the Anchor does not diligently commence or complete the restoration work, where the Anchor is obligated to do so under the REA, Landlord shall take Landlord Anchor Enforcement Action to cause the applicable Anchor to rebuild and restore the applicable building and improvements.

**Section 16.2.** **Procedure.** Landlord (or Landlord's mortgagee, if required by the terms of Landlord's mortgage), shall hold in trust any funds payable to Landlord by Landlord's insurance carrier for the restoration of the affected improvements to be restored by Landlord pursuant to this Article 16 in a separate account prior to actual disbursement of funds to restore the affected improvements; with respect to Landlord's FF&E, if Landlord is the insuring



party pursuant to Section 7.1, Landlord shall pay the proceeds of such insurance to Tenant to be held by Tenant for use in the Restoration Work being performed by Tenant; and Tenant (or Tenant's leasehold mortgagee, if required by the terms of Tenant's mortgage), Tenant shall hold in trust any funds payable to Tenant by Tenant's insurance carrier for the restoration of the affected improvements required to be restored by Tenant pursuant to this Article 16 in a separate account prior to actual disbursement of funds to restore the affected improvements. The applicable Restoration Work shall be performed in a good and workmanlike manner in accordance with the original plans and specifications for the affected improvements, except to the extent changes are required under Applicable Law and except for alterations and other changes permitted hereunder. As the reconstruction progresses, the insurance funds (and other funds required to pay for the Restoration Work, if the insurance funds are not sufficient) will be disbursed by Landlord or Tenant (or their respective mortgagees), as the case may be, in accordance with standard construction disbursement practices. Landlord and Tenant each covenants and agrees that all liens that are filed as a consequence of its Restoration Work will be discharged or bonded over as expeditiously as possible so as not to delay reconstruction, and in any event any such lien shall be discharged or bonded over within thirty (30) days of filing. At the completion of the reconstruction of Landlord's Restoration Work, and before Tenant shall be obligated to commence Tenant's Restoration Work, Landlord shall cause its architect to certify to Tenant that Landlord's Restoration Work has been properly completed in accordance with the aforementioned plans and specifications.

**Section 16.3.    Right to Terminate.**

(a)    If, as a result of any damage or destruction to the Premises or as a result of any damage or destruction to any other portion of Landlord's Parcel or the Common Areas (whether or not the Premises or any part thereof is directly damaged), the operation of Tenant's business in the Premises as contemplated hereunder becomes impracticable, whether directly as a consequence of damage or destruction or indirectly as a consequence of Landlord's Restoration Work (herein, a "**Substantial Casualty**"), and if (i) such damage or destruction cannot reasonably be repaired (subject only to completion of punchlist items) within fifteen (15) months following the date of such damage or destruction, or (ii) such damage or destruction has not been repaired (in fact) (subject only to completion of punchlist items) fifteen (15) months following the date of such damage or destruction (subject to extension for not more than ninety (90) days for delays caused by Force Majeure), then in either case Tenant shall have the right to terminate this Lease upon thirty (30) days' prior written notice to Landlord given within sixty (60) days following the date of the damage or destruction or within sixty (60) days following the expiration of the fifteen (15) month period (as extended for delays caused by Force Majeure), (i) of the termination is pursuant to clause (ii) above, as the case may be; provided that if the restoration is completed (subject only to punchlist lists) on or prior to thirty (30) days following the date of the termination notice, the termination shall not be effective. In addition, if a Substantial Casualty occurs and if such damage or destruction cannot reasonably be repaired within fifteen (15) months following the date of the damage or destruction, Landlord may elect to terminate the Lease upon thirty (30) days prior written notice to Tenant given on or before the date which is sixty (60) days following the date of the damage or destruction; provided that if the restoration is completed (subject only to punchlist lists) on or prior to thirty (30) days following the date of the termination notice, the termination shall not be effective. Any dispute between Landlord and Tenant as to the estimate of the time period for repair or as to whether the operation of Tenant's business has become impracticable, may be submitted to arbitration pursuant to Section 18.5. In no event shall any damage or destruction of all or any portion of any building on Landlord's Parcel (other than the Premises, any of the Common Areas or any portion of the Protected Area) give Tenant or Landlord the right to terminate this Lease under this Section 16.3(a) if (A) the vacating of the damaged or destroyed space in the absence of damage or destruction, would not cause a violation of the Co-Tenancy Condition and (B) after taking into account any Floor Area being restored, and excluding any Floor Area which will not be restored, the Floor Area of the portions of the Center remaining on Landlord's Parcel will be equal to or greater than the Minimum Center Floor Area. In addition, if Landlord elects to terminate this Lease pursuant to this Section 16.3(a) but Landlord nevertheless repairs or restores the Center within two (2) years after the date of termination of this Lease with a movie theater



located therein, then Tenant shall have the right and option to reinstate this Lease with the number of Lease Years (and Extension Terms) remaining as of the date of termination.

(b)    If Tenant's Property is damaged or destroyed to the extent of thirty percent (30%) or more of the replacement cost thereof at any time during the last five (5) years of the Term or during any Extension Term, then in either case this Lease may be terminated at Tenant's option upon written notice to Landlord within sixty (60) days of such casualty and in such event Tenant shall not be obligated to perform Tenant's Restoration Work; provided, however, that Landlord may nullify Tenant's election to terminate pursuant to this Section 16.3(b) by providing Tenant with notice, within thirty (30) days following Tenant's termination notice, that Landlord elects to perform and fund all costs of Tenant's Restoration Work and thereafter. Landlord shall diligently commence and complete Tenant's Restoration Work and Landlord shall be the owner of all items installed by Landlord at Landlord's expense as part of Tenant's Restoration Work.

(c)    If the Premises or the Center are damaged or destroyed to the extent of twenty percent (20%) or more of the replacement cost thereof during the last two (2) Lease Years of the Term and Landlord desires not to undertake the applicable Restoration Work then Landlord may elect not to perform Landlord's Restoration Work and to terminate this Lease, by notice of such election to Tenant within sixty (60) days of such casualty, provided that such notice shall be void and Landlord shall nevertheless undertake Landlord's Restoration Work if, within twenty (20) days after receipt of Landlord's notice, Tenant notifies Landlord that Tenant elects to exercise its option to extend the Term (if any unexercised Extension Terms then exists), in which event the Term shall be extended for the next Extension Term, if any. If this Lease is terminated as a consequence of this Section 16.3(c) but Landlord nevertheless repairs or restores the Center within two (2) years after the date of termination and places a movie theater therein, then Tenant shall have the right and option to reinstate this Lease for the number of Lease Years (and Extension Terms) remaining as of the date of termination.

(d)    Except as provided above and subject to Landlord's and Tenant's respective restoration and repair obligations, Landlord shall be entitled to all insurance proceeds payable in respect to any damage to or destruction of the Center, exclusive of the Premises and to Tenant's Property, and Tenant shall be entitled to all insurance proceeds payable in respect to any damage to or destruction of the Premises and/or Tenant's Property. If this Lease is terminated pursuant to this Section 16.3, then any insurance proceeds received by Tenant for Landlord's FF&E shall be paid by Tenant to Landlord

Section 16.4.    Rental Abatement. If, as a result of any damage or destruction to the Center or the performance of Landlord's Restoration Work, access to or visibility of the Premises, the operation of Tenant's business in the Premises (such as may be caused by excessive noise or debris in connection with Landlord's Restoration Work), or use of or access to the Common Areas within the Protected Area, or the use of or access to the Parking Area is materially and adversely affected, whether directly as a consequence of the damage or destruction or indirectly as a consequence of the repair and restoration activities, but Tenant nevertheless continues to operate its business in the Premises, then Base Rent otherwise payable by Tenant shall be Equitably Abated during the applicable period. If the damage or destruction is so extensive as to constitute a Substantial Casualty and Tenant ceases operating its business in the Premises as a consequence thereof, then the Rent and other charges payable hereunder shall abate in full until such time as Landlord substantially completes Landlord's Restoration Work or Tenant recommences operation of its business in the Premises, whichever first occurs. If this Lease is terminated as a result of damage or destruction and if any Rent or other charge has been paid in advance by Tenant, then Landlord shall refund to Tenant all sums so paid for the period after the date of termination and if Tenant has ceased operating prior to the date of termination, all Rent paid by Tenant for the period from and after the date Tenant ceased operations shall also be refunded to Tenant. If, during the period after the casualty occurs and prior to termination, Tenant operates its business within all or a portion of the Premises, any Rent paid by Tenant for the period of operation shall also be Equitably Abated, and Landlord shall refund to Tenant any overpayment.

Century Stratford Square Lease.v21.12-5-05



**Section 16.5.  Tenant's Special Self-Help Rights.**  If the Premises or the Common Areas within the Protected Area or the Critical Accessways are damaged or destroyed in any manner that (directly or indirectly) materially interferes with the conduct of Tenant's business in the Premises and this Lease is not terminated in accordance with this Article 16 but either (i) Landlord fails to commence Landlord's Restoration Work with respect thereto within sixty (60) days after the date of such damage or destruction or as soon thereafter as is reasonably practical or (ii) Landlord commences Landlord's Restoration Work with respect thereto but subsequently fails to prosecute the completion of Landlord's Restoration Work diligently, then unless Landlord commences or recommences the diligent prosecution of Landlord's Restoration Work within thirty (30) days after Tenant notifies Landlord (and each mortgagee of Landlord's Parcel to whom Tenant has been directed in writing to give notices of Landlord's default) of such failure, then: (a) such failure shall constitute a material default by Landlord hereunder, and (b) in addition to all other remedies available to Tenant as a consequence of such default, with respect to the Premises, the Protected Area and the means of access to, from and between the Premises and the Protected Area (including the Critical Accessways), Tenant shall have the right and easement (but not the obligation) to enter onto the affected portions of the Center and to undertake and thereafter prosecute the completion of Landlord's Restoration Work with respect to the affected facilities on Landlord's behalf and at Landlord's sole cost and expense. Notwithstanding the foregoing, if the affected area materially impacts Tenant's ability to provide its patron a first-class experience, Tenant may exercise its self-help rights if Landlord fails to commence to remedy the condition within two (2) business days after receiving written notice or if Landlord thereafter fails to diligently proceed with the restoration. Such notice shall indicate Tenant's intent to exercise its self-help rights within two (2) business days.

If Tenant exercises the so-called "self-help" remedy set forth in this Section 16.5, then, Landlord shall reimburse Tenant, on demand (accompanied by reasonable evidence of the costs incurred), for the actual out-of-pocket costs incurred by Tenant in performing Landlord's Restoration Work.  If Landlord fails to so reimburse Tenant within ten (10) business days after Tenant's demand, then Tenant shall have the right, subject to Section 18.5, to offset the amount thereof (plus interest thereon at the Interest Rate from the date of demand) against Rent and all other sums otherwise payable to Landlord hereunder and, if the Term would otherwise expire prior to the date that Tenant is paid or recoups the entire amount due to Tenant hereunder (including interest thereon as aforesaid), then Tenant shall be entitled to extend the Term, on a Rent-free basis, until the entire amount thereof (including interest thereon as aforesaid) is paid to or otherwise recouped by Tenant.

## ARTICLE 17

## EMINENT DOMAIN

**Section 17.1.  Taking of the Premises.**  If the whole of the Premises or any portion thereof which in Tenant's judgment renders the balance unsuitable for the continuation of Tenant's business shall be taken in condemnation proceedings, by right of eminent domain or by sale in lieu of such taking (each such event, a **"Taking"**), then this Lease shall terminate when possession shall be taken by the condemning authority.

**Section 17.2.  Taking of the Center.**  If, as a result of any Taking directly affecting portions of the Center or affecting any means of ingress or egress or other means of access to or within the Center, either (i) the conduct of Tenant's business in the Premises becomes impracticable, or (ii) the number of parking spaces within the Parking Area as a whole or within the Protected Area is reduced below the applicable number of Minimum Free Parking Spaces specified in Section 1.1, or (iii) twenty percent (20%) or more of the Center (by Floor Area) is taken; then in any such event Tenant shall have the right and option to terminate this Lease upon notice to Landlord within thirty (30) days after Tenant is informed of the applicable occurrence. If any Rent or other charge has been paid in advance, Landlord shall refund to Tenant all sums so paid for the period after the date of termination (or if possession is taken by the condemning authority prior to the date of termination and Tenant ceases operations, the later of the date Tenant ceases operations or the date on which possession is taken).

**Section 17.3.  Obligations if Lease Not Terminated.**  If there is a Taking but this Lease is not terminated pursuant to this Article 17, then:



(a) **Landlord's Obligation to Restore**. Landlord, at its sole cost and expense, shall repair, alter and restore the affected portions of Landlord's Parcel (less any portions thereof so taken), and all means of access to the Protected Area and between the Protected Area and the Premises, to substantially their former condition or as close thereto as practicable. In addition, Landlord shall take Landlord Anchor Enforcement Action to the extent necessary to ensure that any affected Anchor Parcels are similarly restored.

(b) **Tenant's Obligation to Restore**. Upon substantial completion of Landlord's restoration work pursuant to Section 17.3(a), Tenant, at its sole cost and expense, shall repair, alter and restore the affected portions of the Premises to substantially its former condition or as close thereto as possible (subject to further alterations permitted hereunder).

(c) **Abatement of Rent**. If the Floor Area of the Premises is reduced by the Taking, or if any portion of the Protected Areas is affected by the Taking, then from and after the effective date of the Taking, all Base Rent otherwise due hereunder shall be Equitably Abated.

(d) **Limit on Restoration**. In no event shall Landlord or Tenant be obligated to incur costs or expenses under Sections 17.3(a) or (b) in excess of their respective portions of the aggregate condemnation award from the applicable Taking.

**Section 17.4. Temporary Taking**. If any portion of the Premises, or the Parking Areas or the Common Areas within the Protected Area, or any means of access to, from or between the Premises and the Protected Area is Taken on a temporary basis, then Tenant shall be entitled to all of the condemnation award recoverable in respect of such temporary use of the Premises whether in the form of rental or otherwise, for the Taking of Tenant's Property and for moving expenses, and for any restoration of Tenant's Work in the Premises. Except as provided above, this Lease shall be and remain unaffected by such taking and Tenant shall continue to be responsible for all of its obligations hereunder insofar as such obligations are not affected by such taking and shall continue to pay the rent in full when due. If the period of temporary use or occupancy shall extend beyond the expiration of the Term (including any options to extend that shall have been thereafter exercised), that part of the award which represents compensation for the use and occupancy of the Premises (or a part thereof) shall be divided between Landlord and Tenant so that Tenant shall receive so much thereof as represents the period up to and including the expiration date and Landlord shall receive so much thereof as represents the period after the expiration date.

**Section 17.5. Condemnation Award**. Except as otherwise herein provided, the entire compensation award for any Taking shall belong to Landlord. Notwithstanding the foregoing: (i) Tenant shall be entitled to claim, prove and receive in any proceedings such award as may be allowed for Tenant's Property, interruption of business, moving expenses and other damages available to a tenant under Applicable Law (but not any portion of the award attributable to Landlord's FF&E, with any dispute as to whether any FF&E is Landlord's FF&E or Tenant's FF&E to be resolved by arbitration pursuant to Section 18.5), and (ii) with respect to any Taking that results in the termination of this Lease, Tenant shall be entitled to a portion of Landlord's award equal to the fair market value of Tenant's interest under this Lease as of the day immediately prior to such Taking.

**Section 17.6. Takings Generally**. At the election of either Party, any disagreement between Landlord and Tenant with respect to the effect or severity of a Taking that is not resolved within thirty (30) days after the Parties are first notified of the Taking shall be resolved by arbitration in accordance with Section 18.5 below.

## ARTICLE 18

## DEFAULT AND REMEDIES; ARBITRATION

**Section 18.1. Events of Default**. Each of the following shall be deemed an "**Event of Default**" by Tenant and a breach of this Lease:



(a) **Monetary Defaults.** Tenant's failure to pay Rent or other charges payable hereunder within seven (7) business days after written notice from Landlord that the same was not paid when due;

(b) **Insolvency, etc.** The filing of a voluntary bankruptcy petition by Tenant or the admission by Tenant in writing that it is insolvent or is generally unable to pay its debts as the same become due; or the filing of an involuntary bankruptcy petition against Tenant or adjudication of Tenant as insolvent or bankrupt (unless such petition or adjudication is vacated or dismissed within 45 days after the filing or entry thereof); or a general assignment by Tenant for the benefit of creditors; or the appointment of a receiver (except a receiver appointed at the request of Landlord) to take possession of all or substantially all of the assets of Tenant (unless such appointment is vacated or reversed within 45 days after the date of appointment).

(c) **Other Defaults.** Default in the performance of any other material covenant or condition of this Lease on the part of Tenant to be performed for a period of thirty (30) days after written notice from Landlord of such default; provided, however, if the nature of the default is such that it cannot be cured practically within thirty (30) days but Tenant commences the curing within thirty (30) days after notice from Landlord and thereafter diligently prosecutes the curing, then the cure period shall be extended for the amount of time practicably required to effect the cure.

**Section 18.2.** **Landlord's Remedies.** Upon the occurrence of any Event of Default by Tenant hereunder, in addition to any other remedies allowed by law or equity, Landlord may, at its option, do any of the following:

(a) **Termination of Lease.** Landlord shall have the right at any time thereafter to give notice of termination to Tenant, and on the date specified in such notice (which shall not be less than ten (10) days after the giving of such notice), unless the circumstances giving rise to the Event of Default are cured on or before such date, this Lease shall terminate and come to an end as fully and completely as if such date were the day herein definitely fixed for the expiration of this Lease, and Tenant shall remain liable as hereinafter set forth. In the event of any such termination of this Lease, Landlord may then or at any time thereafter, re-enter the Premises as set forth in Section 18.2(b)

(b) **Re-Entry into Premises.** Whether or not Landlord has elected to terminate this Lease pursuant to Section 18.2(a), Landlord shall have the right, upon not less than ten (10) days prior written notice, during which time the circumstances giving rise to the Event of Default are not cured, to re-enter the Premises by summary proceedings or other judicial process in compliance with Applicable Law and remove all persons and property (including, without limitation, Tenant and Tenant's Property) therefrom, and Tenant shall remain liable as hereinafter set forth.

The notices specified in Section 18.2(a) and Section 18.2(b) shall be in addition to any notices required under Section 18.1. If an Event of Default by Tenant shall occur then in addition to any and all other remedies available to Landlord at law, in equity or pursuant to the terms hereof, Landlord may, at its option, incur the expense necessary to perform said obligation of Tenant; provided, however, that prior to incurring such expense, Landlord shall give at least two (2) business days prior notice to Tenant that Landlord intends to incur the expense, and if Tenant notifies Landlord that it disputes the existence of the Event of Default and desires to submit the dispute to arbitration pursuant to Section 18.5 within two (2) business days following receipt of Landlord's notice, then Landlord shall not incur the expense pending the outcome of the arbitration. In no event, however, shall Tenant's failure to pay Base Rent be a subject of Arbitration pursuant to Section 18.5. If Landlord shall incur any expense, including reasonable attorneys' fees, in instituting, prosecuting or defending any action or proceedings instituted by reason of any Event of Default by Tenant, then Tenant shall reimburse Landlord for the amount of such expense, with interest thereon at the Interest Rate from and after the date of demand.

**Section 18.3.** **Damages.** In the event that Landlord shall elect to terminate the Lease pursuant to Section 18.2(a) or to terminate Tenant's right to possession of the Premises pursuant to Section 18.2(b), then:



(a)    If this Lease is terminated pursuant to Section 18.2(a), then Tenant shall pay Landlord on demand (i) the amount of all past due Rent plus reasonable attorneys' fees and court costs incurred by Landlord in connection with the Event of Default and (ii) the portion of the reasonable out-of-pocket costs incurred by Landlord in reletting the Premises (including reasonable brokerage fees and reasonable costs of tenant improvements) which would be amortized on a straight line basis, during the remaining initial Term of the Lease (with the amortization calculation to be based on amortizing the costs of the reletting over the term of the new lease). For example, if the new lease is for a term of eight years and there are only two years remaining in the initial Term at the time the new Lease commences, Tenant would only pay ¼ of the reasonable costs of reletting. In no event shall the amounts payable by Tenant under clause (ii) of this Section 18.3(a) exceed the Rent payable by Tenant during the remaining initial Term of the Lease as of the date of termination.

(b)    If Landlord elects to re-enter as provided in Section 18.2(b), then (provided Landlord does not elect to terminate this Lease pursuant to Section 18.2(a)), Landlord may from time to time without terminating this Lease, either recover all rental as it becomes due or relet the Premises or any part thereof for such term or terms and at such rental or rentals and upon such other terms and conditions as Landlord, in its sole discretion, may deem advisable with the right to make reasonable alterations and repairs to the Premises that may be required to procure a replacement tenant of the Premises (provided that Landlord shall use reasonable efforts to procure a theater tenant before undertaking any alterations). In the event that Landlord shall elect to so relet, then rentals received by Landlord from such reletting shall be applied: first, to the payment of any reasonable cost of such reletting (including, without limitation, reasonable brokerage and legal fees); second, to the payment of the cost of any reasonable alterations and repairs to the Premises; third, to the payment of any indebtedness other than Rent due from Tenant to Landlord; fourth, to the payment of Rent due and unpaid under this Lease; and the residue, if any, shall be held by Landlord and applied in payment of future Rent as the same may become due and payable under this Lease. Should that portion of such rentals received from such reletting during any month, which is applied to the payment of Rent under this Lease, be less than the Rent payable during that month by Tenant hereunder, then Tenant shall pay such deficiency to Landlord immediately upon demand therefor by Landlord. Such deficiency shall be calculated and paid monthly. If the rentals received by Landlord for any month exceed the Rent payable by Tenant for said month, Landlord shall be entitled to retain the excess. Tenant shall also pay to Landlord as soon as ascertained, any costs and expenses incurred by Landlord in such reletting or in making such alterations and repairs not covered by the rentals received from such reletting.

(c)    No re-entry or taking possession of the Premises or any other action shall be construed as an election to terminate this Lease unless a written notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction. Notwithstanding any reletting without termination by Landlord because of any Event of Default by Tenant, Landlord may at any time after such reletting elect to terminate this Lease in accordance with Section 18.2(a) for any such Event of Default.

(d)    Landlord shall use reasonable efforts to mitigate the damages caused by Tenant's default under this Lease. Without limitation, in the event of any re-entry or termination under Section 18.2, Landlord agrees to use reasonable efforts to relet the Premises at a commercially reasonable rent, and to use reasonable efforts to procure a replacement movie theater tenant.

Section 18.4.    **Interest on Late Payments**. In the event that either Party fails to pay any Rent or other charge hereunder when due and such failure continues for ten (10) business days after notice thereof from the Party owed such amount to the Party owing such amount, then such unpaid amounts shall bear interest from the date due until payment thereof at a rate equal to the lesser of (i) the Interest Rate or (ii) the maximum rate permitted under Applicable Law; provided, however, with respect to any failures to pay Base Rent by Tenant when due, Landlord shall only be required to give Tenant two (2) notices of the failure to pay Base Rent under this Section 18.4 during any twelve (12) consecutive month period of the Term. From and after the delivery of the second notice relating to a failure to pay Base Rent under this Section 18.4, if



Tenant fails to pay Base Rent within ten (10) business days of the date due (with or without notice from Landlord), then the unpaid amount will bear interest from the date due until payment thereof at the lesser of the Interest Rate or the maximum rate permitted under applicable law; provided that Landlord's obligation to give notice under this <u>Section 18.4</u> shall be reinstated if there is a period of twelve (12) consecutive months that Tenant pays Base Rent within ten (10) business days of the date due.

Section 18.5.    <u>Arbitration Of Certain Disputes</u>.

(a)    <u>Disputed Defaults</u>.  If either Landlord or Tenant disputes the existence of an alleged default or whether Landlord or Tenant is obligated to cure an alleged default under this Lease after being served with a notice of default, then the Party who is alleged to have committed the default shall have such grace period as is provided in this Lease (or, if no such grace period is provided herein, ten (10) business days after receipt of such notice) in which to submit the matter to binding arbitration as set forth below, in which event Landlord's remedies under <u>Section 18.2</u>, as well as any other right of Landlord at law to recover possession of the Premises or to terminate the Lease, and Tenant's remedies hereunder to terminate this Lease or to abate Rent or to offset amounts allegedly owed by Landlord to Tenant shall be stayed pending the arbitration. In the event that the arbitration results in a finding that either Landlord or Tenant is in default or is required to cure the alleged default, the defaulting Party shall have such grace period as is provided in this Lease to cure such default, commencing from the date the defaulting Party receives a copy of the award of the arbitrator(s).  In addition, if Landlord or Tenant disputes whether an Event of Default exists which entitles the other Party to expend amounts and to cure the Event of Default, as more particularly described in <u>Section 18.2</u> and <u>Section 18.6</u>, and the disputing Party notifies the other Party within two (2) business days of receipt of notice from the other Party that such Party intends to exercise its rights to self-help in curing the Event of Default, then the exercise of the self-help rights shall be stayed pending the arbitration and if the arbitrators determine that an Event of Default exists, then immediately following such determination, the Party claiming the Event of Default may exercise the self-help rights.  Tenant's rights under this <u>Section 18.5(a)</u> shall not apply to a default or Event of Default consisting solely of the failure to pay Base Rent or Additional Rent.  Tenant's rights under this <u>Section 18.5(a)</u> shall not impair or otherwise affect any rights or remedies of Landlord other than the rights to terminate this Lease or to re-enter the Premises or exercise self-help rights.  Landlord's rights under this <u>Section 18.5(a)</u> shall not impair or otherwise affect any rights or remedies of Tenant other than the rights to terminate this Lease or to abate rent or to offset amounts allegedly owed by Landlord to Tenant or to exercise self-help rights in connection with an Event of Default.

(b)    <u>Disputed Reimbursement</u>.  If either Party disputes any demand for reimbursement, refund or offset by the other Party, then the disputing Party may, within thirty (30) days after the receipt of the non-disputing Party's demand for payment or offset serve a notice on the non-disputing Party that it is submitting the matter to binding arbitration, as set forth below; provided, however that this <u>Section 18.5(b)</u> shall not ~~release~~ either Party from its obligations to pay when due any demanded amount that is not being disputed in good faith.  If a Party disputes only a portion of a claim for reimbursement, refund or offset, the disputing Party shall pay the undisputed amounts without regard to the pendency of arbitration.

(c)    <u>Other Disputes</u>.  In the event of any dispute between Landlord and Tenant over the amount of any equitable abatement of rent, or in the event of any other disputed matter that is expressly subject to arbitration under this Lease, such dispute shall be resolved by arbitration in accordance with the provisions of this <u>Section 18.5</u>.

(d)    <u>Arbitrators; Award</u>.  Any disagreement or controversy described in this Section or elsewhere in this Lease where dispute resolution by arbitration is expressly provided or reference is made to this Section, shall be settled by binding arbitration to be held, and the award made pursuant to the then-applicable Commercial Arbitration Rules of the American Arbitration Association.  In any such arbitration, the arbitrator shall be: (i) any person selected by the Parties to the dispute, if they are able to so agree within 10 days after any Party requests the other to so agree, if not, (ii) a three-member arbitration



panel, which shall act by majority vote and which shall consist of one member selected by each Party to the dispute and one member selected by the two members so selected, who shall act as chairman of the arbitration panel. If the first two arbitrators are unable to agree on the selection of the third arbitrator within 20 days after their appointment, the third arbitrator shall be selected by the American Arbitration Association. If one Party requests the other to agree on a single arbitrator and the Parties have failed to agree on such a single arbitrator, and one of the Parties thereafter shall fail or refuse to appoint a person to the arbitration panel under clause (ii) above within 20 days after the original request for agreement on a single arbitrator was made, the arbitration panel shall consist solely of the single arbitrator selected by the other Party. The arbitrator(s) shall apply the substantive law of the state in which the Premises are located. Any costs of arbitration (including the fees of the arbitrators) shall be borne by the Party against whom the award is made, as determined by the arbitrators. Any award of the arbitrator(s) shall state the reasoning on which the award is based.

(e)    **Failure to Appear**. If one of the Parties shall fail or refuse to appear or to present evidence at the arbitration hearing, the arbitrator(s) shall be authorized to accept the evidence presented by the Party in attendance at the hearing and enter an award based on the evidence presented.

(f)    **Reimbursement**. Tenant may reimburse itself with respect to any matter described herein as follows: Landlord's failure to serve a demand for arbitration within the period described above shall be deemed a waiver of any objection to Tenant's demand, and Tenant, if not reimbursed by Landlord, may reimburse itself from, and Tenant shall be entitled to a corresponding credit against, succeeding Base Rent and other charges hereunder, with interest at the Interest Rate from the tenth (10th) business day after Tenant's initial demand. If Landlord timely demands arbitration as set forth in Section 18.5, Tenant shall not reimburse itself pending award of the arbitrator(s). If any amount awarded Tenant in the arbitration is not paid by Landlord within ten (10) business days from the date of award, with interest from the date of the award, Tenant may thereafter reimburse itself from, and Tenant shall be entitled to a corresponding credit against, succeeding Rent and other charges with interest at the Interest Rate from the date of the award. If any amount awarded Landlord in the arbitration is not paid by Tenant within ten (10) business days from the date of the award, with interest, from the date of the award, Landlord may resort to the remedies set forth in this Lease without further notice, as if no grace period ever existed.

(g)    **Enforcement**. Judgment upon the arbitrator's award may be had and enforced in any court of law or equity having jurisdiction over the Parties.

**Section 18.6.    Default by Landlord.**

(a)    **Default and Remedies**. An "Event of Default" by Landlord shall occur if: (i) Landlord fails to pay to Tenant any amounts due by Landlord hereunder and such failure continues for seven (7) business days after written notice from Tenant, or (ii) Landlord shall be in default in the performance of any other material covenant or condition of this Lease on the part of Landlord to be performed for a period of thirty (30) days after written notice from Tenant of such default; provided, however, if the nature of the default is such that it cannot be cured practicably within thirty (30) days, but Landlord commences the curing within thirty (30) days after notice from Tenant and thereafter diligently prosecutes the curing, then the cure period shall be extended for the amount of time practicably required to effect the cure. If an Event of Default by Landlord shall occur, then, in addition to any and all other remedies available to Tenant at law, in equity or pursuant to the terms hereof, Tenant may at its option incur the expense necessary to perform said obligation of Landlord; provided, however, that prior to incurring such expense, Tenant shall give at least two (2) business days prior notice to Landlord that Tenant intends to incur the expense and if Landlord notifies Tenant that it disputes the existence of the Event of Default and desires to submit the dispute to arbitration pursuant to Section 18.5 within two (2) business days following receipt of Tenant's notice, then Tenant shall not incur the expense pending the outcome of the arbitration. If Tenant shall incur any expense, including reasonable attorneys' fees, in instituting, prosecuting or defending any action or proceedings instituted by reason of any Event of Default by



Landlord, then Landlord shall reimburse Tenant for the amount of such expense, with interest thereon at the Interest Rate from and after the date of demand. If Tenant shall recover judgment against Landlord for failure to perform Landlord's obligations under this Lease, or if the matter is submitted by Tenant to arbitration in accordance with Section 18.5 and it is determined that Tenant was entitled to incur such expense, then in either event, Tenant may offset the amount of such judgment or award remaining unpaid, with interest at the Interest Rate, against Rent and other charges coming due hereunder. In the event the costs and expenses incurred by Tenant to cure a default of Landlord exceed the amount recouped by Tenant by its withholding from Rent and other charges as aforesaid through the balance of the Term then in effect, then Tenant shall have the right, but not the obligation, to extend the Term for a period of time sufficient for Tenant to recover such unrecouped costs and expenses from Rent and other charges otherwise payable during such extended period.

(b)     **Limitation on Landlord's Liability.**  Other than for Landlord's failure to pay Real Estate Taxes, failure to fund the Landlord Reimbursement in accordance with the Work Letter, failure to pay the Fair Market Value of Tenant's Interest pursuant to Section 21.18 or failure to apply any insurance proceeds or condemnation awards as required by this Lease (as to which matters the limitations on liability set forth in this Section shall not apply), Tenant shall have the right to, and shall, look solely to Landlord's estate and interest in the land and buildings constituting the Center, the rent therefrom, insurance proceeds or condemnation awards in respect thereof, proceeds of any title insurance, proceeds from the sale or refinancing of the Center or any interest therein and any applicable liability insurance for the satisfaction of any right of Tenant for the collection of a judgment or other judicial process or arbitration award requiring the payment of money by Landlord, and no other property or assets of Landlord shall be subject to levy, lien, execution, attachment or other enforcement procedure for the satisfaction of Tenant's rights and remedies under or with respect to this Lease, the relationship of Landlord and Tenant hereunder or under law, or Tenant's use and occupancy of the Premises or any other liability of Landlord to Tenant relating to any of the foregoing. After any sale or transfer of Landlord's interest in the Center and provided that Landlord's successor expressly assumes the obligations of the Landlord arising hereunder, the transferring Landlord shall have no further liability hereunder except for breaches or defaults arising prior to the date of such sale or transfer, and except for any continuing duty to apply any insurance proceeds and condemnation awards received prior to such sale or transfer.

**Section 18.7.   Consequential Damages.**  Neither Landlord nor Tenant shall be liable to the other for consequential damages under this Lease, and each party hereby waives any right to assert a claim for consequential damages against the other party arising from this Lease.

## ARTICLE 19

## ENVIRONMENTAL

**Section 19.1.   Tenant's Responsibilities.**

(a)     **General Covenant.**  Tenant shall not cause or authorize any Hazardous Materials to be brought upon, stored, used, generated, released into the environment or disposed of in the Premises in violation of Applicable Laws. Subject to Section 7.5, Tenant hereby indemnifies and defends Landlord and agrees to hold Landlord harmless from and against any and all claims, judgments, damages, liabilities and losses which arise from the presence of Hazardous Materials in the Premises in violation of Applicable Laws which are brought upon, stored, used, generated or released into the environment by or through the acts or omissions of Tenant or Tenant's agents, subtenants, employees or contractors (referred to as **"Tenant's Environmental Acts"**). This indemnification by Tenant of Landlord includes any reasonable costs incurred in connection with any investigation of site conditions or any clean up, remedial, removal or restoration work required by any governmental agency because of the presence of such Hazardous Materials in violation of Applicable Laws due to Tenant's Environmental Acts, but excludes consequential damages (such as, without limitation, lost profits or diminution in value of the Center). Tenant shall promptly notify Landlord of any Environmental

68



Hazard in or about the Premises, which Tenant becomes aware of during the Term of this Lease, whether or not caused by Tenant's Environmental Acts.

(b)  **Reporting Requirement**.  Tenant shall promptly notify Landlord of, and shall promptly provide Landlord with copies of the following environmental items relating to the Premises which may be filed or prepared by or on behalf of, or delivered to or served upon, Tenant (excluding those which may be reasonably considered confidential because they are subject to the attorney client privilege or are required to be kept confidential pursuant to Applicable Laws or the requirements of applicable governmental authorities):  all orders, reports, listings and correspondence of or concerning the release, investigation of, compliance, clean up, remedial and corrective actions, and abatement of Hazardous Materials whether or not required by any Applicable Laws, including, reports and notices required by or given pursuant to any Applicable Laws, and all complaints, pleading and other legal documents filed against Tenant related to Tenant's use, handling, storage or disposal of Hazardous Materials in or about the Premises.  In the event of a release of any Environmental Hazard caused by Tenant's Environmental Acts in, on or about the Premises, Tenant shall promptly notify Landlord and provide Landlord with copies of all reports and correspondence with or from all governmental agencies, authorities or any other persons relating to such release (excluding those which may be reasonably considered confidential because they are subject to the attorney client privilege or are required to be kept confidential pursuant to Applicable Laws or the requirements of applicable governmental authorities).

(c)  **Environmental Actions**.  Landlord may join and participate in any legal proceedings or actions initiated in connection with any claims or causes of action arising out Tenant's Environmental Acts which results in:  (i) injury to any person within or about the Premises, (ii) injury to or any contamination of the Premises or (iii) injury to or contamination of any real or personal property wherever situated.  Tenant, at its sole cost and expense, shall promptly take all actions necessary to return the Premises to the condition existing prior to the introduction of such Hazardous Materials as a consequence of Tenant's Environmental Acts and to remedy or repair any such injury or contamination.  Notwithstanding the foregoing, Tenant shall not, without Landlord's prior written consent, which consent shall not be unreasonably withheld or denied or conditioned or delayed, take any remedial action in response to the presence of any such Hazardous Materials in the Premises or enter into any settlement agreement, consent decree or other compromise with any governmental agency with respect to any such Hazardous Materials claims; provided, however, Landlord's prior written consent shall not be necessary in the event that the presence of Hazardous Materials in the Premises (i) poses an immediate threat to the health, safety or welfare of any individual or (ii) is of such nature that an immediate remedial response is necessary and it is not possible to obtain Landlord's consent before taking such action.

**Section 19.2.  Landlord's Responsibilities**.

(a)  **General Covenant**.  Landlord shall not cause, permit or authorize any Hazardous Materials to be brought upon, stored, used, generated, released into the environment or disposed of, on, in, under or about the Common Areas, or any other portion of Landlord's Parcel or Common Areas by Landlord, its tenants, agents, employees, or contractors in violation of Applicable Laws and shall take Landlord Anchor Enforcement Action to prevent an Anchor from causing, permitting or authorizing any Hazardous Material to be brought upon, stored, used, generated, released into the environment or disposed of, on, in under or about the Anchor Parcels in violation of Applicable Laws.  Subject to Section 7.5, Landlord hereby agrees to indemnify, defend and hold Tenant free and harmless from and against any and all claims, judgments, damages, liabilities and losses which arise from Hazardous Materials in or about Landlord's Parcel or the Common Areas which are present at Landlord's Parcel or the Common Areas as of the Effective Date (including, without limitation, the conditions identified in the Identified Environmental Report) or which are brought upon, stored, used, generated or released into the environment in violation of Applicable Laws by or through the acts or omissions of Landlord or Landlord's agents, employees or contractors (referred to as "**Landlord's Environmental Acts**").  This indemnification by Landlord of Tenant includes any reasonable costs incurred in connection with any investigation of

69

site conditions or any clean up, remedial, removal or restoration work required by any governmental agency because of the presence of such Hazardous Materials due to Landlord's Environmental Acts but excludes consequential damages (such as, without limitation, lost profits or diminution in value of Tenant's Property). Landlord shall promptly notify Tenant of any Environmental Hazard in or around the Center, which Landlord becomes aware of during the Term of this Lease, whether or not caused by Landlord's Environmental Acts.

     **(b)**    **Reporting Requirement.** Landlord shall promptly notify Tenant of, and shall promptly provide Tenant with copies of the following environmental items relating to the Center which may be filed or prepared by or on behalf of, or delivered to or served upon, Landlord (excluding those which may be reasonably considered confidential because they are subject to the attorney client privilege or are required to be kept confidential pursuant to Applicable Laws or the requirements of governmental authorities): all orders, reports, listings and correspondence of or concerning the release, investigation of, compliance, clean up, remedial and corrective actions, and abatement of Hazardous Materials whether or not required by any Applicable Laws, including, reports and notices required by or given pursuant to any Applicable Laws, and all complaints, pleading and other legal documents filed against Landlord related to Landlord's use, handling, storage or disposal of Hazardous Materials, Landlord shall promptly notify Tenant and provide Tenant with copies of all reports and correspondence with or from all governmental agencies, authorities or any other persons relating to such release (excluding those which may be reasonably considered confidential because they are subject to the attorney client privilege or are required to be kept confidential pursuant to Applicable Laws or the requirements of governmental authorities).

     **(c)**    **Environmental Actions.** Tenant may join and participate in any legal proceedings or actions initiated in connection with any claims or causes of action arising out Landlord's Environmental Acts which results in: (i) injury to any person within or about the Premises, (ii) injury to or any contamination of the Premises, or (iii) injury to or contamination of any real or personal property of Tenant. Landlord, at its sole cost and expense, shall promptly take all actions necessary to return Landlord's Parcel and Common Areas to the condition existing prior to the introduction of such Hazardous Materials to Landlord's Parcel and Common Areas and to remedy or repair any such injury or contamination. Notwithstanding the foregoing, Landlord shall not, without Tenant's prior written consent, which consent shall not be unreasonably withheld or denied or conditioned or delayed, take any remedial action in response to the presence of any Hazardous Materials in, on, under or about Landlord's Parcel or Common Areas or enter into any settlement agreement, consent decree or other compromise with any governmental agency with respect to any such Hazardous Materials claims; provided, however, Tenant's prior written consent shall not be necessary in the event that the presence of Hazardous Materials in, on, under or about Landlord's Parcel or Common Areas (i) poses an immediate threat to the health, safety or welfare of any individual or (ii) is of such nature that an immediate remedial response is necessary and it is not possible to obtain Tenant's consent before taking such action.

     **(d)**    **Environmental Hazard.** If during the Term an Environmental Hazard, other than an Environmental Hazard caused by Tenant's Environmental Acts, causes the Premises or any other part of the Center to be rendered untenantable, either in whole or in part, or materially and adversely affects Tenant's ability to operate its business in the Premises in the normal course (subject to Landlord's right to submit the matter to arbitration pursuant to <u>Section 18.5</u>, if Landlord disputes Tenant's determination), then Landlord shall promptly remediate or cause to be remediated the Environmental Hazard and rebuild, repair or restore all affected buildings and improvements if located on, under or about the Landlord's Parcel or Common Areas, or take Landlord Anchor Enforcement Action to cause the Environmental Hazards to be remediated and affected buildings and improvements restored if located on the Anchor Parcels. If such condition of untenantability or inability to operate Tenant's business in the normal course continues for more than ninety (90) days following occurrence of the Environmental Hazard, then until such untenantability or inability has ended, Tenant shall have the right to terminate this Lease by written notice to Landlord at any time after such period. In the event that

Century Stratford Square Lease.v21.12-5-05



this Lease shall be terminated as a result of an Environmental Hazard (other than an Environmental Hazard caused by Tenant's Environmental Acts), if any Rent or other charge has been paid in advance, Landlord shall refund to Tenant all sums so paid for the period after the date of untenantability or inability to operate. With respect to any period during which, as the result of an Environmental Hazard (other than an Environmental Hazard caused by Tenant's Environmental Acts) any part of the Premises is untenantable or Tenant is prevented from operating its business therein in the normal course, and Tenant continues to operate in all or a portion of the Premises, then during the period that Tenant operates, Base Rent, Percentage Rent and Additional Rent shall abate, and Tenant shall pay Alternate Rent, until the Environmental Hazard is remedied or Tenant ceases operations, in which case all Rent shall abate. If the untenantability or inability is so extensive as to render the Premises substantially unfit for occupancy by Tenant for the normal conduct of its business, the Rent and other charges payable hereunder shall abate until such time as Tenant resumes the conduct of its business, up to a maximum of one hundred twenty (120) days, after the restoration of the Premises in order to give Tenant sufficient time to refixture and equip the Premises. If by reason of an Environmental Hazard affecting the Premises or the building of which the Premises are a part or to any other part of the Center, the Premises are rendered substantially unusable for Tenant's business by reason of diminished access, the payment of Rent and other charges payable hereunder shall equitably abate until accessibility is restored.

(e)  **General Representation**.  To Landlord's knowledge, there are no Hazardous Materials or Environmental Hazards located within the Center or affecting the Center as of the Effective Date, except as specified in the Identified Environmental Report.

Section 19.3.  **Environmental Remedial Work**.  In the event any investigation or monitoring of site conditions or any clean-up, containment, restoration, removal or other remedial work pertaining to any Hazardous Materials or Environmental Hazard at or affecting Landlord's Parcel or Common Areas (**"Environmental Remedial Work"**) is required (i) under any Applicable Law, (ii) by any judicial, arbitration or administrative order, (iii) to comply with any agreements affecting Landlord's Parcel and Common Areas or (iv) to maintain Landlord's Parcel and Common Areas in a standard of environmental condition which presents no risk to safety or health, prevents the release of any Hazardous Materials to adjacent property and otherwise is consistent with the prudent ownership of property of the character of Landlord's Parcel and Common Areas, then Tenant (if such Environmental Remedial Work is required as a direct result of Tenant's Environmental Acts) or Landlord (if such Environmental Remedial Work is not required as a direct result of Tenant's Environmental Acts), shall perform or cause to be performed such Environmental Remedial Work promptly and in accordance with all Applicable Laws. All Environmental Remedial Work shall be conducted (i) in a diligent and timely fashion by licensed contractors acting under the supervision of a consulting environmental engineer, (ii) pursuant to a detailed written plan for the Environmental Remedial Work approved by any public or private agencies or persons with a legal or contractual right to such approval, (iii) with such insurance coverage pertaining to liabilities arising out of the Environmental Remediation Work as is then customarily maintained with respect to such activities and (iv) only following receipt of any required permits, licenses or approvals. The selection of the Environmental Remedial Work contractors, any disclosures to or agreements with any public or private agencies or parties relating to Environmental Remedial Work and the written plan for the Environmental Remedial Work (and any changes thereto), whether the responsibility of Landlord or Tenant, each shall be subject to the other Party's prior written approval, which approval shall not be unreasonably withheld, denied, conditioned or delayed. In addition, the Party responsible for the Environmental Remedial Work shall submit to the other Party, promptly upon receipt or preparation, copies of any and all reports, studies, analyses, correspondence, governmental comments or approvals, proposed removal or other remedial work contracts and similar information prepared or received by such Party in connection with any Environmental Remedial Work or Hazardous Materials relating to the Center. In the event the Party responsible therefor should fail to commence or cause to be commenced in a timely fashion, or fail diligently to prosecute to completion, such Environmental Remedial Work, the other Party (following written notice) may, but shall not be required to, cause such Environmental Remedial Work to be performed, and all costs and expenses thereof, or incurred in connection therewith (i) in the case where Tenant is the responsible Party, shall be paid by Tenant to Landlord within thirty (30)

days of Landlord's invoice therefor, or (ii) in the case where Landlord is the responsible Party, shall be paid by Landlord to Tenant within thirty (30) days of Tenant's invoice therefor, and if not timely paid by Landlord, in additional to all other rights and remedies, Tenant shall have the right of offset such amount (together with interest thereon at the Interest Rate) against Rent which thereafter becomes due. Neither Party shall be obligated to perform Environmental Remedial Work under this Section while it is contesting the application of any law, regulation or order, provided the other Party is not exposed to any additional liability, risk or damages. The Parties' obligations under this Section are solely for the benefit of the Parties hereto, their successors, and assigns and any subtenants of this Lease, and not for any other third parties.

Section 19.4.    **Effect of Termination**.    All liabilities of Landlord and Tenant, respectively, under this Article 19, accrued as of the date this Lease terminates, shall survive such termination. If this Lease shall be terminated as a result of any Environmental Hazard other than Tenant's Environmental Acts or as a result of the interruption of utility service to the Premises pursuant to Section 8.2, Landlord shall promptly pay to Tenant an amount equal to the Unamortized Tenant Costs as of the date of such termination. If this Lease is terminated pursuant to Section 19.2, Tenant shall have the first right of refusal for the lease of the Premises should the Premises be restored within two (2) years of the termination date. Upon commencing the restoration of the Premises, Landlord shall send a written notice to Tenant stating its intent to restore the Premises and the projected date for the completion of such restoration. Within thirty (30) days of receipt of such notice, Tenant shall notify Landlord as to whether it desires to reinstate the Lease on the original terms and conditions.

Section 19.5.    **Survival of Obligations**.    The obligations of Tenant and Landlord under this Article 19 shall survive and be enforceable following the expiration or earlier termination of this Lease.

## ARTICLE 20

## SURRENDER OF PREMISES AND REMOVAL OF PROPERTY

Section 20.1.    **Surrender; Holdover**.    On or before the expiration of the Term or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in broom clean condition, with the Premises maintained in accordance with Sections 9.2 and 9.3 (provided that Tenant shall not be obligated to deliver operational systems, unless Tenant has elected to make replacements of those systems during the five (5) year period preceding the termination of the Lease), but otherwise "as-is" and without representation or warranty, subject to reasonable wear and tear, repairs and maintenance which are Landlord's obligation hereunder and damage by fire or other casualty or taking by eminent domain; provided, however, Tenant (in its sole and absolute discretion) may remove any or all of Tenant's FF&E, readily removable personal property and trade fixtures (including Tenant's Signs) from the Premises within ten (10) business days after the expiration of the Term or the earlier termination of this Lease, but Tenant shall repair any damage incurred in the removal of the same. If Tenant retains possession of the Premises after the last day of the Term or the earlier termination of this Lease without Landlord's consent (subject to Tenant's right to remove its personal property and Tenant's FF&E within ten (10) business days after the expiration of the Term, as provided above), during the period of such holdover Tenant shall pay (i) Base Rent for the Premises at a rate equal to 125% of the Base Rent payable immediately prior to the expiration of the Term, and (ii) Percentage Rent and Additional Rent, in each case computed on a per diem basis. Tenant shall not be permitted to remove any items constituting Landlord's FF&E at the expiration of the Term (other than Tenant's corporate mural and any signs containing Tenant's name or logo). Tenant shall also be permitted to remove Tenant's name, logo, tradename and/or trademarks from any of Landlord's FF&E remaining in the Premises. In no event shall Landlord or any replacement tenant or subtenant procured by Landlord have the right to utilize Tenant's name, logo, tradename or trademarks at any time during the Term or after the expiration or termination of the Lease (whether or not items having Tenant's name, logo, tradename or trademarks are located in the Premises). The provisions of this Section and the receipt by Landlord of holdover rent pursuant hereto shall not be deemed a waiver of Landlord's right to regain possession of the Premises.

Section 20.2.    **Financing of Trade Fixtures**.    Notwithstanding anything to the contrary contained in Article 14 or elsewhere in this Lease, Tenant may lease or finance Tenant's FF&E and other personal property from a leasing company or lender, hereinafter referred to as the



"Finance Company." Said FF&E and other personal property will be installed, maintained and used in the Premises in order to assist Tenant to carry on its business as provided for herein. Landlord further agrees that any of said FF&E and other personal property shall remain Tenant's personal property, notwithstanding the manner or mode of the attachment to the Premises. Landlord recognizes and acknowledges that any claim or claims that the Finance Company has or hereafter may have against said FF&E and other personal property by virtue of an equipment lease or chattel mortgage or the like is superior to any lien or claim of any nature which Landlord now has or hereafter may have to Tenant's FF&E and other personal property by statute, agreement or otherwise. In the event of default of Tenant in the payment of any rental or other amount due to the Finance Company, or in the performance of any of the other terms and conditions of the equipment lease, chattel mortgage or the like or extensions or renewals thereof, the Finance Company or its assign may remove Tenant's FF&E and other personal property covered by such equipment lease or chattel mortgage or the like or any part thereof from the Premises in accordance with the terms and conditions of the equipment lease or chattel mortgage or the like. Tenant shall be responsible for any damage caused in the removal of any such FF&E and personal property from the Premises. Landlord will make no claim whatsoever to any FF&E or other personal property covered by any equipment lease or chattel mortgage or the like. The Finance Company may, without affecting the validity of this waiver, extend the terms of payment of any rental or the performance of any of the other terms or conditions of the equipment lease or chattel mortgage or the like, without the consent of Landlord and without giving notice to Landlord. This waiver shall inure to the benefit of the successors and assigns of the Finance Company and shall be binding upon the heirs, personal representatives, successors and assigns of Landlord.

Section 20.3.    **Waiver of Liens and Distraint.**    Landlord hereby waives, releases and relinquishes any and all liens in favor of Landlord and rights of distraint (whether arising by virtue of statute, common law or otherwise) upon Tenant's Property. Landlord further agrees not to assert any lien, levy or attachment on or recourse to any of Tenant's Property that is subject to any lien or security interest in favor of any vendor or other supplier under any conditional sale, chattel mortgage or other security arrangement, any consignor, any holder of reserved title or any holder of a security interest, or lender. Although the foregoing shall be self-operative without the necessity for any further instrument or document, Landlord hereby agrees to furnish Tenant or any vendor or other supplier under any conditional sale, chattel mortgage or other security arrangement, any consignor, any holder of reserved title or any holder of a security interest, upon written request from time to time, reasonable waivers of Landlord's liens upon and right to distraint, levy, attachment or recourse with respect to the property subject thereto and exempting the same from distraint, levy, attachment or recourse.

## ARTICLE 21

## GENERAL PROVISIONS

Section 21.1.    **Subordination.**    Tenant agrees to subordinate this Lease to the lien of any first priority mortgage or deed of trust now or hereafter affecting the Premises or Landlord's FF&E (a "**Mortgage**"), provided that the holders of such Mortgage (each a "**Mortgagee**") shall not be a Landlord Affiliate and provided further that the Mortgagee shall acknowledge in writing that, notwithstanding such subordination or the foreclosure of such Mortgage or the transfer by deed in lieu of foreclosure, Tenant's interest in the Premises and rights under this Lease shall be recognized and not be disturbed, and upon transfer of the Landlord's interest hereunder by such foreclosure or deed in lieu thereof Tenant will attorn to the transferee and the transferee will assume, observe and perform the obligations of Landlord hereunder. The instruments effecting such subordination, non-disturbance and attornment (each, a "**Non-Disturbance Agreement**") shall be in form and substance satisfactory to Tenant and the holder of the applicable Mortgage, in their respective reasonable judgments; Tenant acknowledges, however, that the form of Non-Disturbance Agreement attached hereto as Exhibit L is reasonable. The commencement of Tenant's Work Period and Tenant's obligation to pay Rent are conditioned upon Landlord obtaining and delivering to Tenant Non-Disturbance Agreements from the holders of each and every Mortgage (regardless of priority), affecting Landlord's Parcel, which is in existence prior to the recordation of the Memorandum or which is otherwise shown as superior to Tenant's interest hereunder in the Leasehold Title Policy.



**Section 21.2.   Notices.**  Except as provided herein to the contrary (including, without limitation, Sections 5.3, 9.1(f) and 9.5), any notice, request or demand to be given pursuant to this Lease, shall be in writing and shall be sent by United States certified mail, return receipt requested, delivered by a reputable overnight courier delivery service, or legible facsimile transmission addressed to Landlord or Tenant, as the case may be, at their respective addresses set forth in Article 1. All such notices, requests and demands shall be deemed given upon receipt of the addressee (or upon wrongful refusal of attempted delivery or upon attempted delivery if the addressee has moved and not given notice of a new address) or in the case of facsimile transmission, as of the date of facsimile transmission, provided that there is a confirmation that the facsimile was received and that an original of such notice is also sent by one of the other methods set forth above within one (1) business day following the facsimile transmission. Either Party may, by notice, designate different and/or additional addresses for notices, requests or demands to it.

**Section 21.3.   Invalid Provisions.**  The invalidity and unenforceability of any provision of this Lease shall not affect or impair any other provision.

**Section 21.4.   Interlineation.**  Whenever in this Lease any printed portion has been stricken out, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken out which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

**Section 21.5.   Joint Preparation.**  This Lease is to be deemed to have been prepared jointly by the Parties hereto and any uncertainty or ambiguity existing herein, if any, shall not be interpreted against any Party, but shall be interpreted according to the application of the rules of interpretation for arm's-length agreements.

**Section 21.6.   Relationship of Parties.**  Nothing contained in this Lease shall be construed to create the relationship of principal and agent, partnership, joint venture or any other relationship between the Parties hereto other than the relationship of landlord and tenant. Nothing contained herein shall in any way impose any liability upon the stockholders, officers or directors of Landlord or stockholders, officers, directors or trustees of Tenant should such Parties be corporate entities. Landlord shall not use, in its advertising materials or otherwise, any trade names, brands or marks that are owned by or commonly used by Tenant.

**Section 21.7.   Short Form Lease.**  This Lease shall not be recorded; provided, however, Landlord and Tenant will, at the request of either, enter into and allow the requesting party to record a short form memorandum of lease (the "**Memorandum**"), in the form of Exhibit H attached hereto (modified as appropriate to be in recordable form) containing such provisions as the requesting party may reasonably request and, if any portion of Landlord's Parcel is not owned by Landlord, Landlord shall cause the then owner of any portion of Landlord's Parcel not then owned by Landlord to join in such short form memorandum of lease for the limited purpose of reflecting of record the limitations upon Landlord's Parcel set forth in this Lease.

**Section 21.8.   Estoppel Certificate.**  At any time, upon not less than twenty (20) days' prior request from either Party, Landlord and Tenant shall execute and deliver to each other a mutual estoppel certificate substantially in the form of Exhibit F attached hereto.

**Section 21.9.   No Continuing Waiver.**  No waiver of any default hereunder shall be implied from any omission by either Party to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver, and then only for the time and to the extent therein stated. No delay or omission by either Party hereto to exercise any right or power accruing upon any non-compliance or default by the other Party with respect to any of the terms hereof, or otherwise accruing hereunder, shall impair any such right or power or be construed to be a waiver thereof. One or more waivers of any breach of any covenant, term or condition of this Lease shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition. The consent or approval by a Party to or of any act by the other Party requiring the former Party's consent or approval shall not be deemed to waive or render unnecessary such former Party's consent or approval to or of any subsequent similar acts by the other Party



**Section 21.10. Entire Agreement.** All Exhibits attached to this Lease are incorporated herein in their entirety. This Lease and the Exhibits attached hereto include the entire agreement of the Parties concerning this Lease. All prior agreements of Landlord and Tenant with respect to the subject matter hereof (whether written or oral), are hereby merged into this Lease and shall have no further force or effect except to the extent expressly provided herein. No change, amendment or addition to this Lease (or the Exhibits attached hereto) shall be effective unless in writing and signed by both Parties.

**Section 21.11. Captions.** The captions of this Lease are for convenience and reference only and shall not be deemed or construed to define, limit or describe the scope or intent of this Lease or affect its interpretation or construction.

**Section 21.12. Binding Effect.** The covenants contained in this Lease shall apply to, inure to the benefit of, and be binding upon the Parties hereto and their respective successors and assigns, except as expressly otherwise hereinabove provided.

**Section 21.13. Reasonable Consent.** Unless otherwise expressly provided in this Lease, the Parties shall be reasonable whenever their consent or approval is required, and such approval or consent shall not be unreasonably withheld, delayed or conditioned. In the event that any such consent, approval or permission is specifically withheld, the withholding Party shall set forth in writing its reasons for doing so. Except as otherwise provided herein, the Parties will endeavor in good faith to respond to any request from the other Party for a consent or approval within fifteen (15) days after receiving the request, but the failure to so respond shall not imply or constitute consent or approval (or denial of consent or approval) of the requested matter.

**Section 21.14. Brokers' Commissions.** Landlord covenants and agrees to pay all fees and commissions and other compensation that may be due to Landlord's Broker and/or Tenant's Broker that are identified in Section 1.1. The fees and commissions due to Tenant's Broker, in the aggregate amount of $2.25 per square foot of Floor Area within the Premises, shall be paid in installments, as follows: (1) 50% upon the approval of the Final Plans for Landlord's Work and Tenant's Work by Landlord and Tenant, and (2) the balance upon the Commencement Date. Landlord and Tenant each represents and warrants to the other that it has not engaged or worked with any broker in connection with this Lease, other than Landlord's Broker and Tenant's Broker identified in Section 1.1; and Landlord and Tenant each agrees to indemnify the other Party and hold it harmless from any and all liabilities arising from any breach of the foregoing representation and warranty, including claims for brokerage commissions and finder's fees and including the non-breaching Party's attorneys' fees; such agreement shall survive the termination of this Lease.

**Section 21.15. Unavoidable Delays.** If either Party shall be delayed or hindered in or prevented from the performance of any act required hereunder (other than the payment of Rent or other sums due hereunder by either Party) by *Force Majeure*, then, except as expressly provided herein to the contrary, for purposes of determining whether the applicable Party is in default of this Lease (but not for any other purposes hereunder, except as expressly provided herein,) performance of such act shall be extended for a period equivalent to the period of such delay. The foregoing shall not apply to Landlord's covenant of quiet enjoyment, nor to either Party's obligations to pay any sums due hereunder to the other Party in a timely manner.

**Section 21.16. Submission of Lease.** This Lease shall not be binding on either Party hereto unless and until executed by both Landlord and Tenant (subject to Section 21.23 below) and delivered to both Parties. The submission of this Lease by Tenant to Landlord shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any rights or impose any obligations upon either Party until the execution and delivery hereof by both Landlord and Tenant. Either Party may revoke its execution of this Lease at any time prior to its receipt of executed counterpart hereof from the other Party.

**Section 21.17. Attorneys' Fees.** If, Landlord or Tenant institute any action or proceeding against the other relating to the provisions of this Lease or any default hereunder or if either Party invokes the arbitration procedures of Section 18.5, the non-prevailing Party in such action or proceeding (as determined by the court or arbitrators, as the case may be) agrees to reimburse the prevailing Party for the reasonable expenses of such action (including appeals and enforcement actions, if the Party seeking reimbursement prevails), including reasonable



attorneys' fees and disbursements incurred by the prevailing Party, regardless of whether the action or proceeding is prosecuted to judgment. The term "attorneys' fees" wherever used in this Lease, shall mean only the reasonable charges for services actually performed and rendered, of independent, outside legal counsel who are not the employees of the Party in question.

Section 21.18. REA Termination. If at any time during the Term (as the same may be extended), the REA is terminated as to all or any portion of the Center by any party thereto as a result of (i) the expiration of the term of the REA in the year 2031 (or such later date as the term of the REA may be extended) or (ii) the termination of the REA pursuant to Article XX of the REA (as such Article may be amended), either of which shall constitute an "REA Termination", then the following shall apply:

(a)    Landlord shall give notice of the REA Termination to Tenant within sixty (60) days following the occurrence thereof. Landlord's failure to timely provide such notice shall extend all time periods in this Section 21.18 that commence on the date of the REA Termination. Tenant shall have the unfettered right to terminate this Lease by written notice to Landlord given at any time following the REA Termination (but prior to the date which is three (3) years following the REA Termination), with the termination to be effective on the date which is one hundred eighty (180) days following the date of Tenant's termination notice.

(b)    In addition to Tenant's rights under subsection (a) above, but within the same time period as subsection (a), if any of the following shall occur as a result of, or following the REA Termination, Tenant shall have the right to terminate the Lease by written notice to Landlord (with the termination to be effective one hundred eighty (180) days following the date of Tenant's termination notice, and Landlord shall pay to Tenant the Fair Market Value of Tenant's Interest (with the Fair Market Value of Tenant's Interest to be calculated as if the REA Termination had not occurred and the REA remained in effect) within ten (10) business days following the determination of the Fair Market Value of Tenant's Interest in accordance with the procedures described in Exhibit M:

(i)    The REA Termination results in a loss of (A) the use by Tenant, its patrons, employees, customers and/or invitees of any portion of the Protected Area, including the Priority Parking Area, (B) the use by Tenant, its patrons, employees, customers and/or invitees of any portion of the ring road or (C) the ability of Tenant's patrons, employees, customers and/or invitees to conveniently access the Premises from the Priority Parking Area.

(ii)    The REA Termination results in Landlord breaching any of its material obligations under the Lease in a manner that would have a "Material and Adverse Effect" (as defined in Section 11.2 of this Lease) on Tenant, with the parties agreeing that, among other things, any failure by Landlord to provide the Minimum Free Parking Spaces (as to the Center and/or the Priority Parking Area) will constitute a Material and Adverse Effect;

(iii)    The use of any portion of the Center no longer subject to the REA is changed to a use which is not compatible with a First Class shopping center and the change has a "Material and Adverse Effect" (as defined in Section 11.2 of the Lease) on Tenant; or

(iv)    Any change occurs to the Center which would constitute a "Material and Adverse Effect" under Section 2.2(c) or Section 11.2 of the Lease.

(c).    In addition to Tenant's rights under subsections (a) and (b) above, if attendance at Tenant's theaters in the Premises during the two (2) year period following a REA Termination is reduced by 15% or more from the average attendance during the two (2) years immediately prior to the REA Termination, then Tenant may terminate the Lease by notice to Landlord given within ninety (90) days following the end of the two (2) year period following the REA Termination, and Landlord, in connection with the termination of the Lease shall pay to Tenant the Fair Market Value of Tenant's Interest, within ten (10) business days following the determination of such amount pursuant to



Exhibit M, plus such additional sums/damages as are necessary to compensate Tenant for the loss of attendance during the period after the REA termination until the Lease terminates as hereinafter provided (i.e., to cover the lost profit after all expenses resulting from the attendance reduction or if the reduction in attendance increases Tenant's operating losses, to cover the increased losses resulting from the reduction). During the two-year period following the REA termination, Tenant will continue to diligently operate the theater in a manner comparable to the manner it was operated during the two-year period prior to the REA termination (i.e. Tenant shall not intentionally cause attendance to be reduced) and if Tenant does not comply with the foregoing operation obligation, Tenant shall have no rights under this subsection (c). If Tenant elects to terminate under this subsection (c), the termination shall take effect one hundred eighty (180) days following Tenant's notice of termination.

Section 21.19. **Quiet Enjoyment.** Landlord covenants and agrees that, so long as Tenant is not in default in its obligations hereunder beyond the expiration of any applicable cure or grace period, Tenant shall have and enjoy the peaceable and quiet enjoyment of the Premises subject to the terms of this Lease, free and clear of any molestation, hindrance, eviction, nuisance, claim, interruption or impairment by Landlord or by any person or entity claiming by, through or under Landlord.

Section 21.20. **Tenant's Operation.** Except as expressly provided in this Lease, nothing contained in this Lease (including, without limitation, the provisions hereof concerning Percentage Rent and Alternate Rent) or in the rules or regulations (if any) promulgated by Landlord be deemed in any way (i) to regulate the manner of operation by Tenant of its business or the hours or days such operation, or (ii) to constitute or imply a covenant by Tenant to operate continuously in the Premises at any time, or (iii) to limit Tenant's use of the Premises or to give Landlord any censorship right, express or implied, over any movies, films or other attractions exhibited by Tenant or over the content of Tenant's advertising.

Section 21.21. **Promotional Activities/Merchants' Association.** Tenant shall not be obligated to join any merchants' association established for the tenants and occupants of the Center or to pay "dues" or otherwise to contribute to or participate in any promotional activities or advertising of the Center or any promotional fund or merchants' association.

Section 21.22. **Business Days.** Any references in this Lease to "business days" refer to days other than a Saturday, Sunday or a legal holiday under the laws of the United States or the State of Illinois.

Section 21.23. **Counterparts.** This Lease may be executed in any number of identical counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

Section 21.24. **Confidentiality of Financial Information.** Without limiting the provisions of Section 4.5, all financial information (including statements of Tenant's Gross Sales) provided by Tenant to Landlord under this Lease concerning Tenant's operation, shall be received, handled and treated in all respects as confidential information, to be used solely by Landlord in connection with the bona fide purposes in connection with the administration of this Lease, and shall not be communicated, delivered, published or otherwise disclosed to any person or entity (in summary form or otherwise) without the express prior written consent of Tenant in each instance, provided, however, that nothing contained herein shall prohibit Landlord from making disclosures of any such information to the extent required by law or in pursuance of a valid subpoena or legal process or to Landlord's actual or prospective investors or lenders (provided that if Landlord is no longer an affiliate of a publicly traded company, the prospective investors and lenders shall not own or operate any movie theaters and in all cases that such disclosure shall be made subject to the confidentiality and non-disclosure requirements hereof) or to prospective purchasers of Landlord's Parcel, subject to the confidentiality and non-disclosure requirements hereof. In addition, Tenant acknowledges that Landlord is currently an affiliate of a publicly traded company and as such is required to make certain disclosures in written and oral form to its shareholders and regulatory agencies, provided, that except as otherwise required by Applicable Law, the disclosures with respect to the Lease shall be limited to the amount of Base Rent and Additional Rent payable under the Lease, the length of the Lease Term, and as to Gross Sales, the total Gross Sales reported by Tenant from the Premises and not individual line items

77



and Landlord shall in all events, except as otherwise required by Applicable Law, use commercially reasonable efforts to avoid disclosures to Tenant's competitors. The provisions of this Section 21.24 shall survive the expiration of the Term or the earlier termination of this Lease.

Section 21.25. **Exhibits**. Each Exhibit to which reference is made herein and which is attached hereto is made a part hereof by reference.

Section 21.26. **Governing Law**. This Lease shall be governed by and construed in accordance with the laws of the State of Illinois (excluding conflicts of laws principles).

Section 21.27. **Time of Essence**. Time is of the essence of this Lease and the provisions hereof.

Section 21.28. **Severability**. If any provision of this Lease or the application thereof to any person or circumstance is or shall be deemed to be illegal, invalid or unenforceable, the remaining provisions hereof shall remain in full force and effect and this Lease shall be interpreted as if such illegal, invalid or unenforceable provision did not exist herein.

Section 21.29. **Waiver of Jury Trial**. Landlord and Tenant waive trial by jury in the event of any action, proceeding or counterclaim brought by either Landlord or Tenant against the other in connection with this Lease.

Section 21.30. **Anti-Merger**. The voluntary or otherwise surrender of this Lease by Tenant, or a mutual cancellation of this Lease shall not work a merger but shall at the option of Landlord either: (i) terminate any existing subleases or subtenancies; or (ii) operate as an assignment to Landlord (and assumption by Landlord) of any subleases or subtenancies.



**IN WITNESS WHEREOF**, the Parties have hereunto set their hands on the day and year first aforesaid.

LANDLORD:                                    TENANT:

FMP STRATFORD LLC, a                         CENTURY THEATRES, INC.,
Delaware limited liability company           a California corporation

By: _____                  By: _____
Name: Scott Jensen                            Name: Raymond W. Syufy
Its: Vice President                           Its: Chairman and CEO

## EXHIBIT A

### CENTER SITE PLAN AND FLOOR PLAN(S)



Exhibit A 1of3: Site Plan

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall

## EXHIBIT A

### CENTER SITE PLAN AND FLOOR PLAN(S)



EXHIBIT A

CENTER SITE PLAN AND FLOOR PLAN(S)





EXHIBIT A.1

CENTER FLOOR PLAN SHOWING PREMISES LOCATION



Exhibit A.1 - 1 of 2

**DLR Group**
Architecture Engineering Planning Interiors

| | Exhibits for Century Lease Agreement |
| | Stratford Square Mall |



**EXHIBIT A.1**

**CENTER FLOOR PLAN SHOWING PREMISES LOCATION**



UPPER LEVEL

NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES.
THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.

SEARS

LOCATION OF TENANT
PREMISES FLOOR AREA

CENTURY
THEATRE

Exhibit A.1 - 2 of 2

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall



**EXHIBIT A.2**

**PROTECTED AREA**



Exhibit A.2, page 1 of 2 - Tenant's Protected Area

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall

**EXHIBIT A 2**

**PROTECTED AREA**



Exhibit A.2, page 2 of 2 - Tenant's Protected Area

**DLR Group**

Exhibits for Century Lease Agreement
Stratford Square Mall



EXHIBIT A.3

PRIORITY PARKING AREA



NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES.
THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.

CONSTRUCTION
STAGING AREA

RESTAURANT PAD:
APPROX. 15,000 SF

PRIORITY PARKING
950 SPACES

RESTAURANT PAD:
APPROX. 15,000 SF

KOHL'S

SEARS

CENTURY
THEATRE

FUTURE RESTAURANT
OR LIFESTYLE PLAZA
AREA

Exhibit A.3 - Priority Parking

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall



EXHIBIT A.4

REQUIRED VERTICAL TRANSPORTION



UPPER LEVEL

NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES.
THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.

KOHL'S

EXISTING ELEVATOR AND ESCALATOR:
LANDLORD MAY RELOCATE EXISTING
ELEVATOR OR ESCALATOR WITHIN SHADED
AREA HOWEVER TO THE EXTENT EITHER ARE
MOVED THE LANDLORD IS REQUIRED TO HAVE
A SUBSTITUTE ELEVATOR OR ESCALATOR IN
PLACE BEFORE REMOVING THE EXISTING
ELEVATOR OR ESCALATOR.

SEARS

EXISTING PASSENGER ELEVATOR*

CENTURY THEATRE

EXISTING FREIGHT
ELEVATOR *

* LANDLORD MAY RELOCATE EXISTING
FREIGHT ELEVATOR WITHIN SHADED AREA
HOWEVER TO THE EXTENT THE ELEVATOR IS
MOVED THE LANDLORD IS REQUIRED TO HAVE
A SUBSTITUTE ELEVATOR IN PLACE BEFORE
REMOVING THE EXISTING ELEVATOR.

Exhibit A.4 - Required Vertical Transportation

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall



**EXHIBIT A.5**

**NO CART/KIOSK AREA**



NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES.
THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.

NO-CART /
NO-KIOSK AREA

KOHL'S

SEARS

CENTURY
THEATRE

Exhibit A.5, page 1of 2

**DLR Group**

| | Exhibits for Century Lease Agreement |
| --- | --- |
| | Stratford Square Mall |



### EXHIBIT A.5

### NO CART/KIOSK AREA





**EXHIBIT A.6**

**NO VENDING AREA**
**NO VIDEO/GAME AREA**
**CANDY RESTRICTED AREA**
**BEVERAGE RESTRICTED AREA**
**GENERAL CONCESSION RESTRICTED AREA**



Exhibit A.6, page 1 of 10



DLR Group
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall

**EXHIBIT A.6**

**NO VENDING AREA**
**NO VIDEO/GAME AREA**
**CANDY RESTRICTED AREA**
**BEVERAGE RESTRICTED AREA**
**GENERAL CONCESSION RESTRICTED AREA**



Exhibit A.6, page 2 of 10

DLR Group

Exhibits for Century Lease Agreement
Stratford Square Mall



**EXHIBIT A.6**

**NO VENDING AREA**
**NO VIDEO/GAME AREA**
**CANDY RESTRICTED AREA**
**BEVERAGE RESTRICTED AREA**
**GENERAL CONCESSION RESTRICTED AREA**



NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES.
THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER

NO VIDEO / GAME AREA

FUTURE RESTAURANT /
PATIO LOCATIONS

ANY PORTION OF THE HATCHED AREA THAT IS DIVIDED OR SPLIT IN SUCH A MANNER WHERE THE RESULTING STOREFRONT OF A GIVEN PREMISE DOES NOT FACE THE THEATRE PREMISE OR THE CENTER COURT COMMON AREA, THAT PREMISE WILL NO LONGER BE PART OF THE NO VIDEO/GAME AREA RESTRICTION. ANY PREMISE IN THE HATCHED AREA HAVING STOREFRONT VISIBILITY TO THE THEATRE PREMISES MUST COMPLY WITH THE NO VIDEO/GAME AREA RESTRICTION IN THE ENTIRE STORE REGARDLESS OF WHETHER IT IS HATCHED.

KOHL'S

SEARS

CENTURY
THEATRE

Exhibit A.6, page 3 of 10

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall



## EXHIBIT A.6

### NO VENDING AREA
### NO VIDEO/GAME AREA
### CANDY RESTRICTED AREA
### BEVERAGE RESTRICTED AREA
### GENERAL CONCESSION RESTRICTED AREA



UPPER LEVEL

NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES.
THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.

KOHL'S

SEARS

NO VIDEO /
GAME AREA

ANY PORTION OF THE HATCHED AREA
THAT IS DIVIDED OR SPLIT IN SUCH A
MANNER WHERE THE RESULTING
STOREFRONT OF A GIVEN PREMISE
DOES NOT FACE THE THEATRE
PREMISE OR THE CENTER COURT
COMMON AREA, THAT PREMISE WILL
NO LONGER BE PART OF THE NO
VIDEO/GAME AREA RESTRICTION. ANY
PREMISE IN THE HATCHED AREA
HAVING STOREFRONT VISIBILITY TO
THE THEATRE PREMISES MUST
COMPLY WITH THE NO VIDEO/GAME
AREA RESTRICTION IN THE ENTIRE
STORE REGARDLESS OF WHETHER IT
IS HATCHED.

CENTURY
THEATRE

Exhibit A.6, page 4 of 10

 DLR Group
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall

## EXHIBIT A.6

### NO VENDING AREA
### NO VIDEO/GAME AREA
### CANDY RESTRICTED AREA
### BEVERAGE RESTRICTED AREA
### GENERAL CONCESSION RESTRICTED AREA



NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES. THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.

CANDY RESTRICTED AREA

FUTURE RESTAURANT / PATIO LOCATIONS

ANY PORTION OF THE HATCHED AREA THAT IS DIVIDED OR SPLIT IN SUCH A MANNER WHERE THE RESULTING STOREFRONT OF A GIVEN PREMISE DOES NOT FACE THE THEATRE PREMISE OR THE CENTER COURT COMMON AREA, THAT PREMISE WILL NO LONGER BE PART OF THE CANDY RESTRICTED AREA. ANY PREMISE IN THE HATCHED AREA HAVING STOREFRONT VISIBILITY TO THE THEATRE PREMISES MUST COMPLY WITH THE NO CANDY RESTRICTION IN THE ENTIRE STORE REGARDLESS OF WHETHER IT IS HATCHED.

KOHL'S

SEARS

CENTURY THEATRE

Exhibit A.6, page 5 of 10

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall

EXHIBIT A.6

NO VENDING AREA
NO VIDEO/GAME AREA
CANDY RESTRICTED AREA
BEVERAGE RESTRICTED AREA
GENERAL CONCESSION RESTRICTED AREA



UPPER LEVEL

NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES.
THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.

KOHL'S

SEARS

CANDY RESTRICTED AREA

ANY PORTION OF THE HATCHED AREA THAT IS DIVIDED OR SPLIT IN SUCH A MANNER WHERE THE RESULTING STOREFRONT OF A GIVEN PREMISE DOES NOT FACE THE THEATRE PREMISE OR THE CENTER COURT COMMON AREA, THAT PREMISE WILL NO LONGER BE PART OF THE CANDY RESTRICTED AREA. ANY PREMISE IN THE HATCHED AREA HAVING STOREFRONT VISIBILITY TO THE THEATRE PREMISES MUST COMPLY WITH THE NO CANDY RESTRICTION IN THE ENTIRE STORE REGARDLESS OF WHETHER IT IS HATCHED.

CENTURY THEATRE

Exhibit A.6, page 6 of 10

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall



## EXHIBIT A.6

### NO VENDING AREA
### NO VIDEO/GAME AREA
### CANDY RESTRICTED AREA
### BEVERAGE RESTRICTED AREA
### GENERAL CONCESSION RESTRICTED AREA



Exhibit A.6, page 7 of 10

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall



EXHIBIT A.6

NO VENDING AREA
NO VIDEO/GAME AREA
CANDY RESTRICTED AREA
BEVERAGE RESTRICTED AREA
GENERAL CONCESSION RESTRICTED AREA



UPPER LEVEL

NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES.
THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.

KOHL'S

BEVERAGE
RESTRICTED
AREA

SEARS

CENTURY
THEATRE

Exhibit A.6, page 8 of 10



**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall

**EXHIBIT A.6**

**NO VENDING AREA**
**NO VIDEO/GAME AREA**
**CANDY RESTRICTED AREA**
**BEVERAGE RESTRICTED AREA**
**GENERAL CONCESSION RESTRICTED AREA**



Exhibit A.6, page 9 of 10

**DLR Group**

Exhibits for Century Lease Agreement
Stratford Square Mall



# EXHIBIT A.6

## NO VENDING AREA
## NO VIDEO/GAME AREA
## CANDY RESTRICTED AREA
## BEVERAGE RESTRICTED AREA
## GENERAL CONCESSION RESTRICTED AREA



Exhibit A.6, page 10 of 10



Exhibits for Century Lease Agreement
Stratford Square Mall

**DLR Group**

**EXHIBIT A.7**

**CRITICAL ACCESSWAYS**



Exhibit A.7 - Critical Accessways



**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall

EXHIBIT A.8

TENANT'S REFUSE COMPACTOR



UPPER LEVEL

NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES. THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.

SEARS

GARBAGE CHUTE LOCATION
(ABOVE COMMON AREA COMPACTOR)

CENTURY THEATRE

Trash Chute to deliver trash directly from the theater level directly into the Tenant Refuse Compactor, with a minimum clear area inside the chute of 42" by 42" with no bends, although the trash chute may be angled, but must provide a clear passage with no projections on the inside which would snag garbage.
If subsequent discovery renders marked location as not desired, both Landlord and Tenant will work to find a mutually acceptable alternative location.

Exhibit A.8 - Tenant's Refuse Compactor

 DLR Group

Exhibits for Century Lease Agreement
Stratford Square Mall



**EXHIBIT A.9**

**LONG TERM RETAIL LEASE AREA**





**EXHIBIT A.9**

**LONG TERM RETAIL LEASE AREA**



Exhibit A.9 - 2 of 2 - Upper Level Long Term Retail Area



DLR Group
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall

EXHIBIT A.10

VICTORIA'S SECRET LOCATION





## EXHIBIT B

## LANDLORD'S PARCEL - LEGAL DESCRIPTION

**Parcel A:**

Parcels 9, 11, 12, 13, 14 and 16 in Stratford Assessment Plat Number 9 in the Southeast quarter of Section 17 and the Northeast quarter of Section 20, all in Township 40 North, Range 10, East of the Third Principal Meridian, according to said Stratford Assessment Plat Number 9 recorded November 29, 1984 as document R84-95983, in DuPage County, Illinois.

**Parcel B:**

Lots 1 and 3 in Gary King County Clerk's Stratford Assessment Plat Number 10, of Parcel 10 in Jay C. Bennett Sr. County Clerk's Stratford Assessment Plat Number 9, all in the Southeast quarter of Section 17, Township 40 North, Range 10, East of the Third Principal Meridian, according to the Plat of said Gary King County Clerk's Stratford Assessment Plat Number 10, recorded December 31, 1990 as document number R90-170572, in DuPage County, Illinois.

**Parcel C:**

The reciprocal non-exclusive easements for ingress and egress for the benefit of Parcels 1 and 2 over the "Ring Road" and access roads situated between Wheaton Road, Schick Road, Gary Avenue, and Army Trail Road and other permanent reciprocal and non-exclusive rights, easements and privilege of use, egress, ingress, parking, utility and other purposes together with all rights, powers, privileges and benefits as established by and contained in that certain Easement and Operating Agreement dated October 22, 1979 and recorded November 5, 1979 as document R79-100343, by and among Urban Investment and Development Co., a Delaware corporation, ("Urban"), Marshall Field and Company, a Delaware corporation ("Field"), Carson Pirie Scott and Company, a Delaware corporation ("Carson"), Wieboldt Stores, Inc., an Illinois corporation ("Wieboldt"), and Montgomery Ward Development Corporation, a Delaware corporation ("Ward"); as modified by that certain Amendment to Easement and Operating Agreement, dated as of April 1, 1992, and recorded December 30, 1993 as document R93-306905, by and between Urban Bloomingdale Limited Partnership, an Illinois limited partnership (successor-in-interest to Urban); Field, CPS Realty Partnership, an Illinois general partnership (successor-in-interest to Carson), LaSalle National Trust, N.A., as Successor Trustee to LaSalle National Bank, as Trustee under that certain Trust Agreement dated May 27, 1988 and known as Trust No. 113250 (successor-in-interest to Wieboldt), Ward, Kohl's Department Stores Inc., a Delaware corporation, and Sears Roebuck and Co., a New York corporation; as modified on that certain Assignment and Assumption of Amended and Restated Construction, Operation and Easement Agreement dated December 28, 2004 and recorded January 4, 2005 as document number R2005-001652 made by LaSalle Bank National Association, as Trustee under Trust No. 100100 to PBP Stratford LLC, a Delaware limited liability company.

**Parcel D:**

Lot 1 and Lot 2 in Stratford Assessment Plat No. 16, being a part of Lots 4, 7, 8 and 9 in Stratford Assessment Plat No. 3 in the Southeast 1/4 of Section 17 and the Northeast 1/4 of Section 20, Township 40 North Range 10 East, of the Third Principal Meridian, according to the Plat of said Stratford Assessment Plat No. 16 recorded October 5, 1987 as document R87-145419 and re-recorded December 8, 1987 as document R87-172475, in DuPage County, Illinois, less and except the following described land:

That part of Lot 2 in Stratford Assessment Plat No. 16 in the Northeast quarter of Section 20, Township 40 North, Range 10 East of the Third Principal Meridian, according to the plat thereof recorded October 5, 1987 as document no. R87-145419 and re-recorded December 8, 1987 as document no. R87-172475, described as follows:

Beginning at the Northwest corner of said Lot 2; thence South 76 degrees 33 minutes 36 seconds East, record being South 76 degrees 32 minutes 36 seconds East; along the Northerly line of said Lot 2, a distance of 80.81 feet, record being 80.71 feet, to a point of curvature, thence Northeasterly along said Northerly line of Lot 2, being along a curve concave to the Northwest having a radius of 203.96 feet, an arc distance of 332.77 feet, record being 332.87 feet, to a point of tangency, the chord of said arc having a length of 297.05 feet, record being 297.14 feet and bearing North 56 degrees 41 minutes 35 seconds East, record being North 56 degrees 42 minutes 15 seconds East; thence North 09 degrees 57 minutes 02 seconds East along said Northerly line of Lot 2, a distance of 98.71 feet to a point of curvature; thence Northeasterly along said Northerly line of Lot 2, being along a curve concave to the Southeast having a radius of 454.23 feet, an arc distance of 435.27 feet to a point of compound curvature, the chord of said arc having a length of 418.81 feet and a bearing of North 37 degrees 24 minutes 10 seconds East; thence Easterly along said Northerly line of Lot 2, being along a curve concave to the South having a radius of 225.44 feet, an



I OF 2

## EXHIBIT B

## LANDLORD'S PARCEL – LEGAL DESCRIPTION

a distance of 150.07 feet to a point of compound curvature, the chord of said arc having a length of 147.31 feet and a bearing of South 83 degrees 55 minutes 30 seconds East, thence Southeasterly along the Easterly line of said Lot 2, being along a curve concave to the Southwest having a radius of 156.52 feet, an arc distance of 187.61 feet to a point of compound curvature, the chord of said arc having a length of 170.58 feet and bearing of South 42 degrees 39 minutes 56 seconds East; thence Southerly along said Easterly line of Lot 2, being along a curve concave to the West having a radius of 808.64 feet, an arc distance of 664.24 feet, record being 664.25 feet, to a point of tangency, the chord of said arc having a length of 664.02 feet, record being 664.03 feet, and bearing of South 15 degrees 54 minutes 59 seconds West, record being South 15 degrees 54 minutes 55 seconds West, thence South 40 degrees 09 minutes 22 seconds West along said Easterly line of Lot 2, a distance of 106.43 feet, record being 106.44 feet, to a point of curvature; thence Westerly along the Southerly line of said Lot 2, being along a curve concave to the North having a radius of 209.15 feet, an arc distance of 370.15 feet to a point of reverse curvature, the chord of said arc having a length of 341.06 feet and bearing of South 79 degrees 33 minutes 13 seconds West; thence Westerly along said Southerly line of Lot 2, being along a curve concave to the South having a radius of 217.77 feet, an arc distance of 139.12 feet to a point of tangency, the chord of said arc having a length of 136.70 feet and bearing of North 79 degrees 20 minutes 59 seconds West; thence South 82 degrees 20 minutes 55 seconds West along said Southerly line of Lot 2, a distance of 144.61 feet, West line of said Lot 2, a distance of 25.22 feet; thence North 82 degrees 20 minutes 58 seconds West along the West line of said Lot 2, a distance of 25.22 feet; thence North 82 degrees 20 minutes 58 seconds East an arc distance of 155.09 feet to a point of curvature; thence Easterly along a curve concave to the South having a radius of 242.77 feet an arc distance of 155.09 feet to a point of reverse curvature, the chord of said arc having a length of 152.46 feet and bearing of South 79 degrees 20 minutes 59 seconds East; thence Easterly along a curve concave to the North having a radius of 244.15 feet an arc distance of 335.76 feet to a point of tangency, the chord of said arc having a length of 309.92 feet and bearing of North 79 degrees 33 minutes 13 seconds East; thence North 40 degrees 09 minutes 22 seconds East, 106.43 feet to a point of curvature; thence Northerly along a curve concave to the West having a radius of 783.64 feet an arc distance of 663.10 feet to a point of compound curvature, the chord of said arc having a length of 643.50 feet and bearing of North 15 degrees 54 minutes 59 seconds East; thence Northwesterly along a curve concave to the Southwest having a radius of 131.52 feet, an arc distance of 187.65 feet to a point of compound curvature, the chord of said arc having a length of 148.38 feet and bearing of North 42 degrees 39 minutes 56 seconds West; thence Westerly along a curve concave to the South having a radius of 200.44 feet, an arc distance of 133.42 feet to a point of compound curvature, the chord of said arc having a length of 130.97 feet and a bearing of South 83 degrees 55 minutes 30 seconds West; thence Southwesterly along a curve concave to the Southeast having a radius of 429.23 feet, an arc distance of 411.31 feet to a point of tangency, the chord of said arc having a length of 395.76 feet and bearing of South 37 degrees 24 minutes 10 seconds West; thence South 09 degrees 57 minutes 02 seconds West, 98.71 feet to a point of curvature; thence Southeasterly along a curve concave to the Northwest having a radius of 228.96 feet an arc distance of 373.53 feet to a point of tangency, the chord of said arc having a length of 333.46 feet and bearing of South 56 degrees 41 minutes 35 seconds West; thence North 76 degrees 33 minutes 36 seconds West, 74.84 feet to the West line of said Lot 2; thence North 00 degrees 00 minutes 00 seconds East along said West line of Lot 2, a distance of 25.78 feet to the place of beginning, in DuPage County, Illinois.

2 OF 2



EXHIBIT B.1

LEGAL DESCRIPTION/DEPICTION OF PREMISES



Exhibit B.1: Depiction of the Premises

DLR Group

Exhibits for Century Lease Agreement
Stratford Square Mall



EXHIBIT B.2

LEGAL DESCRIPTION OF CENTER

PENNEY'S PROPERTY

A tract of land in the South East 1/4 of Section 17, Township 40 North, Range 10, East of the Third Principal Meridian, described as follows: Commencing at the North West corner of said South East 1/4; Thence due South 2087.56 feet along the West line of said South East 1/4; Thence due East 57.04 feet to a place of beginning; Thence North 05 degrees 28 minutes 37 seconds East 42 feet to a point of curve; Thence easterly, on a curve Convex to the South, having a radius of 563.91 feet, an arc distance of 249.33 feet and a chord bearing of North 72 degrees 43 minutes 30 seconds East; Thence North 15 degrees 52 minutes 29 seconds East 55.85 feet to a point on curve; Thence Northerly, on a curve Convex to the West, having a radius of 732.81 feet, an arc distance of 216.18 feet and a chord bearing of North 20 degrees 04 minutes 01 seconds West to a point on curve; Thence Northerly on a curve convex to the West, having a radius of 1443.66 feet, an arc distance of 48.82 feet and a chord bearing of North 15 degrees 13 minutes 20 seconds West; thence North 20 degrees 34 minutes 57 seconds East 195 feet; Thence North 14 degrees 25 minutes 03 seconds West 18.34 feet; Thence North 80 degrees 57 seconds East 201.51 feet; Thence North 35 degrees 30 minutes East 350 feet; thence North 77 degrees 06 minutes 15 seconds East 96.51 feet; Thence North 35 degrees 30 minutes East 82 feet; Thence South 54 degrees 30 minutes East 306 feet; Thence South 35 degrees 30 minutes East 62 feet; Thence South 9 degrees 30 minutes East 33.54 feet; Thence South 35 degrees 30 minutes West 204 feet; Thence North 54 degrees 30 minutes West 21.08 feet Thence South 35 degrees 30 minutes West 162.95 feet to a point on curve; Thence Northwesterly, on a curve convex to the South West having a radius of 1102.31 feet, an arc distance of 71.53 feet and a chord bearing of North 43 degrees 15 minutes 25 seconds West to a point on curve; Thence Northwesterly, on a curve convex to the South West having a radius of 1634.04 feet, an arc distance of 135.16 feet and a chord bearing of North 43 degrees 51 minutes 18 seconds West to a point on curve; Thence Northwesterly, on a curve convex to the South West having a radius of 801.35 feet, an arc distance of 96.23 feet and a chord bearing of North 39 degrees 29 minutes 21 seconds West; Thence North 35 degrees 30 minutes 10 seconds West 52.99 feet to a point on curve; Thence westerly, on a curve convex to the South, having a radius of 616.37 feet, an arc distance of 276.58 feet, and a chord bearing of South 12 degrees 29 minutes 39 seconds West to a point of tangent; Thence South 85 degrees 28 minutes 31 seconds West 42 feet; Thence North 4 degrees 31 minutes 24 seconds West 51 feet to the place of beginning, all in Du Page County, Illinois.

Permanent Index Numbers: 02-17-400-071
02-17-400-072

KOHL'S PROPERTY

Parcel 15 in (Jay C. Bennett Sr., County Clerk's) Stratford Assessment Plat No. 9 in the South west Quarter of Section 17, and the northeast 1/4 of Section 20, all in Township 40 North, Range 10 East of the Third Principal Meridian, according to the Plat thereof recorded November 29, 1984 as Document R84-95983 in DuPage County, Illinois.

Permanent Index Numbers: 02-17-400-081



Exhibit B.2

## SEARS' PROPERTY

Lot 2 in (Gary King, County Clerk's) Stratford Assessment Plat No. 10 of Parcel 10 in Jay C. Bennett Sr., County Clerk's Stratford Assessment Plat No. 9 all in the Southeast Quarter of Section 17, Township 40 North, Range 10 East of the Third Principal Meridian, according to the plat thereof recorded December 31, 1990 as Document No. R90-176572 in DuPage County, Illinois.

Permanent Index Number: 02-17-400-088

## FIELD'S PROPERTY

Parcels 1 and 2 in (Jay C. Bennett Sr., County Clerk's) Stratford Assessment Plat No. 9 in the Southeast Quarter of Section 17, and the northeast quarter of Section 20, all in Township 40 North, Range 10 East of the Third Principal Meridian, according to the plat thereof recorded November 29, 1984 as Document R84-95983 in DuPage County, Illinois.

Permanent Index Numbers:  02-17-400-068
                          02-17-400-069

## BURLINGTON'S PROPERTY

Parcels 5 and 6 in (Jay C. Bennett Sr., County Clerk's) Stratford Assessment Plat No. 9 in the Southeast Quarter of Section 17, and in the Northeast Quarter of Section 20, all in Township 40 North, Range 10 East of the Third Principal Meridian, according to the Plat thereof recorded November 29, 1984 as Document R84-95983 in DuPage County, Illinois.

Permanent Index Numbers:  02-17-400-074
                          02-17-400-075

## CARSON'S PROPERTY

Parcels 7 and 8 in (Jay C. Bennett Sr., County Clerk's) Stratford Assessment Plat No. 9 in the Southeast Quarter of Section 17, and in the Northeast Quarter of Section 20, all in Township 40 North, Range 10 East of the Third Principal Meridian, according to the plat thereof recorded November 29, 1984 as Document R84-95983 in DuPage County, Illinois.

Permanent Index Numbers:  02-17-400-076
                          02-17-400-077

 2 OF 4



CH1 02.3/216078.v9

Exhibit B-2

**Parcel A:**

Parcels 9, 11, 12, 13, 14 and 16 in Stratford Assessment Plat Number 9 in the Southeast quarter of Section 17 and the Northeast quarter of Section 20, all in Township 40 North, Range 10, East of the Third Principal Meridian, according to said Stratford Assessment Plat Number 9 recorded November 29, 1984 as document R84-95983, in DuPage County, Illinois.

**Parcel B:**

Lots 1 and 3 in Gary King County Clerk's Stratford Assessment Plat Number 10, of Parcel 10 in Jay C. Bennett Sr. County Clerk's Stratford Assessment Plat Number 9, all in the Southeast quarter of Section 17, Township 40 North, Range 10, East of the Third Principal Meridian, according to the Plat of said Gary King County Clerk's Stratford Assessment Plat Number 10, recorded December 31, 1990 as document number R90-176572, in DuPage County, Illinois.

**Parcel C:**

The reciprocal non-exclusive easements for ingress and egress for the benefit of Parcels 1 and 2 over the "Ring Road" and access roads situated between Wheaton Road, Schick Road, Gary Avenue, and Army Trail Road and other permanent reciprocal and non-exclusive rights, easements and privilege of use, egress, ingress, parking, utility and other purposes together with all rights, powers, privileges and benefits as established by and contained in that certain Easement and Operating Agreement dated October 22, 1979 and recorded November 5, 1979 as document R79-100343, by and among Urban Investment and Development Co., a Delaware corporation, ("Urban"), Marshall Field and Company, a Delaware corporation ("Field"), Carson Pirie Scott and Company, a Delaware corporation ("Carson"), Wieboldt Stores Inc., an Illinois corporation ("Wieboldt"), and Montgomery Ward Development Corporation, a Delaware corporation ("Ward"); as modified by that certain Amendment to Easement and Operating Agreement, dated as of April 1, 1992, and recorded December 30, 1993 as document R93-386905, by and between Urban Bloomingdale Limited Partnership, an Illinois limited partnership (successor-in-interest to Urban), Field, CPS Realty Partnership, an Illinois general partnership (successor-in-interest to Carson), LaSalle National Trust, N.A., as Successor Trustee to LaSalle National Bank, as Trustee under that certain Trust Agreement dated May 27, 1988 and known as Trust No. 113250 (successor-in-interest to Wieboldt), Ward, Kohl's Department Stores Inc., a Delaware corporation, and Sears Roebuck and Co., a New York corporation; as modified on that certain Assignment and Assumption of Amended and Restated Construction, Operation and Easement Agreement dated December 28, 2004 and recorded January 4, 2005 as document number R2005-001652 made by LaSalle Bank National Association, as Trustee under Trust No. 108100 to FMP Stratford LLC, a Delaware limited liability company.

**Parcel D:**

Lot 1 and Lot 2 in Stratford Assessment Plat No. 16, being a part of Lots 4, 7, 8 and 9 in Stratford Assessment Plat No. 3 in the Southeast 1/4 of Section 17 and the Northeast 1/4 of Section 20, Township 40 North Range 10 East, of the Third Principal Meridian, according to the Plat of said Stratford Assessment Plat No. 16 recorded October 5, 1987 as document R87-145419 and re-recorded December 8, 1987 as document R87-171475, in DuPage County, Illinois, less and except the following described land:

That part of Lot 2 in Stratford Assessment Plat No. 16 in the Northeast quarter of Section 20, Township 40 North, Range 10 East of the Third Principal Meridian, according to the plat thereof recorded October 5, 1987 as document no. R87-145419 and re-recorded December 8, 1987 as document no. R87-171475, described as follows:

Beginning at the Northwest corner of said Lot 2; thence South 76 degrees 33 minutes 36 seconds East, record being South 76 degrees 32 minutes 36 seconds East; along the Northerly line of said Lot 2, a distance of 80.81 feet, record being 80.71 feet, to a point of curvature, thence Northeasterly along said Northerly line of Lot 2, being along a curve concave to the Northwest having a radius of 203.96 feet, an arc distance of 332.77 feet, record being 332.87 feet, to a point of tangency, the chord of said arc having a length of 297.05 feet, record being 297.14 feet and bearing North 56 degrees 41 minutes 35 seconds East, record being North 56 degrees 42 minutes 13 seconds East; thence North 09 degrees 57 minutes 02 seconds East along said Northerly line of Lot 2, a distance of 98.71 feet to a point of curvature; thence Northeasterly along said Northerly line of Lot 2, being along a curve concave to the Southeast having a radius of 454.23 feet, an arc distance of 435.27 feet to a point of compound curvature, the chord of said arc having a length of 418.81 feet and a bearing of North 37 degrees 24 minutes 16 seconds East; thence Easterly along said Northerly line of Lot 2, being along a curve concave to the South having a radius of 225.44 feet, an

WBD MidSouth 80426_07 Rev: CD/2003

3 OF 4



Exhibit B.2

are distance of 150.07 feet to a point of compound curvature, the chord of said arc having a length of 147.31 feet and a bearing of North 83 degrees 55 minutes 30 seconds East; thence Southeasterly along the Easterly line of said Lot 2, being along a curve concave to the Southwest having a radius of 156.52 feet, an arc distance of 187.61 feet to a point of compound curvature, the chord of said arc having a length of 176.58 feet and bearing of South 42 degrees 39 minutes 56 seconds East; thence Southerly along said Easterly line of Lot 3, being along a curve concave to the West having a radius of 808.64 feet, an arc distance of 684.24 feet, record being 684.25 feet, to a point of tangency, the chord of said arc having a length of 664.02 feet, record being South 15 degrees 54 minutes 55 seconds West, record being South 15 degrees 54 minutes 59 seconds West, record being South 15 degrees 54 minutes 55 seconds West; thence South 40 degrees 09 minutes 22 seconds West along said Easterly line of Lot 2, a distance of 106.43 feet, record being 106.44 feet, to a point of curvature; thence Westerly along the Southerly line of said Lot 2, being along a curve concave to the North having a radius of 269.15 feet, an arc distance of 370.15 feet to a point of reverse curvature, the chord of said arc having a length of 341.66 feet and bearing of South 79 degrees 33 minutes 13 seconds West; thence Westerly along said Southerly line of Lot 2, being along a curve concave to the South having a radius of 217.77 feet, an arc distance of 139.12 feet to a point of tangency, the chord of said arc having a length of 136.76 feet and bearing of North 79 degrees 20 minutes 59 seconds West; thence South 82 degrees 20 minutes 58 seconds West along said Southerly line of Lot 2, a distance of 144.61 feet, record being 144.62 feet, to the Southwest corner of said Lot 2; thence North 00 degrees 00 minutes 00 seconds East along the West line of said Lot 2, a distance of 25.23 feet; thence North 82 degrees 20 minutes 58 seconds East, 141.25 feet to a point of curvature; thence Easterly along a curve concave to the South having a radius of 242.77 feet an arc distance of 155.09 feet to a point of reverse curvature, the chord of said arc having a length of 152.46 feet and bearing of South 79 degrees 20 minutes 59 seconds East; thence Easterly along a curve concave to the North having a radius of 244.15 feet an arc distance of 335.76 feet to a point of tangency, the chord of said arc having a length of 309.92 feet and bearing of North 79 degrees 33 minutes 13 seconds East; thence North 40 degrees 09 minutes 22 seconds East, 106.43 feet to a point of curvature; thence Northerly along a curve concave to the West having a radius of 783.64 feet an arc distance of 663.10 feet to a point of compound curvature, the chord of said arc having a length of 643.50 feet and bearing of North 15 degrees 54 minutes 59 seconds East; thence Northwesterly along a curve concave to the Southwest having a radius of 131.52 feet, an arc distance of 157.65 feet to a point of compound curvature, the chord of said arc having a length of 148.38 feet and bearing of North 42 degrees 39 minutes 56 seconds West; thence Westerly along a curve concave to the South having a radius of 200.44 feet, an arc distance of 133.42 feet to a point of compound curvature, the chord of said arc having a length of 130.97 feet and a bearing of South 83 degrees 55 minutes 30 seconds West; thence Southwesterly along a curve concave to the Southeast having a radius of 429.23 feet, an arc distance of 411.31 feet to a point of tangency, the chord of said arc having a length of 395.76 feet and bearing of South 37 degrees 24 minutes 10 seconds West; thence South 09 degrees 57 minutes 02 seconds West, 98.71 feet to a point of curvature; thence Southwesterly along a curve concave to the Northwest having a radius of 228.96 feet an arc distance of 373.53 feet to a point of tangency, the chord of said arc having a length of 333.46 feet and bearing of South 56 degrees 41 minutes 35 seconds West; thence North 76 degrees 33 minutes 36 seconds West, 74.84 feet to the West line of said Lot 2; thence North 00 degrees 00 minutes 00 seconds East along said West line of Lot 2, a distance 25.70 feet to the place of beginning, in DuPage County, Illinois.

4 of 4



## EXHIBIT C

## COMMENCEMENT DATE CONDITIONS

1.    Completion and installation of all utilities serving the Premises to the extent required to be installed by Landlord as part of Landlord's Work.

2.    The substantial completion of Landlord's Work.

3.    Issuance by the City of a final certificate of occupancy for the Premises or a temporary certificate of occupancy for the Premises (or functional equivalent issued by the City, evidencing the right to lawfully use and occupy the Premises) containing conditions acceptable to Tenant (unless the failure to issue the final or temporary certificate of occupancy results from Tenant's failure to complete Tenant's Work).

4.    Funding of the entire Landlord Reimbursement by Landlord to Tenant (or as Tenant may direct).

--CHGO2.20216078.v9



### EXHIBIT D

### WORK LETTER

**THIS WORK LETTER** is attached to and forms a part of the Lease Agreement, dated as of December **12**, 2005 (the "Effective Date") by and between FMP STRATFORD LLC, as Landlord, and CENTURY THEATRES, INC., as Tenant, covering premises situated in the Village of Bloomingdale ("City"), DuPage County, Illinois. Capitalized terms used in this Work Letter and not otherwise defined herein shall have the meanings ascribed to them in the Lease. In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Work Letter, except as otherwise set forth below, the terms and provisions hereof shall govern and control. The provisions of Section 21.13 of the Lease shall apply with respect to any consents or approvals required in this Work Letter. Except for notices of default and termination notices (which shall be sent in accordance with Section 21.2 of the Lease), all deliverables and notices required under this Work Letter shall be delivered to the following individuals: (i) for Tenant, to the attention of Tenant's Chief Operating Officer (with a copy to the Project Manager for Tenant assigned to the project) at Tenant's address for notice purposes set forth in Section 1.1 of the Lease, and (ii) for Landlord, at Landlord's address for notice purposes set forth in Section 1.1 of the Lease and to Tom Rao, Foothills Mall Management Office, 7401 North La Cholla, Tucson, Arizona 85741.

**I.   LANDLORD'S AND TENANT'S WORK**

Section 1.1   **Landlord's Work.** Landlord, at its sole cost and expense (except as provided to the contrary herein or in the Lease), shall perform the following work ("Landlord's Work") in accordance with the Final Plans (as hereinafter defined):

a.   **Theatre Improvements.** Landlord shall perform all work, other than Tenant's Work (as hereinafter defined), associated with the demolition and/or renovation (as necessary) of existing tenant spaces which are to be included in the Premises, the existing theater space and existing structures and the construction and installation of improvements comprising the approximately 14 to 16 screen, approximately 2,600 to 3,000 theatre seat, First-Class "Century Theatres" movie theater complex within the Center, containing stadium seating with 18-inch risers, a spacious lobby with ceiling height of a minimum of 30 feet (measured from finished floor to decorative ceiling) and, to the extent feasible, up to 50 feet (and Landlord hereby covenants to use best efforts to accommodate a minimum ceiling height for the theater lobby of at least 40 feet), containing approximately 50,000 to 60,000 square feet, in strict accordance with Landlord's Final Plans and Tenant's Theater Standards (as each is hereinafter defined), to be situated in the location shown on the site plan of the Center attached hereto as Exhibit D-1 (the "Site Plan") and to be improved in accordance with the "Site Specifications" attached hereto as Exhibit D.2. Landlord's Work shall also include the work to be performed by Landlord and described on the work matrix attached hereto as Exhibit D-3 ("Work Matrix");

b.   **Site Improvements and Common Area Improvements.** The area within Landlord's Parcel designated as the "Site Improvement Area" on the Site Plan shall be improved in accordance with the Site Specifications. As part of Landlord's Work, Landlord shall also construct the Common Area improvements described below (and any other Common Area improvements necessary for the lawful occupancy, use and operation of the Premises):

i.   Construction, installation, furnishing, fixturing and finishing a queuing area and the entranceway and all other accessways to the Premises and between the Premises and the building exit to the Priority Parking Area and the other Common Areas, the renovation of certain Common Areas in the Center and of the restrooms adjacent to the food court, the installation and renovation of interior Common Area lighting and renovation of the Priority Parking Area (including a drop-off area) and the walkways providing access to and from the Premises and between the Premises and



the Priority Parking Area (including, but not limited to, sidewalks, hardscape, landscape, curbs, gutters, paving and drainage) all as more particularly depicted or described on Exhibit D-4;

ii.     The Common Area improvements required by Applicable Laws to be constructed, completed or installed in connection with or relating to or arising out of the development and operation of the Renovation or otherwise required for the issuance of a final, unconditional certificate of occupancy for the Premises (or for a temporary certificate of occupancy for the Premises, provided that the conditions for issuance of the final certificate of occupancy are satisfactory to Tenant, and provided that if a temporary certificate of occupancy is issued, Landlord shall promptly and diligently satisfy all conditions to issuance of, and obtain and provide Tenant with a copy of the final unconditional certificate of occupancy);

iii.    Obtains all permits and approvals for, and construction and installation of Tenant's Signs, featuring Tenant's corporate logo and branded font, consisting of the following: (A) the Marquee Sign described in Section 15.1 of the Lease (the cost of which shall be allocated between Landlord and Tenant in accordance with Section 1.3(b) of the Work Letter); (B) the Blade Sign described in Section 15.1 of the Lease (the cost of which shall be allocated between Landlord and Tenant in accordance with Section 1.3(a) of the Work Letter); (C) shared (i.e., having signage for multiple tenants) pylon and monument signs pursuant to Section 15.1 of the Lease; and (D) directional signage pursuant to Section 15.7 of the Lease. Subject to the provisions for cost sharing in Sections 1.3(a) and 1.3(b) for the Marquee Sign and the Blade Sign, Landlord's Work shall, except as specifically provided in the Lease or this Section 1.1.b.(iii), include the construction and installation of all aspects of Tenant's Signs, including without limitation, structural supports, electrical power, decorative lighting, data cable, neon, finishes and conduit; and

iv.     The renovation of that portion of the Protected Area designated as the "Mall Entry Area" on Exhibit D-1, which serves as the primary entrance from the Priority Parking Area to the Premises, as well as the Common Areas between the point of entry and the Premises (such area being referred to as the "Mall Entry Area," with the renovation and improvements referred to herein being the "Mall Entry Improvements") with high-end finishes, in accordance with the baseline plans and specifications attached hereto as Exhibit D-5 ("Baseline Mall Entry Plans") with such enhancements as are to be approved by Landlord and Tenant, as hereinafter provided. Tenant and Landlord will work together to enhance the finishes set forth in the Baseline Mall Entry Plans, with Tenant having the right to propose changes to the Baseline Mall Entry Plans to help create a high end entertainment zone in the Mall Entry Area, subject to Landlord's approval, not to be unreasonably withheld, conditioned or delayed; provided that Landlord shall not be obligated to expend more than Five Hundred Thousand Dollars ($500,000) ("Mall Entry Allowance") in hard costs of construction on such enhancements and changes in excess of the costs Landlord would have incurred for the Mall Entry Improvements if constructed in accordance with the Baseline Mall Entry Plans (unless Tenant elects in writing to have Landlord utilize all or a portion of the amounts available for Upgrades (as hereinafter defined) pursuant to Section 1.1.1, or funds from Landlord's Reimbursement to fund costs in excess of the Mall Entry Allowance, in which case the Mall Entry Allowance shall be accordingly increased). Landlord (working cooperatively with Tenant) shall cause the Mall Entry Improvements described in the revised Baseline Mall Entry Plans (as well as the improvements in the existing Baseline Mall Entry Plans) to be competitively bid, and the contractor will provide Landlord and Tenant with a price for the Mall Entry Improvements pursuant to the Baseline



Mall Entry Plans and the revised Baseline Mall Entry Plans. Tenant shall be entitled to fully participate in the bid process, including reviewing and approving both the bid packages and the bids received, and discussing the bids with the subcontractors and general contractor, as well as making changes to the revised Baseline Mall Entry Plans to the extent needed to reduce the excess hard costs so that they do not exceed the Mall Entry Allowance. If the entire Mall Entry Allowance is not utilized for the excess costs of the Mall Entry Improvements, any remaining amount may be utilized by Tenant for Upgrades by increasing the Upgrades Cap pursuant to Section 1.1.1 for costs of Tenant's Work and/or for any costs related to the Blade Sign or Marquee Sign which Tenant is obligated to pay under Section 1.3 of this Work Letter.

c.   **Roadways and Accessways.**   Landlord shall provide the roadways and accessways within Landlord's Parcel set forth in the Site Plan.

d.   **Off-Site Improvements.**   Landlord shall provide and construct any off-site (i.e., outside Landlord's Parcel) improvements reasonably required by any Governmental Authority in connection with the entitlement, construction and operation of the Premises.

e.   **General Improvements.**   All other details, appurtenances and building features as shown within the Center on the Final Landlord Plans and/or the Site Plan, except for items specifically identified as Tenant's Work therein or in the Work Matrix. All of Landlord's Work shall (i) be designed and constructed to meet the physical requirements of the site and to overcome all conditions relative to soil, water and structural support, (ii) materially comply with all Applicable Laws and (iii) be performed in a good and workmanlike manner. All Landlord's Work shall be performed under contracts made by and in the name of Landlord.

f.   **Site Utilities.**   Landlord shall install the following utilities, with the capacities not less than the capacities listed below, in the Premises as shown on the Final Landlord Plans and shall deliver to Tenant "as-built" drawings of such utilities:

i.   Electrical Power (separately metered and independent of the electric power furnished to any other premises), including conduit, ground wire and conductors. Service shall be 277/480 volt, 3 phase/4 wire, 60hz, 2,500 amps;

ii.   Natural Gas – Landlord to provide natural gas service, four-inch minimum diameter, adequate in capacity to provide natural gas service to Premises at a minimum of 5,500 cubic feet per hour to be stubbed to a location in the roof of the Premises approved by Tenant pursuant to the Final Plans (Landlord may request to reduce the diameter of the line provided that Tenant's consultants determine that there is sufficient gas pressure for the smaller line);

iii.   Sanitary Sewer – six-inch minimum diameter sewer service to the Premises (Landlord may request to reduce the diameter of the line provided that Tenant's consultants determine that there is sufficient sewer line capacity to service the Premises);

iv.   Water – Landlord to provide (1) domestic water service including piping and valves with service to be a minimum 2.5"-inch diameter, and a minimum of 53 PSI, in capacity dictated by Tenant, including meter, and (2) fire sprinkler water service including piping and valves, with service to be a minimum 6 inch diameter, and a minimum of 53 PSI and be adequate in capacity to accommodate the Premises fire sprinkler system (post indicator valve a minimum of 25 feet away from the Premises with tamper switch and flow indictor);

v.   Grease Line and interceptor for the initial theater improvements per local



code, if required by local code, with grease interceptor to be adequate in capacity to accommodate the Premises needs and installed in a location reasonably acceptable to Landlord and Tenant;

vi.    Storm Drain – six-inch drain with multiple connections (including tie-in from the roof drain on the Building) (to be determined and coordinated with the Final Plans); and

vii.   Phone – two (2) 4-inch conduits with pull strings; (66 Black and Facility cable with dial tone to Phone Room).

g.    **Intentionally Deleted**.

h.    **Ticket Kiosks**. Landlord shall cooperate with Tenant in good faith to provide as part of Landlord's Work up to four (4) suitable, mutually acceptable location(s) within or adjacent to the Common Areas, for Tenant's installation, use and operation of one or more kiosks or other devices for the remote sales of tickets to Tenant's patrons as and to the extent provided in Section 5.4 of the Lease.

i.    **Work Area**. During the period when Tenant is performing Tenant's Work, Landlord shall provide a reasonable work area within the Mall for Tenant's contractors, as required by Tenant's contractors, the size, configuration and location of which to be determined by Landlord and Tenant acting reasonably and in good faith, which work area shall contain fax, phone, DSL connection, electricity and plumbing (all separately metered utility charges shall be billed to and paid by Tenant) for Tenant and Tenant's Agents use as well as a staging area for Tenant's Work in an acceptable location, as determined by Landlord and Tenant acting reasonably and in good faith.

j.    **Permits**. Landlord shall, at its sole cost and expense, use commercially reasonable efforts to obtain all permits and approvals on a timely basis for the construction and occupancy of the Building and the Premises, including, without limitation, the building permit and certificate of occupancy for Landlord's Work. Landlord shall be responsible for the cost of any and all transformers, meters, conduits, cabling, plumbing, pipes and accessories required for the Premises and for all "tap," "hook-up," "connection" or other fees, however designated, for connection of all utilities to the Premises in accordance with the specifications provided in the Final Plans. Landlord also shall be responsible for any and all impact fees payable as a consequence of the Renovation including the development of the Premises in accordance with the Lease and for the connection of the sanitary system in the Premises to the municipal sanitary sewer system of the locality wherein the Premises are located, so-called "development" and "impact" fees that are attributable to the governmental entitlements for the Renovation (including the Premises) as contemplated hereunder (collectively, **"Landlord Permit Fees"**).

k.    **Tenant's Refuse Compactor**. Landlord, at its sole cost and expense, shall provide a Refuse Compactor consistent with specifications provided by Tenant, which specifications shall be subject to Landlord's reasonable approval, and a trash chute to deliver trash directly from the theater level directly into Tenant's Refuse Compactor, with a minimum clear area inside the chute of 42" by 42" with no bends. The trash chute may be angled, but must provide a clear passage with no projections on the inside which would snag garbage.

l.    **Tenant Upgrades**. In addition to the items of Landlord's Work described in Sections 1.1a through k above, Landlord and Tenant agree that the budget for Landlord's Work currently includes providing Tenant with improvements and finishes to the theater lobby (**"Lobby"**) which are comparable in quality to the lobby finishes constructed in Tenant's theater located in Deer Park, Illinois, the plans and specifications of which are attached hereto as Exhibit D-6, and that Landlord has also received from Tenant a finish board showing the materials used



by Tenant at Deer Park, a photograph of which is attached hereto as Exhibit D-7 (collectively the "Deer Park Lobby Finishes"). Tenant shall have the right to cause Landlord to provide additional upgraded finishes to the Lobby which are selected by Tenant and are greater in quality than the Deer Park Lobby Finishes. (the "Upgrades"), in accordance with plans and specifications prepared by or for Tenant ("Upgrade Plans") and approved by Landlord (such approval not to be unreasonably withheld), at Landlord's sole cost; provided that, except as hereinafter provided Landlord shall not be obligated to expend in excess of $1,000,000 (subject to increase in accordance with Sections 1.1.b.(iv) and 5.2 to include any portion of the Mall Entry Allowance not utilized for the excess costs of Mall Entry Improvements or any portion of the Landlord's Reimbursement that Tenant elects to utilize for that purpose) (as the same may be increased, the "Upgrade Cap") in hard costs of construction for the Upgrades. As part of the design process, Fehlman LaBarre shall provide Landlord and Tenant with the Upgrade Plans containing Tenant's proposed Upgrades. Prior to implementing the Upgrades, Landlord (working cooperatively with Tenant) shall cause the Upgrades to be competitively bid, and shall also request that the contractor and subcontractors provide bids for the lobby work based on the Deer Park Lobby Finishes. Tenant shall be entitled to participate in the bid process, including meeting with contractors, subcontractors and vendors supplying materials, reviewing and approving bid packages and reviewing and approving the bids, as well as the amount of additional hard costs of construction ("Upgrade Cost") allocable to the enhanced quality of finishes above the cost of finishes comparable to the Deer Park Lobby Finishes (which shall be detailed in the bids). Tenant shall have the right to meet with the contractor, which meeting shall be scheduled by Landlord within five (5) business days following request by Tenant. Prior to commencing construction of the Upgrades, Tenant shall be entitled to approve the final Upgrade Costs in writing, which approval shall be deemed withheld if Tenant does not approve the Upgrade Costs within twenty one (21) days following receipt of the bids. If the Upgrade Costs (as established by the bid process) exceed the Upgrade Cap (as is increased by any portion of the unused Mall Entry Allowance Tenant elects to apply to the Upgrades and any portion of Landlord's Reimbursement that Tenant elects to utilize for that purpose), Tenant may elect either to (i) have Landlord implement the Upgrades, in which case Tenant shall either utilize a portion of the Landlord's Reimbursement or Mall Entry Allowance to fund the excess or pay the excess directly; (ii) meet with the contractors, subcontractors and vendors supplying the bids and value engineer and revise the Upgrade Plans and have the contractors re-bid, so that the costs of the Upgrades do not exceed the Upgrade Cap; or (iii) have Landlord construct the Lobby of the Premises using the Deer Park Lobby Finishes. To the extent the cost of the Upgrades are less than the Upgrade Cap, Tenant may elect to apply any unused amounts to increase the Mall Entry Allowance, to increase the Landlord's Reimbursement and/or costs to be paid by Tenant for the Marquee Sign or Blade Sign pursuant to Section 1.3 of this Work Letter.

If Tenant withholds approval and does not resolve its objections by adopting one of options (i), (ii) or (iii) above within the twenty one (21) day period and the resolution of the issue involves the Landlord declining to take action requested by the Tenant ("Landlord Refusal") regarding the Upgrade option, then Landlord and Tenant shall proceed to approve all other aspects of the plans (so that work can proceed) while the disputed issues are resolved through arbitration. If Landlord has acted reasonably and the unresolved upgrade issue has caused a delay in the final approval of the Final Landlord Plans (defined in 3.2 below) then the requirement for Landlord to satisfy the Tenant's Work Commencement Conditions on or before seventeen (17) months following the Effective Date shall be extended by the number of days of delay in approval of the Final Landlord Plans caused as a result of Tenant's failure to approve the upgrades.

If Tenant withholds approval and does not resolve its objections by adopting one of options (i), (ii) or (iii) above within the twenty one (21) day period and the resolution of the issue does not involve a Landlord Refusal, then Landlord shall be entitled to provide Tenant with notice that Tenant must resolve the outstanding

~CHGO2:20218065.v6



Upgrade issues within thirty (30) days. After the expiration of this thirty (30) day period, if Tenant is still withholding approval or has not resolved its objections by adopting one of the options (i), (ii) or (iii) above, then Landlord shall provide a second notice that Tenant must resolve the outstanding Upgrade issue within three (3) days. If at the end of this three (3) day period, Tenant is still withholding approval or has not resolved its objections by adopting one of the options (i), (ii) or (iii) above, then Tenant shall be entitled to proceed with the Dear Park Lobby Finishes without the upgrade issue that is unresolved. Both Landlord and Tenant shall cooperate in good faith to proceed to approve all other aspects of the plans (so that work can proceed) while Tenant attempts to resolve the unresolved Upgrade issue.

Section 1.2    **Tenant's Work**. Tenant, at its sole cost and expense (except as provided to the contrary herein or in the Lease), shall unload, supply and install such furniture, fixtures and equipment for its theatre operations in the Premises, identified as "Tenant Supply/Tenant's contractor install" or "TSTI" on the Fixtures, Furnishings and Equipment list attached to the Lease as Exhibit E and/or on the Work Matrix ("Tenant's Work"), and also as part of Tenant's Work, Tenant shall supply, but Landlord shall install at Landlord's sole cost and expense, those items on Exhibit E and/or on the Work Matrix identified as Tenant Supply/Landlord contractor install" or "TSCI." Tenant's Work shall also include the obligation to assist Landlord in obtaining all necessary permits and approvals for the development of the Premises as contemplated hereunder, such as (without limitation) appearance and support of Landlord at appropriate public hearings and meetings with staff of Governmental Authorities; provided, however, that Tenant shall not be obligated to incur any significant expenses in connection with such assistance.

Section 1.3    **Construction Cost**. Except as expressly provided to the contrary in the Lease or in this Work Letter, Landlord shall be responsible for paying all so-called "soft costs" and "hard costs" with respect to Landlord's Work and Tenant shall be responsible for paying all so-called "soft costs" and "hard costs" with respect to Tenant's Work. Notwithstanding the foregoing, the following shall apply to with respect to the costs of the Blade Sign and Marquee Sign:

(a)    **Blade Sign**. Landlord's obligation to pay the costs of construction of the Blade Sign shall be limited to paying all soft costs, all structural costs, and up to One Hundred Fifty Thousand Dollars ($150,000) in hard costs of construction for the Blade Sign (exclusive of structural costs) (the "Blade Sign Cap"). Upon approval of the elements of the Final Plans which cover the Blade Sign, Landlord shall cause the cost of constructing and installing the Blade Sign to be competitively bid. Tenant shall be entitled to participate in the bid process, including reviewing bid packages, and reviewing the bids as they are received. Tenant may request that Landlord include a specific signage company in the competitive bid process. Each bid shall specify the hard costs of construction attributable to (i) the structural components of the Blade Sign and (ii) the other elements of the Blade Sign (the portion related to the other elements being herein referred to as the "Blade Sign Cost"). If the Blade Sign Cost exceeds the Blade Sign Cap, Tenant may elect to either (i) fund the excess cost as set forth in the bid or utilize the Landlord's Reimbursement and/or any unused amounts under Sections 1.1.b(iv) and or 1.1.l to cover the excess; or (ii) to consult with the contractors and suppliers providing the bid to "value engineer" in order to cause the Final Plans to be revised in a manner which will reduce the Blade Sign Cost to an amount equal to the Blade Sign Cap. If Tenant elects to pay the excess costs pursuant to clause (i), the amount shall be due upon the later of completion of Landlord's Work or ten (10) business days following Landlord's request for payment, accompanied by invoices evidencing the costs incurred (not to exceed the Blade Sign Costs approved by Tenant). Approval of the plans for the Blade Sign is not part of the Final Landlord Plans. Landlord and Tenant shall work together in good faith to finalize the plans for the Blade Sign as soon as possible.

(b)    **Marquee Sign**. Landlord's obligation to pay the costs of construction of the Blade Sign shall be limited to paying all soft costs, all structural costs, and up to Seventy Five Thousand Dollars ($75,000) in hard costs of the Marquee Sign (exclusive of structural costs) (the "Marquee Sign Cap"). Upon approval of the elements of the Final Plans which cover the Marquee Sign, Landlord shall cause the cost of constructing and installing the Marquee Sign to



be competitively bid. Tenant shall be entitled to participate in the bid process, including reviewing bid packages, and reviewing the bids as they are received. Tenant may request the Landlord include a specific signage company in the competitive bid process. Each bid shall specify the hard costs of construction attributable to (i) the structural components of the Marquee Sign and (ii) the other elements of the Marquee Sign (the portion related to the other elements being herein referred to as the "Marquee Sign Cost"). If the Marquee Sign Cost exceeds the Marquee Sign Cap, Tenant may elect to either (i) fund the excess cost as set forth in the bid or utilize the Landlord's Reimbursement to cover the excess and/or any unused amounts under Sections 1.1.b(iv) and/or 1.1.f; or (ii) to consult with the contractors and suppliers providing the bid to "value engineer" in order to cause the Final Plans to be revised in a manner which will reduce the Marquee Sign Cost to an amount equal to the Marquee Sign Cap. If Tenant elects to pay the excess costs pursuant to clause (i), the amount shall be due upon the later of completion of Landlord's Work or ten (10) business days following Landlord's request for payment, accompanied by invoices evidencing the costs incurred (not to exceed the Marquee Sign Costs approved by Tenant). Approval of the plans for the Marquee Sign is not part of the Final Landlord Plans. Landlord and Tenant shall work together in good faith to finalize the plans for the Marquee Sign as soon as possible.

Section 1.4    **Hazardous Materials.** If any Hazardous Materials are discovered in, on or under the land or the improvements on or in which any of Landlord's Work is to be constructed, Landlord shall be solely responsible for remediating, disposing, and complying with all laws relating to any such Hazardous Materials.

## II.    ENTITLEMENTS AND TENANT THEATRE SPECIFICATIONS

Section 2.1    **Intentionally Omitted.**

Section 2.2    **Tenant Deliverables.**

a.    **Tenant's Theatre Specifications.** Within five (5) days from the Effective Date, Tenant shall provide the Architects (as hereinafter defined) with Tenant's standard theatre specifications for those elements of the Premises and the improvements therein included in Landlord's Work ("Tenant's Theatre Specifications") as well as specifications for all furniture, fixtures and equipment ("Tenant's Interior Theatre Finishes"). Tenant represents and warrants to Landlord that Tenant's Theater Specifications are the general specifications used in connection with Tenant's Deer Park theater and other new theaters. Tenant may revise Tenant's Theater Specifications and/or Tenant's Interior Theatre Finishes by written notice to Landlord prior to completion of the Final Plans (hereinafter defined), so long as the suggested changes do not delay substantial completion of Landlord's Work or increase the costs of Landlord's Work (except as otherwise provided in Section 1.11. Tenant's Interior Theatre Finishes shall be comparable to Tenant's interior theater finishes at Tenant's other theaters in the Metropolitan Area, subject to Tenant's rights to have Upgrades provided to the Lobby in accordance with Section 1.11.

b.    **Confidentiality.** Except as otherwise provided in this Section 2.2(b), Landlord shall keep Tenant's Theatre Specifications confidential. Tenant's Theatre Specifications are the sole property of Tenant, and are being provided to Landlord for its use in connection with this Work Letter; any other direct or indirect use of the Tenant's Theatre Specifications is strictly prohibited. Landlord shall protect and safeguard Tenant's Theatre Specifications against unauthorized use, publication or disclosure, and in furtherance thereof Landlord (i) shall not use or authorize the use of the Tenant's Theatre Specifications for any purpose other than as permitted under this Work Letter, (ii) shall not disclose, divulge or otherwise furnish Tenant's Theatre Specifications to any third party except (A) to Landlord's Agents, Landlord's Representative, the Architect(s) and Landlord's attorneys, accountants and lenders, and then only with written confidentiality provisions consistent with this Work Letter, and (B) as required by law, regulation or an order of a court of competent jurisdiction and upon written notice to Tenant,



and (iii) shall return Tenant's Theatre Specifications book (and any copies thereof) to Tenant upon completion of Landlord's Work. Notwithstanding the foregoing, Landlord shall not have breached this confidentiality provision with respect to disclosure of any confidential information to the extent (1) the information disclosed or communicated is already public knowledge or known to the person to whom the information is given, which knowledge in the latter case did not result from such prior disclosures in contravention of Landlord's obligations under this Work Letter; or (2) such disclosure or communication is required to be made by Landlord to its contractors, attorneys, accountants or lenders; or (3) Landlord uses Tenant's Theatre Specifications and Plans following a termination of the Lease as a result of an Event of Default by Tenant, for the sole and limited purpose of completing construction of the Premises, and for no other purpose (or location) whatsoever, and in no event shall Landlord be permitted to utilize Tenant's name, logo or corporate mural/signage. Notwithstanding the foregoing, Landlord shall have the right to maintain a set of the "As-Built" drawings at the Center for its use after completion of the theater in connection with the Center.

## III.    PLANS AND SPECIFICATIONS

Section 3.1    **Architect/Consultant**. Landlord shall hire and directly pay Fehlman LaBarre for the design and construction of a certain portion of Landlord's Work. In addition, Landlord may elect to hire DLR for the design and construction of the shell and MEP of the Building and certain other portions of Landlord's Work. Landlord is responsible for coordinating the design of the two architectural firms and their respective consultants. (DLR and Fehlman LaBarre shall be collectively referred to as "**Architects**."). Landlord shall retain or cause Architect to retain such qualified and licensed mechanical and/or electrical engineers, ADA consultants and acoustical consultants (collectively, the "**Engineers**") to prepare engineering, mechanical, structural and electrical working drawings and to address acoustical concerns for the build-out of the Landlord's Work. The Architects will submit to Tenant for its review one coordinated set of plans for Tenant's review.

Section 3.2    **Building and Site Improvement Plans**.

a.    Landlord shall instruct the Architects to prepare, within (twenty) 20 days from the Effective Date, detailed conceptual drawings sufficient to convey the architectural design and layout of the theatre for Tenant's approval, which conceptual drawings shall be consistent with Tenant's standard layout and the description of Landlord's Work in this Work Letter (the "**Conceptual Drawing**"). The Conceptual Drawing shall be reviewed and approved by Tenant within seven (7) days upon receipt of such drawings. Landlord shall instruct the Architects to prepare the architectural drawings and specifications for Landlord's Work based on the approved Conceptual Drawings and the Tenant's Theatre Specifications. Upon receipt of Tenant's and Landlord's approval of the Conceptual Drawings, Landlord shall instruct the Architects to complete and deliver to Tenant, within forty five (45) days following Tenant's approval of the Conceptual Drawings, a twenty percent (20%) package (A) relating to the Premises consisting of (i) Mechanical: equipment location and preliminary sizes; (ii) Plumbing: single duct runs and sizes and preliminary plumbing runs; (iii) Electrical: single line diagram, equipment locations, lighting, layout, and control locations; (iv) Structural: in process of calculation models, no drawings (unless basic framing plan is then available); (v) Architectural: floor plans with wall types and some dimensions, ceiling plans, exit plans, roof plans, and sections and (B) relating to other items of Landlord's Work specified in Section 1.1 that pertain to construction of the Premises and the Common Area improvements contemplated by this Work Letter (with civil plans prepared by a licensed civil engineer selected by Landlord and approved by Tenant). Upon receipt of such plans, Tenant shall have ten (10) days to provide a written response to Landlord based on its review of the twenty percent (20%) package. To the extent that any comments are made by Tenant and approved by Landlord regarding the twenty percent (20%) plans, Landlord shall instruct the Architects to revise the plans and submit fifty percent (50%) plans within thirty (30) days of receiving the comments, and Tenant shall have fourteen (14) days after receipt of the 50% plans within which to review, approve and/or provide additional comments on the fifty percent (50%) plans. To the extent that any comments are made by Tenant and approved by Landlord regarding the fifty percent (50%) plans, Landlord shall instruct the Architects to prepare and deliver to Tenant within sixty (60) days the one hundred percent (100%) package

CHGO2:20218065 v6



(A) relating to the Premises consisting of (i) Mechanical: equipment sized and located, duct work sized and located, plumbing sized and located, schedules and legends, incorporated comments from Tenant; (ii) Electrical: package plus schedules and legends, circuiting, and incorporated comments from Tenant; (iii) Structural: framing and foundation plans, details (steel, concrete and masonry), and general notes; (iv) Architectural: one hundred percent (100%) package plus exterior elevations, wall types, stair plans, enlarged toilet plans, door and finish schedules, and incorporated comments from Tenant and (B) relating to all other items of Landlord's Work specified in Section 1.1 that pertain to construction of the Premises. Upon receipt of such plans, Tenant shall have fourteen (14) days to provide a written response to Landlord based on its review of the one hundred percent (100%) package. To the extent that any comments are made by Tenant and approved by Landlord, Landlord shall instruct the Architects to revise the plans and resubmit them within ten (10) days of receiving the comments and Tenant shall have an additional five (5) business days after receipt of the resubmitted plans within which to review, approve and/or provide additional comments on the resubmitted plans. The one hundred percent (100%) package, as finalized and approved by Landlord and Tenant, is hereinafter referred to as the **"Final Landlord Plans."** Notwithstanding anything to the contrary herein, if Landlord does not want to implement any changes to the plans required/requested by Tenant, either Party may refer any dispute as to whether the requested changes are appropriate or reasonable given the Theater Use and the terms of this Work Letter to binding arbitration in accordance with Section 18.5 of the Lease; provided that in no event shall Landlord refuse to implement (or be entitled to arbitrate) any changes which are consistent with Tenant's Theatre Specifications, are consistent with the way Tenant designs other similar first class theaters, or are a reasonable outgrowth of or are reasonably consistent with any previously approved plans. Within five (5) days of Tenant's approval of the **Final Landlord Plans,** Landlord shall submit to the City a building permit application package for the Premises. Notwithstanding Tenant's approval of the Final Landlord Plans, Landlord shall have a continuing and independent obligation to provide Landlord's Work in a manner that meets or exceeds Tenant's specifications, contained in Exhibit D-1 through D-7 hereto. Landlord and Tenant shall cooperate in good faith and use commercially reasonable efforts to reach an agreement on the preliminary and Final Landlord Plans.

Section 3.3    **Costs.**    All costs and expenses associated with the preparation, modification and revision of and to the Conceptual Drawings, any preliminary plans, and Final Landlord Plans (including costs with third-party consultants, but excluding salaries of Tenant's employees) shall be paid for entirely by Landlord, except as otherwise provided in Section 2.2(a). Tenant shall have no right to retain any consultants or incur any other expense payable by Landlord without Landlord's prior written authorization, which authorization shall expressly state that Landlord is responsible for payment of the expense being authorized.

Section 3.4    **Intentionally Deleted.**

Section 3.5    **Local Jurisdiction Approval.**    Within five (5) days of Tenant's approval of the Final Landlord Plans, Landlord shall submit these final plans to the City. To the extent any material changes are required by the local jurisdiction, Tenant shall have the right to approve such changes, which approval shall not be unreasonably withheld; provided that Tenant shall be entitled to withhold its approval in its sole discretion, if the requested changes, would, in Tenant's reasonable judgment, compromise Tenant's theater standards or the quality of its motion picture presentations or increase the costs of operating the Premises. Upon receiving the necessary approval from the local jurisdiction, Landlord shall submit to Tenant a full set of the Final Landlord Plans approved by the local jurisdiction, together with a copy of the construction permit issued by said jurisdiction. Landlord shall use diligent and commercially reasonable efforts to obtain the necessary approvals from the local jurisdiction within sixty (60) days from Tenant's approval of the Final Landlord Plans.

Section 3.6    **Coordinated Construction.**    Landlord and Tenant shall each instruct their respective architect, engineers and construction and design professionals to cooperate fully with the other party's architects, engineers and construction and design professionals in providing all necessary information regarding each other's work. Landlord and Tenant acknowledge and agree that the preparation of plans and specifications as set forth herein are dependent upon each party's cooperation. Accordingly, Landlord and Tenant agree that they shall mutually work together and shall cause their respective architects, engineers and construction and design professionals to mutually work together to prepare the criteria for the plans and specifications

9



which will permit their respective architects, engineers and construction and design professionals to proceed without delay.

Section 3.7  **Change in Final Plans.**  Once approved the parties shall enter into an agreement identifying the Final Landlord Plans by date and number, and the same shall be deemed to be the final and official plans and specifications (hereinafter called the "**Final Plans**").  Neither Landlord (with respect to Landlord's Work) nor Tenant shall make any material changes to the Final Plans (or the work contemplated thereunder) without the prior written approval of the other party in accordance with this Work Letter, which approval may not be unreasonably withheld or delayed but may be conditioned upon payment by the party proposing such change of all additional costs and expenses incurred by the approving party as a consequence thereof.  In the event the Lease is terminated prior to the completion of Landlord's Work and Tenant's Work, then unless such termination resulted from Tenant's default (beyond any applicable cure period) of its obligations under the Lease (in which case Landlord shall have the right to utilize such plans for the limited and sole purpose of completing construction of the Premises, subject further to the limitations set forth in Section 2.2.b(3) of this Work Letter), all right and title to the plans and specifications developed pursuant to this Section 3 (exclusive of Shell plans prepared by DLR) and containing any of Tenant's Theatre Specifications shall be vested in Tenant and, upon Tenant's request, all such plans and specifications shall be transmitted to Tenant.

Section 3.8  **Delay in Approvals.**  If the Final Landlord Plans under this Work Letter are not approved by Tenant in the initial time period provided for such approval in Section 3.2 of this Work Letter and such failure causes a delay in Landlord's ability to meet the condition in Section 2.3(e) of the Lease, the time periods stated in Section 2.3(e) of the Lease shall be extended from the end of such initial time period to the date on which Tenant provides such approval or is deemed to have done so.

## IV.  CONSTRUCTION OF IMPROVEMENTS

Section 4.1  **Construction Schedule.**

a.  **Construction Schedule.**  Upon approval of the Final Plans, and prior to commencement of Landlord's Work or Tenant's Work, Landlord and Tenant and their respective construction representatives shall meet and confer, in good faith, to schedule and coordinate the concurrent performance of Landlord's Work and Tenant's Work in accordance with sound design and construction practices, with the intent and purpose of minimizing the avoidable delays and cost inefficiencies that would be associated with the sequential performance of all of Landlord's Work followed by Tenant's Work.  The resultant construction schedule, as mutually agreed to by Landlord and Tenant (the "**Work Schedule**"), shall be initialed by the parties and shall be deemed incorporated into this Work Letter as if fully set forth herein.  Landlord and Tenant shall meet regularly during the course of construction and periodically update the Work Schedule and coordinate the same with the schedules for Tenant's Work and Landlord's Work and the requirements of this Work Letter.  Each party shall use all commercially reasonable efforts to comply with the Work Schedule and shall keep the other party well informed of the progress of its work in relation to the Work Schedule.  If either Landlord or Tenant shall fail to comply with its respective obligations under the Work Schedule, then the time allowed to the other party for performance of its construction obligations under the Lease (including, without limitation, Tenant's Work Period if Landlord fails to comply with the Work Schedule) shall be extended on a day for day basis for each day such failure continues.

b.  **Landlord Deadlines.**  Notwithstanding anything to the contrary in Section 4.1(a) above, the Work Schedule shall provide that (i) Landlord shall be obligated to start its demolition of existing improvements work within thirty (30) days after receiving final governmental approval of the Final Plans, and (ii) the date for substantial completion of Landlord's Work as to the Premises shall be not later than seven (7) months from the issuance of the building permit Landlord's Work.



Section 4.2   **Landlord's Contractor.**

c.   **General Contractor.**   A general contractor shall be retained by Landlord ("**Landlord's Contractor**") to construct Landlord's Work.

d.   **Landlord's Agents.**   As used herein, the term "**Landlord's Agents**" shall mean Landlord's Contractor and any and all subcontractors, laborers, materialmen and suppliers engaged by Landlord and/or Landlord's Contractor performing Landlord's Work.

Section 4.3   **Manner of Construction.**   Landlord shall cause Landlord's Work to be constructed with diligence in a good and workmanlike, first-class manner, consistent with other similar First Class developments in the Metropolitan Area and in material compliance with all Applicable Laws.

Section 4.4   **Inspections.**

a.   **Inspection By Tenant.**   Tenant shall have the right to inspect Landlord's Work at all times; provided, however, Tenant's failure to inspect Landlord's Work shall in no event constitute a waiver of any of Tenant's rights hereunder or under the Lease, nor shall Tenant's inspection of Landlord's Work constitute Tenant's approval of the same.   Without limiting the generality of the foregoing, as part of the construction schedule to be agreed upon in accordance with Section 4.1 above, Landlord and Tenant will agree on "major stages" of inspection of the Premises, such as, for example, completion of structural improvements and the completion of major Premises systems serving the Premises.   Landlord will use reasonable efforts to give Tenant's Project Manager not less than one week's advance notice of any major stage inspection.   Should Tenant disapprove of any portion of the Landlord's Work in accordance with the terms of this Work Letter, Tenant shall notify Landlord in writing of such disapproval and shall specify the items disapproved.   Should such disapproved portion of Landlord's Work constitute a material deviation from the Final Plans, Tenant's Project Manager shall have the right to direct stoppages in any work in the Premises, but only in the event Tenant's Project Manager reasonably believes that such work is in violation of Landlord's obligations under this Work Letter and constitutes a material deviation from the Final Plans.   Any defects or deviations in, and/or disapproval by Tenant of the Landlord's Work shall be rectified by Landlord at no expense to Tenant.

b.   **Inspections and Approvals Not a Representation.**   Landlord agrees that any inspections by Tenant of the Landlord's Work and any approval rights of such work hereunder are for the purpose of protecting Tenant's interests under this Work Letter, and that no such inspection or approval shall be a representation by Tenant that the construction is free from faulty material or workmanship or that such construction has been completed in full compliance with all Applicable Laws.

Section 4.5   **Scheduling of Government Inspections.**   Landlord will notify Tenant in advance of any and all major scheduled governmental inspections of Landlord's Work as to the Premises and use reasonable efforts to notify Tenant in advance of any other inspections.   A representative of Tenant shall have the right to be present at all governmental inspections. Landlord will use reasonable efforts to schedule inspections convenient to Tenant.

Section 4.6   **Construction Warranties.**   Landlord shall obtain all standard warranties from Landlord's Contractor and subcontractors and suppliers for Landlord's Work, as well as the one year labor and parts HVAC warranty contemplated by Section 9.3 of the Lease and a one (1) year (labor and parts) warranty for the Blade Sign (including the neon elements) which shall be in form and substance consistent with industry standards, all of which warranties shall expressly provide that Tenant is a third-party beneficiary of all express and implied warranties arising thereunder.

Section 4.7   **Substantial Completion.**   Landlord shall deliver the Premises to Tenant upon the substantial completion of Landlord's Work.   For purposes of this Work Letter and the



-CHGO2:20218065.v6

Lease, the term **"substantial completion"** shall mean such date when Landlord's Work is completed, subject only to the final completion of Punch-List Items (as hereinafter defined). Landlord shall give Tenant at least thirty (30) days written notice in advance of the date on which Landlord estimates that Landlord's Work in the Premises will be substantially complete. Landlord shall clean the Premises prior to delivering same to Tenant for the commencement of Tenant's Work, including removal of all rubbish and debris produced by Landlord's Work.

Section 4.8    **Punchlist Procedure.** As used herein, the term "Punch List Items" means, individually and collectively, unfinished and improperly finished items of construction relating to Landlord's Work, which unfinished or improperly finished items of construction (in Tenant's reasonable discretion) are not necessary for: (i) the uninterrupted and unimpeded performance of Tenant's Work in accordance with customary construction industry practices, with respect to the aspects of Landlord's Work that are required to be completed prior to the commencement of Tenant Work Period in accordance with this Work Letter, or (ii) the use, enjoyment and occupancy of the Premises and Common Areas (including unimpeded access) by Tenant and Tenant's patrons, employees, licensees and invitees as contemplated under this Lease without interference, inconvenience or impediment, with respect to all other aspects of Landlord's Work.

a.    Landlord shall give Tenant not less than thirty (30) days prior written notice of the date on which Landlord anticipates satisfying Tenant's Work Commencement Conditions (the "Pre-Delivery Notice"). Within ten (10) business days following its receipt of the Pre-Delivery Notice, Tenant shall inspect or cause to be inspected Landlord's Work for compliance with this Work Letter and the Lease, and Tenant shall notify Landlord of the Punch List Items pertaining to the aspects of Landlord's Work which are required to be completed prior to the commencement of Tenant's Work (the "Pre-Delivery Punch-List"). Landlord also shall give Tenant not less than thirty (30) days prior written notice of the date on which Landlord anticipates satisfying Commencement Date Conditions (the "Pre-Commencement Notice"). Within ten (10) business days following its receipt of the Pre-Commencement Notice, Tenant shall inspect or cause to be inspected Landlord's Work for compliance with this Work Letter and the Lease, and Tenant shall notify Landlord of the Punch List Items pertaining to the aspects of Landlord's Work which are required to be completed prior to the Commencement Date (the "Pre-Commencement Punch-List"). Landlord shall acknowledge the Pre-Delivery Punch-List and the Pre-Commencement Punch-List, or specify to Tenant, in writing, any disagreement with the Punch List Items identified by Tenant, within five (5) business days after receipt thereof from Tenant. Landlord and Tenant shall work together in good faith to resolve any disagreement regarding the Punch-List Items. Tenant's failure to prepare and deliver to Landlord a Pre-Delivery Punch-List or a Pre-Commencement Punch-List, or Tenant's failure to include any incomplete or improperly completed aspect of Landlord's Work on the Pre-Delivery Punch-List or the Pre-Commencement Punch-List, shall not constitute acceptance of Landlord's Work or waiver or approval of any defect in Landlord's Work (latent or patent) or incomplete or improperly completed aspect of Landlord's Work.

b.    Promptly after receipt of the Pre-Delivery Punch-List or the Pre-Commencement Punch-List, as the case may be, Landlord shall commence and thereafter diligently prosecute to completion all of the Punch-List Items noted thereon, at no cost or expense to Tenant and without interfering or causing any inconvenience or delay in the continued performance of Tenant's Work or the use, enjoyment and occupancy of the Premises (including the Common Areas) in accordance with the Lease. With respect to the Pre-Delivery Punch List, Tenant's Work Period shall not be deemed to have commenced until Tenant determines, in its reasonable discretion, that Landlord has provided adequate assurances that it will perform the Punch-List Items noted thereon promptly and without expense, hindrance or delay in the performance of Tenant's Work. With respect to the Pre-Commencement Punch List, the Commencement Date shall not be deemed to have occurred (unless Tenant commences to operate its business in the Premises) until Landlord has provided adequate assurances that it will perform the Punch-List Items noted thereon promptly and without expense to Tenant or hindrance or delay in the use,



enjoyment and occupancy of the Premises (including the Common Areas) in accordance with the Lease. In any event, if Landlord fails to diligently prosecute completion of the applicable Punch-List Items or if the Punch-List Items are not in fact completed within thirty (30) days after Tenant delivers the Pre-Delivery Punch-List or Pre-Commencement Punch-List (as applicable) to Landlord (or within such longer period as may be agreed to in writing by Tenant), then (i) Tenant may (but shall not be obligated to) undertake the completion of all or any of the incomplete Punch-List Items at the sole cost and expense of Landlord, and/or (ii) with respect to the Pre-Delivery Punch-List, Tenant shall be entitled to a day-for-day extension in Tenant's Work Period until the Punch List Items noted thereon are satisfactorily completed. If Tenant incurs any cost or expense to perform or complete any of the Punch-List Items pursuant to clause (i) above, then Landlord shall reimburse Tenant for all amounts so incurred by Tenant within ten (10) business days after Landlord's receipt of Tenant's demand accompanied with reasonable supporting documentation, and if Landlord fails to pay such amount within ten (10) business days after such demand then Tenant shall be entitled to (subject to the terms of Section 18.5 of the Lease, to the extent applicable) off-set the amount due from Landlord, plus interest at the Interest Rate, from Base Rent and any other amount due by Tenant under the Lease; provided that Landlord shall only be permitted to arbitrate disputes regarding Tenant's offset to the extent Tenant's cost to remedy all Punch-List Items exceeds $15,000.00.

## V.    TENANT'S WORK

Section 5.1    **Tenant's Work.** Following the substantial completion of Landlord's Work, Tenant shall cause Tenant's Work to be constructed in material compliance with all Applicable Laws (subject, however to Landlord funding the Landlord's Reimbursement to Tenant in accordance with this Work Letter). Within thirty (30) days after Tenant's Work Commencement Conditions (defined below) are satisfied, Tenant shall commence and thereafter proceed to perform Tenant's Work. Notwithstanding anything to the contrary, however, Tenant's obligation to commence and perform Tenant's Work shall be subject to the satisfaction of the following conditions ("**Tenant's Work Commencement Conditions**"):

a.    Landlord shall have (A) completed Landlord's Work sufficiently to allow Tenant to commence Tenant's Work and thereafter proceed with Tenant's Work without delay caused by any incomplete aspects of Landlord's Work (including, without limitation, receipt of all applicable permits and approvals, satisfactory inspection of Landlord's Work, and completion and availability of the access, staging area and temporary utilities), as determined by Tenant in its reasonable discretion, and (B) furnished to Tenant's satisfactory evidence (in Tenant's reasonable discretion) that (1) the Pre-Delivery Punch List Items shall be completed without hindrance or delay in the performance of Tenant's Work, and (2) all other incomplete items of Landlord's Work will be substantially completed no later than the expiration of Tenant's Work Period;

b.    Satisfaction or written waiver by Tenant of the conditions specified in Section 2.3 of the Lease;

c.    Tenant shall have received all permits and approvals necessary to enable Tenant to commence and complete Tenant's Work; and

d.    Landlord shall have received (and provided Tenant with copies of) all permits and approvals required to commence and complete Landlord's Work.

Landlord shall provide not less than thirty (30) days' prior written notice to Tenant of the date Landlord anticipates satisfying the conditions specified in item clauses (a) and (b) above.

Section 5.2    **Landlord's Reimbursement.**    Landlord shall pay the Landlord's Reimbursement to Tenant, in the amount specified in Section 1.1 of the Lease, in progress payments during the course of construction of Tenant's Work, in the following manner (subject to Tenant's rights under Sections 1.1.b(iv), 1.1.(l) and 1.3 of this Work Letter to have the

Landlord's Reimbursement applied to certain excess costs of Mall Entry Improvements, Upgrades and signage):

(a)    Within fifteen (15) business days after Tenant submits a written request for payment to Landlord accompanied by invoices evidencing costs incurred in connection with Tenant's Work (but not more frequently than once each month), Landlord shall pay Tenant the amount set forth in the request for payment.

(b)    The Landlord's Reimbursement shall be increased by an amount equal to Tenant's actual costs incurred as a result of Landlord's failure to perform its obligations hereunder, including Landlord's failure to provide and/or maintain in serviceable condition the temporary utilities required under this Work Letter.

(c)    If Landlord fails to pay Tenant all or any portion of the Landlord's Reimbursement to Tenant when due, then, in addition to Tenant's other rights and remedies, Tenant may withhold payment of the Base Rent and other charges due under this Lease until Tenant has recouped such amount in full together with interest thereon at the Default Rate specified in the Lease.

**Section 5.3    Funding Delays.**  Notwithstanding anything to the contrary in this Lease, Landlord and Tenant agree that if (i) Tenant shall have made a proper demand upon Landlord under this Work Letter for payment of the Landlord's Reimbursement or a portion thereof (**"Requested Payment"**), and (ii) the conditions to Landlord's obligation to pay the Requested Payment to Tenant as set forth in this Work Letter shall have been satisfied, and (iii) Landlord fails or refuses to pay the Requested Payment when due, then:

(a)    Tenant shall have the right at any time thereafter to cease performing Tenant's Work until such Requested Payment (together with interest thereon at the Default Rate) is paid to Tenant (each such period during which a Requested Payment is not paid to Tenant in accordance with the terms of this Work Letter being herein referred to as a **"Funding Delay"**), and Tenant shall not be deemed in default under this Lease and shall have no liability to Landlord on account of any costs, expenses or liability incurred by Landlord due to Tenant's election to cease performing Tenant's Work during a Funding Delay. If Tenant elects to cease performing Tenant's Work during a Funding Delay, then each time period set forth in this Lease for the completion of all or any portion of Tenant's Work and each deadline or date for the commencement or payment of Rent and other charges under this Lease shall be deemed tolled, extended or increased, as the case may be, for a period of time equal to each Funding Delay, plus a reasonable time thereafter for Tenant to re-mobilize for Tenant's Work.

(b)    If one or more Funding Delay(s) shall continue for more than sixty (60) days in the aggregate, then, in addition to Tenant's other remedies, Tenant shall have the right to terminate this Lease by notice thereof to Landlord at any time during the continuance of such Funding Delay. If Tenant so elects to terminate this Lease, then Landlord shall reimburse Tenant upon demand for all out-of-pocket expenses incurred by Tenant in connection with this Lease and Tenant's Work, including, without limitation, the costs of preparing Tenant's Plans, site investigation costs and legal fees, and construction costs (including any penalty or other similar fees due any contractors or subcontractors for the early termination of any contract).

(c)    The provisions of this Section 5.3 shall be in addition to and not in limitation of all other rights or remedies of Tenant under this Lease (including Tenant's right of offset set forth in Section 5.2(c) of this Work Letter).

**Section 5.4    Tenant's Agents.**  The names, addresses and contact persons for all contractors of Tenant (to be known collectively as **"Tenant's Agents"**) shall be submitted in writing to Landlord.

**Section 5.5    Entry in Accordance With Lease.**  Entry by Tenant or Tenant's Agents into the Premises or any part thereof for purposes of carrying out Tenant's Work shall be deemed to be under all the terms, covenants, conditions, provisions and agreements of the Lease.



## VI.　INSURANCE

Section 6.1　**Insurance**.　In addition to the insurance requirements set forth in the Lease, Tenant and Landlord shall comply with the following requirements:

a.　**General Coverages**.　The contractors and all of their subcontractors shall carry worker's compensation insurance covering all of their respective employees, and shall also carry commercial liability insurance, including property damage, all with limits, in form and with companies as are required to be carried by Tenant as set forth in the Lease.

b.　**Special Coverages**.　Landlord shall carry "Builders All Risk" insurance in an amount covering the construction of Landlord's Work.　Tenant shall carry "Builders All Risk" insurance in an amount covering the construction of Tenant's Work or may, at its option, self-insure over such risk.

c.　**General Terms**.　Certificates for all insurance carried pursuant to the foregoing sections shall be delivered to the other party before the commencement of construction of the improvements and before contractor's equipment is moved onto the site.　All policies carried under this Section 6.1 shall insure Landlord and Tenant, as their interest may appear.　All insurance shall be maintained in full force and effect until all improvements are completed.

## VII.　MISCELLANEOUS

Section 7.1　**Notice of Completion; Copy of Record Set of Plans**.　Upon substantial completion of Landlord's Work:　(i) Landlord shall cause the Architects and Landlord's Contractor (A) to update the Final Plans as necessary to reflect all changes made thereto during the course of construction and in accordance with the terms of this Work Letter, (B) to certify to the best of their knowledge that the "record-set" of as-built drawings are true and correct, and (C) to deliver to Tenant and Landlord two (2) sets of copies of such record set of drawings within thirty (30) days following substantial completion, and (ii) Landlord shall deliver to Tenant a copy of all warranties, guaranties, and operating manuals and information relating to the improvements, equipment, and systems in the Premises.

**LANDLORD:**

**FMP STRATFORD LLC**, a Delaware limited liability corporation

By: _____
Name:　Scott Jensen
Its:　　Vice President

**TENANT**:

**CENTURY THEATERS, INC.**,
a California corporation

By: _____
Name:　RAYMOND W. SYUFY
Its:　　CHAIRMAN

~CHGO2:20218065.v6



**EXHIBIT D.1**

**SITE PLAN**



Exhibit D.1 - 1 of 2 - Site Plan and Site Improvement Area

**DLR Group**
Architecture Engineering Planning Interiors

Exhibits for Century Lease Agreement
Stratford Square Mall

**EXHIBIT D.1**

**SITE PLAN**



Exhibit D.1 - 2 of 2 - Site Plan and Site Improvement Area

Exhibits for Century Lease Agreement
Stratford Square Mall

## EXHIBIT D-2

## SITE SPECIFICATIONS

The Landlord's architect should address the items below in the A/E basis of design as outlined on the following pages.

1.  Parking Lot

    1.1.  Century Parking Requirement - Site Specific
- Minimum Code Requirements
- Provide a minimum of a 24' driving aisle for each driving aisle with two-way traffic and a minimum of 16' driving aisle for each driving aisle with one-way traffic.

    1.2.  Minimum Parking Space Size
- Dimension - Per Local Municipal Parking Code
- Overhang - 2'-3" at Curb or Wheel Stop

    1.3.  Minimum Parking Lot Driving Aisle
- Minimum Code Requirements

    1.4.  Accessible Parking Spaces (must meet all ADA and local accessibility requirements including but not limited to the items below):
- Provide the number of car and van accessible spaces based on local code or ADA standards (whichever is more restrictive).

- Locate accessible spaces closest to elevator or on-grade access to theater.

- Place accessible spaces in front of building, if allowed by local code.

- Include signage stating unauthorized vehicles will be towed, as required by local code or ADA.

- Include specific signage for van accessible spaces.

- Outline disabled spaces in blue with 36" x 36" wheelchair icon.

- Parking access aisles -- car space must have access aisle on passenger side (unless sharing with another space); van accessible space must always have access aisle on passenger side.

- No ramp into access aisle.

1



Century Theatres
Site Standards
Stratford Square

## EXHIBIT D.2

## SITE SPECIFICATIONS

- Widths of spaces and access aisles (for car and van spaces) based on local code or ADA standards (whichever is more restrictive).

1.5. Minimum Parking Drive Width in Front of Theater
- Dimension - Provide a minimum of 30' of drive lane in front with no parking between drive lane and plaza.

- Drop Off Lane - Minimum of 15' Wide and minimum 100' long.

1.6. Landscaping
- Provide per Local Code Standards
- Trees and plants to be indigenous to the area

2. Pedestrian Circulation

2.1. Pedestrian Circulation Path - Meet All Local Codes and ADA
- Maximum Allowable Grade Change – Existing condition as of Effective Date of the Lease is acceptable. Any change subsequent to the Effective Date of the Lease will have a maximum allowable grade change of 1:20 in direct path of travel, 1:50 in cross grade.

- Maximum Walking Distance - 800', 400' is desirable

3. Lighting Requirements

3.1. Site Light Level – Existing lighting condition across site parking area is acceptable and, subject to changes required by governmental authorities, the Landlord will not reduce the foot candle illumination across the site parking area.

4. Sign Requirements

4.1. To be mutually agreed to in the Lease.

5. Hardscape and Landscape at Mall Entry Area

5.1 The hardscape area at the Mall Entry Area closest to the Premises will consist of pavers soley. (Landlord shall not use concrete.) In addition, Landlord shall provide potted plants of significant size in the Mall Entry Area.

6. Transformer providing power to the Premises, Location:
- Existing location of Commonwealth Edison serving the building and the Premises is acceptable.

Century Theatres
Site Standards
Stratford Square




## EXHIBIT D.2

## SITE SPECIFICATIONS

7.  Trash Locations & Facilities:  (minimum local requirements)

- A 20-yard trash compactor per Century standards.  Such compactor shall be connected to the trash chute from the Premises.

- Hose bib to be located inside of enclosure.

- Trench drain at rear of enclosure with concrete sloping at 1/4" per foot to drain.

- Verify with city and health departments if waste is required to discharge into grease interceptor.

- Lights to equal 1-foot candle connected to outside building lights.

- Cover trash enclosures in bad weather areas.

- Provide minimum of two (2) exterior trash cans at Mall Entry closest to the Premises.

8.  Site Utility Requirements

- See Lease for specifications.

END OF SECTION

3

Century Theatres
Site Standards
Stratford Square



## EXHIBIT D.3

## WORK MATRIX

| CSI  Description Outline | DESIGNED BY | | BUILT BY | | FUNDED BY | | Notes |
|---|---|---|---|---|---|---|---|
| | Tenant | Landlord | Tenant | Landlord | Tenant | Landlord | |
| **General Conditions and Requirements** | | | | | | | |
| Temporary power to the site space for use during tenant construction | | L | | L | | L | |
| Construction staging and lay down area, all weather surface | | L | | L | | L | |
| Site fencing | | L | | L | | L | |
| Site security and site access control | | L | | L | | L | |
| All site work, incl. fire, loading dock, and parking areas | | L | | L | | L | |
| **Concrete** | | | | | | | |
| Foundation System | | L | | L | | L | |
| Slab on grade | | L | | C | | L | |
| Concrete on metal deck for mezzanine slab, projector platform and level | | L | | L | | L | |
| Flooring pit | | L | | L | | L | |
| Stair pan fills | | L | | L | | L | |
| Concrete deck pours on all stadium seating | | L | | L | | L | |
| Amphitheater treads, sloped floors | | L | | L | | L | |
| Slab depressions at concessions and entrances | | L | | L | | L | |
| Slab depressions in auditoriums @ stadium seating ramps | | L | | L | | L | |
| Concrete fills at ramps and stairs connecting mezzanine levels and projector platforms | | L | | L | | L | |
| Concrete footing for tenant concession sign | | L | | L | | L | |
| **Masonry** | | | | | | | |
| Exterior masonry wall system to meet acoustical requirements per plans and specs | | L | | L | | L | |
| **Miscellaneous metals** | | | | | | | |
| Exterior emergency exit stair railings | | L | | L | | L | |
| Interior railings and guardrails in projection booth and auditoriums | | L | | L | | L | |
| Wall handrails in auditoriums | | L | | L | | L | |
| Handrail systems at stadium seating | | L | | L | | L | |
| Wall rails at sloped floors and ramps in auditoriums | | L | | L | | L | |
| Toilet partition support | | L | | L | | L | |
| All other interior metals | | L | | L | | L | |
| **Structural metals** | | | | | | | |
| Structural steel for floor framing | | L | | L | | L | |
| Structural steel for mezzanine framing | | L | | L | | L | |
| Structural steel for roof framing and canopy framing | | L | | L | | L | |
| Roof joists furnished and installed | | L | | L | | L | |
| Metal decking - floor and roof | | L | | L | | L | |
| Metal decking - mezzanine | | L | | L | | L | |
| Metal decking - stadium seating | | L | | L | | L | |
| Structural steel for stadium seating including columns, beams, rake beams and structural steel connections | | L | | L | | L | |
| Structural steel for projector platform | | L | | L | | L | |
| Structural steel and necessary backing support for Tenant's signs (Concession and site exterior tenant identification signs) | | L | | L | | L | Column support for concession signs to be provided by Tenant |
| Stair structure including handrails connecting 1st floor of theater to mezzanine level and from mezzanine level to | | L | | L | | L | |
| Stair and ramp structures connecting mezzanine levels | | L | | L | | L | |
| **Rough carpentry** | | | | | | | |
| Miscellaneous blocking within shell portion or shell on site | | L | | L | | L | |
| Blocking backing for Tenant exterior signage | | L | | L | | L | Tenant must approve locations upon review of CDs |
| Blocking backing for Tenant interior signage | | L | | L | | L | |
| Theatre miscellaneous blocking and backing | | L | | L | | L | |
| **Finish carpentry** | | | | | | | |
| Auditorium trash enclosures | | L | | | | | |
| Wood trim | | L | | | | | |
| Concession Counter Cafe facilities | T | | T | | T | | |
| Wood trim and chair rail | | L | | | | L | |

D.3-1



**EXHIBIT D.3**

**WORK MATRIX**

| CSI Description Outline | DESIGNED BY | | BUILT BY | | FUNDED BY | | Notes |
|---|---|---|---|---|---|---|---|
| | Tenant | Landlord | Tenant | Landlord | Tenant | Landlord | |
| Box office and pass-through counters | T | | | | T | | |
| | | | | | | | |
| **Insulation** | | | | | | | |
| Roof insulation | | L | | | | L | |
| Insulation in interior walls only, as shown on plan | | L | | | | L | |
| Insulation in exterior forms in exterior walls as recommended by acoustical consultant | | | | L | | L | |
| Any shell acoustical consultant requirement at roof slab or floor areas or perimeter walls. | | L | | | | L | |
| | | | | | | | |
| **Fireproofing** | | | | | | | |
| Spray fireproofing to floor and roof structure | | L | | | | L | |
| | | | | | | | |
| **Waterproofing** | | | | | | | |
| Waterproofing at all wet areas and any necessary waterproofing at all other penetrations | | | | L | | L | |
| | | | | | | | |
| **Sheet metal** | | | | | | | |
| Miscellaneous flashing | | L | | L | | L | |
| Scuppers | | L | | L | | L | |
| Roof/wall sheets for all roof penetrations | | L | | L | | L | |
| Expansion joints and covers | | L | | L | | L | |
| | | | | | | | |
| **Roofing** | | | | | | | |
| Complete roofing system | | L | | | | L | |
| Walkway pads | | L | | | | L | |
| Roof hatch access | L | | | | | L | |
| Roof control of penetrations | | L | | | | L | |
| | | | | | | | |
| 8  **Doors, frames, hardware** | | | | | | | |
| Roll down security gate at entry to theater lobby | | L | | | | L | |
| Emergency exit doors with hardware and sound seals | | L | | L | | L | |
| All doors in exterior with hardware and sound seals | | L | | L | | L | |
| Theaters interior doors | | L | | L | | L | |
| Storefront doors | | L | | L | | L | |
| All drywall necessary to create an acoustically sound shell space | | L | | L | | L | |
| | | | | | | | |
| 8  **Glass and glazing** | | | | | | | |
| All glass at storefront | | L | | L | | L | |
| | | | | | | | |
| 9  **Drywall & Framing** | | | | | | | |
| All metal stud framing and wall systems, including canopy framing, gut plants and spens | | L | | L | | L | |
| Metal stud framing to support additional parking seating | L | | | | | L | |
| | | | | | | | |
| Theaters interior drywall ceilings and soffits | | L | | L | | L | |
| Theaters interior audiorium demising walls | | L | | L | | L | |
| Theaters interior partitions | | L | | L | | L | |
| Storefront | | L | | L | | L | |
| All drywall necessary to create an acoustically sound shell space. | | L | | L | | L | |
| | | | | | | | |
| 9  **Floor, ceiling, wall treatment/Coatings/carpet** | | | | | | | |
| Theaters 1-hour ceiling | | L | | L | | L | |
| Wall carpet and drapes | | L | | L | | L | |
| Theaters ceramic tile and stonework | | L | | L | | L | |
| Theaters VCT, resilient base, sheet vinyl | | L | | L | | L | |
| Theaters carpet | | L | | L | | L | |
| | | | | | | | |
| 9  **Plaster/EIFS** | | | | | | | |
| All exterior finish systems | | L | | | | L | |
| | | | | | | | |
| 10  **Specialties** | | | | | | | |
| Toilet partitions and accessories | | L | | L | | L | |
| Toilet, Towels, Urinal screens | | L | | L | | L | |
| Fire extinguishers | | L | | L | | L | |
| | | | | | | | |
| Pneumatic Tube System (exclusive of underground systems) | T | | T | | T | | |

D.3-1



## EXHIBIT D.3

## WORK MATRIX

| CSI Description Outline | DESIGNED BY Tenant | DESIGNED BY Landlord | BUILT BY Tenant | BUILT BY Landlord | FUNDED BY Tenant | FUNDED BY Landlord | Notes |
|---|---|---|---|---|---|---|---|
| Lobby Signage | T | | T | | T | | |
| Hallway Reader Board Signage | T | | T | | T | | |
| Box Office Equipment | T | | T | | T | | |
| Projection Oven Assembly | T | | T | | T | | |
| Box Office Sign (as shown in drawings) | T | | T | | T | | |
| Cash Drawers | T | | T | | T | | |
| Box Office Speaker System | T | | T | | T | | |
| Box Office Stools | T | | T | | T | | |
| Ticket Issuing Systems/Computers and Printers (DBC) | T | | T | | T | | |
| Interior Benches | T | | T | | T | | |
| Trash Receptacles | T | | T | | T | | |
| Cigarette Urns | T | | T | | T | | |
| Crowd Control Ropes and Posts | T | | T | | T | | |
| Crowd Control Stanchions | T | | T | | T | | |
| Trash Receptacles | T | | T | | T | | |
| Restroom Door Signs | T | | T | | T | | |
| Communication Systems (phone systems, intercom, computer conduit) | T | | T | | T | | |
| Sound Communication and Special Systems | T | | T | | T | | |
| Accessory Systems | T | | T | | T | | |
| Sinks | T | | T | | T | | |
| Miscellaneous Office Furniture | T | | T | | T | | |
| Aisle Lighting | T | | T | | T | | |
| Auditorium Drapes (side wall and back) | T | | T | | T | | |
| Movable Masking | T | | T | | T | | |
| Screen Frame | T | | T | | T | | |
| Seats | T | | T | | T | | |
| Projector and Platters | T | | T | | T | | |
| Miscellaneous Projection Equipment | T | | T | | T | | |
| Sound Equipment | T | | T | | T | | |
| Hearing Assisted Equipment | T | | T | | T | | |
| Speakers (to be provided by Landlord) | T | | T | | T | | |
| Screens | T | | T | | T | | |
| Lenses | T | | T | | T | | |
| Concession Equipment | T | | T | | T | | |
| Drink Equipment (vendors by Landlord) | T | | T | | T | | |
| Projection Supplies | T | | T | | T | | |
| Installation Supplies | T | | T | | T | | |
| Ice Machine and Bins | T | | T | | T | | |
| Shelving | T | | T | | T | | |
| Refrigerator | T | | T | | T | | |
| Bulk Candy Holders | T | | T | | T | | |
| | | | | | | | |
| **14 Elevators and Escalators** | | | | | | | |
| One 4500 pound capacity mechanical level elevator per plans and specs | | L | | L | | L | |
| One Single elevator within theater space | | L | | L | | L | |
| Trash compactor + By yard capacity - with trash chute from theater delivery to compactor | | L | | L | | L | |
| Escalators, elevators and stairs to Tenant's space (if applicable) | | L | | L | | L | |
| | | | | | | | |
| **15 Fire Protection** | | | | | | | |
| FDC, back flow preventer | | L | | L | | L | |
| Structure designed to support of sprinkler piping | | L | | L | | L | |
| Fire sprinkler main installed to entire space, tested and approved by local authority | | L | | L | | L | |
| Fire hose stations (if required by local authority) | | L | | L | | L | |
| Horns | | L | | L | | L | |
| | | | | | | | |
| **15 Plumbing** | | | | | | | |
| Sewer service below slab stubbed to required locations (Restrooms, Janitor rooms and Concession area) | | L | | L | | L | |
| Water service below slab stubbed to required locations (Restrooms, Janitor rooms and Concession area) | | L | | L | | L | |
| Roof drain system complete from roof to tie | | L | | L | | L | |
| Gas service complete stubbed to roof | | L | | L | | L | |
| Vent system penetrations through roof | | L | | L | | L | |



**EXHIBIT D.3**

**WORK MATRIX**

| CSI  Description Outline | DESIGNED BY | | BUILT BY | | FUNDED BY | | Notes |
|---|---|---|---|---|---|---|---|
| | Tenant | Landlord | Tenant | Landlord | Tenant | Landlord | |
| Extend water lines and make final connections within Premises | T | | | L | | L | |
| Set fixtures | | T | | L | | L | |
| Connect theatre sewer vent stacks to stubs thru roof by Landlord | | T | | L | | L | |
| Connect theatres refrigerant lines to rooftop condensers | | T | | L | | L | |
| Allocate slab plumbing per plans and specs | | T | | L | | L | |
| Obtain wastepaper and complete process piping system, if required by code | | T | | L | | L | |
| Complete restrooms per Tenant's specifications including toilet partitions, finishes, sinks and mirrors | | T | | L | | L | |
| | | | | | | | |
| **15  HVAC** | | | | | | | |
| Rooftop units | | L | | L | | L | |
| HVAC ducts / ductwork, vibrocoustic II with acoustical packages | | L | | L | | L | |
| All exhaust fans | | L | | L | | L | |
| Theatres ductwork | | L | | L | | L | |
| Theatres control wiring | | L | | L | | L | |
| | | | | | | | |
| **16  Electrical** | | | | | | | |
| Main switchgear and meter panels on 1st floor with conduit and wire stubbed to two electrical rooms on semi theatre level | | T | | L | | L | |
| Sub panels connected to power rooftop units | | L | | L | | L | |
| Telephone conduit from R.P.O.E. to electrical room on main theatre level | | T | | L | | L | |
| All sleeve penetrations through roof to rooftop units | | T | | L | | T | |
| Conductor connections from Panels to Rooftop HVAC | | T | | L | | L | |
| Exterior light fixture / building lighting | | T | | L | | L | |
| Theatres control wiring | | T | | L | | L | |
| Theatres sub panels | | T | | L | | L | |
| Theatres interior electrical system | | T | | L | | L | |
| Theatres interior fixtures | | T | | L | | L | |
| Theatres security system | | T | | L | | L | |
| Theatres energy management system | | T | | L | | L | |
| Theatres sound conduit and wire | | T | | L | | L | |
| Theatres telephone system | | T | | L | | L | |
| All underground conduit per plans and specs | | T | | L | | L | |
| Theatres fire alarm system | | T | | L | | L | |
| Design and construction including all conduit, wiring, equipment, permitting, testing and inspection of landlord monitoring of tenant fire alarm and fire sprinkler system (if required by landlord or local authority) | | T | | | | L | |
| | | | | | | | |
| **Signage / Ticketing Kiosk** | | | | | | | |
| Theatre interior lobby signage | T | | T | | T | | |
| Theatre ticketing kiosk | T | | T | | T | | |
| Structural blocking and conduit to exterior tenant identification signage | | T | | L | | L | |
| Conduit and data to ticketing kiosk location from box office | | T | | L | | L | |
| Power to signage and ticketing kiosk (final connection by tenant) | | L | | L | | L | |
| Power Cages | T | | T | | T | | Landlord to install and provide final wiring connections |



# EXHIBIT D.4

## COMMON AREA IMPROVEMENTS



Exhibit D.4 - 1 of 2 - Common Area Improvements

**DLR Group**

Exhibits for Century Lease Agreement
Stratford Square Mall

**EXHIBIT D.4**

**COMMON AREA IMPROVEMENTS**



Exhibit D.4 - 2 of 2 - Common Area Improvements

**DLR Group**

Exhibits for Century Lease Agreement
Stratford Square Mall

NOTE: THIS EXHIBIT REFLECTS THE PRELIMINARY CONFIGURATION OF THE PREMISES.
THE FINAL CONFIGURATION OF THE PREMISES SHALL BE DETERMINED IN ACCORDANCE WITH THE WORK LETTER.



NOT INCLUDED / NOT REPRESENTED

**Baseline Mall Entry Elevation**

**UPGRADE ITEMS:**
- New Stratford Square Mall signage band and canopy
- New entry portal lanterns
- Replace concrete at entry with pavers
- Re-clad and raise existing planter walls
- New entry door and glazing system to match existing.

Exhibit D.5 - 1 of 4 - Baseline Mall Entry

 **DLR Group**
Architecture Engineering Planning Interiors

| 23-06466-00 | Exhibits for Century Lease Agreement |
| 05 DECEMBER 2006 | Stratford Square Mall |



Exhibits for Century Lease Agreement—Exhibit D.5—page 2 of 4

Note: This exhibit reflects the preliminary configuration of the premises. The final configuration of the premises shall be determined in accordance with the work letter.



Exhibits for Century Lease Agreement—Exhibit D.5—page 3 of 4

Note: This exhibit reflects the preliminary configuration of the premises. The final configuration of the premises shall be determined in accordance with the work letter.

Recessed fluorescent slot fixture to provide direct light component at lower level ceiling. These will increase light levels at the floor.

New downlights to increase light levels outside the retail locations and in the circulation space.

New decorative sconces to provide downlight to the corridor and a glowing element to the space.

Indirect fluorescent pendants to uplight the ceiling surface. The increased brightness will "lift up" the ceiling at these areas and give the entire space a greater perceived brightness.



Exhibits for Century Lease Agreement—Exhibit D.5—page 4 of 4

**Note:** This exhibit reflects the preliminary configuration of the premises. The final configuration of the premises shall be determined in accordance with the work letter.

Uplight "sail" structures to reflect light back into the space. Also have the option to use colored or patterned light to enhance this area.

Downlight component of fixture to grate column and highlight new surface materials. Also adds light accents at floor level.

Remove existing track around column tops.

Place new lockable track fixtures along structural elements and concealed between "sails" to illuminate the floor and highlight the fountain.

**EXHIBIT D.5**

**MALL ENTRY PLANS**

EXHIBIT D.6

DEER PARK PLANS



EXHIBIT D.6

DEER PARK PLANS



**EXHIBIT D.6**

**DEER PARK PLANS**



CENTURY
THEATRES

**DEER PARK - 16**
VILLAGE OF DEER PARK
DEER PARK,    ILLINOIS

A116

**EXHIBIT D.6**

**DEER PARK PLANS**



CENTURY THEATRES

**DEER PARK – 16**
VILLAGE OF DEER PARK
DEER PARK,     ILLINOIS

EXHIBIT D.6

DEER PARK PLANS





**EXHIBIT D.7**

**DEER PARK LOBBY FINISHES**



## EXHIBIT E

### FIXTURES, FURNISHINGS AND EQUIPMENT

Tenants Fixtures, Furnishings and Equipment ("FF&E") generally consist of the following:

Pneumatic Tube System (exclusive of underground systems) (TSCI)
Poster Cases (TSCI)
Hallway Reader Board Signage (TSCI)
Box Office Equipment (TSTI)
Projection Port Assembly (TSCI)
Box Office Sign (as shown in drawings) (TSCI)
Cash Drawers (TSTI)
Box Office Speaker System (TSCI)
Box Office Stools (TSTI)
Ticket Issuing Systems/Computer and Printers (DBC)
Interior Benches (TSTI)
Trash Receptacles (TSTI)
Cigarette Urns (TSTI)
Crowd Control Ropes and Pulls (TSTI)
Crowd Control Accessories (TSTI)
Trash Receptacles (TSTI)
Restroom Door Signs (TSCI)
Communication Systems (phone system, intercom, computer modem) (TSTI)
Sound, Communication and Special Systems (TSTI)
Answering System (TSTI)
Safes (TSTI)
Miscellaneous Office Furniture (TSTI)
Floor Carpet (TSCI)
Aisle Lighting (TSTI)
Drapes or Auditorium Panels (side wall and back) (TSCI)
Movable Masking (TSTI)
Screen Frame (TSTI)
Seats (TSTI)
Wall Carpet (TSCI)
Projector and Platters (TSTI)
Miscellaneous Projection Equipment (TSTI)
Sound Equipment (TSTI)
Hearing Assisted Equipment (TSTI)
Speakers (conduit by contractor) (TSTI)
Screens (TSTI)
Lenses (TSTI)
Concession Equipment (TSTI)
Drink Equipment (conduit by contractor) (TSCI)
Projection Supplies (TSTI)
Installation Supplies (TSTI)
Ice Machine and Bins (TSCI)
Shelving (TSTI)
Refrigerator (TSCI)
Bulk Candy Holders (TSTI)



-CHGO2.20216078.v9

**EXHIBIT F**

**FORM OF ESTOPPEL CERTIFICATE**

This Mutual Estoppel Certificate (this "Certificate"), dated as of _____ __, 20__, is made by and between (i) Century Theatres, Inc., a California corporation ("Tenant"), and (ii) _____ ("Landlord"), with reference to that certain Lease Agreement dated as of _____, 2005 (as heretofore modified and amended, the "Lease") pursuant to which Landlord has leased to Tenant and Tenant leases from Landlord certain Premises in the Stratford Square shopping center located in Bloomingdale, Illinois (the "Center").

For and in consideration of the mutual certifications and agreements set forth in this Certificate and other good and valuable consideration, Tenant and Landlord hereby agree and certify as follows, intending that this Certificate shall and may be relied upon by the applicable Reliance Parties identified below:

      1.     The copy of the Lease attached hereto as Schedule A is a true, correct and complete copy of the Lease, including all amendments, supplements and modifications thereof, and the Lease is in full force and effect. Capitalized terms that are not otherwise defined herein shall have the same meaning as in the Lease. The Lease attached hereto as Schedule A (together with the documents and instruments expressly contemplated under the Lease) sets forth all promises and representations made by either party to the other concerning the Lease, the Center or the Premises.

      2.     As of this date, Tenant [has/has not] accepted possession and is not in occupancy of the Premises. The Commencement Date and expiration date of the Initial Term [are _____ and _____ respectively/are not presently known and shall be determined in accordance with Article 3 of the Lease]. The Initial Term of the Lease shall be for fifteen (15) Lease Years, and Tenant shall have the option to extend the Term of the Lease for five (5) consecutive Extension Terms of five (5) Lease Years each.

      3.     Tenant [is currently paying/is not currently obligated to pay] Rent under the Lease. The amount of Base Rent, Percentage Rent and Tenant's obligations to pay or contribute toward Real Estate Taxes and to pay the Annual CAM Amount, shall be as set forth in the Lease.

      4.     Tenant has no right to relocate to different space, or any right of first refusal to lease other space in the Center or any option or right to purchase the Center or any part thereof.

      5.     Tenant has not received written notice from Landlord, asserting any default by Tenant which has not been cured, except as follows: [If none, so state.] _____.

      6.     Landlord has not received written notice from Tenant asserting any default by Landlord which has not been cured, except as follows: [If none, so state.] _____.

      7.     To the best of Tenant's knowledge (but without independent inquiry), no material uncured default on the part of Tenant or Landlord currently exists under the Lease, except as follows: [If none, so state] _____.

      8.     To the best of Landlord's knowledge (but without independent inquiry), no material uncured default on the part of Tenant or Landlord currently exists under the Lease, except as follows: [If none, so state] _____.

      9.     Tenant has not assigned, sublet, or transferred its interest in the Lease and/or the Premises, or any part thereof, except as follows: [If none, so state] _____.

      10.     Tenant currently asserts no defenses, offsets or counterclaims against Landlord with respect to Tenant's obligations under the Lease, except as follows: [If none, so state] _____.

~CHGO2:20216078.v9



**EXHIBIT H**

RECORDING REQUESTED BY,
AND AFTER RECORDING
PLEASE RETURN TO:

Michael P. Kuppersmith
DLA Piper Rudnick LLP
203 North LaSalle Street
Chicago, Illinois 60601

*This space reserved for Recorder's use only.*

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (this "Memorandum") is made and entered into as of _____ *[Effective Date of Lease]* by and between FMP STRATFORD LLC, a Delaware limited liability company ("Landlord"), and **CENTURY THEATRES, INC.**, a California corporation ("Tenant"):

### R E C I T A L S

A.    Landlord is the fee simple title owner of a certain parcel of property located in the City of Bloomingdale, DuPage County, Illinois, which is legally described on Exhibit B attached hereto and made a part hereof ("Landlord's Parcel").

B.    Landlord's Parcel has been developed by Landlord's predecessor as a regional shopping center (the "Center"), the site plan for which is attached hereto and made a part hereof as Exhibit A and Exhibits A.1 through A.10 (collectively the "Site Plan"). The Center includes certain Common Areas (including, without limitation, certain Parking Areas), the location of which is depicted on the Site Plan.

C.    Landlord and Tenant have entered into that certain Lease Agreement dated as of _____ (as amended from time to time, the "Lease") pursuant to which Landlord has leased and demised to Tenant certain premises located on Landlord's Parcel, as depicted and/or described on Exhibit B.1 attached hereto and made a part hereof and as more particularly described in the Lease (the "Premise Land").

D.    Landlord and Tenant desire to set forth in this Memorandum certain terms and provisions of the Lease (or summaries thereof), for notice and recording purposes.

NOW, THEREFORE, for and in consideration of the rents reserved and the covenants and conditions set forth in the Lease, Landlord and Tenant hereby covenant and agree as follows:

1)    **Recitals Incorporated; Defined Terms.**    The Recitals set forth above are incorporated herein by this reference and shall be deemed terms and provisions hereof, the same as if fully set forth in this Paragraph 1. Capitalized terms that are used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Lease.

2)    **Grant and Demise.**    Pursuant to the Lease and this Memorandum, Landlord has demised and hereby demises unto Tenant, and Tenant has leased and hereby leases from Landlord, for the Term and upon the terms and conditions of the Lease, the Premises together with (i) all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto, whether arising under any private or public grant or authority, including, without limitation, the direct right of ingress to and egress from the Premises and the streets and walkways shown on the Site Plan via the Protected Area and Critical Accessways and through the other entrances and exits to or from the Building shown on the Site Plan or as shown on or inferable from Final Plans approved by Landlord and Tenant pursuant to the Work Letter (such as emergency exit corridors), and (ii) a non-exclusive, irrevocable right and easement for Tenant,



its employees, patrons and invitees to use the Common Areas (including the Parking Areas) for their intended purposes throughout the Term, subject to the terms of the Lease.

3)    **Term**.  The term of the Lease shall be comprised of the Initial Term and, if applicable, the Extension Terms.  The Initial Term of the Lease is for approximately Fifteen (15) years, commencing on the Commencement Date.  The Commencement Date shall be determined in accordance with Section 3.1 of the Lease.  In addition to any other termination rights set forth in the Lease, and pursuant to Section 3.3 of the Lease, Tenant has the option to extend the Term of the Lease, after the expiration of the Initial Term, for up to five (5) consecutive Extension Terms of five (5) years each.  Pursuant to Sections 3.5 and 3.6 of the Lease, Tenant has certain rights to terminate the Lease prior to the expiration of the Initial Term, upon the terms set forth therein.

4)    **Exclusive Use**.  The Lease provides that:

a)    Landlord shall not sell, rent, use or permit to be used any premises or space that is located within Landlord's Parcel (other than the Premises) or other portion of the Center hereafter acquired or controlled by Landlord or a Landlord Affiliate, or on any other land adjoining or adjacent to any part of the Center (including land separate from the Center by streets and rights of way) which is developed, owned or controlled by Landlord or a Landlord Affiliate, for use as a motion picture theater or for the commercial exhibition of full length (i.e., at least 80 minutes in length) motion pictures or films in a manner that encourages patrons to sit down and view the entire feature from start to finish with the audio portion of the presentation being utilized, including, without limitation, so-called specialty theaters (e.g., I-Max, I-Works and Showscan-type theaters, and ride/simulator theaters), or for the sale of tickets to any other motion picture theater (other than the Premises and other theaters operated by a Tenant Affiliate).

b)    Landlord agrees that if any owner, operator and/or tenant of an Anchor Parcel requests consent or approval of Landlord under the REA or otherwise for use of all or any portion of any Anchor Parcel in a manner which constitutes an Anchor Violation or seeks approvals or permits from any Governmental Authority to utilize all or any portion of an Anchor Parcel in a manner which would constitute an Anchor Violation, Landlord shall not grant any such consent or approval and shall use diligent best efforts through appropriate legal proceedings to oppose any efforts of the owner, operator and/or tenant to obtain approvals to utilize the Anchor Parcel in a manner which constitutes an Anchor Violation and to enforce any rights of Landlord with respect to such Anchor Violation.  Without limitation of the foregoing, if Landlord obtains an Anchor Exclusive Consent from an Anchor, and an Anchor Violation thereafter occurs with respect to such Anchor or its Anchor Parcel, Landlord shall promptly take Landlord Anchor Enforcement Action to cause the Anchor Violation to cease.  Landlord further acknowledges that the use of any Anchor Parcel in a manner which constitutes an Anchor Violation may result in significant, irreparable harm to Tenant.  Accordingly, Landlord and Tenant further agree that unless and until Landlord obtains an enforceable agreement(s) in form reasonably satisfactory to Tenant from each of the Anchors acknowledging that the signing Anchor (and the Anchor Parcels owned by the signing Anchor) will be prohibited from taking or allowing the Anchor Parcel to be used in a manner that would constitute an Anchor Violation, if an Anchor Violation occurs, Tenant shall have the remedies set forth in Section 13.3(b) of the Lease.  As used in the Lease, "Anchor Violation" means if any portion of an Anchor Parcel is used for a motion picture theater or for the commercial exhibition of full length (i.e., not less than 80 minutes) motion pictures or films (with audio of the feature being utilized) whether on a continuous, recurring or periodic basis, in a manner which encourages patrons to sit down and view the entire feature from start to finish, including, without limitation, so-called specialty theaters (e.g., I-Max, I-Works and Showscan-type theaters).

c)    Landlord will not sell or suffer or permit to be sold or served: (i) popcorn from any premises or space (other than the Premises) within Landlord's Parcel, or (ii) bulk candy from any premises or space (other than the Premises) within the "Candy Restricted Area" shown on the Site Plan, or (iii) frozen carbonated beverages, soft drinks, coffee or espresso drinks from any premises or space (other than the Premises) within the "Beverage Restricted Area" shown on Exhibit A.6 of the Site Plan, or (iv) hot dogs, pizza



by the slice, chicken tenders, pastries, or other food or beverage items generally sold in movie theaters as of the Effective Date, anywhere within or from the Common Areas or from any other premises or space (other than the Premises) located within or adjacent to the "General Concession Restricted Area" shown on Exhibit A.6 of the Site Plan; for clarity, Tenant acknowledges that the Candy Restricted Area, the Beverage Restricted Area and the General Concession Restricted Area do not affect any level of the Center other than the level on which Tenant's main entrance to the Premises is located (i.e., the "second floor" of the Center). In addition, Landlord shall not provide, or permit or suffer to be provided, any free or complementary food or beverages from anywhere on Landlord's Parcel (other than the Premises and other than sample tastings entirely within another tenant's premises) that is located within five hundred feet (500') of Tenant's box office and is on the same level of the mall building as Tenant's box office is located. In addition, Landlord shall take Landlord Anchor Enforcement Action to prevent the Anchors from providing any complementary food or beverages from any portion of the Common Areas on the same level of the mall as Tenant's box office, and is within five hundred feet (500') of Tenant's box office. Further, except for the signage contemplated under Article 15, Landlord shall not display or distribute or permit or suffer to be displayed or distributed, anywhere within Landlord's Parcel or (to the extent Landlord has the right under the REA or otherwise to restrict such activities in the Common Areas) the Common Areas, any signage, advertisement, flyer, announcement or other information that directly or indirectly refers to the Premises (by name, description of Tenant's business or otherwise) or invites a comparison to the food, beverages or other concessions sold or served within Premises. (As an example and not as a limitation of the foregoing, no tenant or other occupant of Landlord's Parcel shall be permitted to display signage or other advertising that states or implies that food or beverage products sold within such premises may be available at prices lower than the prices for similar food or beverage products within the Premises.) The provisions of this Section 13.4 shall be included in the Memorandum of Lease and recorded against Landlord's Parcel. The provisions of this Section 13.4 shall not, however, apply to conduct within a current tenant's premises that Landlord cannot legally prohibit under the terms of such tenant's currently existing lease but Landlord covenants to include such prohibitions in any extension of such currently existing lease for which Landlord's approval is required and in all future leases. Additionally, Landlord shall adopt rules and regulations with respect to the Common Areas that contain the prohibitions in this Section 13.4 and shall enforce such rules and regulations. Finally, Landlord shall not enter into Temporary Leases for space within the Long Term Retail Area or leases with Non-Retail tenants for any space in the Long-Term Retail Area during the initial Term of this Lease without Tenant's prior written consent, which shall not be unreasonably withheld, except that Tenant's consent shall not be required in connection with the execution of Temporary Leases with first class seasonal retail tenants (e.g., Hickory Farms).

d)    Landlord shall not construct or permit or suffer the construction or location of any kiosks, pushcarts or sales booths which (i) are located within the "No Kiosk Area" shown on Exhibit A.5 of the Site Plan attached hereto (except for the "Permitted Kiosks", as shown on the Site Plan), or (ii) serve food and/or beverage items and are located within the "Protected Area" shown on Exhibit A.2 of the Site Plan attached hereto. In addition, Landlord shall not place, construct or otherwise permit the following: (a) any vending machines located within the "No Vending Area" shown on Exhibit A.6 of the Site Plan attached hereto, or (b) any video games, pinball machines or similar entertainment devices located within the "No Video/Games Area" shown on Exhibit A.6 of the Site Plan attached hereto; (c) any improvements, including without limitation, kiosks, planters, structures or other installations of any kind in the portion of the Common Areas which run the length of Tenant's box office and extend out twenty (20) feet from Tenant's box office, as located and relocated by Tenant from time to time; or (iv) any improvements within Landlord's Parcel or the Common Areas which unreasonably impairs the visibility of Tenant's marquee storefront signage contemplated in Section 15.1. Landlord acknowledges that the queuing of Tenant's patrons will take place in the Common Areas adjacent to Tenant's box office and hereby grants Tenant the right to utilize such area for queuing purposes.



5)    **Parking**.    The Lease provides, and Landlord covenants and agrees, that (i) the Parking Areas shall at all times from and after the Commencement Date contain not less than the applicable Minimum Free Parking Spaces specified in Section 1.1 of the Lease, (ii) all parking spaces within the Parking Areas shall be available on a first-come, first-served, non-exclusive and unreserved basis, without time limitation subject to the requirements of Section 12.3 of the Lease, (iii) the Parking Areas (and convenient pedestrian access thereto from the Premises) shall be open and operated (including lighting and security) seven (7) days per week, every week of the year (including holidays), for at least the hours commencing two (2) hours before Tenant's opening and ending one (1) hour after Tenant's closing each day, and (iv) no charge or fee shall be assessed by Landlord or the operator of the Parking Areas for the use thereof by Tenant's patrons.

6)    **Ownership of Tenant's Property**.    Throughout the Term, Tenant shall be and remain the owner of the following (collectively, "**Tenant's Property**"):  (i) all leasehold improvements made by Tenant to and within the Premises paid for by Tenant and not funded from or reimbursed to Tenant from Landlord's Reimbursement, including all equipment, machinery, systems and building fixtures within or exclusively serving the Premises paid for and installed by Tenant and not funded from or reimbursed to Tenant from Landlord's Reimbursement, (ii) Tenant's FF&E and all other removable personal property and equipment which is installed in the Premises by Tenant, and (iii) to the extent not included above, all alterations, improvements and additions following completion of Landlord's Work undertaken pursuant to Article 10 of the Lease. Tenant shall be entitled to any depreciation on Tenant's Property.

7)    **Additional Provisions**.    The entirety of the Lease is incorporated into this Memorandum by this reference, and all of the terms thereof shall apply to and be binding upon Landlord and Tenant in connection with this Memorandum. Without limitation, notice is hereby given that the Lease provides:

a)    That, without the prior written consent of Tenant, Landlord is prohibited from effecting or permitting any modification changes, revisions or deviations to the Site Plan ("Site Plan Modifications"), which affect the Protected Area, Premises, or the ring road or any other Site Plan Modifications which have a "Material Adverse Affect", as described in Section 2.2(c) of the Lease.

b)    That any reciprocal easement agreements that affect the Protected Area or would have a "Material and Adverse Affect" on Tenant (as defined in Section 11.2 of the Lease) and are proposed to be entered into by Landlord after the Effective Date of the Lease shall be subject to Tenant's prior written approval, which shall not be unreasonably withheld, delayed or conditioned.

c)    That, under certain circumstances more particularly set forth in the Lease, if the Lease is terminated for reasons other than the default of Tenant and Landlord thereafter desires to sell or lease premises in the Center for use as a motion picture theater, then Tenant shall have the right of first offer or the right of first refusal to purchase or lease such premises.

8)    **Notices**.    Inquiries regarding the terms and conditions of the Lease and notices to the parties under the Lease shall be directed as follows (or as Landlord and Tenant may otherwise direct from time to time):

| | |
|---|---|
| **Notice Address for Landlord:** | FMP Stratford LLC |
| | c/o Feldman Mall Properties |
| | 3225 North Central Avenue, Suite 1205 |
| | Phoenix, Arizona 85012 |
| | Attention:  Lease Administration |
| | Facsimile No.:  (602) 277-7774 |
| | |
| **with a copy to:** | FMP Stratford LLC |
| | c/o Mall Management Office |
| | 152 Stratford Square Mall |
| | Bloomingdale, Illinois 60108 |



|  | Attention: General Manager |
|---|---|
|  | Facsimile No.: (630) 351-9769 |
| **Landlord's Telephone Number:** | (602) 277-5559 |
| **Notice Address for Tenant:** | Century Theatres, Inc. |
|  | 150 Pelican Way |
|  | San Rafael, California 94901 |
|  | Attention: Chief Executive Officer |
| **with a copy to:** | Century Theatres, Inc. |
|  | 150 Pelican Way |
|  | San Rafael, California 94901 |
|  | Attention: General Counsel |
| **with a copy to:** | David B. Sickle, Esq. |
|  | DLA Piper Rudnick LLP |
|  | 203 North LaSalle Street |
|  | Chicago, Illinois 60601 |
| **Tenant's Telephone Number** | 415-448-8400 |

9)    **Effect of Memorandum**.  To the extent that a conflict or inconsistency may exist between the terms and conditions of this Memorandum and the terms and conditions contained in the Lease, such terms and conditions contained in the Lease shall govern and control.  This Memorandum is executed and recorded in furtherance of the Lease and does not modify or amend the Lease in any respect, the primary purpose hereof being to create record notice of the Lease and certain of Tenant's rights thereunder.  The rights and obligations of Landlord and Tenant shall be solely as set forth in the Lease.

10)    **Successors and Assigns**.  The Lease and this Memorandum shall be binding upon and inure to the benefit of the Landlord and Tenant and their respective successors and assigns (subject to the terms of the Lease restricting Tenant's ability to assign the Lease or sublet the Premises), including, without limitation, any successor-in-interest of Landlord with respect to Landlord's Parcel who, by accepting any interest in Landlord's Parcel shall be personally bound by the terms of the Lease which affect or apply to such interest.

**IN WITNESS WHEREOF**, the parties have hereunto set their hands on the day and year first aforesaid.

| **LANDLORD:** | **TENANT:** |
|---|---|
| FMP STRATFORD LLC, a Delaware limited liability company | CENTURY THEATRES, INC., a California corporation |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Its: _____ | Its: _____ |



STATE OF _____ )

COUNTY OF _____)

I, the undersigned, a Notary Public in and for said County and State, do hereby certify that _____, as the _____ for FMP Stratford, LLC, a Delaware limited liability company, personally known to me, or satisfactorily proven to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that said person of said company signed and delivered this instrument as a free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and seal this ___ day of _____, 2005

_____

My commission expires:

STATE OF _____ )

COUNTY OF _____)

I, the undersigned, a Notary Public in and for said County and State, do hereby certify that _____, as the _____ for Century Theatres, Inc., a California corporation, personally known to me, or satisfactorily proven to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that said person of said company signed and delivered this instrument as a free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and seal this ___ day of _____, 2005

_____

My commission expires:



**EXHIBIT "A"**

**SITE PLAN**



**EXHIBIT "A-1"**

**SITE PLAN**



**EXHIBIT "A.2"**

**SITE PLAN**

~CHGO2:40077S09.v1



**EXHIBIT "A.3"**

**SITE PLAN**



**EXHIBIT "A.4"**

**SITE PLAN**

~CHGO2:40077309.v1



EXHIBIT "A.5"

SITE PLAN

EXHIBIT "A.6"

SITE PLAN

~CHGO2:40077509.v1

EXHIBIT "A.7"

SITE PLAN

# EXHIBIT "A.8"

## SITE PLAN


–CHGO2:40077509.v1



## EXHIBIT "A.9"

## SITE PLAN



**EXHIBIT "A.10"**

**SITE PLAN**



**EXHIBIT "B"**
**LEGAL DESCRIPTION OF LANDLORD'S PARCEL**



## EXHIBIT "B.1"

### LEGAL DESCRIPTION AND/OR DEPICTION OF THE DEMISED LAN



**EXHIBIT I**

**INTENTIONALLY DELETED**



**EXHIBIT J**

**EXISTING EXCLUSIVES**

**STRATFORD SQUARE**

**Tenant Exclusives**
**October 11, 2005**

The location of the tenants listed below are identified on Exhibit A.
**1. Coldstone Creamery**

To the extent Landlord is not prohibited by any existing or future Law, and proceeded Tenant is not in default under this Lease, as of the date hereof, Landlord agrees that if any time during the Term both of the following events (the "Required Events") occur: (x) Landlord breaches the Competition Covenant (hereinafter defined), Tenant, as its sole remedy, shall be entitled to pay Substitute Rent (hereinafter defined) in accordance with Article 8.F(3) below. For purposes of this Article 8.F, the "Competition Covenant" shall mean the covenant by Landlord not to enter into a lease or other agreement granting possession of space to tenants (other than Majors) at the Center in the area identified on Exhibit A-1 (the "Exclusive Zone") attached hereto (collectively, an "Occupancy Agreement") with a Competitor (as hereinafter defined) for a term scheduled to commence during the Term of this Lease. For purposed of this Section 8.F, "Competitor" shall mean any tenant (other than Majors) in the Exclusive Zone who meets both the following tests: (i) such tenant is not a Pre-Existing Tenant (as hereinafter defined) and (ii) such tenant's primary use is the retail sale of ice cream, frozen yogurt and frozen desserts (the "Subject Primary Use" and any item within the Subject Primary Use that is specifically identified shall be referred to as a "Specifically Prohibited Item"). For purposes of this Section 8.F, a "Pre-Existing Tenant" shall mean any tenant (except Majors) in the Exclusive Zone (whether such tenant occupies its original premises or relocated and/or expanded its premises) (a) who is open for business on or prior to the date hereof, or (b) whose Occupancy Agreement is dated on or prior to the date thereof, of (c) who is in possession of its space pursuant to a renewal or extension of the Occupancy Agreement of a tenant described in either of the immediately preceding clauses (a) and (b) (whether or not such renewal or extension is pursuant to an express right to renew or extend contained in the Occupancy Agreement or a new lease), or (d) who is an assignee or sublease of a tenant described in any of the immediately preceding clauses (a), (b), and/or (c).

Notwithstanding anything to the contrary contained herein, the provisions of this Section 8.F shall be inapplicable to (a) any Majors, (b) any tenant who has been permitted to assume an Occupancy Agreement or otherwise operate its business in the Exclusive Zone based upon or as a result of a bankruptcy, insolvency or similar action, or (c) any tenant who has been permitted to operate as a result of an action or order by a court of competent jurisdiction.

**2. The Disney Store**

Article 21.H. entitled "Changes to Center" is hereby amended by adding the following thereto: In the exercise of its rights hereunder, Landlord will not (i) unreasonably interfere with access to or from the Premises, (ii) construct a permanent kiosk of any kind which sells plush toys or any kiosk within the extensions of the side lease lines of the Premises and within ten (10) feet of the Premise, without Tenant's prior consent, not to be unreasonably withheld or delayed.

**3. First American Bank**

If a Competing Business (defined below) shall operate for business in the enclosed mall of the Center or in an entrance thereto with Licensor's consent, and shall continue to operate after thirty (30) days written notice from Licensee to Licensor, then, as Licensee's sole remedy on account thereof, so long as the competing Business thereafter continues to operate, Licensee shall have the choice of terminating this Agreement of Licensee's annual License Fee (defined below) shall decrease to fifty percent (50%) of the amount that is otherwise set forth in this Agreement. A "Competing Business" shall mean the operation of one (1) or more free-standing ATM's or Deposit Boxes in the Center, provided that "Competing Business" shall not include (i)

~CHGO2:20216078.v9



any ATM or Deposit Box operated in the premises of, or entrances to, the store of any "Major" (as hereafter defined) or (ii) any ATM or Deposit Box installed in any bank located within or on the Center. For purposes hereof, "Major" shall mean any store or other establishment of more than 30,000 square feet.

A Competing Business shall be considered to be operating with Licensor's consent only if: (i) Licensor after the date of this Agreement entered into a lease or other occupancy agreement with the tenant in question expressly permitting it to engage in the Competing Business, or (ii) Licensor's consent is required for any change to a tenant's permitted use, and Licensor consents, after the date of this Agreement, to change such use to permit such tenant to be a Competing Business. A Competing Business shall not be considered to be operating with Licensor's Consent if the Competing Business has been permitted to assume a lease or operate its business based upon or as a result of a bankruptcy, insolvency or similar action or if the Competing Business has been permitted to operate as the result of an action or order by a court.

Notwithstanding anything herein to the contrary, Licensee shall not be entitled to the remedy set forth in this provision if Licensee shall have ceased to operate the ATM and/or Deposit Box for a period of thirty (30) days or more, or if Licensee shall otherwise not be operating for business at the Premises in accordance with the provisions of this Agreement, or if Licensee is otherwise in default under this Agreement, or if Licensee shall have assigned or otherwise transferred this Agreement at any time or if control of Licensee has changed without the prior written consent of Licensor.

The remedy set forth in this provision shall be Licensee's sole and exclusive remedy on account of the operation of a Competing Business.

## 4. FYE

If a Competing Business (defined below) shall operate for business at the Center with Landlord's consent, and shall continue to operate after thirty (30) days' written notice from Tenant to Landlord, then, as Tenant's sole remedy on account thereof, so long as the Competing Business thereafter continues to operate, Tenant shall pay in lieu of Minimum Rent and Percentage Rent an amount (the "Substitute Rent") equal to six percent (6%) of Tenant's Gross Sales for each month. Tenant shall pay the Substitute Rent for each month within fifteen (15) days after the end of the month.

A "Competing Business" shall mean a store which (i) devotes in excess of 300 square feet to the display and sale of prerecorded music or (ii) devotes in excess of 300 square feet to the display and sale of prerecorded videos (provided, if Tenant does not at any time operate a full-line video department, then a "Competing Business" shall not include (ii) above) or (iii) devotes in excess of 300 square feet to the operation of a "game room" (provided, in that event that Tenant fails to operate a "game room" for any consecutive twelve-month period during the Term, then a "Competing business" shall not include (iii) above). Notwithstanding anything herein contained to the contrary a "Competing Business" shall in no event include a store that sells prerecorded music or video of a certain theme or nature as part of a range of products in connection with such theme or nature, such as (without limitation) The Disney Store, Warner Brothers Studio Store, Store of Knowledge or World of Science, Lemstone, or a children's toy store such as Noodle Kidoodle, K.B. Toys, FAO Schwartz or Galt Toys. Also a "Competing Business" shall not include any existing leases (where the tenant thereunder is open for business) at the Center on the date of this Lease, except the Suncoast and Sam Goody leases as provided below, provided, however, Landlord agrees that it will not amend or waive any provision of such existing leases in any manner which will permit any of such tenants to sell more prerecorded music or prerecorded video recordings so that they could be a Competing Business. Tenant specifically understands that in today's rapidly changing retail environment that tenants can and do change their methods of operation and what they sell. The intent of this provision is not penalize Landlord if a Tenant changes into a Competing Business after opening for business as something else so long as Landlord has not changed the tenant's lease to enable it to be a Competing Business.

A Competing Business shall be considered to be operating with Landlord's consent only if: (i) Landlord entered into a lease or other occupancy agreement with the tenant in question



expressly permitting it to engage in the Competing Business, or (ii) Landlord's consent is required for any change to a tenant's permitted use, and Landlord consents to change such use to permit such tenant to be a Competing Business. A Competing Business shall not be considered to be operating with Landlord's consent if the Competing Business has been permitted to assume a lease or operate its business based upon or as a result of a bankruptcy, insolvency or similar action or if the Competing Business has been permitted to operate as the result of an action or order by a court.

Notwithstanding anything herein to the contrary, Tenant shall not be entitled to the remedy set forth in this provision if Tenant shall have ceased to operate as a primary retail seller of prerecorded music and/or prerecorded videos or if Tenant shall otherwise not be operating for business at the Premises in accordance with the provisions of this Lease, or if Tenant is otherwise in default under this Lease, or if Tenant shall have assigned sublet or otherwise transferred this Lease at any time or if control of Tenant has changed, other than permitted transfer which did not require Landlord's consent hereunder pursuant to Article 20.

Notwithstanding anything foregoing to the contrary, in no event shall a Major, theatre, outparcel at the Center, or a parent, subsidiary or affiliate of Tenant, be deemed to be a "Competing Business" under this provision.

The remedies set forth in this provision shall be Tenant's sole and exclusive remedies on account of the operation of a Competing Business.

Landlord acknowledges that the lease agreements for the tenants in the Center doing business as, respectively, "Suncoast" and "Sam Goody" (i) will expire on December 31, 1999 and January 31, 2006 respectively, ("Scheduled Expiration Date") and (ii) that neither lease term shall be renewed or extended by Landlord at the Center. In the event "Suncoast" or "Sam Goody" (or any respective successor in interest to "Suncoast" or "Sam Goody" operating in the "Suncoast" premises or the "Sam Goody" premises under the same or similar respective trade names as the case may be) shall be deemed to be operating in the Suncoast or Sam Goody premises in the Center after the respective Scheduled Expiration Date, Landlord agrees to use commercially reasonable efforts to cause such operation to cease. In the event such operation continues for in excess of 90 days after the respective Scheduled Expiration Date, then as Tenant's sole and exclusive remedy, commencing on the 91st day after the respective Scheduled Expiration Date and for such time as "Suncoast" or "Sam Goody," as the case may be, continue to operate, Tenant shall pay Substitute Rent in lieu of Minimum and Percentage Rent.

Century Lease – With regard to the FYE provision above, the Landlord represents that FYE has not operated a "game room" for a consecutive twelve-month period during the FYE term, therefore the Competing Business provisions applicable to a "game room" shall not apply to the Century Lease.

**5. Sarku Japan**

Notwithstanding anything contained in this Lease to the contrary and to the extent Landlord is not prohibited by any existing or future law, Landlord covenants (i) not to enter into any lease with a tenant for space in the Food Court which would permit such tenant to use the following Japanese menu names: "Teriyaki", "Sukiyaki", "Tempura", "Kato", "Yakitori", "Sushi" and "Sashimi" provided such lease is scheduled to commence during the Term of this Lease and (ii) except to the extent permitted (or not prohibited) by its lease use clause, Landlord shall use commercially reasonable efforts (which shall not include the commence of any legal proceedings) to ensure that no other tenant in the Food Court with Leases dated on or before the date of this Lease shall use any of the above-referenced Japanese menu names.

**6. Shoe Department**

Notwithstanding the foregoing, in the event that, during the Term of this Lease, Landlord enters in to a lease with a tenant or occupant for a store location (i) containing at least 3,000 square feet of gross leasable area, (ii) fronting on the enclosed mall of the Shopping Center, (iii) whose primary and principal use is the retail sale of nationally recognized brand-name family footwear, and further provided that Tenant (iv) is not in default under the terms and provisions of

CHGO2:20216028.v9



this Lease, and (v) is open and operating its business in the Leased Premises in accordance with its Permitted Use, then, in all of those events, Tenant's Minimum Annual Rental and all additional rents and charges (except taxes and utilities, utilities defined to include Landlord-provided electric for HVAC use metered and billed by Landlord), shall be reduced by fifty percent (50%) and Tenant's Percentage Rent Rate shall be reduced one percent (1%) from the date such right of reduction no longer exist and the Annual Sales Base shall remain. In the event such condition continued for 12 consecutive months, and Tenant's sales for the 12 consecutive months of violation meet or exceed a 5.1% increase in sales, Tenant's right to terminate becomes null and void. The terms of this provision shall not be applicable to any areas of the Shopping Center that are owned, leased, assigned and/or subleased to Shoe Show and Shoe Show Kids, any anchor, any variety or specialty stores, theater, grocery store, drug store, existing tenants or occupants, or their renewal, or any expansion thereof, their successors, assignees and replacement, or any tenant whose sale of nationally recognized brand-name family footwear is incidental to its primary use or any tenant occupying premises containing less than 3,000 square feet of gross leasable area. If any other tenant or occupant of the Shopping Center, exclusive of the aforementioned, engages in the primary sale of nationally recognized brand-name footwear in direct contravention of its permitted use and without any action by Landlord permitting such sale by signed lease or agreement provision, then Tenant shall not be entitled to the aforementioned reduction of rent provided that Landlord uses reasonable efforts to enforce the terms and provisions of said tenant's or occupant's permitted use. Any trade name change by an existing tenant of occupant shall not be considered "entering into a lease" for the purpose of this provision.

7.    **Starbucks**

A.    To the extent Landlord is not prohibited by any existing or future Law, and provided Tenant is not in default under the Lease beyond any applicable notice and cure period, Landlord covenants not to enter into a lease agreement for space (i) on the second level of the Shopping Center in the area shown cross-hatched on Exhibit F attached hereto (the "Second Level Non-Competition Area"), or (ii) on the first level of the enclosed mall of the Shopping Center (the "First Level Non-Competition Area" and together with the Second Level Non-Competition Area the "Non-Competition Areas"), with a Competitor (as hereinafter defined) for a term scheduled to commence during the Term of this Lease, or consent to the use of any portion of the Shopping Center (except the Leased Premises and any premises operated by an Affiliated User [hereinafter defined]) for the Competing Use, where Landlord's consent would be required for such Competing Use.

B.    For purposes of this Section 17.23, a "Competitor" shall mean any tenant in the Shopping Center whose lease or other agreement with Landlord (collectively, an "Occupancy Agreement") is dated on or after the date of the Lease and whose primary use is the sale at retail of whole or freshly ground coffee beans, gourmet, brand-identified brewed coffee and/or espresso coffee or espresso-based drinks or tea or tea-based drinks, or blended beverages containing coffee, tea or espresso (the "Competing Use"). Tenant acknowledges that another occupant of the Shopping Center will be deemed to be operating for the Competing Use only if such use is such occupant's primary use. Landlord acknowledges that Caribou Coffee, as the same is currently operated, is an example of a coffee shop operating for the Competing Use. Competitor shall not in any event include: (a) a Pre-Existing Tenant (hereinafter defined), or (b) a tenant who has been permitted to assume an Occupancy Agreement or otherwise operate its business in the Shopping Center based upon or as a result of a bankruptcy, insolvency or similar action, or (c) a business (an "Affiliated User") operated by, or whose coffee or coffee products are supplied by, a Starbucks Affiliate or by Tenant, or a parent or affiliate of Tenant, or (d) any tenant who has been permitted to operate as a result of an action or order by a court of competent jurisdiction, or (e) a sit-down restaurant which sells brewed tea, coffee or espresso or coffee, tea or espresso-based drinks primarily for on-premises consumption, or (f) a tenant who serves brewed coffee or tea that is either (i) not brand identified coffee or tea or (ii) is a house brand, that is not identified as a gourmet brand, or (g) Major Stores, or (h) any tenant who is primarily perceived by the public as having a non-coffee primary use, such as the sale of donuts, cinnamon rolls, bagels or fruit smoothies, or (i) the Permitted Coffee Shops (hereinafter defined). For purposes of this Section 17.23, a "Pre-Existing Tenant" shall mean any tenant in the Shopping Center and any replacement of such Pre-Existing Tenant (whether such tenant occupies its original premises or relocated and/or expanded its premises) (i) who is open for business on or



prior to the date hereof, or (ii) whose Occupancy Agreement is dated on or prior to the date thereof, or (iii) who is in possession of its space pursuant to a renewal or extension of the Occupancy Agreement of a tenant described in either of the immediately preceding clauses (i) or (ii) (whether or not such renewal or extension is pursuant to an express right to renew or extend contained in the Occupancy Agreement and whether such renewal is accomplished by means of an amendment or new lease), or (iv) who is an assignee or sublessee of a tenant described in any of the immediately preceding clauses (i), (ii) and/or (iii), and "Permitted Coffee Shops" shall mean (aa) the two premises currently operated by Gloria Jeans in the Shopping Center as of the date of this Lease whose primary use is the Competing Use, or a replacement for either of such Permitted Coffee Shops (regardless of whether such replacement Permitted Coffee Shop leases the prior Permitted Coffee Shop's space or a different space in the Shopping Center and regardless of when such replacement occurs) and (bb) one (1) additional Satellite Store Space tenant (the "Additional Permitted Coffee Tenant") not in the Shopping Center as of the date of this Lease whose primary use is the Competing Use, or a replacement for such Additional Permitted Coffee Tenant (regardless of whether such replacement Additional Permitted Coffee Tenant leases the prior Additional Permitted Coffee Tenant's space or a different space in the Shopping Center and regardless of when such replacement occurs), provided such Permitted Coffee Shops may only be located on the first level of the Shopping Center.

C.    Notwithstanding anything herein to the contrary, if Tenant's primary use is no longer the Competing Use, or Tenant assigns the Lease or sublets all or any part of the Leased Premises to an entity other than a Qualified Party (hereinafter defined), this provision shall be null and void and of no further force and effect. For purposes hereof, the term "Qualified Party" shall mean any party that is either (i) a Starbucks Affiliate or (ii) a Transferee to whom Tenant assigns the Lease through a Corporate Transfer that does not require Landlord's consent pursuant to Article XV of the Lease.

D.    If (i) a Competitor, as defined above, operates in the Shopping Center, without Landlord's consent or (ii) a party changes the use of its premises to operate as a Competing Use without Landlord's consent when Landlord's consent would be required for such change in its use (the events described in the immediately preceding clauses (i) and (ii) shall each be referred to herein as a "Non-Voluntary Violation" and the tenant or occupant of the Shopping Center causing such Non-Voluntary Violation shall be referred to herein as a "Violating Party"); then, upon Tenant's request, Landlord shall, at its option, take such steps as are reasonably necessary to cause such party to cease the Competing Use, provided, however, in no event shall Landlord be required to commence litigation or arbitration or otherwise incur material expense in connection with its efforts. Tenant shall indemnify, defend and hold Landlord harmless against and from all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including without limitation, reasonable attorney's fees, which may be imposed upon, incurred by, or asserted against Landlord arising, directly or indirectly, out of or in connection with any claim (whether valid or otherwise) by any third party that the provisions of this Section 17.23 are anti-competitive or otherwise violate anti-trust laws or similar laws or public policy. In case any action or proceeding is brought against Landlord by reason of the foregoing, Tenant shall, at Tenant's sole cost and expense, resist or defend such action or proceeding with counsel approved by Landlord.

E.    (1) If, at any time or from time to time on or after the date hereof, a Non-Voluntary Violation occurs (as described above in this Section 17.23[D]) and such Non-Voluntary Violation is not cured within the 90-day period (the "Non-Voluntary Violation Cure Period") after the later to occur of (a) the date Tenant gives Landlord written notice of such Non-Voluntary Violation (the "Non-Voluntary Violation Notice") and (b) the date that the Violating Party commences to operate as a Competing Use, and Tenant is not in default under this Lease beyond any applicable notice and cure period, then, as Tenant's sole remedy, in lieu of the Minimum Rent and Percentage Rent provided in Sections 1.1(E) and 1.1(F), respectively, of this Lease, commencing on the date immediately following the last day of the Non-Voluntary Violation Cure Period, Tenant shall pay to Landlord substitute rent equal to six percent (6%) of Gross Sales ("Competition Substitute Rent") in accordance with the provisions of Section 17.23(F) below until such time as (i) the Violating Party closes its store; (ii) the Violating Party's Occupancy Agreement terminates; (iii) the Violating Party's primary use is no longer the Competing Use; or (iv) Tenant's primary use is no longer the Competing Use (provided that Tenant shall have no right to change its Permitted Use without the written consent of Landlord,



which Landlord may withhold in its sole and absolute discretion), at which time the Competition Substitute Rent Period (as hereinafter defined) shall end and Tenant shall again pay to Landlord Minimum Rent and Percentage Rent as provided in Sections 1.1(E) and 1.1(F), respectively, of this Lease.

In the event a Competition Substitute Rent Period caused by a Non-Voluntary Violation continues uninterrupted for a period of twelve (12) consecutive months (excluding any Excluded Periods), Tenant, in its sole discretion, may terminate this Lease by giving written notice to Landlord (the "Competition Termination Notice") within thirty (30) days after the end of such twelve (12) month period. In the event Tenant gives such Competition Termination Notice to Landlord within such thirty (30) day period, this Lease shall terminate on the ninetieth (90th) day after such Competition Termination Notice is received by Landlord with the same force and effect as if this Lease by its terms expired on such date; provided, however, that if the Competition Substitute Rent Period ends within the first forty-five (45) days of such ninety (90) day period, such Competition Termination Notice shall be of no force and effect and this Lease shall continue unaffected by such notice. Tenant's right to terminate this Lease as provided in this paragraph shall be automatically and irrevocably waived unless such Competition Termination Notice is given by Tenant to Landlord within such thirty (30) day period. If Tenant does not deliver such Competition Termination Notice within such thirty (30) day period in accordance with the provisions of this paragraph, then as of the day immediately following the last day of such thirty (30) day period, the Competition Substitute Rent Period shall end and Tenant shall again pay to Landlord Minimum Rent and Percentage Rent as provided in Article V of this Lease.

If, at any time or from time to time on or after the date hereof, Landlord is in breach of the covenants set forth in Section 17.23(A) above, and Tenant is not in default under this Lease beyond any applicable notice and cure period, then, as Tenant's sole remedy, in lieu of the Minimum Rent and Percentage Rent provided in Sections 1.1(E) and 1.1(F), respectively, of this Lease, commencing on the date of the opening for business of such Competitor, Tenant shall pay to Landlord (Competition Substitute Rent) equal to six percent (6%) of Gross Sales) in accordance with the provisions of Section 17.23(F) below until such time as (i) the Competitor closes its store; (ii) the Competitor's Occupancy Agreement terminates; (iii) the Competitor's primary use is no longer the Competing Use; or (iv) Tenant's primary use is no longer the Competing Use (provided that Tenant shall have no right to change its Permitted Use without the written consent of Landlord, which Landlord may withhold in its sole and absolute discretion), at which time the Competition Substitute Rent Period shall end and Tenant shall again pay to Landlord Minimum Rent and Percentage Rent as provided in Sections 1.1(E) and 1.1(F), respectively, of this Lease. Notwithstanding anything to the contrary contained herein, in the event Landlord breaches the covenant contained in Section 17.23 (A) above, Tenant shall give Landlord written notice thereof (the "Competing Use Notice"). In the event Landlord fails to cure such breach within sixty (60) days after the date of such Competing Use Notice, Tenant shall be entitled to pay Competition Substitute Rent in accordance with this Section 17.23(E)(2), retroactive to the date of Tenant's notice.

Competition Substitute Rent shall be paid to Landlord commencing on the twentieth (20th) day of the month immediately following the month in which the Competition Substitute Rent Period began, and on the twentieth (20th) day of each month thereafter until the end of such Competition Substitute Rent Period, provided that Competition Substitute Rent for the last month of such Competition Substitute Rent Period shall be payable on the twentieth (20th) day of the month immediately following the month in which such Competition Substitute Rent Period ended. During any Competition Substitute Rent Period, Tenant shall (i) remain obligated to provide statements of Gross Sales as provided in Section 5.5 and to comply with the provisions of Section 5.6 of this Lease, but substituting the words "Competition Substitute Rent" whenever the words "Percentage Rent" appear in said Sections 5.5 and 5.6 of this Lease and (ii) continue to pay any and all Rent, other than Minimum and Percentage Rent, as required under this Lease, and any adjustments thereto. Increases in Rent which are scheduled to occur pursuant to this Lease during the Competition Substitute Rent Period shall not be reduced or delayed thereby. Notwithstanding anything to the contrary contained herein, for the sole purpose of calculating Percentage Rent due for the Lease Year[s] and/or Partial Lease Year[s] in which the Competition Substitute Rent Period begins and ends; if such period does not begin on the first day of the Lease Year (or Partial Lease Year) and/or end on the last day of the Lease Year (or

~CHGO2 20316078.v9



Partial Lease Year), any portion of such Lease Year or Partial Lease Year (as the case may be) that is not contained within the Competition Substitute Rent Period shall be treated as a Partial Lease Year and the applicable Breakpoint shall be prorated for a Partial Lease Year as provided in Section 1.1(F). Any time during the Term when Tenant is entitled to pay Competition Substitute Rent to Landlord is hereinafter referred to a "Competition Substitute Rent Period

**8. Waldenbooks**

Landlord agrees not to enter into a lease at the Center, the primary Permitted Use being the retail sale of books in more than 1,000 square feet of rentable area. Notwithstanding the foregoing Landlord may enter into a lease for a store with a Permitted Use being the selling of comic books and magazines with a store selling comic books and magazines. For violation of this provision, as Tenant's sole and exclusive remedy, one-half (1/2) of the Minimum Rent due under this Lease shall be abated during the time the violation continues, provided Tenant shall continue to pay in full all other charges due hereunder but with no adjustment to the Breakpoint. In the event Landlord ceases to be in violation of this provision, from the date of cessation, the full Minimum Rent payable under this Lease shall be due. Notwithstanding the foregoing, the existing Lemstone Books and the B. Dalton stores in the Center, or their renewals or replacements, are specifically permitted and do not constitute a violation of this provision.



**STRATFORD SQUARE**
**Exclusives - Capitalized Terms Defined**

1. **Coldstone Creamery**

   A.    "Center" shall mean the building or structure in which the Premises are located and any other buildings or structures owned or ground leased by Landlord from time to time and operated in conjunction therewith (whether or not shown on Exhibit A hereto, together with the Common Areas, and all parcels or tracts of land owned or ground leased by Landlord from time to time on which all or any portion of the foregoing items are located and any fixtures, Systems and Equipment, furniture and other personal property owned or leased by Landlord located thereon or therein and used in connection therewith. "Center" shall also include, at Landlord's election from time to time, Majors and other buildings, structures and parcels or tracts of land owned by other parties which adjoin the other areas of the Center or the Common Areas.

   D.    Definition of Common Areas.  The term "Common Areas" herein means all areas of the Center which are now or hereafter made available by Landlord from time to time for the general use or benefit of Landlord, any Majors, other tenants at the Center, other parties to whom the right to use the Common Areas has been or is hereafter granted, and their employees and invitees, as such areas currently exist and as they may be changed from time to time. The Common Areas may, at Landlord's election, include areas at adjoining properties which are or become available to Landlord, tenants, employees and invitees of the Center and which are maintained with the Common Areas under any reciprocal easement agreement, operating agreement or other such agreement now or hereafter in effect. Without limiting the generality of the foregoing, the Common Areas may include, as designated by Landlord from time to time, any parking areas and structures (whether in lots or at, above or below grade), mall enclosures and roofs covering Center buildings, entrances, sidewalks, streets or roadways, passageways, concourses, courts, arcades, service corridors, loading platforms and truck docks, delivery areas, escalators and elevators, ramps, stairs, landscaped and vacant areas, public bathrooms, information and telephone booths, directory signs and equipment, common lighting facilities, drainage areas, lounges and shelters, package pick-up stations, drinking fountains, public comfort and first aid stations, public meeting rooms, auditoriums, bus stops, taxi stands, and all furniture, decorations, fixtures, improvements, Systems and Equipment, and other facilities, located in or serving any of the foregoing, except to the extent constructed for use by one or more designated tenants.

   E.    "Major" shall mean any store of any type in excess of 25,000 square feet of rentable area in, or at Landlord's election from time to time adjoining, the Center, whether in buildings or on parcels owned by Landlord or other parties.

2. **First American Bank**

   WHEREAS, Licensor is the legal owner of that certain property commonly known as Stratford Square Shopping Center, 152 Stratford Square, Bloomingdale, Illinois 60108 (the "Center").



3.  FYE

C.  "Center" shall mean the building or structure in which the Premises are located and all other buildings or structures owned or ground leased by Landlord from time to time and used in connection therewith, whether or not shown on Exhibit A hereto, together with the Common Areas, and all parcels or tracts of land owned or ground leased by Landlord from time to time in connection with any portion of the foregoing items are located and any fixtures, Systems and Equipment, furniture and other personal property owned or leased by Landlord located thereon or in connection therewith. "Center" shall also include, at Landlord's election from time to time, Majors and other buildings, structures and parcels or tracts of land owned by other parties which adjoin the other areas of the Center or the Common Areas.

D.  **Definition of Common Areas.**  The term "Common Areas" herein means all areas of the Center which are now or hereafter made available by Landlord from time to time for the general use or benefit of Landlord, any Majors, other tenants at the Center, other parties to whom the right to use the Common Areas has been or is hereafter granted, and their employees and invitees, as such areas currently exist and as they may be changed from time to time. The Common Areas may, at Landlord's election, include areas in adjoining properties which are or become available to Landlord, tenants, employees and invitees of the Center and which are maintained with the Common Areas under any reciprocal easement agreement, operating agreement or other such agreement now or hereafter in effect.  Without limiting the generality of the foregoing, the Common Areas may include, as designated by Landlord from time to time, any parking areas and structures (whether in tiers or at, above or below grade), mall enclosures and malls covering Center buildings, entrances, sidewalks, streets or roadways, passageways, sidewalks, courts, arcades, service corridors, loading platforms and truck docks, delivery areas, escalators and elevators, ramps, stairs, landscaped and vacant areas, public bathrooms, information and telephone booths, directory signs and equipment, common lighting facilities, drainage areas, fountains and shelters, package pickup stations, drinking fountains, public comfort and first aid stations, public meeting rooms, auditoriums, bus stops, taxi stands, and all furniture, decorations, fixtures, improvements, Systems and Equipment, and other facilities, located in or serving any of the foregoing, except to the extent reserved for use by one or more designated tenants.

E.  "Major" shall mean any store of any type in excess of 25,000 square feet of ~~50,000~~ retailing area ~~or~~ at Landlord's election from time to time adjoining the Center, whether or buildings or on parcels owned by Landlord or other parties. [operating under the trade name]

4.  Sarku:  "Food Court"  not defined

5.  Shoe Dept.:  "Shopping Center"  not defined

6.   Starbucks

d.   Major Stores: those premises (other than Common Areas) within the Shopping Center
whether occupied or vacant which contain Floor Space of sixty thousand (60,000) square feet or more.

e.   Satellite Store Space: the aggregate Floor Space of all premises in the Shopping Center
which are appropriated for use by a tenant, whether occupied or vacant, but excluding the Floor Space
of (i) mezzanine space, (ii) basement space (if any), (iii) storage space not located within a tenant's or
its guest's premises, and (iv) Major Stores.  For purposes of this Lease, the Floor Space
comprised in clauses (i), (ii) and (iii) herein shall be collectively referred to as the "Ancillary Space."

f.   Shopping Center: that certain commercial project presently known as Stratford Square
Mall, which is located in Bloomingdale, Illinois.

7.   Waldenbooks

A.   "Center" shall mean the building or structure in which the Premises are located
and any other buildings or structures owned or ground leased by Landlord from time to time and
operated in conjunction therewith, whether or not shown on Exhibit A hereto, together with the
Common Areas, and all parcels or tracts of land owned or ground leased by Landlord from time
to time on which all or any portion of the foregoing items are located and any fixtures, Systems
and Equipment, furniture and other personal property owned or leased by Landlord located thereon
and used in connection therewith.  "Center" shall also include, at Landlord's election
from time to time, Majors and other buildings, structures and parcels or tracts of land owned by
other parties which adjoin the other areas of the Center or the Common Areas.

B.   Definition of Common Areas. The term "Common Areas" herein means all areas
of the Center which are now or hereafter made available by Landlord from time to time for the
general use or benefit of Landlord, any Majors, other tenants at the Center, other parties to whom
the right to use the Common Areas has been or is hereafter granted, and their employees and
invitees, as such areas currently exist and as they may be changed from time to time.  The
Common Areas may, at Landlord's election, include areas in adjoining properties which are or
become available to Landlord, tenants, employees and invitees of the Center and which are
maintained with the Common Areas under any reciprocal easement agreement, operating
agreement or other such agreement now or hereafter in effect. Without limiting the generality of
the foregoing, the Common Areas may include, as designated by Landlord from time to time, any
parking areas and structures (whether in tiers or at, above or below grade), mall enclosures and
malls (covering Center buildings), entrances, sidewalks, streets or roadways, passageways,
concourses, courts, arcades, service corridors, loading platforms and truck docks, delivery areas,
escalators and elevators, ramps, stairs, landscaped and vacant areas, public bathrooms,
information and telephone booths, directory signs and equipment, common lighting facilities,
drainage areas, lounges and shelters, package pick-up stations, drinking fountains, public comfort
and first aid stations, public meeting rooms, auditoriums, bus stops, taxi stands, and all furniture,
decorations, fixtures, improvements, Systems and Equipment, and other facilities, located in or
serving any of the foregoing, except to the extent reserved for use by one or more designated
tenants.





EXHIBIT J

Starbucks
Stratford Square





COLDSTONE

EXHIBIT J

PAGE 1



## EXHIBIT K

## LEGAL DESCRIPTION OF ANCHOR PARCELS

SEARS' PROPERTY

Lot 2 in (Gary King, County Clerk's) Stratford Assessment Plat No. 10 of Parcel 10 in Jay C. Bennett Sr. County Clerk's Stratford Assessment Plat No. 9 all in the Southeast Quarter of Section 17, Township 40 North, Range 10 East of the Third Principal Meridian, according to the plat thereof recorded December 31, 1990 as Document No. R90-176572 in DuPage County, Illinois.

Permanent Index Number: 02-17-400-088

FIELD'S PROPERTY

Parcels 1 and 2 in (Jay C. Bennett Sr., County Clerk's) Stratford Assessment Plat No. 9 in the Southeast Quarter of Section 17, and the northeast quarter of Section 20, all in Township 40 North, Range 10 East of the Third Principal Meridian, according to the plat thereof recorded November 29, 1984 as Document R84-95983 in DuPage County, Illinois.

Permanent Index Numbers: 02-17-400-068
                          02-17-400-069

BURLINGTON'S PROPERTY

Parcels 5 and 6 in (Jay C. Bennett Sr., County Clerk's) Stratford Assessment Plat No. 9 in the Southeast Quarter of Section 17, and in the Northeast Quarter of Section 20, all in Township 40 North, Range 10 East of the Third Principal Meridian, according to the Plat thereof recorded November 29, 1984 as Document R84-95983 in DuPage County, Illinois.

Permanent Index Numbers: 02-17-400-074
                          02-17-400-075

CARSON'S PROPERTY

Parcels 7 and 8 in (Jay C. Bennett Sr., County Clerk's) Stratford Assessment Plat No. 9 in the Southeast Quarter of Section 17, and in the Northeast Quarter of Section 20, all in Township 40 North, Range 10 East of the Third Principal Meridian, according to the plat thereof recorded November 29, 1984 as Document R84-95983 in DuPage County, Illinois.

Permanent Index Numbers: 02-17-400-076
                          02-17-400-077



EXHIBIT K

## PENNEY'S PROPERTY

A tract of land in the South East 1/4 of Section 17, Township 40 North, Range 10, East of the Third Principal Meridian, described as follows. Commencing at the North West corner of said South East 1/4; Thence due South 2287.55. feet along the West line of said South East 1/4; Thence due East 87.04 feet to a place of beginning; Thence North 85 degrees 28 minutes 32 seconds East 48 feet to a point of curve; Thence easterly, on a curve Convex to the South, having a radius of 563.97 feet, an arc distance of 248.33 feet and a chord bearing of North 72 degrees 48 seconds East; Thence North 45 degrees 52 minutes 24 seconds East 55.85 feet to a point on curve; Thence Northerly, on a curve Convex to the West, having a radius of 732.51 feet, an arc distance of 214 78 feet and a chord bearing of North 20 degrees 00 minutes 03 seconds West to a point on curve; Thence Northerly on a curve convex to the West, having a radius of 1443.05 feet, an arc distance of 48.82 feet and a chord bearing of North 15 degrees 13 minutes 20 seconds West; Thence North 50 degrees 39 minutes 57 seconds East 155 feet; Thence North 34 degrees 25 minutes 03 seconds West 30.34 feet; Thence North 80 degrees 34 minutes 57 seconds East 201.31 feet; Thence North 35 degrees 30 minutes East 380 feet; Thence North 77 degrees 06 minutes 15 seconds East 94.83 feet; Thence North 35 degrees 30 minutes East 82 feet; Thence South 54 degrees 30 minutes East 306 feet; Thence South 35 degrees 30 minutes West 52 feet; Thence South 6 degrees 30 minutes East 33.94 feet; Thence South 35 degrees 30 minutes west 204 feet; Thence North 54 degrees 30 minutes West 21.36 feet; Thence South 35 degrees 30 minutes West 762.95 feet to a point on curve; Thence Northwesterly, on a curve convex to the South West having a radius of 1102.31 feet, an arc distance of 77.52 feet and a chord bearing of North 48 degrees 15 minutes 25 seconds West to a point on curve; Thence Northwesterly, on a curve convex to the South West having a radius of 1638 04 feet, an arc distance of 336.16 feet and a chord bearing of North 43 degrees 51 minutes 18 seconds West to a point on curve; Thence Northwesterly, on a curve convex to the South West having a radius of 801.39 feet, an arc distance of 55.23 feet and a chord bearing of North 39 degrees 29 minutes 21 seconds West; Thence Westerly, on a curve convex to the South, having a radius of 616.57 feet, an arc distance of 279.58 feet, and a chord bearing of South 72 degrees 29 minutes 39 seconds West to a point of tangent; Thence South 85 degrees 28 minutes 32 seconds West 42 feet; Thence North 4 degrees 31 minutes 24 seconds West 53 feet to the place of beginning, all in Du Page County, Illinois.

Permanent Index Numbers: 02-17-400-071
02-17-400-072

## KOHL'S PROPERTY

Parcel 15 in (Jay C. Bennett Sr., County Clerk's) Stratford Assessment Plat No. 9 in the South West Quarter of Section 17, and the northeast 1/4 of Section 20, all in Township 40 North, Range 10 East of the Third Principal Meridian, according to the Plat thereof recorded November 29, 1984 as Document R84-95983 in DuPage County, Illinois.

Permanent Index Numbers: 02-17-400-081

EXHIBIT L

<u>NON-DISTURBANCE AGREEMENT</u>

_____

(Mortgagee)

- and -

CENTURY THEATRES, INC.
(Tenant)

SUBORDINATION, NON-DISTURBANCE
AND ATTORNMENT AGREEMENT

Dated:      December ___, 2005

Location:     Stratford Square Mall,

City, State:   Bloomingdale, Illinois

County:      DuPage

PREPARED BY AND UPON
RECORDATION RETURN TO:

Feldman Mall Properties
3225 N. Central Avenue, Suite 1205
Phoenix, Arizona 85012
Attention: Jeff Erhart

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made this ___ day of December, 2005 by and between _____, having an address of _____, as Mortgagee and mortgagee for the lenders ("Mortgagee") and Century Theatres, Inc., having an address of 150 Pelican Way, San Rafael, California 94901 ("Tenant").

### RECITALS:

A.    Mortgagee is the present owner and holder of that certain Mortgage and Security Agreement dated January 5, 2005 (the "Mortgage"), given by Landlord to Mortgagee, which encumbers Landlord's interests in those certain premises described in Exhibit A attached hereto (the "Property");

B.    Tenant has leased a portion of the Property under and pursuant to the provisions of that certain lease dated December ___, 2005 between FMP Stratford LLC, as Landlord ("Landlord") and Century Theatres, Inc., as tenant (the "Lease"); and

C.    Tenant has agreed to subordinate the Lease to the Mortgage and to the lien thereof and Mortgagee has agreed to grant non-disturbance to Tenant under the Lease on the terms and conditions hereinafter set forth.

### AGREEMENT:

For good and valuable consideration, Tenant and Mortgagee agree as follows:

1.    <u>Subordination</u>. Tenant agrees that the Lease and all of the terms, covenants and provisions thereof and all rights, remedies and options of Tenant thereunder are and shall at all times continue to be subject and subordinate in all respects to the lien of the Mortgage including, without limitation, all renewals, increases, modifications, spreaders, consolidations, replacements and extensions thereof and to all sums secured thereby with the same force and effect as if the Mortgage had been executed, delivered and recorded prior to the execution and delivery of the Lease.

2.    <u>Non-Disturbance</u>. Mortgagee agrees that if any action or proceeding is commenced by Mortgagee for the foreclosure of the Mortgage or the sale of the Property, Tenant shall not be named as a party therein unless such joinder shall be required by law; <u>provided</u>, <u>however</u>, that such joinder shall not result in the termination of the Lease or disturb Tenant's possession or use of the premises demised thereunder, and the sale of the Property in any such action or proceeding and the exercise by Mortgagee of any of its rights under the Mortgage shall be made subject to all rights of Tenant under the Lease; <u>provided</u>, <u>further</u>, <u>however</u>, that at the time of the commencement of any such action or proceeding or at the time of any such sale or exercise of any such other rights (a) the Lease shall be in full force and effect and (b) Tenant shall not be in default, in any material respect, under any of the terms, covenants or conditions of the Lease on Tenant's part to be observed or performed beyond the expiration of any applicable notice or grace periods.

3.    <u>Attornment</u>. Mortgagee and Tenant agree that, subject to Section 2 above, upon the conveyance of the Property to Mortgagee or any other transferee (the "Transferee") by reason of the foreclosure of the Mortgage or the acceptance of a deed or assignment in lieu of foreclosure or otherwise, (the "Attornment Event") the Lease shall not be terminated or affected thereby but shall continue in full force and effect as a direct lease between Transferee and Tenant upon all of the terms, covenants and conditions set forth in the Lease and upon notice from Transferee to Tenant that the Attornment Event occurred and confirming that Transferee has assumed the obligations of the Landlord under the Lease (subject to the terms of this Agreement), Tenant agrees to attorn to the Transferee and the Transferee shall accept such attornment; <u>provided</u>, <u>however</u>, that the provisions in the Lease shall govern with respect to the disposition of any casualty insurance proceeds or condemnation awards, and the Transferee shall not be (a) subject to any offsets, defenses, abatements, claims or counterclaims which shall have accrued to Tenant, against Landlord, except as provided in the Lease against Landlord, (b) bound by any rent or additional rent which Tenant shall have paid more than one (1) month in advance to any prior landlord (including Landlord) unless (x) such sums

2

are actually received by Mortgagee or Transferee or (y) such prepayment shall have been expressly approved of by Mortgagee or the Transferee  (c) bound to make any payment to Tenant which was required under the Lease, or otherwise, to be made prior to the time the Transferee succeeded Landlord's interest, unless Mortgagee or Transferee has been provided prior notice of, and opportunity to cure the event giving rise to such payment (d) bound by any amendment or modification to the Lease which has not been consented to in writing by Mortgagee or the Transferee, (e) liable for (x) any act of omission of any prior landlord (including Landlord), but the Transferee nevertheless shall be liable for any breaches or defaults which are of a continuing nature, until cured by the Transferee, and only to the extent Mortgagee or Transferee shall have been provided notice and an opportunity to cure such defaults or (y) return of any security deposit made by Tenant to Landlord unless Mortgagee or Transferee shall have actually received such security deposit.

4.     Notice to Tenant.  After notice is given to Tenant by Mortgagee that the Landlord is in default under the Mortgage and that the rental payments due under the Leases should be paid to Mortgagee pursuant to the terms of the assignment of leases and rents executed and delivered by Landlord to Mortgagee in connection therewith, Tenant shall thereafter pay to Mortgagee or as directed by the Mortgagee, all rentals and all other monies due or to become due to Landlord under the Lease and Landlord hereby expressly authorizes Tenant to make such payments to Mortgagee and hereby releases and discharges Tenant from any liability to Landlord on account of any such payments.

5.     Mortgagee's Consent.  Tenant shall not, without obtaining the prior written consent of Mortgagee, (a) enter into any agreement amending, modifying or terminating the Lease, (but the foregoing restriction shall not apply to the express termination and alternate rent rights of Tenant under Sections 2.3, 3.1, 3.5, 3.6, 4.6, 8.2, 9.1(h), 9.4, 10.4, 13.3, 13.7, 16.3, 17.2, 19.2, 19.4 and/or 21.18 of the Lease, and/or Section 5.3 of the Work Letter attached as Exhibit D of the Lease (the "Special Rights Provisions")), (b) prepay any of the rents, additional rents or other sums due under the Lease for more than one (1) month in advance of the due dates thereof, (c) voluntarily surrender the premises demised under the Lease or terminate or shorten the Lease term, as a consequence of a breach of the Lease by Landlord unless Mortgagee or Transferee shall have been given prior notice and opportunity to cure any default under the Lease which gives rise to such termination, including under the Special Rights Provisions, to the extent that such Special Rights Provisions are based on a default by Landlord, or (d) assign the Lease or sublet the premises demised under the Lease or any part thereof in violation of the Lease; and any such amendment, modification, termination, prepayment, voluntary surrender, assignment or subletting, without Mortgagee's prior consent, shall not be binding upon Mortgagee.

6.     Mortgagee to Receive Notices.  Tenant shall provide Mortgagee with copies of all written notices of default sent to Landlord pursuant to the Lease simultaneously with the transmission of such notices to the Landlord. Tenant shall notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to cancel the Lease. No notice of default under the Lease shall be effective to give Tenant the right to terminate unless Mortgagee shall have received notice of default and shall have failed within sixty (60) days after receipt of such notice to cure such default, or if such default cannot be cured within sixty (60) days, shall have failed within sixty (60) days after receipt of such notice to commence and thereafter diligently pursue any action necessary to cure such default but in no event shall such additional cure period extend beyond one hundred eighty (180) days.

7.     Notices.  All notices, requests, demands, statements, authorizations, approvals, directions, consents and other communications provided for herein shall be given or made in writing and shall be deemed sufficiently given or served for all purposes as of the date (a) when hand delivered (provided that delivery shall be evidenced by a receipt executed by or on behalf of such addressee), (b) three (3) days after being sent by postage pre-paid registered or certified mail, return receipt requested, (c) one (1) Business Day after being sent by reputable overnight courier service (with delivery evidenced by written receipt), or (d) with a simultaneous delivery by one of the means in (a), (b) or (c) by facsimile, when sent, with confirmation and a copy sent by first class mail, in each case addressed to the intended recipient at the following address, or, as to any party, at such other address as shall be designated by such party in a notice to each other party:

If to Tenant:    Century Theatres, Inc.
                 150 Pelican Way
                 San Rafael, California 94901
                 Attention: Chief Executive Officer

3

With a separate copy to:  Century Theatres, Inc.
                                    150 Pelican Way
                                    San Rafael, California 94901
                                    Attention:  General Counsel
                                    Facsimile No.:  (415) 448-8499

And an additional copy to:  DLA Piper Rudnick Gray Cary US LLP
                                    203 N. LaSalle Street, Suite 1900
                                    Chicago, Illinois 60601
                                    Attention:  David B. Sickle, Esq.

If to Mortgagee:  _____
                   _____
                   _____
                   _____
                   _____

With a copy to:  Eurohypo AG, New York Branch
                        1114 Avenue of the Americas
                        Twenty-Ninth Floor
                        New York, New York 10036
                        Attention: Legal Director
                        Facsimile No: (212) 479-5800

If to Landlord: FMP Stratford LLC
                      c/o Feldman Mall Properties
                      3225 North Central Avenue, Suite 1205
                      Phoenix, Arizona 85012
                      Attention:  Lease Administration
                      Facsimile No.: (602) 277-7774

And a copy to: FMP Stratford LLC
                      c/o Mall Management Office
                      152 Stratford Square Mall
                      Bloomingdale, Illinois 60108
                      Attention:  General Manager
                      Facsimile No.:  (630) 351-9769

For the purposes of this Section, the term "Business Day" shall mean a day on which commercial banks are not authorized or as required by law to close in New York, New York.

        8.     <u>Joint and Several Liability</u>.  It Tenant consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.  This Agreement shall be binding upon and inure to the benefit of Mortgagee and Tenant and their respective successors and assigns.

        9.     <u>Definitions</u>.  The term "Mortgagee" as used herein shall include the successors and assigns of Mortgagee and any person, party or entity which shall become the owner of Landlord's interest in the Property by reason of foreclosure of the Mortgage or the acceptance of a deed (or assignment) in lieu of foreclosure of the Mortgage or other similar process.  The term "Tenant" as used herein shall include the successors and assigns of Tenant and any person, party or entity which shall become the owner of the leasehold interest under the Lease by reason of foreclosure of a leasehold mortgage or the acceptance of a deed (or assignment) in lieu of foreclosure of a leasehold mortgage or other similar process.  The term "Landlord" as used herein shall mean and include the present landlord under the Lease and such landlord's predecessors and successors in interest under the Lease, but shall not mean or include Mortgagee or the Lenders.  The term "Property" as used herein shall mean the Property, the improvements now or hereafter located thereon and the estates therein encumbered by the Mortgage.

        10.    <u>No Oral Modifications</u>.  This Agreement may not be modified in any manner or terminated except by an instrument in writing executed by the parties hereto.

4

11.     <u>Governing Law</u>. This Agreement shall be deemed to be a contract entered into pursuant to the laws of the state where the Property is located and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the state where the Property is located.

12.     <u>Inapplicable Provisions</u>. If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

13.     <u>Duplicate Originals; Counterparts</u>. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

14.     <u>Number and Gender</u>. Whatever context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

15.     <u>Further Acts</u>. Tenant will, at the cost of Landlord, and without expense to Mortgagee, do, execute, acknowledge and deliver all and every such further acts and assurances as Mortgagee shall, from time to time, require, to confirm the rights and agreements hereunder, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording this Agreement, or for complying with all applicable laws.

16.     <u>Limitations on Liability</u>. Tenant acknowledges that it is not third-party beneficiary under the Mortgage or the loan documents related thereto. In no event shall Mortgagee or the Lenders or any purchaser of the Property at foreclosure sale of any grantee of the Property named in a deed-in-lieu of foreclosure, nor any heir, legal representative, successor or assignee of Mortgagee or the Lenders or any such purchaser or grantee (Mortgagee, the Lenders, and any such purchaser, grantee, heir, legal representative, successor or assignee, collectively the "Subsequent Landlord") have any personal liability for the obligations of Landlord under the Lease and should the Subsequent Landlord succeed to the interests of the Landlord under the Lease, Tenant shall look only to the estate and property of any such Subsequent Landlord in the Property for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by any Subsequent Landlord as landlord under the Lease, and no other property or assets of any Subsequent Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of any such judgment against Subsequent Landlord under or with respect to the Lease or <u>provided</u>, <u>however</u>, that Tenant may exercise any other right or remedy provided by the Lease, by law or in equity in the event of any failure by Subsequent Landlord to perform any such default.



IN WITNESS WHEREOF, Mortgagee and Tenant have duly executed this Agreement as of the date first above written.

MORTGAGEE:

By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____


TENANT:

CENTURY THEATRES, INC.,
a California corporation


By: _____
Name: _____
Title: _____


The undersigned accepts and agrees to
the provisions of Section 4 hereof:

LANDLORD:
FMP Stratford, LLC, a Delaware limited
liability company


By: _____
Name: _____
Title: _____

6

## EXHIBIT M

### FAIR MARKET VALUE OF TENANT'S INTEREST

If the Lease is terminated under circumstances where Tenant is entitled to the Fair Market Value of Tenant's Interest, then the Fair Market Value of Tenant's Interest shall be determined in accordance with the following procedures.

Within ninety (90) days after the date of the applicable termination or recapture notice, Landlord and Tenant shall each simultaneously submit to the other, in a sealed envelope, its good faith estimate of such Fair Market Value of Tenant's Interest (collectively referred to as the "Estimates"). Tenant shall provide any information reasonably requested by Landlord which is relevant to the valuation of Tenant's business, to the extent in Tenant's possession, within ten (10) days following Landlord's request (with all such information provided to be treated by Landlord as confidential, in accordance with Section 21.24 of the Lease). If the higher of such Estimates is not more than one hundred five percent (105%) of the lower of such Estimates, then such Fair Market Value of Tenant's Interest shall be the average of the two Estimates.

If such Fair Market Value of Tenant's Interest is not resolved by the exchange of Estimates, Landlord and Tenant, within seven (7) days after the exchange of Estimates, shall each select an appraiser to determine which of the two Estimates most closely reflects such Fair Market Value of Tenant's Interest. Each appraiser so selected shall be certified as an MAI appraiser or as an ASA appraiser and shall have had at least five (5) years experience within the previous ten (10) years as a real estate appraiser working in the Metropolitan Area, with working knowledge of current retail rental rates and practices and the motion picture exhibition industry. For purposes of the Lease, an "MAI" appraiser means an individual who holds an MAI designation conferred by, and is an independent member of, the American Institute of Real Estate Appraisers (or its successor organization, or in the event there is no successor organization, the organization and designation most similar), and an "ASA" appraiser means an individual who holds the Senior Member designation conferred by, and is an independent member of, the American Society of Appraisers (or its successor organization, or, in the event there is no successor organization, the organization and designation most similar).

Upon selection, Landlord's and Tenant's appraisers shall work together in good faith to agree upon which of the two Estimates most closely reflects such Fair Market Value of Tenant's Interest. The Estimate chosen by such appraisers shall be binding on both Landlord and Tenant as such Fair Market Value of Tenant's Interest. If either Landlord or Tenant fails to appoint an appraiser within the seven (7) day period referred to above, the appraiser appointed by the other party shall be the sole appraiser for the purposes hereof.

If the two appraisers cannot agree upon which of the two Estimates most closely reflects such Fair Market Value of Tenant's Interest within the twenty (20) days after their appointment, then, within ten (10) days after the expiration of such twenty (20) day period, the two appraisers shall select a third appraiser (the "arbitrator") meeting the aforementioned criteria. Once the arbitrator has been selected as provided for above, then, as soon thereafter as practicable but in any case within fourteen (14) days, the arbitrator shall make his determination of which of the two Estimates most closely reflects such Fair Market Value of Tenant's Interest and such Estimate shall be binding on both Landlord and Tenant as such Fair Market Value of Tenant's Interest. If the arbitrator believes that expert advice would materially assist him, he may retain one or more qualified persons, to provide such expert advice. The parties shall share equally in the costs of the arbitrator. Any fees of any appraiser, counsel or experts engaged directly by Landlord or Tenant, however, shall be borne by the party retaining such appraiser, counsel or expert.